## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re

OPEN ROAD FILMS, LLC, a Delaware
limited liability company, *et al*.,[1]

Debtors.

Chapter 11

Case No.:  18-12012 (___)

(Joint Administration Requested)

### DECLARATION OF AMIR AGAM IN SUPPORT OF FIRST DAY MOTIONS

I, Amir Agam, declare as follows:

1.       I am a Senior Managing Director at FTI Consulting, Inc. ("FTI") and I have been

appointed to serve and am currently serving as the Chief Restructuring Officer ("CRO") for

Open Road Films, LLC and its affiliated debtors and debtors in possession (the "Company" or

the "Debtors") in the above-captioned chapter 11 cases (the "Cases").[2]  I am familiar with the

day-to-day operations and business and financial affairs of the Debtors, having served in my

current capacity as CRO for the Debtors since August 3, 2018.  All facts set forth in this

Declaration are based on my personal knowledge, my communications with other members of

the Debtors' senior management, discussions with my colleagues who are also working on this

matter, my review of relevant documents, or my opinion, based on my overall professional

experience, in light of my personal knowledge of the Debtors' operations, business affairs, and

financial condition.  If called as a witness, I could and would competently testify to the matters

set forth herein based on the foregoing.

---

[1]    The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows:
Open Road Films, LLC (4435-Del.); Open Road Releasing, LLC (4736-Del.); OR Productions LLC
(5873-Del.); Briarcliff LLC (7304-Del.); Open Road International LLC (4109-Del.); and Empire Productions
LLC (9375-Del.).  The Debtors' address is 2049 Century Park East, 4th Floor, Los Angeles, CA 90067.

[2]    By separate application, the Debtors are seeking this Court's approval of FTI's employment and my
appointment as CRO.

2.      I have twenty years of experience in the restructuring and turnaround industry (including related non-distressed consulting), all of which are either at FTI, or, prior to its acquisition by FTI, at the Business Recovery Services practice that existed prior to September 2002 at PricewaterhouseCoopers, LLP.  Prior to joining the Debtors, I served as chief restructuring officer to Fresh & Easy LLC, a 100 store grocery chain that filed chapter 11 cases in this District, and was the interim chief financial officer to two other companies.  I have also previously advised (among others) Corinthian Colleges, Inc., a public for-profit education debtor; THQ Inc., a public video game production and distribution debtor; and Fleetwood Enterprises, a billion dollar public manufacturer of manufactured housing and recreational vehicles.  I have a Bachelor's degree in Business Economics with a Minor in Accounting from the University of California, Los Angeles and an M.B.A. from The Wharton School, University of Pennsylvania.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of the Bankruptcy Code, thus commencing these chapter 11 Cases. To enable the Debtors to operate as effectively as possible, minimize disruption to those ongoing operations, and maximize the value of their assets, the Debtors have filed various applications and motions seeking immediate or expedited relief.  Specifically, the following have been filed on behalf of the Debtors (collectively, the "First Day Motions").

(a)     Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105(a), 361, 362, 363(c), 503(b), and 507(b) of the Bankruptcy Code, (i) Authorizing Debtors to Use  Cash Collateral, (ii) Granting Adequate Protection, (iii) Setting Final Hearing, and (iv) Granting Related Relief (the "Cash Collateral Motion");

(b)     Debtors' Motion for Entry of an Order Authorizing and Directing the Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only (the "Joint Administration Motion");

(c)     Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing Payment of Limited Prepetition Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (ii) Authorizing Payment of Reimbursement for Prepetition Expenses, (iii) Authorizing Payment of Withholding and Payroll-Related Taxes, (iv) Authorizing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments, and (v) Scheduling Final Hearing (the "Employee Compensation and Benefits Motion");

(d)     Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing Continued Use of Cash Management System, (ii) Authorizing the Continuation of Intercompany and Affiliate Transactions, (iii) Granting Administrative Priority Status to Postpetition Intercompany and Affiliate Claims, (iv) Authorizing Use of Prepetition Bank Accounts, Account Control Agreements, and Payment Methods, (v) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (vi) Scheduling Final Hearing (the "Cash Management Motion"); and

(e)     Debtors' Application for an Order Appointing Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), *Nunc Pro Tunc* to the Petition Date (the "Section 156(c) Application").

4.      This Declaration is submitted in support of the First Day Motions, which are described in greater detail below, and may serve as support for additional motions that may be filed on or after the Petition Date.

## I.      GENERAL BACKGROUND

### A.      Company Overview and Operations

5.      The Company is an independent distributor of motion pictures in the United States and licenses motion pictures in ancillary markets, principally to home entertainment, pay television, subscription and transactional video-on-demand, free television, and other non-theatrical entertainment distribution markets.  Based in Los Angeles, California, the Company was launched in 2011 as a strategic partnership between Regal Entertainment Group and AMC Entertainment, two leading film exhibitors in the United States.

01:23603163.1

6.      On information and belief, the Company has released 45 films since its inception, generating a total of over $1.3 billion in worldwide theatrical box office receipts.  Its films have been nominated for 49 Academy Awards and have won 13 Academy Awards.  In 2015, the Company made history by becoming the youngest studio to win a Best Picture Academy Award<sup>TM</sup> for the film *Spotlight*.

7.      The Company's film library includes, among others, *Killer Elite (2011)*, *Jobs* (2013), *Machete Kills* (2013), *Side Effects* (2013), *JB: Believe* (2013), *Nightcrawler* (2014), *Chef* (2014), *Rosewater* (2014), *The Gunman* (2015), *Little Boy* (2015), *Dope* (2015), *Mother's Day* (2016), and *The Nut Job 2* (2017).  Currently and after a major reduction in force, the Company utilizes the services of approximately 40 employees, certain of which, as described below, are shared with non-Debtor affiliates.

