# EXHIBIT C

**Engagement Letter**



PRIVATE & CONFIDENTIAL

LUKE SCHAEFFER
FTI CONSULTING, INC.
1840 CENTURY PARK EAST | SUITE 400
LOS ANGELES, CA 90067
CELL: 415.378.0490
LUKE.SCHAEFFER@FTICONSULTING.COM

August 3, 2018

Rob Friedman
Chief Executive Officer
Open Road Films LLC
2049 Century Park East
Fourth Floor
Los Angeles, California 90067

Re: Chief Restructuring Officer, Temporary Employees and Transaction Support

Dear Mr. Friedman:

1. **Introduction**

   This letter confirms the terms of engagement (this "Engagement") between FTI Consulting, Inc. ("FTI") and Open Road Films LLC (the "Company"), pursuant to which the Company has engaged FTI, effective as of August 1, 2018, to provide certain services to the Company, as set forth below, in connection with potential transaction or restructuring of the Company (the "Services"). With regards to the Services, FTI (including the CRO (as defined below)) shall report to the Board of Directors (the "Board"). This letter of engagement and the related Standard Terms and Conditions constitute the engagement contract (the "Engagement Contract") pursuant to which the Services will be provided. This Engagement Contract and the acceptance of the Engagement is conditioned at the time of execution and an ongoing condition of this engagement that an appropriately sized Directors and Officers Insurance Policy is in place.

2. **Scope of Services**

   The Services, to be performed at the direction of the Board, are expected to include the following:
   - FTI will provide Amir Agam to serve as the Company's Chief Restructuring Officer (the "CRO"). The CRO, as well as any additional Hourly Temporary Staff (as defined below), shall have such duties as the Board may from time to time determine. Without limiting the foregoing, the CRO, as well as any Hourly Temporary Staff, shall work with other senior management and employees of the Company, and other professionals, to provide the Services.
   - In addition to providing the CRO, FTI shall also provide the Company with additional supportive staff (the "Hourly Temporary Staff" and, together with the CRO, the "FTI Professionals"), subject to the terms and conditions of this Agreement. The Hourly Temporary Staff may be assisted by or replaced by other FTI professionals reasonably satisfactory to the Board, who shall also become Hourly Temporary Staff for purposes hereof. The initial list of Hourly Temporary Staff will be provided prior to the start of the Services. FTI will keep the Company reasonably informed as to FTI's staffing and will not add additional Hourly Temporary Staff to the assignment without first consulting with the Board. The Hourly Temporary Staff services may be performed by FTI or by any

subsidiary of FTI, as FTI shall determine. FTI may also provide Hourly Temporary Staff services through its or its subsidiaries' agents or independent contractors, in a manner reasonably acceptable to the Board. References herein to FTI and its employees shall be deemed to apply also, unless the context shall otherwise indicate, to employees of each such subsidiary and to any such agents or independent contractors and their employees.

- Services to be performed by the CRO or Hourly Temporary Staff will include:
    - Assist the Company to prepare appropriate cash and liquidity forecasts, including a rolling 13-week cash flow forecast.
    - Assist the company in daily cash management and in preparing, reviewing and reporting on the 13-week cash flow forecast and work with Management to preserve and maximize cash availability while preserving value in the business.
    - Assist the Company's management in responding to requests from, and negotiation with, lenders, other creditors and investors, and any government investigators, as requested
    - Provide forecasting, valuation and transaction support ("Transaction Support") in connection with a possible merger, consolidation, joint venture, partnership, spin-off, split-off, business combination, tender or exchange offer, recapitalization, acquisition, sale, distribution, transfer or other disposition of assets or equity interests, or similar transaction, involving all or a substantial portion of the business, assets or equity interests of the Company and its subsidiaries, taken as a whole, or any right or option to acquire any of the foregoing, in each case involving a transfer of control of the Company, in one or more transactions (collectively referred to herein as, the "Transaction"). Transaction Support may include:
        - Develop cash flow forecasts potentially including the Company's previously released filmed entertainment and related library rights (the "Library"), unreleased filmed entertainment and related rights ("Current Programs"), rent a system agreements, future going concern based upon Company management's business plans, inclusive of forecasted development costs ("Future Programs") and corporate and divisional operating expenses ("Operating Expenses").
        - Present or communicate such forecasts to parties interested in buying all or a portion of the Company and/or its assets and other parties as directed by the Company
        - If requested by the Company, prepare a written report expressing our conclusions on a range of valuation indications for each of the Library, Current Programs, Future Programs, and consolidated Company operations on an enterprise basis;
        - Provide additional support reasonably related to the foregoing, as appropriate.
    - Running a process to consummate one or multiple Transactions. Such process will include:
        - Advise the Company regarding parties that may be interested in a Transaction ("Bidders");
        - A request for proposal which notifies Bidders that potential Transactions can include a sale of all or a portion of the Company and/or its assets;
        - Provide Bidders and secured lenders access to a data room which contains adequate information needed to assess and evaluate a Transaction;
        - Contact and solicit proposals regarding a Transaction;
        - Screen, diligence, rank, and evaluate any proposals received from Bidders, and then select a Bidder to consummate Transaction with;
        - Assist the Company in its negotiations with Bidders;

