**<u>EXHIBIT 2</u>**

Form APA

**ASSET PURCHASE AGREEMENT**

by and among

**OPEN ROAD FILMS, LLC**

**OPEN ROAD RELEASING, LLC**

**OR PRODUCTIONS, LLC**

**BRIARCLIFF LLC**

**OPEN ROAD INTERNATIONAL LLC**

**EMPIRE PRODUCTIONS LLC**

and

**[BUYER]**

**Dated as of [_____], 2018**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ........................................................................................4
    Section 1.1.    Definitions.............................................................................4
    Section 1.2.    Cross-References.................................................................13
ARTICLE II PURCHASE AND SALE OF PURCHASED ASSETS AND
ASSUMPTIONS AND ASSUMED LIABILITIES ....................................................13
    Section 2.1.    Purchase and Sale of Purchased Assets .....................................13
    Section 2.2.    Excluded Assets ..................................................................14
    Section 2.3.    Assumption of Liabilities.......................................................14
    Section 2.4.    Excluded Liabilities .............................................................14
    Section 2.5.    Closing ..............................................................................14
    Section 2.6.    Deposit ..............................................................................15
    Section 2.7.    Aggregate Purchase Price .....................................................15
    Section 2.8.    Assumed Contracts; Cure Amount ...........................................15
    Section 2.9.    Payment of Aggregate Purchase Price; Deposit Amount .........16
    Section 2.10.   Closing Deliverables...........................................................17
    Section 2.11.   Post-Closing Purchase Price Adjustment...............................17
ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER
PARTIES ..................................................................................................................19
    Section 3.1.    Corporate Organization, Qualification, Power and Authority ...19
    Section 3.2.    Consents and Approvals; No Violations...................................20
    Section 3.3.    No Conflict.........................................................................20
    Section 3.4.    Title to Assets ....................................................................20
    Section 3.5.    Intellectual Property............................................................20
    Section 3.6.    Material Contracts ..............................................................21
    Section 3.7.    Brokers and Finders ...........................................................21
ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER................................21
    Section 4.1.    Corporate Organization, Qualification, Power, Authority........21
    Section 4.2.    Consents and Approvals; No Violations...................................22
    Section 4.3.    Financial Capability............................................................22
    Section 4.4.    Brokers and Finders ...........................................................22
    Section 4.5.    Solvency.............................................................................22
    Section 4.6.    Condition of the Purchased Assets ........................................22
    Section 4.7.    Other Agreements ...............................................................23
ARTICLE V PRE-CLOSING COVENANTS AND AGREEMENTS ........................................23
    Section 5.1.    Affirmative Covenants ..........................................................23
    Section 5.2.    Negative Covenants .............................................................23
    Section 5.3.    Permitted Pre-Closing Actions ..............................................23
    Section 5.4.    Access; Books and Records ...................................................24
    Section 5.5.    Notice of Developments .......................................................24
    Section 5.6.    Competition Filings ............................................................24
    Section 5.7.    Reasonable Best Efforts........................................................25

ARTICLE VI POST-CLOSING COVENANTS AND AGREEMENTS ....................................25

    Section 6.1.    Guild Matters ...............................................................................25
    Section 6.2.    Employee Matters ........................................................................26
    Section 6.3.    WARN ..........................................................................................26
    Section 6.4.    Certain Tax Matters .....................................................................26
    Section 6.5.    Further Assurances.......................................................................28
    Section 6.6.    Access to Books and Records for the Seller Parties ...................28
    Section 6.7.    Announcements............................................................................28
    Section 6.8.    No Obligation to Continue Existence ..........................................29

ARTICLE VII BANKRUPTCY COURT MATTERS.............................................................29

    Section 7.1.    Alternative Transactions ..............................................................29
    Section 7.2.    Sale Order ....................................................................................29
    Section 7.3.    Bankruptcy Filings.......................................................................29

ARTICLE VIII CONDITIONS TO OBLIGATIONS OF THE SELLER PARTIES AND
BUYER .................................................................................................................30

    Section 8.1.    No Injunction ...............................................................................30
    Section 8.2.    [HSR Waiting Period ...................................................................30
    Section 8.3.    Bankruptcy Court Approval.........................................................30

ARTICLE IX CONDITIONS TO OBLIGATIONS OF THE SELLER PARTIES ....................30

    Section 9.1.    Representations and Warranties of Buyer....................................30
    Section 9.2.    Performance of the Obligations of Buyer ...................................30

ARTICLE X CONDITIONS TO OBLIGATIONS OF BUYER ..............................................31

    Section 10.1.   Representations and Warranties of the Seller Parties ................31
    Section 10.2.   Performance of the Obligations of the Seller Parties.................31

ARTICLE XI TERMINATION................................................................................................31

    Section 11.1.   Conditions of Termination ..........................................................31
    Section 11.2.   Effect of Termination..................................................................32

ARTICLE XII REMEDIES ......................................................................................................33

    Section 12.1.   Non-Survival of Representations, Warranties, Covenants and
Agreements; Remedies ................................................................33
    Section 12.2.   Specific Performance ..................................................................33
    Section 12.3.   Return or Retention of Deposit Amount......................................33
    Section 12.4.   [Expense Reimbursement and Break-Up Fee ............................34

ARTICLE XIII MISCELLANEOUS PROVISIONS ................................................................35

    Section 13.1.   Notices .........................................................................................35
    Section 13.2.   Amendments; Waivers.................................................................36
    Section 13.3.   Assignment and Parties in Interest..............................................36
    Section 13.4.   Expenses ......................................................................................36
    Section 13.5.   Entire Agreement ........................................................................36
    Section 13.6.   GOVERNING LAW; VENUE; WAIVER OF JURY TRIAL ................37
    Section 13.7.   No Other Seller Representations and Warranties .......................37
    Section 13.8.   Disclosure Schedule....................................................................38
    Section 13.9.   Headings ......................................................................................38

Section 13.10. References.................................................................................................38

Section 13.11. General Interpretative Provisions ...........................................................38

Section 13.12. Currency..................................................................................................39

Section 13.13. Construction.............................................................................................39

Section 13.14. Severability .............................................................................................39

Section 13.15. Rights Cumulative ...................................................................................39

Section 13.16. Counterparts.............................................................................................39

| | |
|---|---|
| Schedule 1.1 | Titles |
| Schedule 2.1(d) | Other Purchased Assets |
| Schedule 2.3 | Other Assumed Liabilities |
| | |
| Exhibit A | Form of Assignment and Assumption Agreement |
| Exhibit B | Form of Bill of Sale |
| Exhibit C | Form of Intellectual Property Assignment Agreement |
| Exhibit D | Purchase Price Allocation Principles |

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of [●], 2018 (the "Execution Date"), by and among (a) Open Road Films, LLC, a Delaware limited liability company ("Open Road"), Open Road Releasing, LLC, a Delaware limited liability company, OR Productions, LLC, a Delaware limited liability company, Briarcliff LLC, a Delaware limited liability company, Open Road International LLC, a Delaware limited liability company, Empire Productions LLC, a Delaware limited liability company (the parties in this clause (a), each, a "Seller Party" and, collectively, the "Seller Parties"), and (b) [insert Buyer's name], a [insert Buyer's jurisdiction of formation and entity type] ("Buyer").  Each of the foregoing may be referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

A.     On September 6, 2018 (the "Petition Date"), each Seller Party commenced voluntary cases (such cases, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.     Each Seller continues in possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession.

C.     The Seller Parties desire to sell to Buyer, and Buyer desires to purchase from the Seller Parties, all of the Purchased Assets, and Buyer desires to assume all of the Assumed Liabilities pursuant to the Sale Order approving such sale, free and clear of all Liens (other than Permitted Liens), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1.    Definitions.  For purposes of this Agreement:

"Acquisition Proposal" means any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) concerning an Alternative Transaction.

"Action" means any action, cause of action, claim, complaint, charge, investigation, suit, arbitration or other proceeding, whether civil or criminal, in Law or in equity, or before any arbitrator or Governmental Agency.

"Adjusted Purchase Price" means an amount in cash equal to (a) the Base Purchase Price, less (b) Net Library Cash Flow.

"Affiliate" means, as to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with, such Person.  As used in this definition, "control" means, directly or indirectly, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Alternative Transaction" means (a) any transaction involving the direct or indirect sale or sales of all or substantially all or a portion of the Purchased Assets to a Person or Persons other than Buyer or (b) a chapter 11 plan that does not contemplate the sale of the Purchased Assets to Buyer in accordance with the terms hereof.

"Ancillary Agreements" means each agreement, document, instrument or certificate, other than this Agreement, to be executed and delivered in connection with the consummation of the Transactions, including the Assignment and Assumption Agreement, the Bill of Sale, the Intellectual Property Assignment Agreement, the Guild Assumption Agreements, bills of sale, any other instruments of transfer as may be agreed upon by the Parties, and the other documentation required by Section 6.1.

"Assignment and Assumption Agreement" means that certain Assignment and Assumption Agreement, substantially in the form attached hereto as Exhibit A.

"Bankruptcy Code" means Title 11 of the United States Code.

"Base Purchase Price" means $[_____].

"Bidding Procedures Order" means the *Order (1) Approving Bid and Sale Procedures, (2) Approving Assumption, Assignment and Cure Procedures and Related Notices, (3) Establishing Date for Auction and Approving Related Procedures, (4) Scheduling the Sale Hearing and Related Deadlines, and (5) Granting Related Relief* entered by the Bankruptcy Court on October [2], 2018 [Docket. No. [●]].

"Bill of Sale" means that certain Bill of Sale, substantially in the form attached hereto as Exhibit B.

["Break-Up Fee" means $[_____].][1]

"Business" means the business of developing, producing, distributing and otherwise Exploiting motion pictures, television programs and other audio visual content as currently conducted by the Seller Parties.

"Business Day" means any day other than a Saturday, Sunday or a day on which banking institutions in the City of New York, New York are authorized or required by law to close.

"Buyer Designee" means any Persons designated by Buyer to purchase any of the Purchased Assets pursuant to the terms of this Agreement.

---

[1] Only to be included for stalking horse agreement.

"Buyer Related Parties" means any officers, managers, employees, directors, agents, stockholders, equityholders, members, partners, other beneficial owners, controlling persons, subsidiaries, Affiliates, representatives, financial advisors, accountants, lawyers, investment bankers or other consultants of Buyer, or of any of its Affiliates.

"Claim" has the meaning set forth in the Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements or other agreements with any Union.

"Confidentiality Agreement" means that certain Confidentiality and Non-Disclosure Agreement, dated as of [●], 2018, by and between [Buyer] and Open Road.

"Consent" means any consent, approval, authorization, clearance, exemption, waiver, or similar affirmation by, or filing with or notification to, a Person pursuant to any Contract, Law, Order or Permit.

"Contract" means any written contract, lease, license, agreement, arrangement, understanding, commitment or instrument.

"Cure Amounts" means any amounts necessary to cure any monetary default as required by Section 365 of the Bankruptcy Code with respect to an Assumed Contract.

"Disclosure Schedule" means the disclosure schedule, dated as of the Execution Date, provided by the Seller Parties to Buyer in connection with the execution and delivery of this Agreement, as may be updated from time to time prior to the Closing pursuant to Section 13.8.

"Employment Contract" means any Contract between any employee of a Seller Party, on the one hand, and a Seller Party, on the other hand, memorializing the terms of employment or severance of such employee.

"Estimated Purchase Price" means an amount in cash equal to (a) Base Purchase Price, less (b) Estimated Net Library Cash Flow.