8.      The Company generates revenue from the exhibition or licensing of films.  Each film is distributed theatrically to major and independent exhibitors of motion pictures in the United States and other countries. Home entertainment, subscription and transactional video-on-demand, free television, and non-theatrical distribution of each film are generally effected through a major film distribution, pay subscription, or television broadcasting company in the United States.  The Company operates under longstanding relationships with theatrical exhibitors, and under output agreements with leading home entertainment, Pay TV, Streaming, Video On-Demand, and non-theatrical providers, including Showtime, Amazon Instant Video, Paramount, and Universal.

## B.      Capital Structure

### a.      Secured Debt

9.      In 2015, the Company, Bank of America, N.A., as lender and L/C Issuer and each of the lenders party thereto (together, the "Prepetition Lenders"), and Bank of America, N.A., as

administrative agent (in such capacity the "Agent" and, together with the Prepetition Lenders, the "Prepetition Secured Parties"), entered into that certain *Second Amended and Restated Credit, Security, Guaranty and Pledge Agreement*, dated as of April 8, 2015 (as has been and may be amended, restated, amended and restated, refinanced, replaced, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition Credit Agreement").  As of September 5, 2018, I believe that the outstanding aggregate principal amount owing under the Prepetition Credit Agreement was approximately $90,750,000.

10.    Other potential security interests may be asserted by counterparties to certain distributions agreements.  The Debtors do not believe they have any other material secured debt, other than potentially amounts owed in respect of residuals and/or participations, however, the Debtors' review and analysis of such amounts and the extent to which they may be secured (if at all) is ongoing.

### b.    Unsecured Debt

11.    As of the Petition Date, the Debtors believe that estimated unsecured claims that may be asserted against the Debtors based on the Debtors' accounts payable are approximately $50 million.  Additional unsecured claims against the Debtors may also include (among other items): (i) litigation claims as a result of ongoing litigation or new legal actions, (ii) contract rejection claims for leases, employment agreements, and other contracts, (iii) claims from current and former employees, (iv) participation and residual claims which are found to be unsecured, and (v) any claims from the Debtor's' non-debtor affiliates.

### c.    Equity Interests

12.    As described more fully in the following section, Open Road Releasing is a wholly owned subsidiary of non-Debtor Tang Media Partners Holdings LLC ("TMP Holdings"), which is in turn a wholly owned subsidiary of non-debtor Tang Media Partners Limited

("TMPL").  Debtor Open Road Films is a wholly-owned subsidiary of Debtor Open Road Releasing.  Debtors OR Productions, Briarcliff, and Open Road International are wholly-owned subsidiaries of Open Road Films.  Debtor Empire Productions is a wholly-owned subsidiary of OR Productions.  A chart depicting the Company's organizational structure is attached hereto as **Exhibit 1**.

**C.    Events Leading to the Chapter 11 Cases**

**a.    The 2017 Sale and Planned Global Road Restructure.**

13.    On August 4, 2017, the equity membership interests in Open Road Releasing, LLC were sold (the "2017 Sale") by its then-members (Regal and AMC) to TMP Holdings, part of a media enterprise owned by TMPL, whose shareholders include Donald Tang.   On information and belief, at the time of the 2017 Sale, TMPL's intention was to combine (i) the Company and (ii) certain assets of non-Debtor IM Global LLC ("IM Global"), which entity focuses on the complementary activities of international film sales, co-financing, production, and distribution and which had also recently been acquired by a TMPL affiliate, into a newly-formed non-Debtor entity, Global Road Entertainment, LLC ("Global Road"), a subsidiary of TMP Holdings (the "Global Road Restructure").  The Global Road Restructure was intended to be consummated contemporaneously with the fundraising round which TMPL was in the process of arranging (the "Round D Financing").

14.    On information and belief, during much of the past year, preparations were made for the closing of the Round D Financing and the Global Road Restructure, neither of which was consummated as originally contemplated.  Along with adding to the management team and expanding the scope of the Company's activities, those preparations also included efforts to begin consolidating and streamlining the overlapping activities of the entities, together with their related expenses—including, but not limited to, the following:

01:23603163.1

a.      *Benefits, Insurance, and Utilities:* Many of the Debtors' expenses—such as employee benefit contracts, insurance agreements, and utilities—are actually direct contractual obligations of non-Debtor affiliates, and as such are paid directly by non-Debtor affiliates.  My understanding is that it was the entities' intention that these obligations would be ultimately subsumed under Global Road and, pending the Global Road Restructure, the Debtors would bear their pro rata share of such expenses.   In other words, I understand that the objective was to streamline costs and processes by obtaining, for example, *one* employee health plan for the affiliated entities which would be ultimately subsumed under and administered by Global Road in the Global Road Restructure.  Until then, the costs of that plan were intended to be equitably allocated among entities, instead of purchasing (or continuing) separate plans for each entity or group of entities.

b.      *Employees:*  Similarly, because the Global Road Restructure was not consummated, many employees—whether formally employed by a Debtor or by a non-Debtor—currently allocate their time between one or more entities, such that, by way of illustration, one employee may have a contract with Global Road, yet, as a practical matter, be currently performing work for Open Road Films or splitting time  between Open Road Films and IM Global—which entities would thus currently fund to Global Road their portion of such employee's wages.  During much of the past year, many employees were, in fact, hired by Global Road in anticipation of the Global Road Restructure, and were subsequently "shared" by Global Road among the entities which would be subsumed in that restructuring.  In other instances, employees that were originally hired by a Debtor entity currently provide services to non-Debtor entities,

which non-Debtor entities fund an allocated portion of such employees' wages (and vice versa).  Currently, there is an understanding amongst the entities as to the portion of each employee's cost that is funded by the Debtors, based upon the percentage of time that it is estimated that such employee devotes to the business of the Debtors and affiliated entities, respectively.

       c.      *Lease:*  Also in anticipation of the Global Road Restructure, in January 2018, Open Road Films, IM Global, Global Road, and Tang Media Partners LLC ("TMP"), jointly and severally as tenants, entered into an approximately ten-year office lease (the "Lease") in respect of the Company's proposed headquarters to be constructed at 2049 Century Park East in Los Angeles, California.  I understand that construction of the headquarters space was discontinued in July 2018 and the Company remains in a temporary space.  Based on discussions with management, it is my understanding that, in light of current circumstances, however, the tenants are negotiating a termination of the Lease that would include a short term period of continued occupancy of the existing temporary premises at a negotiated monthly rent (which expense would be allocated among the tenants in occupancy).