- Provide timely reporting to the Company and the Administrative Agent for its secured lenders on the status and progress of the above no less frequently than weekly; and
- Assist the Company on any Transaction through closing.
  - Prepare for possible Chapter 11 filing and procedures, as neccessary.
  - Other services as may be reasonably requested by the Company, and are customary in this type of engagement.

The Services, as outlined above, are subject to change as mutually agreed between us. The Services do not include audit, legal, tax, environmental, accounting, actuarial, employee benefits, insurance advice or similar specialist and other professional services which are typically outsourced and which shall be obtained directly where required by the Company at Company's expense. The Client agrees to supply office space, and office and support services to FTI as reasonably requested by FTI in connection with the performance of its duties hereunder.

FTI will exercise its independent professional judgment in the performance of the Services. In light of FTI's duty hereunder to report to and perform the Services at the direction of the Board, it will follow the instructions of the Board over any conflicting instructions received from any other executive, officer or employee of the Company in so performing the Services.

As part of the Services, FTI may be requested to assist the Company (and its legal or other advisors) in negotiating with the Company's creditors and equity holders and with other interested parties. In the event that we participate in such negotiations, the representations made and the positions advanced will be those of the Company and its management, not FTI or its employees.

If cases under the Bankruptcy Code are commenced and our retention is approved, our role will include serving as the CRO with supporting services as principal bankruptcy financial advisors to the debtors and debtors in possession in those cases under a general retainer, subject to court approval.

As usual, our Engagement is to represent the Company and not its individual directors, officers, employees or shareholders. However, we anticipate that in the course of that Engagement, we may provide information or advice to directors, officers or employees in their corporate capacities.

The Services may be performed by FTI or by any subsidiary of FTI, as FTI shall determine. FTI may also provide Services through its or its subsidiaries' agents or independent contractors. References herein to FTI and its employees shall be deemed to apply also, unless the context shall otherwise indicate, to employees of each such subsidiary and to any such agents or independent contractors and their employees. In the event the Services contemplated hereunder will involve the offering and/or sale of securities, such services shall be specifically provided by FTI's wholly-owned investment banking subsidiary, FTI Capital Advisors, LLC ("FTICA"), in accordance with the terms of this Engagement Contract. The FTI engagement team will include members of FTICA, FTI's wholly-owned broker dealer subsidiary, which is a member of the FINRA and SIPC. While the engagement may be staffed by personnel from both FTICA and FTI, all matters pertaining to rules and regulations governed by the Financial Industry Regulatory Authority. ("FINRA") related to the Engagement Contract will be under the authority and direction of FTICA as required by applicable law. For the purpose of the Engagement Letter, references to FTI will include FTI, FTICA, and all affiliates.

3.  **Confidential Services**

    We understand that work performed by us under this Engagement Contract, including any written reports, memoranda, status summaries, or other analyses we may prepare, may constitute private and confidential communications and, as such, will be maintained in accordance with our retention procedures and shall be prominently labeled "Private and Confidential". Except as may be required by law, regulation or valid judicial or administrative process, we will not disclose to anyone, without the Company's prior written permission, the content of any oral or written confidential communication received during the course of this Engagement or any information gained from the inspection or review of any records or documents provided by the Company (which content and information shall, unless otherwise identified by the Company, be deemed to be confidential).