"Estimated Net Library Cash Flow" means Open Road's good faith estimate of the amount of Net Library Cash Flow, based on the books and records of the Seller Parties.

"Excluded Contracts" all Contracts to which a Seller Party is a party that are not Assumed Contracts including (a) all Contracts set forth in Section 2.8(a) of the Disclosure Schedule under the heading "Excluded Contracts" and (b) all Contracts deemed to be "Excluded Contracts" pursuant to Section 2.8.

["Expense Reimbursement" means an amount equal to the reasonable and documented out-of-pocket costs, fees and expenses of Buyer (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses) related to the

Transactions, which amount shall constitute a superpriority administrative expense of the Seller Parties with priority over any and all administrative expenses of any kind, including those specified in Sections 503(b) or 507(b) of the Bankruptcy Code and over any debtor-in-possession financing obligations; provided, however, that the aggregate amount of the Expense Reimbursement shall not exceed $[_____].]²

"Exploit" means, with respect to a Purchased Title, the exhibition, distribution, reproduction, development, subdistribution, transmission, display, broadcast, performance, dissemination, publication, production, co-production, promotion, publicizing, advertising, reproduction, rental, leasing, subleasing, selling, licensing, sublicensing, transfer, disposal of, commercializing, marketing, usage, trading in, turning to account, dealing with and in and otherwise exploiting such Purchased Title by any and all means, methods, processes, media devices and delivery systems of every kind or character, whether now known or hereafter created, including, without limitation, the right to exercise the ancillary rights relating thereto and to produce and develop such Purchased Titles (including derivative rights therein), to the extent included in the Title Rights. The meaning of the term "Exploitation" shall be correlative to the foregoing.

"Final Order" means an Order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing is pending or (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the Order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending.

"FTC" means the United States Federal Trade Commission.

"Governmental Agency" means (a) any federal, state, county, local or municipal government or administrative agency or political subdivision thereof, (b) any governmental agency, authority, board, bureau, commission, department or instrumentality thereof, (c) any court or administrative tribunal, (d) any non-governmental agency, tribunal or entity that is vested by a governmental agency with applicable jurisdiction or (e) any arbitration tribunal with applicable jurisdiction.

"Guild" means any and all of the Screen Actors Guild, American Federation of Television and Radio Artists, American Federation of Musicians, Directors Guild of America,

---

² Only to be included for stalking horse agreement.

Writers Guild of America, British Equity, British Musicians Union, Alliance of Canadian Cinema Television and Radio Artists, Directors Guild of Canada, and all other applicable guilds, unions, trade associations or collectives.

"Guild Assumption Agreements" means, collectively, assumption agreements, in a form agreeable to Buyer and to be negotiated between Buyer and the applicable Guilds in connection with the Transactions or to evidence Buyer's assumption of certain Liabilities under any Collective Bargaining Agreement in place with such Guilds with respect to Guild Secured Titles.

"Guild Residuals" means all amounts that have accrued and are payable prior to the Closing Date and/or accruing after the Closing Date required to be paid to third parties pursuant to collective bargaining, union or guild agreements (in all applicable jurisdictions) by reason of, in connection with, as a condition to or arising from the use or Exploitation of the Purchased Titles, or any part thereof, or any use or reuse thereof, in any media, including residuals, supplemental market payments, pension, health and welfare payments, and employer share of taxes.

"Guild Secured Titles" means the Purchased Titles listed on Schedule 1.1 under the heading "Guild Secured Titles".

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, together with the rules and regulations promulgated thereunder.

"Independent Accountant" means [_____] or any other firm of independent accountants of national standing to which Open Road and Buyer agree in writing.

"Intellectual Property" means any or all of the following as they exist in any jurisdiction throughout the world: (a) patents, patent applications, continuations-in-part, divisions or reissues; (b) trade names, d/b/a's, trademarks, service marks and trade dress, logos, and other indicia or origin, and registrations and applications for registration thereof, together with the goodwill connected with the use of and symbolized by any of the foregoing; (c) any and all copyrightable works of authorship, including but not limited to registered copyrights in both published works and unpublished works, unregistered copyrights in both published works and unpublished works, and applications to register copyrightable works of authorship; (d) trade secrets, including, confidential business information, know-how, concepts, methods, processes, specifications, inventions, formulae, reports, data, customer lists, mailing lists, business plans or other material confidential and proprietary information; (e) all registered domain names; and (f) proprietary computer software, including all source code, object code, and documentation related thereto.

"Intellectual Property Assignment Agreement" means that certain Intellectual Property Assignment Agreement, substantially in the form attached hereto as Exhibit C.

"IRS" means the U.S. Internal Revenue Service.

"Laws" means all laws, codes, statutes, common laws, rules, regulations, ordinances and codes of any Governmental Agency.

"Liabilities" means all claims, demands, expenses, commitments and obligations (whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated, arising prior to, at or after the commencement of any bankruptcy proceeding) of or against the Seller Parties or any of the Purchased Assets.

"Lien" means any charge, lien, Claim, right, demand, mortgage, lease, debt, judgment, penalty, liability, obligation, commitment, assessment, charge, license, sublicense, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, easement, restrictive covenant, right of way, preemptive right, conditional sale, servitude, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), encroachment, encumbrance, third-party interest or other restriction or limitation of any kind, whether imposed by Contract, legal requirement, equity or otherwise.

"Material Adverse Effect" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events, states of fact or occurrences) has had a material adverse change in or material adverse effect on (x) the Purchased Assets or (y) the ability of the Seller Parties to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement, but, with respect to clause (x), excluding (a) any change or effect to the extent that it results from or arises out of (i) the commencement of the Bankruptcy Cases, including the impact thereof on the relationships of the Seller Parties with employees, customers, distributors, financing sources, service providers and other business partners; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the Transactions; (iii) changes in Law or accounting regulation or (iv) any specific action required to be taken by this Agreement or taken at the written request of Buyer after the Execution Date; and (b) any change or effect of economic or political conditions (including acts of terrorism or war) or due to force majeure events to the extent that such conditions or events do not disproportionately affect the Seller Parties, taken as a whole, as compared to other companies in the same industry as the Seller Parties, or the securities or financial markets in any country or region.

"Net Library Cash Flow" means, for the period between July 31, 2018 and the Closing Date, an amount equal to (a) all cash proceeds received by the Seller Parties from the Exploitation of the Title Rights, less (b) all cash disbursements paid by the Seller Parties for Participations and Guild Residuals, less (c) all other cash disbursements paid by the Seller Parties with respect to the Title Rights.

"Order" means any judgment, order, injunction, decree, writ, permit or license issued or entered by a court of competent jurisdiction, including the Bankruptcy Court, whether interlocutory or final.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business, consistent with past practice.

"Organizational Documents" means, with respect to any Person, the articles of incorporation, certificate of incorporation, certificate of formation, certificate of limited

partnership, bylaws, limited liability company agreement, operating agreement, partnership agreement and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation or organization of such Person, including any amendments and other modifications thereto.

"Participations" means, with respect to any Purchased Title, any contractually required amounts (excluding Guild Residuals) payable to or on behalf of any third party involved in the development and/or production of such Purchased Title, including all third parties who rendered services or granted rights in connection with such Purchased Title, which are (a) a contingent amount determined in whole or in part based on the financial performance or other performance of such Purchased Title, including amounts contingent upon or determined by box office receipts, gross receipts, net receipts, or a percentage of such gross receipts or net receipts however defined, denominated or calculated, or are otherwise determined by reference to the performance of the Purchased Title however measured or determined, and are payable in a fixed or allocable amount or as a percentage of such receipts; and/or (b) payable in a fixed amount upon the occurrence of contingent events commencing after the Exploitation of such Purchased Title such as receipt of an award or the sale of a specified number of video devices or the attainment of a specified level of receipts or contingent proceeds from, or other financial performance of the Exploitation of such Purchased Title.

"Permit" means any license, permit, certificate of occupancy, franchise, certificate of authority or approval, or any waiver of the foregoing, required to be issued by any Governmental Agency, in connection with the operation of the Business.

"Permitted Liens" means any Liens (a) with respect to Guild Residuals, (b) with respect to Participations, (c) which are Liens for Taxes owed by the Seller Parties that are not yet due and payable or which are being contested in good faith by appropriate proceedings, (d) with respect to Assumed Liabilities and (e) which are mechanic's, materialman's, carrier's, supplier's, vendor's, repairer's or other similar Liens arising in the ordinary course of business and securing amounts that are not delinquent or are being contested in good faith.

"Person" means any individual, partnership, corporation, trust, association, limited liability company, joint venture, an unincorporated organization, a division or operating group of any of the foregoing, a Governmental Agency or any other entity.

"Post-Closing Tax Period" means any taxable period (or portion thereof) beginning after the Closing Date.

"Pre-Closing Tax Period" means any taxable period (or portion thereof) ending on or before the Closing Date.

"Privileged Material" means any information, in written, oral, electronic or other tangible or intangible form, including any communications by, to or otherwise involving attorneys (including attorney-client privileged communications) or memoranda and other materials protected by the work product doctrine, with respect to which any Seller Party, or any Seller Related Party would be entitled to assert or have asserted a privilege or other protection,

including the attorney-client and work product privileges, in each case, as such privilege relates to the Excluded Assets or Excluded Liabilities.

"Purchased Intellectual Property" means all Intellectual Property owned by any Seller Party that is primarily related to the Purchased Assets but excluding any Seller Party's rights, title and interest of any kind or nature in and to the Excluded Assets, including the Exploitation rights and Purchased Tangible Materials relating thereto.

["Purchased Tangible Materials" means, with respect to any Purchased Title, collectively, all physical embodiments of such Purchased Title or its elements in whatever state of completion, wherever located (including in any film laboratory or storage facility owned or controlled by a Seller Party or any other Person), in any video, audio or other format, including: (a) all positive, negative, fine grain and answer prints; (b) all exposed or developed film, pre-print materials (including positives, interpositives, negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements), subtitles, special effects, cutouts, stock footage, outtakes, tabs and trims; (c) tapes, discs, hard drives, computer memory, or other electronic media of any nature; (d) all sound and music tracks, audio and video recordings of all types and gauges (whether analog, digital or otherwise) in all languages; and (e) electronic copies of any of the foregoing stored on any media.][3]

"Purchased Titles" means, collectively, the motion pictures set forth in <u>Schedule 1.1</u> under the heading "Purchased Titles".

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Sale Hearing" means the hearing before the Bankruptcy Court to approve this Agreement or the otherwise highest and best bid(s) for the Purchased Assets.

"Sale Order" means an Order of the Bankruptcy Court approving and authorizing the sale of the Purchased Assets to Buyer, free and clear of all Liens (other than Assumed Liabilities and Permitted Liens), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, and the assumption, assignment and sale of the Assumed Contracts, to Buyer on the terms set forth herein, which Order shall otherwise be in form and substance reasonably satisfactory to Buyer.

"Seller Parties' Knowledge" means the actual knowledge of [●].

"Seller Related Parties" means any current or former officers, managers, employees, directors, agents, stockholders, equityholders, members, partners, other beneficial owners, controlling persons, subsidiaries, Affiliates, representatives, financial advisors, accountants, lawyers, investment bankers or other consultants of a Seller Party, or of any of their Affiliates.

---

[3] NTD: To be confirmed.

"Taxes" means all forms of U.S. federal, state, local and non-U.S. taxes, assessments or other government charges, in each case in the nature of a tax, including income, gross receipts, excise, employment, ad valorem, sales, use, transfer, license, payroll, franchise, severance, stamp, withholding, Social Security, unemployment, disability, real property, personal property, registration, alternative or add-on minimum, estimated, admission, amusement or other taxes of any kind whatsoever, including any interest, penalties or additions thereto, imposed by any Taxing Authority.