      **b.**      **Several Factors Caused the Delay of Closing the Round D Financing, Preventing the Global Road Restructure and Precipitating a Liquidity Crisis and Consideration of Strategic Alternatives**

    15.    On information and belief, several factors led to the Company's current state of financial distress.  Among other things, increased volatility in overall film performance exacerbated investor concerns regarding the probability and predictability of studio financial success, especially outside of the major studios.  This overall volatility was exacerbated by the specific underperformance of certain of the Company's recent motion picture releases, most of which were initiated by prior management.  In addition, competitive options for consumers limit

01:23603163.1

interest in theatrical distribution and the traditional film business model, imposing additional pressure on companies like the Debtors, and further fueling investor skepticism.  Accordingly, management has indicated that the Company incurred significant losses from operating activities during 2017, after the 2017 Sale, and used significant cash in operations, including significant equity contributions.  It is my understanding based on discussions with management that the Company's losses were beyond the scope anticipated by TMP Holdings at the time it acquired the Company, partially as a result of alleged breaches of representations and warranties by the sellers in the 2017 Sale.[3]

16.    My understanding and belief is that as a result of these and other factors, it was not possible for TMPL to consummate the Round D Financing by April 2018, which was necessary to fund elements of the Global Road Restructure; specifically, my understanding and belief is that new financing was necessary to repay the secured indebtedness encumbering the assets of non-Debtor IM Global LLC, assets that were necessary and critical for an integrated Global Road but which could not be contributed to Global Road while still encumbered by secured debt.  Thus, despite the Global Road Restructure preparations, TMPL was unable to proceed with the business combination and continued to seek additional financing to allow it to do so.  Meanwhile, my understanding and belief is that Global Road has never owned, nor does it currently own, any material assets or any business operations, whether of the Debtors or otherwise.

---

[3]    Management has informed me that upon closing the purchase of the Company, TMP Holdings quickly became aware of inaccuracies in certain of the seller's representations and warranties in connection with the sale, including those related to the expected revenues that the Company would derive from its home entertainment distribution agreement, whose actual revenue estimates were significantly below those which were disclosed to TMP Holdings.  On information and belief, this claim was tendered by TMP Holdings to its insurance carrier, AIG, which upheld TMP Holdings' claim.

17.     My understanding and belief, based on discussions with management, is that TMPL could not consummate the Round D Financing by April 2018, which financing, if consummated, would have enabled TMPL to put money into the Company.  The inability to consummate the Round D Financing left TMPL without the funds to put into the Company, and thus the Company was unable to obtain an audit opinion without a "going-concern" qualification, putting the Company in default under the Prepetition Credit Agreement.  The Company entered into a Fourth Amendment to the Credit Agreement in May 2018, which provided an additional 60 days until June 30, 2018 to provide the required financial statements.  TMPL proceeded to work toward documenting and closing additional financing from TMPL's shareholders, some of which could in turn be provided to the Company and to facilitate the Global Road Restructure. Subsequent to June 30, 2018, some of TMPL's shareholders communicated to Management that they were not positioned to lend additional funds to TMPL for funding to the Company.

18.     My understanding and belief is that the Company's financial position deteriorated further in May and June 2018, as it suffered from the disappointing box office performance of its motion picture releases, in connection with which the Company had incurred tens of millions of dollars in marketing and advertising expenses to third parties.  My understanding based on discussions with Management is that, in part as a result of this disappointing performance, in the beginning of July 2018, TMPL's Board of Directors decided not to make available any additional funds to the Debtors.  I have been informed that the Company promptly informed the Prepetition Secured Parties of this circumstance and that in the meantime, the Company's media vendors pressed for payment.  My understanding and belief is that, at that time, the Company and the Prepetition Secured Parties began to negotiate a forbearance agreement.

01:23603163.1

19.     Recognizing these challenging realities and to comply with the anticipated requirements of a forbearance agreement in negotiation, the Company retained FTI to provide a Chief Restructuring Officer and supporting staff to explore strategic alternatives.  FTI and the Company, working with Company management and the Prepetition Secured Parties, determined that the most likely and feasible alternative was an orderly bankruptcy sale, which would allow the Company to maximize value by enabling a sale of the Company's valuable assets free and clear of liens, claims, encumbrances, and other interests.

20.     The forbearance agreement was never executed and the Prepetition Secured Parties exercised their rights under the Prepetition Credit Agreement and related loan documents to block the Company's access to certain of its deposit accounts, reducing the amount of cash available to the Company.  In light of the foregoing, the Company had no alternative but to undertake significant layoffs on August 28, 2018.

21.     Since its engagement, FTI has begun to diligently and aggressively market the Company's assets through a comprehensive sale and marketing process.  FTI has developed a thorough list of potential buyers—both strategic and financial—based on management discussions and FTI's industry experience and relationships.  To date, FTI has identified approximately 40 potential buyers.  As of September 1, 2018, 27 of these potential buyers have signed non-disclosure agreements and 11 have submitted indications of interest for the Debtors' assets.  FTI and the management of the Debtors are continuing to work towards a value maximizing sale.