4.  **Transaction Support - Content of Report; Disclosure**

    With regards to the Transaction Support, FTI's procedures, analyses and conclusions may be documented in one or more written reports with, where appropriate, supporting schedules (individually or collectively, the "Report"). All conclusions presented and documentation delivered are intended solely for the use of the Company, solely for the purpose of facilitating the closing of a Transaction. The conclusions rendered in the Report will be based on methods and techniques that FTI considers appropriate under the circumstances and shall represent the opinion of FTI based solely upon the information furnished by, or on behalf of, the Company and other publicly accessible sources, and said conclusions shall be considered as advisory in nature only. No opinion, counsel or interpretation is intended in matters that require legal, regulatory, compliance, accounting, tax, insurance or other appropriate professional advice. It is assumed that such opinions, counsel or interpretations have been, or will be, obtained from the appropriate professional sources.

    The Company agrees that all information reasonably required by FTI will be provided to FTI within a mutually agreeable period of time, in a form and format reasonably requested by FTI, and shall be accurate and complete in all material respects to the best of the Company's knowledge. The Company will promptly notify FTI if the Company learns of any material misstatement in, or material omission from, any information previously delivered to FTI. FTI may rely, without independent verification, on the accuracy and completeness of all information furnished by, or on behalf of, the Company. The Company understands that FTI will not be responsible for independently verifying the accuracy of such information, and shall not be liable for any inaccuracies therein. The foregoing shall remain operative and in full force and effect regardless of any investigation made by or on behalf of FTI or any other Indemnified Person (as hereinafter defined).

    Any summary of, or reference to, the Report or any oral presentation with respect thereto, any submission of the Report, in whole or in part, to third parties, or any reference to FTI, will be subject, in each instance, to our prior review and written approval, not to be unreasonably withheld. FTI's approval may be conditioned upon each and any such recipient's prior execution of an agreement in the form attached hereto as Schedule A. Neither our oral conclusions nor the Report will be used for any purpose other than in connection with facilitating a Transaction.

5.  **Fees**

    **CRO**

Open Road Films LLC August 3, 2018

For services rendered in connection with this assignment during the first two months after execution of this letter, the Company agrees to pay FTI a monthly, non-refundable advisory fee of $125,000 for the services of Amir Agam as Chief Restructuring Officer. These fees will be billed at the beginning of each month and considered earned when paid. For services rendered in connection with this assignment after the first two months after execution of this letter, the Company agrees to pay FTI at the hourly rate of $935 for the services of Amir Agam as Chief Restructuring Officer.

**Hourly Temporary Staff**
Aside from the CRO, all other FTI employees providing services will be Hourly Temporary Staff. Supportive services rendered by the Hourly Temporary Staff will be billed at their current hourly rate. Upon approval of the Board, FTI will add additional Hourly Temporary Staff as necessary. Fees are payable in advance and may be billed as frequently as weekly and will be billed not less frequently than monthly. Fees in connection with this Engagement will be based upon the time incurred providing the Services, multiplied by our standard hourly rates, summarized as follows:

**United States**

|  | Per Hour (USD) |
|---|---|
| Senior Managing Directors and Senior Advisors | $840-1,075 |
| Directors / Senior Directors / Managing Directors | 630- 835 |
| Consultants/Senior Consultants | 335- 605 |
| Administrative / Paraprofessionals | 135- 265 |

Hourly rates are generally revised periodically. We will notify the Company in writing prior to any changes to our rates. To the extent this Engagement requires services of our International divisions or personnel (as reasonably determined by FTI in consultation with the Company), the time will be multiplied by our standard hourly rates applicable for the International divisions or personnel. Note that we do not provide any assurance regarding the outcome of our work, and our fees will not be contingent on the results of such work.