"Tax Return" means any report, return, declaration, claim for refund or other statement relating to Taxes, including any schedules or attachments thereto and any amendment thereof.

"Taxing Authority" means the IRS and any other Governmental Agency responsible for the administration or collection of any Tax.

"Title Rights" means the following: (a) all right, title and interest of the Seller Parties to the Purchased Titles and any and all versions existing thereof, and all elements thereof (including the screenplay and story) and all trailers, "bloopers", footage, trims and outtakes thereof (including, without limitation, the director's cut and the final cut and any and all versions of each of the foregoing (in any and all languages), all versions rated by the Motion Picture Association of America or any other rating association and unrated versions of each Purchased Title, "behind the scenes", "making of", and any and all other documentary or short form content concerning each Purchased Title, and all footage, "bloopers", trims and outtakes of each of the foregoing); (b) [all right, title and interest of the Seller Parties to the Purchased Tangible Property]; (c) all of the Seller Parties' rights with respect to the Purchased Intellectual Property; (d) all of the Seller Parties' rights to manufacture, distribute, license, exhibit, market, promote, reissue, and otherwise Exploit each Purchased Title, in all languages, by any and all means and devices now known or hereafter devised, and howsoever accessed by the viewer, and to otherwise Exploit each Purchased Title in all media, whether now known or hereafter existing and howsoever accessed; and all of the Seller Parties' rights to license and Exploit each Purchased Title in all ancillary markets; (e) all of the Seller Parties' merchandising rights with respect to each Purchased Title; and (f) all other of the Seller Parties' rights to Exploit each Purchased Title and any and all elements thereof not expressly provided for hereunder.

"Transactions" means the purchase and sale of the Purchased Assets to Buyer and the assumption by Buyer of the Assumed Liabilities, and all other transactions contemplated by, and set forth and described in, this Agreement and the Ancillary Agreements.

"Transfer Taxes" means any and all sales, use, transfer, value-added, documentary, recording or similar Taxes, fees or charges and all interest and penalties due in connection therewith imposed on or in connection with the purchase, sale or transfer of the Purchased Assets and the other Transactions (including the assumption by Buyer of the Assumed Liabilities).

"Union" means any union, works council or labor organization.

"WARN Act" means the Worker Adjustment and Retraining Notification Act or analogous state or local Laws, or any applicable Law regarding the termination or layoff of employees for employees outside the United States.

Section 1.2.   Cross-References.  The following terms have the meanings set forth in the sections set forth below:

Accounting Firm ................................................................................................ Section 6.4(d)
Aggregate Purchase Price ...................................................................................... Section 2.7
Agreement ............................................................................................................... Preamble
Allocation Statement ........................................................................................... Section 6.4(d)
Antitrust Division ................................................................................................. Section 5.6(a)
Assumed Contracts .............................................................................................. Section 2.8(a)
Assumed Liabilities .................................................................................................. Section 2.3
Available Contracts ............................................................................................... Section 2.8(a)
Bankruptcy and Equity Exception .......................................................................... Section 3.1
Bankruptcy Court ..................................................................................................... Recitals
Buyer ...................................................................................................................... Preamble
Buyer Employees ................................................................................................. Section 5.6(a)
Chapter 11 Cases ..................................................................................................... Recitals
Closing .................................................................................................................. Section 2.5
Closing Date .......................................................................................................... Section 2.5
Deposit Amount .................................................................................................... Section 2.6
Disputed Contracts .............................................................................................. Section 2.8(c)
End Date ............................................................................................................... Section 11.1(b)
Excluded Assets .................................................................................................... Section 2.2
Excluded Liabilities ............................................................................................... Section 2.4
Execution Date ...................................................................................................... Preamble
Material Contracts ................................................................................................ Section 3.6
Objection Notice ................................................................................................... Section 2.11(a)
Objection Period ................................................................................................... Section 2.11(a)
Open Road ............................................................................................................ Preamble
Party ...................................................................................................................... Preamble
Petition Date .......................................................................................................... Recitals
Post-Closing Calculation Objection ..................................................................... Section 2.11(a)
Post-Closing Statement ....................................................................................... Section 2.11(a)
Purchased Assets .................................................................................................. Section 2.1
Registered Purchased Intellectual Property ......................................................... Section 3.5(a)
Requisite Regulatory Approvals ........................................................................... Section 3.2
Seller Party ............................................................................................................ Preamble
Seller Party Employees ......................................................................................... Section 6.2
Transfer Consent ................................................................................................... Section 2.8(e)

# ARTICLE II
## PURCHASE AND SALE OF PURCHASED ASSETS AND ASSUMPTIONS AND ASSUMED LIABILITIES

Section 2.1.   Purchase and Sale of Purchased Assets.  Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, the Seller Parties shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred,

assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, acquire and accept from the Seller Parties, free and clear of all Liens (except for Permitted Liens), all of the Seller Parties' right, title and interest in, to or under the following (collectively, the "Purchased Assets"):

   (a) all of the Seller Parties' right, title and interest in and to the Title Rights;

   (b) all of the Seller Parties' rights under the Assumed Contracts;

   (c) all rights, claims, causes of action against third parties relating to or arising from the Title Rights or the Assumed Contracts, except for (i) claims and Actions of the Seller Parties arising under Sections 544, 547, 548, 549, and 550 of the United States Bankruptcy Code and (ii) all Actions which any Seller Party has or may have against any other Seller Party, any Seller Related Party, any lender or creditor of any Seller Party, Regal Distribution Holdings, LLC, American Multi-Cinema, Inc. and any of its or their respective members, stockholders, other beneficial owners, or Representatives; and

   (d) all assets of the Seller Parties listed on Schedule 2.1(d).

  Section 2.2. Excluded Assets.  Nothing contained herein or in any of the Ancillary Agreements shall be deemed to sell, transfer, assign, convey or deliver any assets, properties, interests and rights of the Seller Parties, other than the Purchased Assets (the "Excluded Assets").

  Section 2.3. Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, Buyer shall (a) at the Closing, assume from the Seller Parties and thereafter pay, perform or discharge when due those Liabilities of the Seller Parties (i) arising out of the operation of the Purchased Assets (including the Assumed Contracts) for periods following the Closing Date or (ii) for or in respect of outstanding Participations or Guild Residuals arising from or related to any Title Rights, (b) at the Closing, pay the Cure Amounts associated with the Assumed Contracts, (c) pay, be responsible for or reimburse the Seller Parties for payment of all Taxes to the extent required under Sections 6.4(a), and 6.4(b) and 6.4(c), and (d) assume the Liabilities set forth on Schedule 2.3, if any (collectively, the Liabilities to be assumed pursuant to the foregoing clauses (a), (b), (c) and (d), the "Assumed Liabilities").

  Section 2.4. Excluded Liabilities.  Notwithstanding any provision in this Agreement, Buyer is assuming only the Assumed Liabilities and is not assuming any other Liability of any Seller Party of whatever nature, whether presently in existence or arising hereafter (all such Liabilities not being assumed by Buyer being herein referred to as the "Excluded Liabilities").

  Section 2.5. Closing.  On the terms and subject to the conditions set forth in this Agreement, the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "Closing") shall take place at the offices of Klee, Tuchin, Bogdanoff & Stern LLP at 1999 Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, California commencing at 9:00 a.m. Pacific Time, on a date that is no later than three Business Days after the last of the closing conditions set forth in Article VIII, Article IX and Article X is satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), or at such

other location, date or time as Open Road and Buyer may mutually agree in writing. The date the Closing actually occurs is referred to in this Agreement as the "<u>Closing Date</u>".

Section 2.6. <u>Deposit</u>. Concurrently with the execution of this Agreement, Buyer shall deposit $[●]⁴ (the "<u>Deposit Amount</u>") in immediately available funds in a segregated account designated by Open Road.

Section 2.7. <u>Aggregate Purchase Price</u>. The total purchase price for the Purchased Assets (the "<u>Aggregate Purchase Price</u>") shall be, in addition to the assumption of the Assumed Liabilities at Closing, an amount equal to the sum of (a) the Adjusted Purchase Price, <u>plus</u> (b) the aggregate Cure Amounts required to be paid at the Closing pursuant to <u>Section 2.8(b)</u>.

Section 2.8. <u>Assumed Contracts; Cure Amount</u>.

(a) <u>Available Contracts</u>. <u>Section 2.8(a)</u> of the Disclosure Schedule sets forth a list under the heading "Available Contracts" of all executory Contracts (the "<u>Available Contracts</u>") primarily relating to the Purchased Assets to which one or more of the Seller Parties are party but excluding the Contracts described in clause (a) of the definition of "Excluded Contracts". At least five Business Days prior to the Sale Hearing, Buyer, in its sole discretion by written notice to the Seller Parties, shall designate in writing which Available Contracts Buyer wishes to "assume" (the "<u>Assumed Contracts</u>"). Except as provided for in <u>Section 2.8(c)</u>, once Buyer has designated an Available Contract as an Assumed Contract, Buyer may not later determine not to "assume" such Available Contract. All Contracts of the Seller Parties that are listed on <u>Section 2.8(a)</u> of the Disclosure Schedule as of the Closing Date and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Purchased Assets and shall automatically be deemed "Excluded Contracts" (and for the avoidance of doubt, Buyer shall not be responsible for any related Cure Costs related to any Excluded Contracts). Upon Buyer's reasonable request, the Seller Parties shall provide to Buyer such additional information as may be available to the Seller Parties as to the Liabilities under the Available Contracts sufficient for Buyer to make an assessment whether to accept an assignment and assumption of any of the Available Contracts hereunder.

(b) <u>Buyer Commitment to Cure Amounts</u>. The Seller Parties shall use commercially reasonable efforts to establish and verify all Cure Amounts for the Contracts set forth on <u>Section 2.8(a)</u> of the Disclosure Schedule prior to entry of the Sale Order. Subject to the other provisions of this <u>Section 2.8</u>, Buyer agrees to pay all Cure Amounts required to assume the Assumed Contracts pursuant to this <u>Section 2.8</u> at the Closing. The Seller Parties shall use commercially reasonable efforts to assume, assign and sell the Assumed Contracts to Buyer (which, for the avoidance of doubt, shall in no event require any Seller Party to pay any Cure Amounts or any portion thereof, which shall be the sole responsibility of Buyer), including taking actions reasonably required to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

---

⁴ Deposit to equal 10% of the Base Purchase Price.

(c)     Determination of Cure Amounts.   Upon objection by the nondebtor Contract counterparty to the Cure Amount asserted by the Seller Parties with regard to any Assumed Contract (such contract, a "Disputed Contract"), the Seller Parties shall either settle the objection of such party or shall, at Buyer's sole cost and expense, litigate such objection under procedures as the Bankruptcy Court shall approve and prescribe; provided, that the Seller Parties shall not be required to litigate any such objection unless Buyer advances to the Seller Parties all reasonable costs, fees and expenses of the Seller Parties (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses) related to litigating such objection.  In no event shall any of the Seller Parties settle a Cure Amount objection with regard to any Assumed Contract without the express written consent of Buyer.  In the event that a dispute regarding the Cure Amount with respect to an Assumed Contract has not been resolved as of the Closing Date, the Parties shall nonetheless remain obligated to consummate the Transactions.  Upon an Order determining any Cure Amount regarding any Disputed Contract after the Closing, Buyer shall have the option to (x) pay the Cure Amount with respect to such Disputed Contract and assume the Disputed Contract as an "Assumed Contract" or (y) designate the Disputed Contract as an "Excluded Asset", in which case, for the avoidance of doubt, Buyer shall not assume the Disputed Contract and shall not be responsible for the associated Cure Cost.