**D.     The Company's Goals in These Cases**

22.     The Company intends to utilize the bankruptcy process to continue its robust sale and marketing process.  The Company believes that doing so will ensure that the Company can maximize the value of its assets for the benefit of all stakeholders.

01:23603163.1

23.    To meet this objective, the Company has filed these Cases with (i) a consensual cash collateral stipulation, of which the Company will seek Court approval, with the Prepetition Secured Parties, which provides the Company with the use of cash collateral in accordance with a negotiated budget and which should provide the Company with sufficient runway to navigate through the contemplated sale process, and (ii) proposed bidding procedures (the "Bid Procedures"), of which the Company will seek Court approval pursuant to the *Motion for Orders (A)(I) Establishing Bid And Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into an Asset Purchase Agreement With Stalking Horse Bidder, (III) Establishing and Approving Procedures Relating to the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts and (IV) Scheduling a Hearing to Consider the Proposed Sale and (B)(II) Approving the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, and (III) Granting Certain Related Relief* (the "Bid Procedures Motion"), to ensure an orderly sale process to determine the best bid for the Company's assets.

24.    In sum, based on my experience, I believe that seeking a sale transaction in accordance with the Bid Procedures and with the support of the Prepetition Secured Parties presents the best option for the Company to maximize its value under the circumstances, because it provides a breathing spell for the Company to focus on a value-maximizing sale and provides an attractive mechanism under which potential buyers can acquire the Company's assets.

## II.    FACTS IN SUPPORT OF FIRST DAY MOTIONS

25.    In order to ensure a smooth transition of the Debtors' business operations into chapter 11, the Debtors have requested various types of relief in the First Day Motions filed

concurrently with this Declaration.  A summary of the relief sought in each First Day Motion, as well as the factual basis for each First Day Motion, is set forth below.

26.     I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions: (i) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their current business operations; and (ii) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

**A.     Cash Collateral Motion**

27.     The Cash Collateral Motion seeks the entry of interim and final orders authorizing the use of the Debtors' cash subject to asserted security interests and liens ("Cash Collateral") and provision of adequate protection for the Prepetition Secured Parties under Prepetition Credit Agreement.

28.     The Debtors have an immediate need to use Cash Collateral to fund, among other things, payroll for their current employees and other expenses during the transition into bankruptcy.  Absent access to Cash Collateral, the Debtors will not have liquidity sufficient to pay these and other critical expenses.  In light of this fact, I believe that timely access to Cash Collateral is crucial to maintain the business and to avoid immediate and irreparable harm to the Debtors' estates, employees, customers, and creditors.

29.     The Debtors have provided a budget (along with accompanying footnotes) to the Agent, setting forth in reasonable detail all projected receipts and disbursements of the Debtors on a weekly basis for the thirteen (13) week period following the Petition Date, which budget has been approved in form and substance by the Agent (the "Approved Budget").  I personally helped prepare and negotiate the Approved Budget.  The Approved Budget has been formulated

to provide the Debtors with the liquidity required to prudently meet their anticipated postpetition expenses through the applicable period.  The Prepetition Secured Parties have agreed to allow the Debtors to use Cash Collateral on an interim and final basis in accordance with the Approved Budget and subject to the provisions of the proposed form of order included with the Cash Collateral Motion.

30.     Based on my experience, I believe that the cash collateral arrangements for which the Cash Collateral Motion seeks approval, including the forms of adequate protection described therein, are fair, reasonable, and appropriate under the circumstances.

31.     I also believe that, based on the Debtors' projections, the proposed use of Cash Collateral in accordance with the Approved Budget will provide the Debtors with necessary liquidity to fund the Debtors' sale process and allow the Debtors to maximize the value of their assets.  Accordingly, if approved, the use of Cash Collateral in accordance with the Approved Budget is in the best interests of the Debtors' estates and creditors.

32.     I have personally participated in negotiations with the advisors to the Prepetition Secured Parties regarding the proposed terms and conditions associated with the requested use of Cash Collateral and believe that all negotiations with these parties were conducted at arms' length and in good faith.

**B.      Joint Administration Motion.**

33.     Debtor Open Road Films is a wholly-owned subsidiary of Debtor Open Road Releasing.  Debtors OR Productions, Briarcliff, and Open Road International are wholly-owned subsidiaries of Open Road Films.  Debtor Empire Productions is a wholly-owned subsidiary of OR Productions.  Joint administration will prevent duplicative efforts and unnecessary expenses.

34.     I understand that the joint administration of the Cases will permit the Clerk of the Court to utilize a single general docket for these Cases and combine notices to creditors of the

01:23603163.1

Debtors' respective estates and other parties in interest, which will result in significant savings to the estates.  Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates.

**C.      Employee Compensation and Benefits Motion.**

35.      *The Debtors' Workforce.*  As described above, the Debtors' workforce includes individuals who allocate their time, in whole or in part, among the Debtors and various non-debtor affiliated entities.  For purposes of the Employee Compensation and Benefits Motion, Employees that are formally employed by a Debtor entity and are allocated, in whole or in part, to render services to the Debtors are referred to as "Employees," whereas employees that are formally employed by an affiliated non-debtor entity and are allocated, in whole or in part, to render services to the Debtors are referred to as "Shared Employees."[4]  Prior to the Petition Date, the Debtors undertook a reduction in force pursuant to which approximately 37 former Employees and Shared Employees were terminated in the aggregate.[5]

36.      As of the Petition Date, there are approximately 36 full-time salaried and hourly Employees and Shared Employees (collectively, the "Full Time Employees"), and 3 part-time hourly Employees and Shared Employees ("Part Time Employees"), for a total of 39 Employees and Shared Employees that render services to, and are paid by, in each case in whole or in part, the Debtors.[6]  Of this remaining total workforce, 9 Employees are formally employed by Debtor Open Road Films, 19 Shared Employees are formally employed by non-debtor Global Road, 9

---

[4]    There are also a small number employees that are formally employed by a Debtor entity but are allocated to render services exclusively to non-debtor entities, which employees are referred to in the Employee Compensation and Benefits Motion as the "Excluded Employees."