In addition to the foregoing fees, and as additional consideration for all of the Services, upon the closing and funding (whether partially or in full) of a Transaction, the Company agrees to pay FTICA an additional fee ("Additional Fee") equal to US$750,000. However, so long as no more than 50% of the Company's secured debt is transferred from its current holders to new holders, in the event that the secured lenders to the Company acquire by way of a credit bid all or substantially all of the assets, then there will be no Additional Fee. The Additional Fee shall be paid to FTICA by withholding such fee from the proceeds of the Transaction by instructing the financier, lender, investor or other purchaser of securities to wire transfer said fee directly to FTICA upon the closing of the Transaction. In the event a transaction or series of transactions takes place that does not involve a change in control (e.g. a sale of a sub-set of the film library), the Company and FTICA agree to negotiate in good faith with respect to the additional fees to be paid to FTICA in connection therewith, the terms of which will be documented in a separate agreement between the parties.

In addition to the fees outlined above, FTI will bill for reasonable allocated and direct expenses which are incurred on the Company's behalf during this Engagement. Allocated expenses include the cost of items which are not billed directly to the engagements but are incurred centrally, including out of pocket costs for data services and research materials which FTI subscribes to that we expect to use on your engagement, and are calculated at 3.0% of FTI's standard professional rates. Direct expenses include reasonable and customary out-of-

pocket expenses which are billed directly to the Engagement such as certain telephone, overnight mail, messenger, travel, meals, accommodations and other expenses specifically related to the Engagement. Further, if FTI and/or any of its employees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to this matter, FTI will be compensated by the Company at its regular hourly rates and reimbursed for reasonable direct expenses (including reasonable, documented fees of counsel) with respect thereto.

**Cash on Account**

Initially, the Company will forward to us the amount of $250,000, which funds will be held "on account" to be applied to our professional fees, charges and disbursements for the Engagement as further described herein (the "Initial Cash on Account"). To the extent that this amount exceeds our fees, charges and disbursements upon the completion of the Engagement, we will refund any unused portion. The Company agrees to increase or supplement the Initial Cash on Account from time to time during the course of the Engagement in such amounts as the Company and we mutually shall agree are reasonably necessary to increase the Initial Cash on Account to a level that will be sufficient to fund Engagement fees (other than the Additional Fee), charges, and disbursements reasonably anticipated to be incurred on or prior to the final day of the immediately following month.

We will send the Company periodic invoices (not less frequently than monthly) for services rendered and charges and disbursements incurred on the basis discussed above, and in certain circumstances (but other than with respect to the Additional Fee), an invoice may be for fees, charges and disbursements reasonably anticipated to be incurred through a date certain (which date shall, in no event, be later than the final day of the immediately following month). Each invoice constitutes a request for an interim payment against the fee to be determined at the conclusion of our Services. Upon transmittal of the invoice, we may immediately draw upon the Initial Cash on Account (as replenished from time to time) in the amount of the invoice. The Company agrees upon submission of each such invoice to promptly wire the invoice amount to us as replenishment of the Initial Cash on Account (together with any supplemental amount to which we and the Company mutually agree, as described further above), without prejudice to the Company's right to advise us of any differences it may have with respect to such invoice. We have the right to apply to any outstanding invoice (including amounts billed prior to the date hereof), up to the remaining balance, if any, of the Initial Cash on Account (as may be supplemented from time to time) at any time subject to (and without prejudice to) the Company's opportunity to review and dispute our statements.

The Company agrees to promptly notify FTI if the Company or any of its subsidiaries or controlled affiliates extends (or solicits the possible interest in receiving) an offer of employment to a principal or employee of FTI involved in this Engagement. The Company agrees that it will pay, and that FTI will have earned and be entitled to, a cash fee, upon hiring of any FTI former principal or employee involved in this Engagement that the Company or any of its subsidiaries or controlled affiliates hires at any time up to one year subsequent to the date of the final invoice rendered by FTI with respect to this Engagement, equal to 150% of the aggregate first year's annualized compensation, including any guaranteed or target bonus and equity award, to be paid to such former principal or employee.

In preparation for the filing of any cases under the Bankruptcy Code, we also may require an additional on account payment to supplement the Initial Cash on Account to cover fees, charges and disbursements to be incurred during the initial phase of the chapter 11 cases (the

"Additional Cash on Account"). We will hold the Additional Cash on Account, as we have the Initial Cash on Account. Of course, the reasonableness of the Additional Cash on Account remains subject to review by the court in any ensuing case.