(d)     Adequate Assurance.  Buyer shall use commercially reasonable efforts to provide the Bankruptcy Court any evidence reasonably necessary to prove adequate assurance of future performance necessary to effect the assumption and assignment of the Assumed Contracts.

(e)     Transfer Consent.  The Seller Parties shall transfer and assign all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from the Seller Parties, as of the Closing Date pursuant to the Sale Order and Section 365 of the Bankruptcy Code.  Except as to Assumed Contracts assigned pursuant to Section 365 of the Bankruptcy Code, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party or Governmental Agency (each, a "Transfer Consent"), would constitute a breach or in any way adversely affect the rights of Buyer or the Seller Parties thereunder after giving effect to the entry of the Sale Order.  Buyer and the Seller Parties shall cooperate together in good faith and use commercially reasonable efforts to obtain such Transfer Consents as soon as reasonably practicable and shall promptly inform each other of any discussions and communications with the counterparties from whom a Transfer Consent is required.   If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of the Bankruptcy Code, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, the Seller Parties and Buyer will cooperate in a mutually agreeable arrangement under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

Section 2.9.   Payment of Aggregate Purchase Price; Deposit Amount.

(a)     No later than two Business Days before the Closing Date, Open Road shall deliver to Buyer Open Road's calculation of Estimated Purchase Price and of Estimated Net Library Cash Flow, with reasonable supporting detail as to each such calculation.

(b)     At the Closing, Buyer shall pay to Open Road by wire transfer of immediately available funds, to an account designated in writing by Open Road at least two

Business Days prior to the Closing, an amount equal to (i) the Estimated Purchase Price <u>less</u> (ii) the Deposit Amount.

(c)      At the Closing, the Seller Parties shall apply the Deposit Amount towards payment of the Estimated Purchase Price.

(d)      At the Closing, Buyer shall pay to the non-debtor counterparty to each Assumed Contract, the Cure Amounts applicable to such Assumed Contract.

Section 2.10.  <u>Closing Deliverables</u>.

(a)      At the Closing, Open Road shall deliver, or cause to be delivered to Buyer:

(i)      a duly executed counterpart to each Ancillary Agreement to which a Seller Party is a party; and

(ii)      a certificate dated as of the Closing Date and executed by a duly authorized representative of Open Road, certifying that the conditions set forth in <u>Section 10.1</u> and <u>Section 10.2</u> have been satisfied.

(b)      At the Closing, in addition to compliance in full with the payment and delivery obligations of Buyer set forth in <u>Section 2.9</u>, Buyer shall deliver to Open Road:

(i)      a duly executed counterpart to each Ancillary Agreement to which Buyer is a party; and

(ii)      a certificate dated as of the Closing Date and executed by a duly authorized representative of Buyer, certifying that the conditions set forth in <u>Section 9.1</u> and <u>Section 9.2</u> have been satisfied.

Section 2.11.  <u>Post-Closing Purchase Price Adjustment</u>.

(a)      As promptly as practicable, but in no event later than 30 days following the Closing Date, Buyer shall prepare and deliver to Open Road a statement (the "<u>Post-Closing Statement</u>") setting forth Net Library Cash Flow and the Adjusted Purchase Price, including, in each case, the calculation thereof in reasonable detail.  The calculations set forth in the Post-Closing Statement shall be final and binding on all Parties unless Open Road gives Buyer written notice of its objections thereto (an "<u>Objection Notice</u>"), with reasonable supporting detail as to each such objection (each, a "<u>Post-Closing Calculation Objection</u>"), within 30 days after receipt of the Post-Closing Statement (the "<u>Objection Period</u>").  In the event Open Road fails to give Buyer an Objection Notice prior to the expiration of the Objection Period or otherwise earlier notifies Buyer that Open Road has no objections to the calculations set forth in the Post-Closing Statement, the Post-Closing Statement shall be deemed final and binding on all Parties, and all payments to be made in accordance with Section 2.11(d) shall be derived therefrom.  Any

component of the calculations set forth in the Post-Closing Statement that is not the subject of a timely delivered Objection Notice by Open Road shall be final and binding on all Parties except to the extent such component could be affected by other components of the calculations set forth in the Post-Closing Statement. Throughout the period following the Closing Date until the components of the calculations set forth in the Post-Closing Statement are deemed final and binding pursuant to this Section 2.11, each Party shall permit the other Party and its representatives reasonable access (with the right to make copies), during business hours upon reasonable advance notice, to the financial books and records of such Party and its subsidiaries for the purposes of the review and objection right contemplated herein.

(b) The Parties shall use reasonable efforts to resolve any dispute arising under Section 2.11(a); provided, that if such Parties are unable to do so within 15 days following Open Road's delivery to Buyer of an Objection Notice, then by notice from either such Party to the other such Party, the disagreement with respect to such Post-Closing Calculation Objections may be submitted for resolution to the Independent Accountant. If a dispute is submitted to the Independent Accountant for resolution, the Parties shall enter into a customary engagement letter with, and to the extent necessary each Party to this Agreement will waive and cause its controlling Affiliates to waive any conflicts with, the Independent Accountant at the time such dispute is submitted to the Independent Accountant and shall cooperate with the Independent Accountant in connection with its determination pursuant to this Section 2.11. Within ten days after the Independent Accountant has been retained, each such Party shall furnish, at its own expense, to the Independent Accountant and the other Party a written statement of its positions with respect to each matter in dispute. Within five Business Days after the expiration of such ten day period, each such Party may deliver to the Independent Accountant and to each other its response to the other's position on each matter in dispute. With each submission, each such Party may also furnish to the Independent Accountant such other information and documents as it deems relevant or such information and documents as may be requested by the Independent Accountant with copies being given to the other such Party substantially simultaneously. The Independent Accountant may, at its discretion, conduct a conference concerning the disagreement and each such Party shall have the right to present additional documents, materials and other information and to have present its Representatives. No Party or its Representatives shall be permitted to engage in any ex parte communications with the Independent Accountant.

(c) The Independent Accountant shall be directed to promptly, and in any event within 30 days after its appointment pursuant to Section 2.11(b), render its decision on the disputed Post-Closing Calculation Objections. The Independent Accountant's determination as to each Post-Closing Calculation Objection in dispute shall be set forth in a written statement delivered to each such Party, which shall include the Independent Accountant's determination as to the calculation of the disputed Post-Closing Calculation Objections, all of which shall be final and binding on all Parties absent manifest error. In resolving any disputed Post-Closing Calculation Objection, the Independent Accountant may not assign a value to such Post-Closing Calculation Objection greater than the greatest value for such Post-Closing Calculation Objection claimed by Buyer in its Post-Closing Statement or by Open Road in its Objection Notice or less than the lowest value for such item claimed by Buyer in its Post-Closing Statement or by Open Road in its Objection Notice. The fees and expenses of the Independent Accountant pursuant to this Section 2.11 shall be allocated between Buyer and Open Road based upon the

percentage which the portion of the contested amount not awarded to each such Party bears to the amount actually contested by such Party.

(d)     Within five Business Days after the date that the Post-Closing Statement becomes final and binding in all respects pursuant to this Section 2.11 (whether by a determination rendered by the Independent Accountant or the mutual agreement of the Parties):

(i)     if the amount of the Adjusted Purchase Price (as finally determined pursuant to this Section 2.11) exceeds the amount of the Estimated Purchase Price, Buyer shall pay, or cause to be paid, to Open Road, by wire transfer of immediately available funds, an amount equal to such excess; or

(ii)     if the amount of the Estimated Purchase Price exceeds the Adjusted Purchase Price (as finally determined pursuant to this Section 2.11), the Seller Parties shall pay, or cause to be paid, to Buyer, by wire transfer of immediately available funds, an amount equal to such excess.

(e)     All payments pursuant to this Section 2.11 shall be treated as adjustments to the Adjusted Purchase Price for Tax purposes unless otherwise required by Law.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER PARTIES

Except for the exceptions and disclosures set forth on the Disclosure Schedule, and subject to the limitations in Section 13.8, the Seller Parties hereby represent and warrant to Buyer as follows:

Section 3.1.     Corporate Organization, Qualification, Power and Authority.     Each Seller Party is duly formed and validly existing under the Laws of its jurisdiction of incorporation or formation, as applicable.     Except for such authorization as is required from the Bankruptcy Court, each Seller Party has the requisite limited liability company power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution and delivery by each Seller Party of this Agreement and, at the Closing each Ancillary Agreement to which it is a party and the performance by it of its obligations hereunder and thereunder, and the consummation by each Seller Party of the Transactions, have been (or at the Closing will be) duly and validly authorized by each Seller Party, and no other requisite corporate proceeding on the part of any Seller Party is (or at the Closing, will be) necessary to authorize the execution, delivery or performance hereof or thereof or to consummate the Transactions.     This Agreement and each Ancillary Agreement to which any Seller Party is a party has been (or when delivered, will be) duly and validly executed and delivered by such Seller Party and, assuming this Agreement and the Ancillary Agreements constitute the valid and binding agreement of the other parties hereto or thereto, and the entry of the Sale Order, constitutes the valid and binding agreement of such Seller Party, enforceable against such Seller Party in accordance with its terms, except as such enforcement may be limited by (a) applicable

bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Laws now or hereinafter in effect relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity) (the "Bankruptcy and Equity Exception").

Section 3.2.    Consents and Approvals; No Violations.    Except for [(a) the filing of notification and report forms with the FTC and the Antitrust Division under the HSR Act and the expiration or termination of any applicable waiting period thereunder,] (b) the issuance of Consents of such applications by such agencies, if required, and the expiration or termination of any applicable waiting periods thereunder and (c) the entry of Sale Order, no applications, notices to, Consents of, or filings with, any Governmental Agency are necessary in connection with the execution and delivery by the Seller Parties of this Agreement and the Ancillary Agreements or the consummation by the Seller Parties of the Transactions, except where failure to provide, obtain or make, as applicable, any such any applications, notices, Consents or filings, would individually or in the aggregate, not be reasonably likely to have a Material Adverse Effect.  The notices, notifications, filings, Consents, and expirations or terminations of waiting periods referred to in Section 3.2(a), Section 3.2(b) and Section 3.2(c) are hereinafter referred to as the "Requisite Regulatory Approvals".

Section 3.3.    No Conflict.  Subject to obtaining the Requisite Regulatory Approvals, the execution, delivery and performance by the Seller Parties of this Agreement and the consummation of the transactions contemplated hereby do not and will not violate in any material respect (i) any provision of law, statute, rule or regulation, (ii) any applicable Order of any court or any rule, regulation or Order of any Governmental Agency, where any such conflict, violation, breach or default could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (iii) any provision of or result in the termination of any Material Contract without consent from the counter-party to such Material Contract, except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

Section 3.4.    Title to Assets.    The Seller Parties own, and to the Seller Parties' knowledge have good title to the Purchased Assets and, subject to the entry of the Sale Order, to the Seller Parties' knowledge Buyer will be vested with good title to such Purchased Assets, free and clear of all Liens other than Permitted Liens except where the failure to have title, leasehold or license would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

Section 3.5.    Intellectual Property.

(a)    Section 3.5(a) of the Disclosure Schedule sets forth a list of all applications, registrations and filings for Purchased Intellectual Property that have been registered, filed, certified or otherwise perfected or recorded or are the subject of a pending application for such, with or by any Governmental Agency (other than in connection with any internet domain names), by or on behalf of or in the name of any Seller Party, excluding any items that are cancelled, expired, abandoned, withdrawn, or finally refused (without right of appeal) (the listed Purchased Intellectual Property, the "Registered Purchased Intellectual Property").  The Registered Purchased Intellectual Property is valid and subsisting and in full

force and effect except where such failure to be so valid and subsisting and in full force and effect would not be material to the Purchased Assets taken as a whole.