[5]    In addition, on August 28, 2018, the Debtors ceased funding an allocable share of the costs of approximately 13 former Employees and/or Shared Employees.

[6]    For the avoidance of doubt, the Excluded Employees are not included within the 39 total Employees and Shared Employees.  The Debtors are not seeking to pay any amounts to the Excluding Employees; rather, the Excluded Employees will be compensated by the non-debtor affiliates to which the Excluded Employees render services.

01:23603163.1

Shared Employees are formally employed by non-debtor TMP, and 2 Shared Employees are formally employed by non-debtor IM Global. Global Road, TMP, and IM Global are referred to in the Employee Compensation and Benefits Motion as the "Non-Debtor Employers."

37. *Payroll.* All 39 Employees and Shared Employees are paid bi-weekly on Fridays for the prior two weeks ending on the Friday prior to the pay date. Debtor Open Road Films funds a lump sum for the Debtors' allocable share of the costs of Employees and Shared Employees to non-debtor Global Road. Other non-debtor affiliates also fund certain payroll to Global Road. Global Road then funds payroll in gross for the Employees and Shared Employees to Automated Data Processing ("ADP") approximately two business days before each pay date. ADP is responsible for distributing net pay to the Employees and Shared Employees from its own accounts. The Debtors' allocable share of payroll (excluding amounts for taxes and fringe benefits) to be funded to ADP through Global Road for each postpetition two-week period going forward is projected to be in the range of approximately $160,000 to $300,000.

38. The most recent prepetition payroll date was August 24, 2018. It covered the pay period from August 4, 2018 through August 17, 2018. The total amount of the August 24, 2018 payroll (excluding amounts for taxes and fringe benefits) that was estimated by the Debtors to be their allocable share of payroll for the Employees and Shared Employees was approximately $603,808.[7] The next two scheduled payroll dates are September 7, 2018 (which will cover the pay period from August 18, 2018 through August 31, 2018) and September 21, 2018 (which will cover the pay period from September 1, 2018 through September 14, 2018). Prior to the Petition Date, the Debtors funded their estimated allocable share of payroll for the Employees and the Shared Employees in respect of the period from August 18, 2018 through September 7, 2018 to

---

[7] The Debtors' allocable share of the August 24, 2018 payroll was considerably larger that the Debtors' estimated allocable share of payroll going forward because of the above described prepetition reduction in force.

Global Road, and it is anticipated that Global Road will in turn fund payroll to ADP in the ordinary course of business. Accordingly, the Debtors believe that there will be no unpaid prepetition amounts owing to Employees or Shared Employees on account of the September 7, 2018 payroll (all of which is in respect of the prepetition period) or the September 21, 2018 payroll (a portion of which is in respect of the prepetition period).

39.     In addition, the Debtors rely on the services of one additional worker leased from a temporary placement agency (the "Temporary Worker"). The Temporary Worker is compensated outside of the Debtors' payroll system and receives approximately $6,600 per week, all of which is allocable to the Debtors. The Debtors believe that no prepetition amounts are owing to the Temporary Worker.

40.     *Vacation Time.* Employees and Shared Employees accrue vacation time ("Vacation") on a pro rata basis throughout the year beginning on their first day of employment. Employees and Shared Employees accrue two weeks (80 hours) of Vacation for twelve months of service, up to a maximum accrual of three weeks (120 hours). Once an Employee or Shared Employee reaches the maximum unused Vacation accrual, that Employee or Shared Employee may not accrue any additional Vacation until the Employee or Shared Employee uses Vacation to reduce the amount of accrued unused Vacation below the maximum threshold. Vacation pay is calculated based on the applicable hourly pay or base salary. At separation of employment, Employees and Shared Employees do receive payment for accrued unused Vacation.[8] At any point in time, Vacation is accruing or being used, making it difficult to quantify the cost of accrued Vacation as of the Petition Date. However, prior to the Petition Date, the Debtors

---

[8]     Other than upon termination of employment, Employees and Shared Employees do not receive cash payments on account of Vacation unless the Employee or Shared Employee has deferred his or her Vacation at the Debtors' written request.

estimate that the Debtors' allocable share of accrued unused Vacation for the Employees and

Shared Employees is in the range of approximately $20,000 to $25,000 in the aggregate.

41.     *Holiday Time and Sick Leave*.  The Debtors provide paid holiday time ("Holiday

Time") for several holidays and also provide two paid floating holiday days to be used with prior

supervisor approval.[9]  Holiday Time does not carry over year to year and is never paid out upon

separation of employment.  The Debtors therefore do not make any cash payments on account of

the Holiday Time policy.  The Debtors provide paid sick time ("Sick Leave") to all Full Time

Employees and Part Time Employees.  All non-executive Employees and Shared Employees are

issued six days (48 hours) of Sick Leave on January 1 of each year, none of which carries over to

subsequent years.  Eligible Employees and Shared Employees are not paid for accrued unused

Sick Leave upon separation of employment, and the Debtors therefore do not make any cash

payments on account of the Sick Leave policy.  Executive Employees and Shared Employees

may use personal time off for sick leave with the approval of their respective manager.

42.     *Other Paid Time Off.*  The Debtors offer Employees and Shared Employees

leaves of absence as required by law for the purposes of fulfilling any required legal or military

obligation.  Compensation during such a leave will be offset by any amounts received as jury or

witness fees or as military pay, as applicable.  The Debtors also offer Employees and Shared

Employees up to five consecutive days off for bereavement leave in the event of the death of a

spouse, domestic partner, child, parent, grandparent, sibling, aunt, uncle, cousin, or in-law.