If any of the Company's entities become a debtor in one or more cases under the Bankruptcy Code, some fees, charges, and disbursements (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing. The unused portion, if any, of the Initial Cash on Account and the Additional Cash on Account will be applied to any such unpaid pre-petition fees, charges and disbursements. Any requisite court permission will be obtained in advance. We will then hold any portion of the Initial Cash on Account and the Additional Cash on Account not otherwise properly applied for the payment of any such unpaid pre-filing fees, charges and disbursements (whether or not billed) as on account cash to be applied to our final invoice in any case under the Bankruptcy Code.

Post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court. The Company understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Company shall nevertheless remain liable for payment of court approved post-petition fees and expenses. Such items are afforded administrative priority under 11 U.S.C. § 503(b)(I). The Bankruptcy Code provides in pertinent part, at 11 U.S.C. § 1129(a)(9)(A), that a plan cannot be confirmed unless these priority claims are paid in full in cash on the effective date of any plan (unless the holders of such claims agree to different treatment). It is agreed and understood that the unused portion, if any, of the Initial Cash on Account (as may be supplemented from time to time) and the Additional Cash on Account shall be held by us and applied against the final fee application filed and approved by the court.

**Additional Provisions Regarding Fees:**

a) The Company agrees that FTI is not an employee of the Company and the FTI employees and independent FTI contractors who perform the Services are not employees of the Company, and they shall not receive a W-2 from the Company for any fees earned under this engagement, and such fees are not subject to any form of withholding by the Company. The Company shall provide FTI a standard form 1099 on request for fees earned under this Engagement.

b) Copies of Invoices shall be sent by facsimile or email as follows:

To the Company at:

Mimi Tseng
Chief Financial Officer
Open Road Films LLC
2049 Century Park East
Fourth Floor
Los Angeles, California 90067

6. **Terms and Conditions**

The attached Standard Terms and Conditions set forth the duties of each party with respect to the Services. Further, this letter and the Standard Terms and Conditions attached comprise the entire Engagement Contract for the provision of the Services to the exclusion of any other express or implied terms, whether expressed orally or in writing, including any conditions, warranties and representations, and shall supersede all previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services.

7. **Conflicts of Interest**

    Based on the list of interested parties (the "Potentially Interested Parties"), provided by the Company, we have undertaken a customary review of our records to determine FTI's professional relationships with the Company and the Potentially Related Parties. As the Company may be aware, the administrative agent and/or members of the lending group (or law firms of the administrative agent or the lending group members) regularly retain FTI. However, such representations are in matters unrelated to this Engagement. Further as the Company is aware, FTI has previously performed work for the Company, predecessor entities, or related companies.

    From the results of such review, we are not aware of any conflicts of interest or additional relationships that we believe would preclude us from performing the Services. However, as the Company knows, we are a large consulting firm with numerous offices throughout the United States. We are regularly engaged by new clients, which may include one or more of the Potentially Interested Parties. FTI will not accept an engagement that directly conflicts with this Engagement without the Company's prior written consent.

8. **Acknowledgement and Acceptance**

    Please acknowledge the Company's acceptance of the terms of this Engagement Contract, consisting of this letter and the attached Standard Terms and Conditions, by signing the confirmation and returning a copy of this Engagement Contract to us at the above address.

If you or the Board have any questions regarding this letter or the attached Standard Terms and Conditions, please do not hesitate to contact Luke Schaeffer at 213.452.6396.

Yours faithfully,

FTI CONSULTING, INC.

By: _____

Luke Schaeffer
Senior Managing Director

Attachment – As stated

Open Road Films LLC August 3, 2018

**We agree to engage FTI Consulting, Inc. upon the terms set forth herein and in the attached Standard Terms and Conditions.**

Open Road Films LLC

By: _____
Rob Friedman
Chief Executive Officer

Date:  August 3, 2018

# EXHIBIT A

# FTI CONSULTING, INC.

# STANDARD TERMS AND CONDITIONS

The following are the Standard Terms and Conditions on which we will provide the Services to the Company set forth within the attached letter of engagement dated August 3, 2018. The Engagement Contract forms the entire agreement between us relating to the Services and replaces and supersedes any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services. The headings and titles in the Engagement Contract are included to make it easier to read but do not form part of the Engagement Contract.