(b)     No Seller Party has received any written notice of infringement or misappropriation from any third party with respect to any Purchased Intellectual Property. To the Seller Parties' Knowledge, there has been no infringement or misappropriation by any Person of any Purchased Intellectual Property, and no Seller Party has made or asserted any written complaint or written claim alleging any such infringement or misappropriation has occurred since January 1, 2018.

Section 3.6.     <u>Material Contracts</u>.  Section 3.6 of the Disclosure Schedule sets forth a list of all material Contracts primarily related to the Purchased Assets to which a Seller Party is a party or by which any of them or any of the Purchased Assets are bound (but excluding Contracts that are Excluded Assets and excluding this Agreement) (collectively, the "<u>Material Contracts</u>").  Each Material Contract is, in all material respects, (a) in full force and effect and is a valid and binding obligation of the applicable Seller Party which is a party thereto and (b) enforceable against the applicable Seller Party, and, to the Seller Parties' Knowledge, enforceable against the other party or parties thereto, in accordance with its terms (except that the enforcement thereof may be limited by the Bankruptcy and Equity Exception).

Section 3.7.     <u>Brokers and Finders</u>.    No investment banker, broker, finder or intermediary or other Person in connection is or will be entitled to any investment banking, brokerage, finder's, financial advisory or similar fee or commission in connection with this Agreement, any Ancillary Agreement or the Transactions as a result of any arrangement made by any Seller Party, except as set forth on Section 3.7 of the Disclosure Schedule.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Seller Parties as follows:

Section 4.1.     <u>Corporate Organization, Qualification, Power, Authority</u>.  Buyer is a [●] duly formed and validly existing and in good standing under the Laws of [●].  Buyer has the requisite entity power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the Transactions.  The execution and delivery by Buyer of this Agreement, and at the Closing each Ancillary Agreement to which Buyer will be a party and the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the Transactions, have been (or at the Closing will be) duly and validly authorized by the governing body of Buyer, and no other requisite corporate proceeding on the part of Buyer is (or at the Closing, will be) necessary to authorize the execution, delivery and performance hereof or thereof or to consummate the Transactions.  This Agreement and each Ancillary Agreement to which Buyer is a party has been (or when delivered, will be) duly and validly executed and delivered by Buyer and, assuming this Agreement and the Ancillary Agreements constitute the valid and binding agreement of the other parties hereto or thereto, and the entry of the Sale Order, constitutes the valid and binding agreement of Buyer, enforceable against Buyer in

accordance with its terms, except as such enforcement may be limited by the Bankruptcy and Equity Exception.

Section 4.2.    Consents and Approvals; No Violations.    Subject to the giving of notices and obtaining the Requisite Regulatory Approvals and the entry of the Sale Order, no applications, notices to, Consents of, or filings with, any Governmental Agency, self-regulatory authority or third party are necessary in connection with the execution and delivery by Buyer of this Agreement and the Ancillary Agreements or the consummation by Buyer of the Transactions.    Neither the execution, delivery or performance of this Agreement and the Ancillary Agreements by Buyer, nor the consummation by Buyer of the Transactions, does or will (a) violate in any material respect, or result in any material breach of any material provisions of the Organizational Documents of Buyer; (b) violate in any material respect, result in or constitute a material default under, any of the material terms, conditions or provisions of any material Contract to which Buyer is a party or by which it or any of its properties or assets may be bound; (c) violate in any material respect, or result in or constitute a material default under, any of the material terms, conditions or provisions of any Permit applicable to Buyer; or (d) subject to giving the notices and obtaining the Requisite Regulatory Approvals, and the entry of the Sale Order, violate in any material respect any material Law applicable to Buyer or any of its material properties or assets.

Section 4.3.    Financial Capability.    Buyer has (a) sufficient funds available to pay the Aggregate Purchase Price payable in cash and any expenses incurred by Buyer in connection with the transactions contemplated by this Agreement, (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (c) not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

Section 4.4.    Brokers and Finders.    No investment banker, broker, finder or intermediary or other Person is or will be entitled to any investment banking, brokerage, finder's, financial advisory or similar fee or commission in connection with this Agreement, the Ancillary Agreements or the Transactions as a result of any arrangement made by or on behalf of Buyer.

Section 4.5.    Solvency.    Buyer shall (a) be able to pay its debts as they become due and shall own property which has a fair saleable value greater than the amounts required to pay their respective debts (including a reasonable estimate of the amount of all contingent Liabilities) and (b) have adequate capital to carry on its business as contemplated to be conducted following the Closing.    No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Buyer.

Section 4.6.    Condition of the Purchased Assets.    Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that the Seller Parties are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Seller Parties in Article III (as modified by the Disclosure Schedules), and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is"

basis.  Buyer acknowledges that, in making the determination to proceed with the Transactions, Buyer has relied on the results of its own independent investigation of the Purchased Assets.

Section 4.7.  <u>Other Agreements</u>.  Other than this Agreement and the Ancillary Agreements, there are no Contracts, nor any agreement, arrangement or understanding (whether oral or written) to enter into any Contracts, between, on the one hand, Buyer or any Buyer Related Party, and, on the other hand, the Seller Parties and/or any Seller Related Party, (a) that relate to the Transactions, (b) pursuant to which any Seller Party or any Seller Related Party would be entitled to receive consideration with respect to the Transactions (other than as may be expressly provided in this Agreement), (c) pursuant to which any Seller Party or any Seller Related Party has agreed to approve this Agreement or the Transactions or (d) pursuant to which any Seller Party or any Seller Related Party has agreed to provide, directly or indirectly, consideration to Buyer or any Buyer Related Party to finance, in whole or in part, the Transactions.

# ARTICLE V
## PRE-CLOSING COVENANTS AND AGREEMENTS

Section 5.1.  <u>Affirmative Covenants</u>.  The Parties covenant and agree that, after the Execution Date and prior to the Closing Date, the Parties shall use their respective reasonable best efforts not to take or agree to or commit to assist any other Person in taking any action (a) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (b) that would reasonably be expected to impair the ability of the Parties to consummate the Closing in accordance with the terms hereof or to materially delay such consummation, in each case except (i) as contemplated by the Bidding Procedures Order or (ii) any actions with respect to any Acquisition Proposal.

Section 5.2.  <u>Negative Covenants</u>.  The Seller Parties will not, without the prior written consent of the Buyer (which consent shall not be unreasonably withheld, conditioned or delayed):

(a)  sell, lease, license or otherwise dispose of any Purchased Assets except (i) pursuant to pre-existing contracts or commitments or (ii) as required by Law;

(b)  assume, reject or assign any Assumed Contract other than pursuant to <u>Section 2.8</u>;

(c)  enter into, renew, amend or modify any Material Contract without the approval of the Bankruptcy Court in accordance with section 363(b) of the Bankruptcy Code; or

(d)  agree or commit to do any of the foregoing.

Section 5.3.  <u>Permitted Pre-Closing Actions</u>.

(a)  Notwithstanding anything to the contrary in <u>Section 5.1</u>, <u>Section 5.2</u> or any other provision of this Agreement, from the Execution Date until the Closing Date, the Seller Parties shall have the sole and absolute discretion to take any or all of the following actions: (i) actions required to comply with applicable Law, the Orders of the Bankruptcy Court or the

Bankruptcy Code, (ii) actions required to comply with the agreement entered into by the Seller Parties for post-petition financing, (iii) actions contemplated by this Agreement or (iv) paying any management fees, consulting fees, service fees, director's fees or professional advisor's fees in the Ordinary Course of Business or as approved by the Bankruptcy Court.

(b)     For the avoidance of doubt, the terms and conditions of this <u>Section 5.3</u> are in addition, and without prejudice, to the right of the Seller Parties to take any actions not otherwise prohibited by <u>Section 5.2</u>.

Section 5.4.     <u>Access; Books and Records</u>.  Subject to (a) non-disclosure of information that is Privileged Material and (b) applicable Law, during the period from and after the Execution Date and continuing until the earlier of the Closing Date and a Party's receipt of a notice in connection with <u>Section 11.1</u> notifying a Party hereto of the termination of this Agreement, upon reasonable prior written notice, the Seller Parties shall permit Buyer and a reasonable number of Buyer's attorneys, accountants, representatives and agents to have reasonable access, at Buyer's sole expense, during normal business hours at a location determined at the reasonable discretion of Open Road, in such manner as to not disrupt or interfere with the normal operation of the Business, to the books, records, Tax Returns and other information with respect to the Purchased Assets and the Assumed Liabilities, and to the then current officers and employees of the Seller Parties, as Buyer may from time to time reasonably request.  All information provided or obtained pursuant to the preceding sentence shall be held by Buyer in accordance with, and subject to the terms of, the Confidentiality Agreement.

Section 5.5.     <u>Notice of Developments</u>.  Prior to the Closing, each Party shall notify, as promptly as is reasonably practicable, the other Party, in writing, of any events, circumstances, facts and occurrences arising subsequent to the Execution Date which would result in the impossibility of the satisfaction of any such Party's conditions precedent to Closing; <u>provided</u>, nothing set forth in this <u>Section 5.5</u> shall require any Party to provide any notice if such notice would reasonably be expected to contravene applicable Law or any Seller Party to provide any notice if such notice would reasonably be expected to (a) jeopardize any Privileged Material or (b) result in the disclosure of any Privileged Material.

Section 5.6.     <u>Competition Filings</u>.

(a)     Open Road and Buyer shall, as promptly as practicable but in any event not more than five Business Days after the Execution Date, file, or cause to be filed, all required notification and report forms under the HSR Act with the FTC and the Antitrust Division of the United States Department of Justice (the "<u>Antitrust Division</u>") in connection with the Transactions, file requests for early termination and shall use their respective reasonable best efforts to respond as promptly as practicable to all inquiries received from the FTC or the Antitrust Division for additional information or documentation and to cause the waiting period under the HSR Act to terminate or expire at the earliest possible date (and, in any event, prior to the End Date).  Buyer shall pay 100% of all filing fees payable in respect of any such filings.

(b)     The Seller Parties, on the one hand, and Buyer, on the other hand, will each furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filings or submission that necessary

under the provisions of the HSR Act; provided that each of Open Road and Buyer shall have the right to review and comment in advance on any such filings or submissions made by the other Party; provided, however, that any of the foregoing information may be redacted as necessary to address reasonable privilege, contractual or confidentiality concerns. Open Road and Buyer shall keep each other apprised on a reasonably current basis of the status and content of any communications with, and any inquiries or requests for additional information from, any Governmental Agency (provided that neither the Seller Parties nor Buyer shall have any substantive contact with any Governmental Agency with respect to any filing or proceeding contemplated by this Section 5.6 unless it consults with the other Party in advance and, to the extent permitted by such Governmental Agency, gives the other Party opportunity to participate). In furtherance of and not in limitation of the foregoing, each of the Seller Parties and Buyer shall not, absent the prior written agreement of the other Party, extend any waiting period or comparable period under the HSR Act or enter into any agreement with any Governmental Agency not to consummate the Transactions.