Employees and Shared Employees who have been employed for at least 90 days are entitled to

paid leaves of absence for up to 30 business days in any twelve month period for the purposes of

---

[9]     Holiday Time includes the following holidays: Martin Luther King Day, Presidents' Day, Memorial Day,
Independence Day, Labor Day, Thanksgiving Day, Friday after Thanksgiving, and December 24 through New
Year's Day.  If any individual holiday(s) occurs on a weekend, the Debtors adjust the Holiday Time schedule to
provide a total of seven days of paid Holiday Time in addition to December 24 through New Year's Day.

donating an organ, or for up to five business days in any twelve month period for the purposes of donating bone marrow where there is medical necessity for the donation.  Employees and Shared Employees who have been employed for at least twelve months and have actually worked at least 1,250 hours during the twelve month period preceding leave may be eligible for unpaid medical or family care leaves of absence for up to twelve weeks in a twelve month period.[10]  For pregnancy related disabilities, Employees and Shared Employees may be eligible for medical leaves of absence up to four months for each pregnancy.

43.    *Benefit Programs.*  Prior to the Petition Date, Full Time Employees enjoyed various standard employee benefits (the "<u>Benefit Programs</u>") including, without limitation, (a) medical care, (b) dental and vision insurance, (c) life and disability insurance plans, and (d) COBRA coverage.  Benefit Programs are maintained by the Debtors or the Non-Debtor Employers and the costs of the Benefit Programs will be allocated accordingly on a postpetition basis.  The amounts set forth below reflect the Debtors' projected allocable share of the approximate going forward cost of such Benefit Programs, which the Debtors seek to honor in the ordinary course of business for eligible Employees and Shared Employees during the pendency of these Cases.  Prior to the Petition Date, the Debtors funded to non-debtor affiliates the Debtors' estimated allocable share of costs for all of the Benefit Programs in respect of the period from August 18, 2018 through September 7, 2018.  It is anticipated that these non-debtor affiliates have or will fund disbursements to the appropriate entities in respect of each Benefit Program in the ordinary course of business.  Accordingly, the Debtors believe that as of the Petition Date no prepetition amounts are owing in respect of the Benefit Programs.

---

[10]    Currently, the Debtors are paying, in whole or in part, maternity/paternity leave pay for 3 Shared Employees and the Debtors anticipate that 2 Employees will soon commence maternity/paternity leave.  The Debtors' allocable share of payroll for these 5 Employees and Shared Employees is projected to be in the range of approximately $3,000 to $12,000 per two-week payroll period going forward.

01:23603163.1

44.    *Medical Insurance Program.*  Full Time Employees enjoy a medical and prescription drug program (the "Medical Plan") from Blue Shield.  Premiums under the Medical Plan are paid in part by the Debtors and Non-Debtor Employers and in part by the Full Time Employees through paycheck withholding.  The Debtors' allocable share of the monthly cost (excluding amounts paid through paycheck deductions) of maintaining the Medical Plan for Employees and Shared Employees is projected to be in the range of approximately $20,000 to $40,000 in the aggregate per month.

45.    *Dental & Vision Insurance Program.*  Full Time Employees enjoy a dental and vision program (the "Dental & Vision Plan") from MetLife.  Premiums under the Dental & Vision Plan are paid in part by the Debtors and Non-Debtor Employers and in part by the Full Time Employees through paycheck withholding.  The Debtors' allocable share of the monthly cost (excluding amounts paid through paycheck deductions) of maintaining the Dental & Vision Plan for Employees and Shared Employees is projected to be in the range of approximately $1,000 to $5,000 in the aggregate per month.

46.    *Basic Life Insurance*.  Full Time Employees enjoy basic life insurance (the "Basic Life Plan") from MetLife.  Premiums under the Basic Life Plan are 100% paid by the Debtors and Non-Debtor Employers.  The Debtors' allocable share of the monthly cost of maintaining the Basic Life Plan for Employees and Shared Employees is projected to be in the range of approximately $1,000 to $5,000 in the aggregate per month.

47.    *Voluntary Life Insurance, Disability, and Employee Assistance Program.*  Full Time Employees enjoy voluntary life insurance and short term and long term disability insurance (the "Voluntary Life & Disability Plans") and an employee assistance program (the "EAP") from MetLife.  Premiums under the Voluntary Life & Disability Plans and costs of the EAP are paid

01:23603163.1

in part by the Debtors and Non-Debtor Employers and in part by the Full Time Employees through paycheck withholding.  The Debtors' allocable share of the monthly cost of maintaining the Voluntary Life & Disability Plans and the EAP for Employees and Shared Employees is projected to be in the range of approximately $1,000 to $5,000 in the aggregate per month.

48.    *COBRA*.  Historically, the Debtors and the Non-Debtor Employers have paid for between one month and one year of coverage for former Employees and Shared Employees under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("COBRA") .  Due to a lack of funds, the Debtors were not able to offer to pay for any time period of COBRA coverage for former Employees and Shared Employees who were terminated in the prepetition reduction in force, however, former Employees and Shared Employees can still participate in COBRA at their own expense.

49.    *Workers' Compensation Program*.  Employees and Shared Employees enjoy a workers' compensation benefits program (the "WC Program") from Federal Insurance Company. The WC Program provides benefits to all Employees and Shared Employees for claims arising from or related to employment.  As of the Petition Date, the Debtors believe that there are no prepetition amounts under the WC Program for which the Debtors may be liable to Federal Insurance Company,

50.    *Retirement Savings Program.*  Employees and Shared Employees enjoy a 401(k) retirement savings plan (the "Retirement Plan"), administered by Fidelity Investments, through which qualified and participating Employees and Shared Employees may defer a portion of their salary to help meet their financial goals and accumulate savings for their future.  The Retirement Plan is funded by employee contributions and discretionary employer matching contributions of 100% of the employee contribution for Employees and Shared Employees with more than one

year of employment.  The Debtors believe that no amounts are owing in respect of accrued unfunded prepetition matching contributions under the Retirement Plan.