1. **Reports and Advice**

1.1 **Use and purpose of advice and reports** – Any advice given or report issued by us is provided solely for the use and benefit of the Company and only in connection with the purpose in respect of which the Services are provided. Unless required by law, the Company shall not provide any advice given or report issued by us to any third party (other than the Company's advisors who have a need to know and are bound by obligations of confidentiality and non-disclosure), or refer to us or the Services, without our prior consent, not to be unreasonably withheld. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available, and which shall be conditioned on the execution of a third party release letter in the form provided by FTI.

2. **Information and Assistance**

2.1 **Provision of information and assistance** – Our performance of the Services is dependent upon the Company providing us with such information and assistance as we may reasonably require from time to time.

2.2 **Punctual and accurate information** – The Company personnel shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete in all material respects and relevant for the purpose for which it is required. The Company shall also notify us if the Company subsequently learns that the information provided is incorrect or inaccurate in any material respect or otherwise should not be relied upon.

2.3 **No assurance on financial data** – While our work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof. The Company will be responsible for any and all financial information it provides to us during the course of this Engagement, and we will not examine or compile or verify any such financial information. Moreover, the circumstances of the Engagement may cause our advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period. Accordingly, as part of this Engagement, we will not express any opinion or other form of assurance on financial statements of the Company.

2.4 **Prospective financial information** - In the event the Services involve prospective financial information, our work will not constitute an examination or compilation, or apply agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or otherwise, and we will express no assurance of any kind on such information. There will usually be differences between estimated and actual results, because events and circumstances frequently do not

occur as expected, and those differences may be material. We will take no responsibility for the achievability of results or events projected or anticipated by the management of the Company.

3. **Additional Services**

3.1 **Responsibility for other parties** – The Company shall be solely responsible for the work and fees of any other party engaged by the Company to provide services in connection with the Engagement regardless of whether such party was introduced to the Company by us. Except as provided in this Engagement Contract, we shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters. Further, we acknowledge that we are not authorized under our Engagement Contract to engage any third party to provide services or advice to the Company, other than our agents or independent contractors engaged to provide Services in accordance with the terms thereof, without the Company's written authorization.

4. **Confidentiality**

4.1 **Restrictions on confidential information** – All parties to this Engagement Contract agree that any confidential information received from the other parties shall only be used for the purposes of providing or receiving Services under this or any other contract between us. Except as provided below, no party will disclose other contracting party's confidential information to any third party without such party's prior written consent. Confidential information shall not include information that:

4.1.1 is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1;

4.1.2 is acquired from a third party who, to the recipient party's knowledge, owes no obligation of confidence in respect of the information; or

4.1.3 is or has been independently developed by the recipient; provided that it is understood and agreed that nothing contained in this Clause 4.1.3 permits FTI to disclose information developed by FTI in connection with this Engagement.

4.2 **Disclosing confidential information** – Notwithstanding Clause 1.1 or 4.1 above, all parties will be entitled to disclose confidential information to a third party to the extent that this is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than 2 business days' notice in writing is first given to the other parties.

4.3 **Citation of Engagement** – Without prejudice to Clause 4.1 and Clause 4.2 above, to the extent our Engagement is or becomes known to the public other than as a result of a breach of our obligations hereunder,-we may cite generally the performance of the Services to our clients and prospective clients as an indication of our experience, unless we and the Company specifically agree otherwise in writing.

4.4 **Internal quality reviews** – Notwithstanding the above, we may disclose any information referred to in this Clause 4 to any other FTI entity on a "need-to-know" basis or use it for internal quality reviews.

4.5 **Maintenance of workpapers** – Notwithstanding the above, we may keep one archival set of our working papers from the Engagement, including working papers containing or reflecting confidential information, in accordance with our internal policies.

5.  **Termination**

5.1   **Termination of Engagement with notice** – Either party (the Company and FTI) may terminate the Engagement Contract for whatever reason upon written notice to the other party. Upon receipt of such notice, we will stop all work immediately. Regardless of the terminating party, the Company will be responsible for all fees and expenses incurred by us through the date termination notice is received.