(c)     In furtherance of and without limiting the generality of Section 5.6(a), if any objections are asserted with respect to the transactions contemplated hereby under the HSR Act or if any suit is threatened or instituted by any Governmental Agency or any private party challenging any of the transactions contemplated hereby as violative of the HSR Act, Buyer shall use its best efforts to resolve such objections or challenges as such Governmental Agency or private party may have to such transactions, including to vacate, lift, reverse, or overturn any order, whether temporary, preliminary, or permanent, so as to permit consummation of the transactions contemplated by this Agreement as soon as practicable and in any event on or prior to the End Date.[5]

Section 5.7.     Reasonable Best Efforts.     Without limiting any other provision of this Agreement, upon the terms and subject to the conditions of this Agreement, each of the Parties shall act in good faith and use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable, consistent with applicable Law, to consummate the Transactions as soon as reasonably practicable, including such actions or things as, with respect to any of the Seller Parties, Buyer, and with respect to Buyer, Open Road, may reasonably request to satisfy any of the conditions to such other Party's (or Parties', as applicable) obligation to consummate the Transactions.

## ARTICLE VI
## POST-CLOSING COVENANTS AND AGREEMENTS

Section 6.1.     Guild Matters.     Following the Closing, Buyer shall assume obligations under any Collective Bargaining Agreement between any Seller Party and a Guild with respect to Guild Secured Titles; provided that Buyer will do so: (a) as a new company, and shall not be deemed to be a successor employer of any Seller Party; and (b) only as to Collective Bargaining Agreements associated with the Guild Secured Titles that are Purchased Titles. Buyer shall, within a reasonably practicable time following any request by Open Road or any Guild, as

---

[5] NTD:   To be determined whether HSR or other regulatory approvals are required in connection with the Transactions.

applicable, engage in discussions with the corresponding Guild regarding entering into a Guild Assumption Agreement.

Section 6.2.   Employee Matters.   From the Execution Date until the Closing Date, Buyer may (but shall be under no obligation to) make offers of employment to any individuals who are employed by any Seller Party (as to the individuals, the "Seller Party Employees"), in each case subject to Open Road's prior written consent (such consent not to be unreasonably withheld).   The Seller Parties shall terminate all such Seller Party Employees immediately prior to the Closing that accepts such an offer from Buyer.   Those employees who are offered and accept such offers of employment with Buyer based on the terms and conditions set by Buyer will be considered "Buyer Employees" for purposes of this Agreement.

Section 6.3.   WARN.   With respect to Buyer Employees, Buyer shall be solely responsible for compliance with and Liabilities relating in any way to the WARN Act arising from and after the Closing.   With respect to Seller Party Employees, but excluding any individuals that become Buyer Employees, the Seller Parties shall be solely responsible for compliance with and Liabilities relating in any way to the WARN Act for any act or omission of any Seller Party after the Closing.

Section 6.4.   Certain Tax Matters.

(a)   Liability for Taxes.   Real and personal property taxes, ad valorem taxes, and franchise fees or taxes (that are imposed on a periodic basis (as opposed to a net income basis)) (collectively, "Periodic Taxes") shall be prorated between Seller Parties on the one hand, and Buyer on the other hand, for any taxable periods beginning on or prior to, and ending after, the Closing Date (such taxable periods, "Straddle Periods").   The amount of all such prorations shall be settled and paid on the Closing Date; provided, however, that final payments with respect to prorations that are not able to be calculated on the Closing Date shall be calculated and paid as soon as practicable thereafter.

(b)   In the case of any Straddle Period, all Periodic Taxes with respect to the Purchased Assets for any such period shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period by multiplying such Taxes by a fraction the numerator of which is the number of days in such taxable year or period and the denominator of which is the number of days in the entire Straddle Period.

(c)   Transfer Taxes.   Buyer shall pay when due, be responsible for, and promptly reimburse the Seller Parties for their payment of (a) all Transfer Taxes and (b) all fees, costs and expenses incurred by Buyer and the Seller Parties in complying with this Section 6.4(c).   Buyer and the Seller Parties shall, and shall cause their respective Affiliates to, cooperate to timely prepare and file any Tax Returns or other filings relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.

(d)   Tax Cooperation.   Buyer and the Seller Parties shall cooperate fully, as and to the extent reasonably requested by Buyer or the Seller Parties, as applicable, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to

Transfer Taxes or Taxes otherwise relating to the Business or the Purchased Assets. Such cooperation shall include the retention and (upon the request of, with respect to any of the Seller Parties, Buyer, and with respect to Buyer, Open Road) the provision of records and information that are reasonably relevant to the preparation of any such Tax Return or any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Buyer and the Seller Parties further agree, upon request, to use their reasonable best efforts to obtain any certificate or other document from any Taxing Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed on the Business or with respect to the Purchased Assets (including with respect to the Transactions).

(e)     Purchase Price Allocation. Within 30 days after the date that the Post-Closing Statement becomes final and binding on the parties hereto pursuant to Section 2.11(d), Buyer shall prepare and deliver to Open Road a statement allocating the sum of the Aggregate Purchase Price (and all other amounts comprising the "seller's consideration" as such term is defined in Treasury Regulations Section 1.1060-1(c)(1)) among the Purchased Assets (the "Tax Consideration") in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (and any similar provisions of state, local or foreign Law) and Exhibit D[6] (such statement, the "Allocation Statement"). If within 30 days after the delivery of the initial Allocation Statement, Open Road notifies Buyer in writing that Open Road objects to the initial Allocation Statement, Buyer and Open Road shall use reasonable best efforts to resolve such dispute within 20 days. In the event that Buyer and Open Road are unable to resolve such dispute within 20 days, Buyer and Open Road shall jointly retain a mutually agreed independent accounting firm (the "Accounting Firm") to resolve only such items that remain in dispute; provided, that the Accounting Firm's sole authority and task shall be to ensure that the Allocation Statement is prepared in accordance with Exhibit D. Upon resolution of the disputed items, the Allocation Statement shall be adjusted to reflect such resolution. The costs, fees and expenses of the Accounting Firm shall be borne by Open Road and Buyer in the manner set forth in Section 2.11(c). The Allocation Statement shall become final upon mutual agreement of the Parties or as determined by the Accounting Firm pursuant to this Section 6.4(e). Thereafter, Buyer shall prepare and deliver to Open Road from time to time a revised proposed Allocation Statement updated to reflect any adjustments to the Tax Consideration requiring any adjustment to the Allocation Statement. Such revised allocation statement shall become the Allocation Statement subject to review and dispute resolution rights allowable to the initial proposed Allocation delivered to Buyer pursuant to this Section 6.4(e). If the IRS or any other taxing authority proposes a different allocation, Open Road or Buyer, as the case may be, shall promptly notify the other Party of such proposed allocation. Open Road or Buyer, as the case may be, shall provide the other Party with such information and shall take such actions (including executing documents and powers of attorney in connection with Tax proceedings) as may be reasonably requested by such other Party to carry out the purposes of this Section 6.4(e). Except as otherwise required by any Law or pursuant to a "determination" under Section 1313(a)

---

[6] Exhibit D to reflect an allocation equal to tax basis to all tangible assets, with the remainder of the purchase price being allocated to goodwill and an express covenant to allocate $0 to any covenant not to compete.

of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by this Agreement shall be reported for all Tax purposes in a manner consistent with the final Allocation Statement; and (ii) the Parties shall follow the final Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position inconsistent therewith in any Tax Return, in any refund claim, in any Tax litigation or otherwise. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Purchased Assets or the allocation of the value of the Purchased Assets in any plan or reorganization or liquidation that may be proposed.

Section 6.5.  Further Assurances.  Following the Closing, from time to time, subject to the terms and conditions of this Agreement, each Party shall, at the other's reasonable request and expense, (a) furnish such further information, (b) execute and deliver such other documents, and (c) do such other acts and things, all as the other may reasonably request for the purpose of carrying out the intent of this Agreement and the Ancillary Agreements; provided, however, that subject to the terms and conditions of this Agreement, none of the foregoing shall require any Party to take any action it reasonably believes would increase its Liabilities or responsibility, or adversely affect its rights under this Agreement, any Ancillary Agreement or applicable Law.

Section 6.6.  Access to Books and Records for the Seller Parties.  Until the third anniversary of the Closing Date (or, in the case of any Tax Returns (and books and records and other documents relating thereto), the seventh (7th) anniversary of the Closing Date), Buyer shall provide each Seller Party or any duly-authorized estate representative and a reasonable number of their respective attorneys, accountants, Representatives and agents, at the Seller Parties' or their estates' cost and expense, during ordinary business hours and upon reasonable prior notice, at a location determined at the reasonable discretion of Buyer, in such manner as to not disrupt or interfere with the normal operation of the business by Buyer, with reasonable access to the books, records, Tax Returns and other information (including supporting documents) of the Business or the Purchased Assets relating to all periods through the Closing (including periods commencing prior to and concluding after the Closing) to the extent reasonably requested for accounting, audit, compliance with legal, Tax or reporting matters (including any reporting obligations with respect to the Chapter 11 Cases), or performing any of the Seller Parties' obligations under this Agreement or any Ancillary Agreement; provided, that Buyer shall not be required to disclose any information if such disclosure would violate applicable Law.  All information provided or obtained pursuant to the preceding sentence shall be held by the Seller Parties or estate representative in accordance with the provisions of Section 13.9.  If, at any time within three years after the Closing Date (or within seven years after the Closing Date with respect to Tax Returns (and books and records and other documents relating thereto)), Buyer proposes to dispose of any of such books or records (including supporting documents), Buyer shall first offer to deliver the same to the Seller Parties (or their respective estate representatives) at the sole cost and expense of the Seller Parties.

Section 6.7.  Announcements.  Neither the Seller Parties nor Buyer shall, nor shall any such Party authorize or permit any of its Affiliates or representatives to, orally or in writing publicly disclose, issue any press release or make any other public statement, or otherwise communicate with the media, concerning the existence of this Agreement, any Ancillary Agreement or any of the Transactions, concerning Buyer or the Seller Parties, as applicable, or

any of their respective current, future or former officer, directors or employees, or the terms or subject matter of any of the foregoing, without obtaining the prior written approval of, with respect to any of the Seller Parties, Buyer, and with respect to Buyer, Open Road (which approval may be granted or withheld in the applicable Party's sole discretion); provided that no Party nor any of its Affiliates or representatives shall be prevented from issuing any press release or making any public disclosure that it is required, in such Party's sole discretion, to make under any applicable Law (which the Parties agree they shall provide an opportunity for the other(s) to review in advance of such disclosure to the extent practicable and permitted by applicable Law) or with respect to any filing by or on behalf of such Party with the Bankruptcy Court (or any other court or administrative tribunal). The Seller Parties may freely communicate with any employees or officers regarding this Agreement and the sale of the Purchased Assets.

Section 6.8. No Obligation to Continue Existence. Notwithstanding anything contained in this Agreement or any Ancillary Agreement to the contrary, following the Closing nothing set forth herein or therein shall, nor shall be deemed to, prohibit any of the Seller Parties from dissolving, liquidating, winding-up or otherwise ceasing their respective existence and taking any actions deemed reasonably necessary by any Seller Party in connection therewith.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

Section 7.1. Alternative Transactions. The Parties acknowledge and agree that this Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller Parties and the Bankruptcy Court of higher and otherwise better Alternative Transaction. The Seller Parties and Buyer acknowledge that to obtain such approval, the Seller Parties must demonstrate that they have taken reasonable steps to obtain the highest and best offer possible for the Purchased Assets. Without limiting the immediately preceding sentence, the Seller Parties may, directly or indirectly, (a) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (b) enter into discussions or negotiations with any Person concerning a possible Acquisition Proposal; or (c) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal or Alternative Transaction.