51.     *Employee Expenses.*  Prior to the Petition Date, the Debtors directly or indirectly reimbursed Employees and Shared Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "Employee Expenses").  The Employee Expenses are incurred in the ordinary course of the Debtors' business operations and include, without limitation, expenses for meals, travel, and other business-related expenses.  The Debtors' allocable share of Employee Expenses going forward is projected to be in the range of approximately $1,000 to $25,000 in the aggregate each month.  Because a delay often occurs between the time such expenses are incurred and the time an expense reimbursement request is submitted, it is difficult to determine with precision the aggregate amount of outstanding Employee Expenses.  However, the Debtors estimate that, as of the Petition Date, the Debtors' allocable share of accrued unpaid Employee Expenses for Employees and Shared Employees is in the range of approximately $10,000 to $25,000 in the aggregate.

52.     *Employee Withholdings and Payroll Taxes.*  Certain amounts are routinely deducted from the compensation paid to Employees and Shared Employees on account of earnings that judicial or government authorities or the Employees or Shared Employees have designated for deduction, including, for example, various federal, state, and local income, Federal Insurance Contribution Act ("FICA"), and other taxes; support payments; tax levies; savings programs contributions; benefit plans; health and wellness programs; commuting programs; insurance programs; and other similar programs (collectively, the "Employee Withholdings").  In addition, the Debtors and Non-Debtor Employers are responsible for remitting, for their own account, various taxes and fees associated with payroll pursuant to the

FICA and federal and state laws regarding unemployment and disability taxes ("Payroll Taxes"). The Debtors project that their allocable share of employer-obligated Payroll Taxes will be in the range of approximately $30,000 to $40,000 in the aggregate each month.  Because the Debtors funded prepetition payroll amounts prior to the Petition Date, as described above, the Debtors believe that all prepetition amounts in respect of Employee Withholdings and Payroll Taxes have already been deducted and/or remitted.

53.    I believe that the relief sought in the Employee Compensation and Benefits Motion represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates.  I believe that without the relief requested in the Employee Compensation and Benefits Motion being granted, there is significantly increased risk that the individuals necessary to consummate a successful sale of the Debtors' assets will seek alternative opportunities.  Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to successfully conduct these Cases.

**D.    Cash Management Motion.**

54.    In the ordinary course of their business, the Debtors maintain a complex cash management system (the "Cash Management System"), which includes all activities necessary and pertinent to collecting and disbursing the Debtors' cash assets.  The Cash Management System allows the Debtors to efficiently identify the Debtors' cash requirements and transfer cash as needed to respond to these requirements.  The Cash Management System is important to the efficient execution and achievement of the Debtors' objectives, and, ultimately, to maximizing the value of the Debtors' estates.  The Cash Management System generally operates similarly to the centralized cash management systems used by other companies to manage the cash of numerous operating units in a cost-effective manner.  The Cash Management System

01:23603163.1

consists of bank accounts (the "Bank Accounts"), all of which are maintained at Bank of America, except for one which is maintained at CIT Bank, N.A.

55.     Receipts from the Debtors' operations are all deposited directly into a main collections account (account number ending 7030) maintained by Open Road Films at Bank of America (the "Collections Account").  Funds on deposit in the Collections Account are manually transferred to a main disbursement account (account number ending 5975) maintained by Open Road Films at Bank of America (the "Disbursement Account").  The Debtors make most disbursements, including to fund payroll, residual and participation payments, and other general operating expenses from the Disbursement Account.[11]

56.     In addition to the Collections Account, the Debtors also maintain four ancillary collections accounts (account numbers ending 1547, 1180, 1185, and 5985) at Bank of America (the "Segregated Collections Accounts").  The Segregated Collections Accounts are maintained by Debtors OR Productions LLC, Open Road International LLC, and Open Road Films.  The Segregated Collections Accounts are dedicated collections accounts for domestic and/or international receipts on account of specific film titles.  Disbursements from the Segregated Collections Accounts are made from those accounts to the Disbursement Account, and then from the Disbursement Account to third parties connected with the applicable film title.  One of the Segregated Collections Accounts (account number ending 1547) may also be used for other production projects going forward, as the holder of that account (OR Productions LLC) is a signatory to union contracts with certain industry guilds.

---

[11]   The Debtors formerly used another intermediary disbursement account (account number ending 9652) maintained by Open Road Films at Bank of America (the "Sweep Account"), which funded the Disbursement Account, however the Sweep Account now maintains a zero balance and is no longer in use in the Debtors' Cash Management System.  The Debtors have an additional account (account number ending 7035) maintained by Debtor Open Road Film at Bank of America that has a zero balance and is not in use for any purpose. Finally, the Debtors have one account (account number ending 0445) maintained by Debtor Open Road Films at CIT Bank, N.A., however, this account is likewise not currently in use for any purpose.

01:23603163.1

57.     In addition to the Disbursement Account, the Debtors also maintain eight ancillary disbursement accounts at Bank of America, seven of which (account numbers ending 6710, 3833, 9701, 9017, 6056, 0888, and 0179) are maintained by Debtor Open Road Films (the "P&A Accounts") and one of which (account number ending 7073) is maintained by Debtor Open Road Releasing LLC (the "ORR Account").  The P&A Accounts are dedicated disbursement accounts from which the Debtors make prints and advertising ("P&A") expenditures on account of specific film titles from funds deposited into the P&A Accounts directly by third parties connected with the applicable film title (*i.e.*, producers).  In some instances, expenditures related to a specific film title for which the Debtors maintain a dedicated P&A Account are sometimes disbursed from the Disbursement Account, in which case the Debtors reconcile the charges and make corresponding transfers from the applicable P&A Account to the Collections Account to true up the accounts.  Once P&A activity relating to the film title associated with the particular P&A Account ceases, any remaining funds are refunded back to the appropriate third parties connection with the film title.  The ORR Account maintains a small cash balance and is used to fund tax filing fees and similar minor expenditures for Open Road Releasing, LLC.