5.2   **Continuation of terms** – The terms of the Engagement that by their context are intended to be performed after termination or expiration of this Engagement Contract, including but not limited to, Clauses 3 and 4 of the Engagement Contract, and Clauses 1.1, 4, 6 and 7 of the Standard Terms and Conditions, are intended to survive such termination or expiration and shall continue to bind all parties.

6.  **Indemnification and Liability Limitation**

6.1   **Indemnification** - The Company agrees to indemnify and hold harmless FTI and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contactors and employees (collectively "Indemnified Persons") from and against any and all claims, liabilities, damages, obligations, out-of-pocket costs and expenses (including reasonable and documented fees of outside attorneys and expenses and costs of investigation) arising out of or relating to the Company's retention of FTI, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, except to the extent that any such claim, liability, obligation, damage, cost or expense shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence, bad faith, or willful misconduct of the Indemnified Person or Persons (an "Adverse Determination"). The Company shall reimburse damages and expenses, including reasonable and documented legal fees and disbursements of outside counsel, as they are incurred. FTI agrees that it will reimburse any amounts paid in advance to the extent they relate directly to an Adverse Determination.

6.2   **Limitation of liability** – The Company agrees that no Indemnified Person shall be liable to the Company, or its successors, affiliates or assigns for damages in excess of the total amount of the fees paid to FTI under this Engagement Contract. Without limiting the generality of the foregoing, in no event shall any Indemnified Person be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

6.3   **Insurance** –In addition to the above indemnification and provision regarding advancement of fees/expenses, FTI employees serving as directors or officers of the Company or its affiliates will receive the benefit of the most favorable indemnification and advancement provisions provided by the Company to its directors, officers and any equivalently placed employees, whether under the Company's charter or by-laws, by contract or otherwise. The Company shall specifically include and cover employees and agents serving as directors and officers of the Company or affiliates from time to time with direct coverage under the Company's policy for liability insurance covering its directors, officers and any equivalently placed employees. Prior to FTI accepting any director or officer position, the Company shall, at the request of FTI, provide FTI a copy of its current D&O policy, a certificate of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other document that FTI may reasonably request evidencing the appointment and coverage of the indemnitees. The Company shall maintain such D&O insurance for the period through which claims can be made against such persons. In the event the Company is unable to include FTI employees and agents under the Company's policy or does not have first dollar coverage reasonably acceptable to FTI in effect for at least $10 million, FTI may, subject to the prior written consent of the Company, attempt to purchase a separate D&O insurance policy that will cover the FTI employees and agents only. The cost of the policy shall be invoiced to the Company as an out-of-pocket expense. Notwithstanding anything to the contrary, the Company's indemnification obligations in this Section 6

Open Road Films LLC August 3, 2018

shall be primary to (and without allocation against) any similar indemnification and advancement obligations of FTI, its affiliates and insurers to the indemnitees (which shall be secondary), and the Company's D&O insurance coverage for the indemnitees shall be specifically primary to (and without allocation against) any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by FTI or otherwise).

**7. Governing Law, Jurisdiction and WAIVER OF JURY TRIAL**

7.1 **Governing Law -** The Engagement Contract shall be governed by and interpreted in accordance with the laws of the State of New York, without giving effect to the choice of law provisions thereof.

7.2 **Jurisdiction** - The United States District Court for the Southern District of New York and the appropriate Courts of the State of New York sitting in the Borough of Manhattan, City of New York shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising from it. The parties submit to the jurisdiction of such Courts and irrevocably waive any right they may have to object to any action being brought in these Courts, to claim that the action has been brought in an inconvenient forum or to claim that those Courts do not have jurisdiction.

7.3 **WAIVER OF JURY TRIAL** – TO FACILITATE JUDICIAL RESOLUTION AND SAVE TIME AND EXPENSE, THE COMPANY AND FTI IRREVOCABLY AND UNCONDITIONALLY AGREE TO WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR THIS ENGAGEMENT CONTRACT.

**Confirmation of Standard Terms and Conditions**

Subject to the terms and conditions of the Engagement Letter, we agree that FTI Consulting, Inc. is engaged upon the terms set forth in these Standard Terms and Conditions as outlined above.