Section 7.2. Sale Order. Buyer shall use its commercially reasonable efforts take such actions as are reasonably requested by the Seller Parties to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code. From and after the Execution Date, Buyer shall not take any action that is intended to result in or might reasonably be expected to result in, or fail to take any action the intent of which failure to act would result in, or might reasonably be expected to result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order.

Section 7.3. Bankruptcy Filings. The Seller Parties agree to use commercially reasonable efforts to obtain the entry of the Sale Order. In the event the entry of the Sale Order shall be appealed, the Seller Parties shall use their reasonable best efforts to defend such appeal. The Seller Parties shall comply with all notice requirements (a) of the Bankruptcy Code and the

Federal Rules of Bankruptcy Procedure or (b) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

## ARTICLE VIII
## CONDITIONS TO OBLIGATIONS OF THE SELLER PARTIES AND BUYER

The respective obligations of the Seller Parties and Buyer to consummate the Transactions shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by each of Open Road (on behalf of all of the Seller Parties) and Buyer (in Open Road's and Buyer's respective sole discretion):

Section 8.1.    No Injunction.  No Law shall have been enacted, entered, or promulgated and remain in effect that would prohibit, enjoin or otherwise restrain the consummation of the Transactions.

Section 8.2.    [HSR Waiting Period.  The waiting period (and any extensions thereof) under the HSR Act shall have expired or been terminated.]

Section 8.3.    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order and the Bidding Procedures Order and Sale Order shall be in effect and shall not have been reversed, modified, amended or stayed.

## ARTICLE IX
## CONDITIONS TO OBLIGATIONS OF THE SELLER PARTIES

In addition to the conditions set forth in Article VIII, the obligation of the Seller Parties to consummate the Transactions is further subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by Open Road (in its sole discretion):

Section 9.1.    Representations and Warranties of Buyer.   The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date with the same effect as though made on and as of the Closing Date (except that representations and warranties which speak as of a specified date or period of time shall be true and correct in all material respects only as of such date or period of time).

Section 9.2.    Performance of the Obligations of Buyer.  Buyer shall have performed or complied in all material respects with all obligations, agreements and covenants required under this Agreement and each Ancillary Agreement to be performed or complied with by it on or before the Closing Date (except for such obligations, agreements and covenants that by their nature may only be performed at the Closing, but subject to the performance of such obligations, agreements and covenants).

## ARTICLE X
## CONDITIONS TO OBLIGATIONS OF BUYER

In addition to the conditions set forth in Article VIII, the obligation of Buyer to consummate the Transactions is further subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by Buyer (in its sole discretion):

Section 10.1.  Representations and Warranties of the Seller Parties.  The representations and warranties of the Seller Parties contained in this Agreement shall be true and correct at and as of the Closing Date with the same effect as though made on and as of the Closing Date (except that representations and warranties which speak as of a specified date or period of time shall be true and correct only as of such date or period of time); provided, however, that all representations and warranties of the Seller Parties shall be deemed to be true and correct unless the failure or failures of such representations and warranties to be so true and correct, without regard to any "material", "materiality" or "Material Adverse Effect" qualifiers set forth therein, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect.

Section 10.2.  Performance of the Obligations of the Seller Parties.  The Seller Parties shall have performed or complied in all material respects with all obligations, agreements and covenants required under this Agreement to be performed or complied with by any of them at or prior to Closing (except for such obligations, agreements and covenants that by their nature may only be performed at the Closing, but subject to the performance of such obligations, covenants and agreements).

## ARTICLE XI
## TERMINATION

Section 11.1.  Conditions of Termination.  Notwithstanding anything to the contrary contained herein, this Agreement may be terminated, and the Transactions abandoned at any time prior to the Closing Date by written notice from the terminating Party to the other Party only as follows:

(a)    by mutual written agreement of Open Road and Buyer;

(b)    by Open Road or Buyer if (i) any court of competent jurisdiction or other Governmental Agency shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the Transactions, and such Order shall have become final and nonappealable; provided, however, that the Party seeking to terminate this Agreement pursuant to this clause (i) shall have used all reasonable best efforts to have such Order vacated; or (ii) the Closing shall not have occurred before the date that is [●][7] days after the Execution Date (the "End Date"); provided, however, that the right to terminate this Agreement under this clause (ii) shall not be available to any Party whose breach or failure to fulfill any obligation under this

---

[7] NTD: TBD.

Agreement has been the cause of, or resulted in, the failure of the Closing to be consummated by the End Date;

(c)     by Buyer, if (i) the Seller Parties shall have breached in any material respect any of their respective representations or warranties or shall have breached or failed to perform or comply with any of their respective covenants or agreements in this Agreement in any material respect, (ii) such breach or failure cannot be cured or has not been cured within 30 days after the giving of written notice by Buyer to Open Road specifying such breach or failure, and (iii) such breach or failure, individually or in the aggregate together with all other such breaches and failures by the Seller Parties, makes or will make the satisfaction of one or more of the conditions in Article VIII and Article X impossible; provided, Buyer may not terminate this Agreement pursuant to this Section 11.1(c) if Buyer is then in breach of this Agreement in any material respect;

(d)     by Open Road, if (i)(A) Buyer shall have breached in any material respect any of its representations or warranties or shall have breached or failed to perform or comply with any of its covenants or agreements in this Agreement in any material respect, (B) such breach or failure cannot be cured or has not been cured within 30 days after the giving of written notice by Open Road to Buyer specifying such breach or failure, and (C) such breach or failure, individually or in the aggregate together with all other such breaches and failures by Buyer, makes or will make the satisfaction of one or more of the conditions in Article VIII and Article IX impossible; provided, Open Road may not terminate this Agreement pursuant to this clause (i) if any Seller Party is then in breach of this Agreement in any material respect; or (ii)(W) Buyer makes a general assignment for the benefit of its creditors, (X) Buyer commences a voluntary case or proceeding under any applicable bankruptcy, insolvency or reorganization law seeking to be adjudicated bankrupt or insolvent, (Y) Buyer consents to the entry of an Order for relief in respect of Buyer in an involuntary case or proceeding under any applicable bankruptcy, insolvency or reorganization Law or (Z) a court of competent jurisdiction enters an Order, which Order remains unstayed and in effect for 60 days, under any Law relating to bankruptcy, insolvency or reorganization that is for relief against Buyer in an involuntary case, that appoints a custodian of Buyer or for a substantial part of its property or that orders the winding up or liquidation of Buyer;

(e)     by Buyer if any of the Chapter 11 Cases is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of the Seller Parties is appointed in the Chapter 11 Cases; or

(f)     by Buyer or the Seller Parties upon (i) any announcement by the Seller Parties at an auction held in accordance with the Bidding Procedures Order that the final bid of Buyer at such auction is not the successful bid (unless such bid by Buyer is the backup bid in accordance with the Bidding Procedures Order), or (ii) the consummation of an Alternative Transaction.

Section 11.2.    Effect of Termination.  In the event of the termination of this Agreement, this Agreement shall become void and have no further force and effect, and the Transactions shall be abandoned without any further action or Liabilities of any Party; provided, however, the

following provisions shall survive such termination, subject to any limitations set forth therein: this Section 11.2, Section 12.1, Section 12.3, Section 12.4 and Article XIII and any related definitions set forth in Section 1.1.

**ARTICLE XII**
**REMEDIES**

Section 12.1.   Non-Survival of Representations, Warranties, Covenants and Agreements; Remedies.  The Parties agree that the representations and warranties of the Parties contained in this Agreement shall expire automatically and immediately upon the Closing Date.  None of the covenants and agreements of the Parties contained in this Agreement shall survive the Closing, other than the covenants and agreements contained in Section 2.8, Article VI, this Article XII and Article XIII.  For the avoidance of doubt, the Parties agree that the remedies specified in Section 12.2, Section 12.3, Section 12.4 and/or the termination of this Agreement in accordance with the provisions of Article XI shall be the sole and exclusive remedy of the Seller Parties (if the breaching party is Buyer) or Buyer (if the breaching party is a Seller Party) under this Agreement for any breach of representation and warranty made or any covenant or agreement to be performed on or prior to Closing.

Section 12.2.   Specific Performance.   The Parties agree that irreparable damage for which monetary damages (including, without limitation, any damages to which the Seller Parties are entitled pursuant to Section 12.3(b)), even if available, would not be an adequate remedy, would occur in the event that any Party does not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate the Transactions) in accordance with its specified terms or otherwise breaches such provisions.  It is accordingly agreed that Buyer shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by the Seller Parties and to enforce specifically the terms and provisions hereof, and the Seller Parties shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by Buyer and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which a non-breaching Party is entitled at Law or in equity, including without limitation, any damages to which the Seller Parties are entitled pursuant to Section 12.3(b).

Section 12.3.   Return or Retention of Deposit Amount.

(a)     In the event that, prior to the Closing, Buyer has complied in all respects with all agreements, obligations and covenants to be performed by or on its behalf through the date of termination of this Agreement and this Agreement is validly terminated pursuant to Section 11.1(a), Section 11.1(b), Section 11.1(c), Section 11.1(e) or Section 11.1(f), then Open Road shall promptly, and in any event within two Business Days of Buyer's request, return to Buyer the Deposit Amount by wire transfer of immediately available funds to an account designated by Buyer.

(b)     In the event that, prior to the Closing, this Agreement is validly terminated by the Seller Parties pursuant to Section 11.1(d), without prejudice to the Seller Parties' right to seek an injunction or other equitable relief pursuant to Section 12.2, Buyer acknowledges and agrees that the Seller Parties will suffer substantial economic damages and losses of types which

are impossible to compute and ascertain with certainty as a basis for recovery by Seller Parties of actual damages and that the Deposit Amount is a fair, reasonable and appropriate approximation of damages and is not intended as a penalty. Accordingly, in the event of any termination of this Agreement described in the immediately preceding sentence, the Seller Parties shall be entitled to retain the Deposit Amount as liquidated damages (without the Seller Parties being required to present any evidence of the amount or character of actual damages sustained by reason thereof) and not as a penalty. The Parties acknowledge and agree that the agreements contained in this Section 12.3(b) are an integral part of the Transactions and that without these agreements the other Parties would not enter into this Agreement.

Section 12.4.    [Expense Reimbursement and Break-Up Fee.

(a)    The Seller Parties shall pay the Break-Up Fee to Buyer if (i) Buyer has complied, in all material respects, with all agreements, obligations and covenants to be performed by or on its behalf through the date of termination of this Agreement, (ii) the Seller Parties' entry into this Agreement, including the Break-Up Fee, has been approved by the Bankruptcy Court, (iii) this Agreement is terminated pursuant to Section 11.1(f) and (iv) an Alternative Transaction is consummated. The Seller Parties shall pay to Buyer the Break-Up Fee by wire transfer of immediately available funds no later than three (3) Business Days following the consummation of such Alternative Transaction. The obligations of the Seller Parties to pay the Break-Up Fee (x) shall be entitled to super-priority administrative expense claim status under Sections 503 and 507 of the Bankruptcy Code and (y) shall not be subordinate to any other administrative expense claim against the Seller Parties.

(b)    The Seller Parties shall pay the Expense Reimbursement to Buyer if (i) Buyer has complied, in all material respects, with all agreements, obligations and covenants to be performed by or on its behalf through the date of termination of this Agreement, (ii) the Seller Parties' entry into this Agreement, including the Expense Reimbursement, has been approved by the Bankruptcy Court and (iii) this Agreement is validly terminated pursuant to Section 11.1(c) or Section 11.1(f). The Seller Parties shall pay to Buyer the Expense Reimbursement by wire transfer of immediately available funds no later than three (3) Business Days following such termination of this Agreement. The obligations of the Seller Parties to pay the Expense Reimbursement (x) shall be entitled to super-priority administrative expense claim status under Sections 503 and 507 of the Bankruptcy Code and (y) shall not be subordinate to any other administrative expense claim against the Seller Parties.