58.     Several of the Debtors' accounts are subject to certain Deposit Account Control Agreements between Open Road Films and Bank of America (as amended, the "Deposit Account Control Agreements").  The Debtors intend to maintain the Deposit Account Control Agreements in the ordinary course of their business during the pendency of these Cases and intend that these agreements should govern the postpetition cash management relationship between the Debtors and the banks party thereto.

01:23603163.1

25

59.    Prior to the Petition Date, the Debtors charged expenditures pursuant to a commercial card program between Open Road Films and Bank of America, however, Bank of America terminated that program and the associated credit cards prior to the commencement of these Cases.  As of the Petition Date, the Debtors estimate that there is approximately $8,200 in unpaid charges in connection with the final month these credit cards were used.  In the ordinary course of business, the Debtors also utilize various payment methods that are customary for businesses of this size, including debit, wire, check, and ACH payment methods.

60.    Prior to the Petition Date, the Debtors engaged in certain intercompany transactions with each other in the ordinary course of business (collectively, the "Intercompany Transactions").  As described above in paragraphs 13 and 14, in the ordinary course of business, the Debtors also rely on employees and services and incur expenses that are shared and allocated among the Debtors and certain non-debtor affiliates.  In addition to shared employees and employee related services, the shared services and expenses include, among other things, communications and utility services (including for internet), and parking.[12]  These costs ("Affiliate Transactions") are currently to be allocated among the various Debtor and non-debtor entities based on an allocation methodology that is intended to approximate each applicable entity's use of or benefit from such employees, services, and expenditures.

61.    My understanding and belief is that the Intercompany Claims and Affiliate Claims were not always settled by actual transfers of cash.

62.    In light of the size and complexity of the Debtors' operations, I believe that it is critical that the Debtors continue to utilize their existing Cash Management System without

---

[12]    The shared employees and related services (*i.e.*, health and benefit plans) are described in greater detail in the portion of this declaration describing the Employee Compensation and Benefits Motion.

disruption and believe that the relief requested in the Cash Management Motion is both

necessary and in the best interests of the Debtors' estates and their creditors.

**E.      Section 156(c) Application**

63.      Prior to the selection of Donlin, Recano & Company, Inc. ("DRC") as claims and

noticing agent, the Debtors obtained and reviewed engagement proposals from at least three

claims and noticing agents to ensure selection through a competitive process.  I believe, based on

all engagement proposals obtained and reviewed, that DRC's rates are competitive and

reasonable given DRC's quality of services and expertise.

64.      In view of the number of anticipated claimants and the complexity of the Debtors'

business, I believe that the appointment of DRC as claims and noticing agent is both necessary

and in the best interests of the Debtors' estates and their creditors.

## III.      FACTS IN SUPPORT OF THE BID PROCEDURES MOTION

65.      I believe that the Bid Procedures, including the dates and deadlines contained

therein, are appropriate to ensure that the bidding process is fair and reasonable and are designed

to yield the maximum value for the Debtors' estates and creditors under the circumstances.  The

proposed Bid Procedures, including the dates and deadlines contained therein, are designed to

maximize the value received for the Purchased Assets by facilitating a competitive bidding

process in which all qualified bidders are encouraged to participate and submit competing bids.

The Bid Procedures provide qualified bidders with sufficient notice and an opportunity to

acquire information necessary to submit a timely and informed bid.  Thus, the Debtors and all

parties in interest can be assured that the consideration for the Purchased Assets will be fair and

reasonable under the circumstances.  At the same time, the Bid Procedures provide the Debtors

with the opportunity to consider all competing offers and to select, in their reasonable business

judgment, the highest and best offer for the Purchased Assets.

01:23603163.1

66.      I believe that the Debtors possess ample and sound business reasons for selling the Purchased Assets at this time.  After considering potential alternatives, the Debtors have determined that a sale of the Purchased Assets is the best course to preserve and maximize value. Any extended delay in selling the Purchased Assets could have a detrimental effect on the Debtors' ability to continue operations and preserve value to the fullest extent possible.

67.      In addition, I believe that the proposed Bid Procedures will ensure that any sale of the Purchased Assets will be for a fair and adequate price, reflecting fair market value.  The Debtors and their advisors will market the Purchased Assets up until the Bid Deadline, which is proposed to be nearly two months from the filing of the Bid Procedures Motion—in addition to several weeks of prepetition marketing.  In this way, the Debtors intend to maximize the number of potential purchasers who may participate at the Auction and thereby maximize and establish the fairness and adequacy of the purchase price.  Under these circumstances, the purchase price is expected to exceed the value the Debtors would receive if the Purchased Assets were merely sold in a piecemeal liquidation to multiple purchasers or through some other process less orderly, competitive and efficient than provided for by the Bid Procedures.

68.      The Debtors will enter into a stalking horse agreement with a Stalking Horse Purchaser only if they believe that it will maximize the ultimate sale price for their Purchased Assets.  Any associated Bid Protections will remain subject to approval by the Court.  The Debtors intend to negotiate any stalking horse agreement at arm's-length and in good faith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 6th day of September 2018 at Los Angeles, California.

Open Road Films, LLC, *et al.*,
Debtors and Debtors in Possession

By: */s/ Amir Agam*
  Amir Agam
  Chief Restructuring Officer

**EXHIBIT 1**

# ORGANIZATION CHART