Open Road Films LLC

By: _____
Rob Friedman
Chief Executive Officer

Date: August 3, 2018

## Schedule A (Access Letter Agreement)

[date]
[inside address]

Re: Open Road Films LLC

Dear [ ]:

It is the understanding of FTI Consulting, Inc. ("FTI") that you have requested a copy of the report(s) which we prepared, or may in the future prepare, regarding the above-referenced company or transaction (individually or collectively, and including any drafts, excerpts or other related information, the "Report"). Our engagement agreement with Open Road Films LLC (the "Company") strictly prohibits the delivery of copies of any Report without our prior consent.

At the Company's request, we have indicated that we will consent to the delivery of a copy of the Report to you only after we have received from you your acknowledgment of, and your agreement to, the following:

(i) Your use of the Report shall be subject to the terms and conditions of this letter agreement, and the contents of, and conclusions set forth, in the Report shall be further subject to the (a) conditions, scope and purpose of the Report, and (b) limitations and understandings set forth in the Report.

(ii) The delivery of the Report to you shall not constitute, either expressly or impliedly, any representation or affirmation by FTI (or the Company or any other person or entity) as to the accuracy, completeness and/or fairness of presentation of the Report or any statements or information contained therein.

(iii) With respect to any draft Reports, any Report excerpts or any other Report-related information (whether provided to you orally or in writing), you acknowledge that such drafts, excerpts and other information (a) were prepared based on a number of assumptions and understandings (some of which may not yet be reflected therein), (b) may be subject to the completion of additional due diligence by FTI (and, as such, may not reflect the completion of certain financial analyses and investigations as we might deem appropriate in connection with completing our findings), (c) may not have been approved by the Company, and (d) may not reflect a final determination of the matters addressed therein.

(iv) FTI assumes no express or implied responsibility to you or any other person with respect to the Report. The Report does not constitute advice to you or any party concerning any potential transaction (a "Transaction") involving the Company or any other person or entity.

(v) You will make any decisions in connection with any Transaction based on your own investigation, due diligence and analysis, independent of, and without reliance on, the contents of the Report or any other opinions or conclusions of FTI.

(vi) You agree to keep the Report and its contents strictly confidential and use it and its contents only for the limited purpose for which the Report is being delivered to you; provided that you may disclose the Report (a) to your officers, directors, employees, accountants or legal counsel working on, or consulted in connection with, a Transaction, (b) to any other advisors, agents or representatives, or any of your current or prospective lenders or investors, subject to our prior written consent (which may be conditioned upon their execution of a letter agreement

(vi) substantially in the form of this letter agreement), which will not be unreasonably withheld or delayed, or (c) pursuant to a subpoena, order or request issued by a court of competent jurisdiction or by a judicial, administrative, legislative or regulatory body or committee. You agree that money damages may not be a sufficient remedy for any breach of this provision and, therefore, FTI and the Company shall be entitled to seek, in addition to all other remedies, equitable relief, including injunctive relief and an action for specific performance. Your obligations under this subsection (vi) with respect to any Report shall terminate upon the later to occur of (a) two (2) years after your receipt of said Report, or (b) the term of confidentiality set forth in any confidentiality agreement between you and the Company.

(vii) You covenant not to sue or institute any legal or other proceeding directly or indirectly against FTI either by virtue of your receipt or use of the Report, or on the basis of any statements or information set forth therein, regardless of the legal theory advanced in such proceeding.

(viii) If any party brings an action directly or indirectly based upon this letter agreement or the matters contemplated hereby against any other party, the prevailing party shall be entitled to recover, in addition to any other appropriate amounts, its reasonable costs and expenses in connection with such proceeding.

(ix) This letter agreement incorporates the entire understanding of the parties and supersedes all previous agreements or understandings, whether written or oral, with respect to the subject matter hereof, and may be modified only by an express writing executed by the parties hereto.

(x) This agreement shall be governed by the laws of the State of New York.

Please confirm that the foregoing terms are in accordance with your understanding by signing and returning a counterpart of this letter agreement.

Very truly yours,

FTI CONSULTING, INC.
By: _____
    Name:
    Title:

Agreed to and acknowledged by:

[THIRD PARTY]
By: _____
    Name:
    Title:
Date: _____, 201\_