(c)    The Parties acknowledge and agree that any payment of [the Break- Up Fee and] the Expense Reimbursement described in this Section 12.4 shall be the sole and exclusive remedy of Buyer and any other Person against the Seller Parties for any and all losses or damages suffered or incurred in connection with this Agreement and the transactions contemplated hereby. The Parties acknowledge and agree that the agreements contained in this Section 12.4 are an integral part of this Agreement and the transactions contemplated hereby.][8]

---

[8] Only to be included for stalking horse agreement.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

Section 13.1. <u>Notices</u>.   All notices, requests, demands, waivers and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service if served personally on the Party to whom notice is to be given, (b) on the day of transmission if sent via email (with proof of delivery which may be electronic) prior to 5:00 P.M. in the place of receipt on a Business Day, and otherwise on the next succeeding Business Day, (c) on the Business Day after timely delivery to a reputable next-day courier service if next Business Day delivery is properly requested, or (d) on the third day after mailing by first class mail, registered or certified, postage prepaid, to the Party as follows:

<u>If to Buyer</u>:

[●]
[●]

Attn: [●]

Email: [●]

With a copy to:
(which shall not constitute notice)

[●]
[●]
[●]
Attn: [●]
Email: [●]

<u>If to any Seller Party</u>:

Open Road Films, LLC
2049 Century Park East
4th Floor
Los Angeles, CA 90067
Attn: [●]
Email: [●]

With a copy to:
(which shall not constitute notice)

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars
39th Floor
Attn: Michael L. Tuchin
Email: mtuchin@ktbslaw.com

Any Party may change its address or email for the purpose of this <u>Section 13.1</u> by giving the other Parties written notice of its new address or email address, as applicable, in the manner set forth above.  The Parties acknowledge and agree that any notice that is timely delivered to the then current address of a particular Party prior to the receipt of a notice of change of contact information in accordance with this <u>Section 13.1</u> shall be deemed to have been duly given in accordance with this <u>Section 13.1</u>.

Section 13.2.  <u>Amendments; Waivers</u>.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, in the case of an amendment or modification, only by a written instrument executed by Open Road and Buyer, or, in the case of a waiver by any Seller Party, by Open Road and, in the case of a waiver by Buyer, Buyer.  No other course of dealing between the Parties or any delay in exercising any rights pursuant to this Agreement shall operate as a waiver of any rights of any Party.  Any waiver by Buyer or the Seller Parties, as applicable, of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 13.3.  <u>Assignment and Parties in Interest</u>.

(a)  No Party shall be entitled to assign this Agreement or any rights or obligations hereunder without the prior written consent of, with respect to any assignment by Buyer, Open Road, and, with respect to any assignment by any Seller Party, Buyer, which consent may be withheld by the applicable Party in its sole and absolute discretion, and any such attempted assignment without such prior written consent shall be void and of no force and effect, <u>provided</u>, <u>however</u>, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior written consent of the Seller Parties so long as prior to such assignment such Buyer Designee agrees in writing in favor of the Seller Parties to be bound by the provisions of this Agreement, it being agreed that no such assignment shall relieve Buyer of any of its obligations hereunder.

(b)  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, obligations, or Liabilities under or by reason of this Agreement.

Section 13.4.  <u>Expenses</u>.  Except as otherwise set forth in this Agreement, each Party shall bear all of its legal, accounting, investment banking and other costs, fees and expenses (including all brokerage and finder's fees) incurred by it or on its behalf in connection with the execution and negotiation of this Agreement, any Ancillary Agreement and the consummation of the Transactions, whether or not such Transactions are consummated.

Section 13.5.  <u>Entire Agreement</u>.  This Agreement (including the Exhibits, the Disclosure Schedule and the other Schedules), the Confidentiality Agreement and the Ancillary Agreements (including any exhibits or schedules thereto) constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede and are in full substitution for any and all prior agreements and understandings between them relating to such subject matter, and no Party shall be liable or bound to any other Party in any manner with respect to such subject matter by any warranties, representations, indemnities, covenants, or agreements except as specifically set forth herein or therein.  For the avoidance of doubt, the existence and the terms of this Agreement, the Ancillary Agreements and the Transactions shall

constitute "Confidential Information" under the Confidentiality Agreement. The Exhibits, the Annexes, the Disclosure Schedule and the other Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 13.6. <u>GOVERNING LAW; VENUE; WAIVER OF JURY TRIAL</u>.

(a) THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF DELAWARE SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

(b) THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY AGREEMENT; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN DELAWARE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(c) EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.7. <u>No Other Seller Representations and Warranties</u>. Buyer has conducted its own independent review and analysis of the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities and otherwise in connection with the Transaction and has relied solely on its own review and analysis in determining to proceed with the Transactions. Buyer acknowledges that, without limiting the generality of any other exclusion or qualification set forth in this Agreement, (a) none of the Seller Parties nor any Seller Related Party, is making, has made, or shall be deemed to make, at or as of any past, current or future date, any representation or warranty of any kind, express or implied, at Law or in equity, to Buyer or any Buyer Related Party, with respect to the Seller Parties or any of their respective Affiliates, or any Seller Related Party, the Business, the Transactions, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or any other matter (including with respect to any information or materials made available to Buyer or its representatives (in any format) during the course of their due diligence investigation of the Seller Parties, including any budget, projection, forecast or plans whether before or after the Closing), except for the representations and warranties specifically set forth in <u>Article III</u> of this Agreement (as modified by the Disclosure Schedule), (b) there are no, Buyer has not relied on any, and the Seller Parties hereby expressly disclaim any such other, representation or warranty of any kind, expressed or

implied, at Law or in equity, whether by a Seller Party or any Seller Related Party and (c) Buyer is willing to accept the Purchased Assets at the Closing "as is", "where is" and "with all faults".

Section 13.8.  <u>Disclosure Schedule</u>.  The exceptions and disclosures set forth in the Disclosure Schedule are arranged in sections corresponding to the Section numbers contained in Article III for convenience only and Buyer acknowledges and agrees that each such exception and disclosure in any particular section of the Disclosure Schedule shall be deemed to be disclosed in (and otherwise qualify) each other section of the Disclosure Schedule to which the applicability of such disclosure or exception to such other section of the Disclosure Schedule is reasonably apparent.  The inclusion of information in the Disclosure Schedule shall not be construed as, and shall not constitute, an admission or agreement that a violation, right of termination, default, Liabilities or other obligation of any kind exists with respect to any item, nor shall it be construed as, or constitute, an admission or agreement that such information is material to the Seller Parties or any Seller Related Party.  In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule.  Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  Neither the specifications of any dollar amount in any representation, warranty or covenant contained in this Agreement, nor the inclusion of any specific item in the Disclosure Schedule, is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no Person shall use the fact of the setting forth of any such amount, or the inclusion of any such item, in any dispute or controversy involving any of the Parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is, or is not, material for purposes of this Agreement.  Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no Person shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy involving any of the Parties as to whether any obligation, item or matter not described herein, or included in the Disclosure Schedule, is, or is not, in the ordinary course of business for purposes of this Agreement.  From the date hereof until the Closing, the Parties agree that the Seller Parties may update the Disclosure Schedule as necessary upon written notice to Buyer, and the applicable representation and warranty shall thereafter be deemed amended for all purposes by such updated Disclosure Schedule.

Section 13.9.  <u>Headings</u>.  The headings and subheadings in this Agreement are included for convenience and identification only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any of its provisions.

Section 13.10. <u>References</u>.   All references to "Articles", "Sections", "Exhibits", "Annexes", "Schedules" or the "Disclosure Schedule" shall be references to the Articles, Sections, Exhibits, Annexes, Schedules and Disclosure Schedule to this Agreement, as may be amended, modified, supplemented or restated from time to time.

Section 13.11. <u>General Interpretative Provisions</u>.  Terms for which meanings are defined in this Agreement shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine and

feminine forms.  Words such as "herein", "hereafter", "hereto", "hereby" and "hereunder", when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.  The words "include", "includes", "included", "including" and "such as" shall be construed as if followed by the phrase "without limitation".  No distinction in interpretation shall be made between the terms "shall" and "will".  A reference to a particular gender means a reference to any gender.  A reference to any Person shall include such Person's successors and permitted assigns, unless expressly provided to the contrary.  Unless the context of this Agreement otherwise requires, references to agreements and other documents shall be deemed to include all subsequent amendments and other notifications thereto.

Section 13.12. <u>Currency</u>.  All sums of money expressed in this Agreement are in the lawful money of the United States of America.

Section 13.13. <u>Construction</u>.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party.

Section 13.14. <u>Severability</u>.  The invalidity, illegality or unenforceability of any provision of this Agreement shall not affect the validity, legality or enforceability of any other provisions of this Agreement, each of which shall remain in full force and effect.  In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect.  Furthermore, in lieu of any such invalid, illegal or unenforceable term or provision, the Parties intend that there shall be substituted as a part of this Agreement a provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible that will be valid, legal and enforceable.

Section 13.15. <u>Rights Cumulative</u>.  All rights, powers and privileges conferred hereunder upon the Parties, unless otherwise provided, shall be cumulative and shall not be restricted to those given by Law.  Failure to exercise any power given any Party or to insist upon strict compliance by any other Party shall not constitute a waiver of any Party's right to demand exact compliance with the terms hereof.

Section 13.16. <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts (including by means of PDF or other electronic transmission), each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Seller Parties and Buyer have executed and delivered this Agreement as of the Execution Date.

**SELLER PARTIES:**

OPEN ROAD FILMS, LLC
OPEN ROAD RELEASING, LLC
OR PRODUCTIONS, LLC
BRIARCLIFF LLC
OPEN ROAD INTERNATIONAL LLC
EMPIRE PRODUCTIONS LLC


By: _____
Name:
Title:

**BUYER:**

[_____]

By: _____
Name:
Title:

<u>**SCHEDULE 1.1**</u>

**TITLE**

<u>**Purchased Titles**</u>

1. Killer Elite
2. The Grey
3. Silent House
4. Hit & Run
5. End Of Watch
6. Silent Hill
7. A Haunted House
8. Side Effects
9. The Host
10. Jobs
11. Machete Kills
12. Homefront
13. Justin Bieber - Believe
14. The Nut Job
15. Sabotage
16. A Haunted House 2
17. Chef
18. The Fluffy Movie
19. Nightcrawler
20. Rosewater
21. The Loft
22. Little Boy
23. The Gunman

24. Dope
25. Rock The Kasbah
26. Spotlight
27. Fifty Shades Of Black
28. Triple Nine
29. Mother's Day
30. Gleason
31. Snowden
32. Max Steel
33. Bleed For This
34. Sleepless
35. Collide
36. Before I Fall
37. Spark
38. The Promise
39. The Nut Job 2
40. All I See Is You
41. Home Again
42. Marshall
43. Midnight Sun
44. Show Dogs
45. Hotel Artemis
46. AXL

<u>**Guild Secured Titles**</u>

[To come]

**<u>SCHEDULE 2.1(d)</u>**

**PURCHASED ASSETS**

[None.]

## **SCHEDULE 2.3**

## **OTHER ASSUMED LIABILITIES**

[To come]

## EXHIBIT A

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

[To come]

## **EXHIBIT B**

## FORM OF BILL OF SALE

[To come]

## EXHIBIT C

### FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

[To come]

## EXHIBIT D

## PURCHASE PRICE ALLOCATION PRINCIPLES

[To come]