# **EXHIBIT A**

Stalking Horse Agreement

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

by and among

**OPEN ROAD FILMS, LLC**

**OPEN ROAD RELEASING, LLC**

**OR PRODUCTIONS, LLC**

**BRIARCLIFF LLC**

**OPEN ROAD INTERNATIONAL LLC**

**EMPIRE PRODUCTIONS LLC**

and

**OR ACQUISITION CO, LLC**


**Dated as of October 23, 2018**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...................................................................................4
    Section 1.1.  Definitions......................................................................4
    Section 1.2.  Cross-References ...........................................................16

ARTICLE II PURCHASE AND SALE OF PURCHASED ASSETS AND ASSUMPTIONS AND ASSUMED LIABILITIES ....................................17
    Section 2.1.  Purchase and Sale of Purchased Assets .....................17
    Section 2.2.  Excluded Assets ...........................................................17
    Section 2.3.  Assumption of Liabilities.............................................17
    Section 2.4.  Excluded Liabilities .....................................................18
    Section 2.5.  Closing .........................................................................18
    Section 2.6.  Escrows ........................................................................18
    Section 2.7.  Aggregate Purchase Price ...........................................18
    Section 2.8.  Assumed Contracts; Cure Amount ..............................18
    Section 2.9.  Payment of Aggregate Purchase Price; Escrow Amounts .......................20
    Section 2.10.  Closing Deliverables...................................................21
    Section 2.11.  Post-Closing Purchase Price Adjustment...................22
    Section 2.12.  Release of Adjustment Holdback Funds.....................24

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER PARTIES ........................................................................26
    Section 3.1.  Corporate Organization, Qualification, Power and Authority ..................26
    Section 3.2.  Consents and Approvals; No Violations......................26
    Section 3.3.  No Conflict...................................................................27
    Section 3.4.  Title to Assets ..............................................................27
    Section 3.5.  Intellectual Property.....................................................27
    Section 3.6.  Material Contracts........................................................28
    Section 3.7.  Audits...........................................................................28
    Section 3.8.  Purchased Tangible Materials......................................29
    Section 3.9.  Cure Schedule..............................................................29
    Section 3.10.  Availabilities...............................................................29
    Section 3.11.  Brokers and Finders ...................................................29
    Section 3.12.  Taxes ..........................................................................29

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER................................29
    Section 4.1.  Corporate Organization, Qualification, Power, Authority.......................29
    Section 4.2.  Consents and Approvals; No Violations......................30
    Section 4.3.  Financial Capability.....................................................30
    Section 4.4.  Brokers and Finders ....................................................30
    Section 4.5.  Solvency.......................................................................30
    Section 4.6.  Condition of the Purchased Assets ..............................31
    Section 4.7.  Other Agreements........................................................31

ARTICLE V PRE-CLOSING COVENANTS AND AGREEMENTS .......................................31
    Section 5.1.  Affirmative Covenants.................................................31

Section 5.2.    Negative Covenants ...............................................................31
Section 5.3.    Permitted Pre-Closing Actions .............................................32
Section 5.4.    Access; Books and Records ...................................................32
Section 5.5.    Notice of Developments ........................................................32
Section 5.6.    Competition Filings ...............................................................33
Section 5.7.    Reasonable Best Efforts ........................................................33

ARTICLE VI POST-CLOSING COVENANTS AND AGREEMENTS ....................................34

Section 6.1.    Guild Matters ........................................................................34
Section 6.2.    Employee Matters ..................................................................34
Section 6.3.    WARN ....................................................................................34
Section 6.4.    Certain Tax Matters ...............................................................34
Section 6.5.    Further Assurances.................................................................36
Section 6.6.    Access to Books and Records for the Seller Parties .................36
Section 6.7.    Announcements.......................................................................37
Section 6.8.    No Obligation to Continue Existence .....................................37
Section 6.9.    Certain Claims and Actions ...................................................37

ARTICLE VII BANKRUPTCY COURT MATTERS......................................................38

Section 7.1.    Alternative Transactions .......................................................38
Section 7.2.    Stalking Horse Approval........................................................38
Section 7.3.    Sale Order .............................................................................38
Section 7.4.    Bankruptcy Filings................................................................38

ARTICLE VIII CONDITIONS TO OBLIGATIONS OF THE SELLER PARTIES AND
BUYER ............................................................................................................39

Section 8.1.    No Injunction ........................................................................39
Section 8.2.    HSR Waiting Period ..............................................................39
Section 8.3.    Bankruptcy Court Approval...................................................39

ARTICLE IX CONDITIONS TO OBLIGATIONS OF THE SELLER PARTIES .....................39

Section 9.1.    Representations and Warranties of Buyer...............................39
Section 9.2.    Performance of the Obligations of Buyer ...............................39

ARTICLE X CONDITIONS TO OBLIGATIONS OF BUYER .........................................39

Section 10.1.    Representations and Warranties of the Seller Parties ..............40
Section 10.2.    Performance of the Obligations of the Seller Parties...............40
Section 10.3.    Treatment of Certain Contracts...............................................40

ARTICLE XI TERMINATION..............................................................................40

Section 11.1.    Conditions of Termination.......................................................40
Section 11.2.    Effect of Termination...............................................................42

ARTICLE XII REMEDIES ..................................................................................42

Section 12.1.    Non-Survival of Representations, Warranties, Covenants and
Agreements; Remedies ...........................................................42
Section 12.2.    Specific Performance ..............................................................42
Section 12.3.    Release of Deposit Escrow Amount ........................................42
Section 12.4.    Expense Reimbursement and Break-Up Fee ............................43

ARTICLE XIII MISCELLANEOUS PROVISIONS ................................................................44
    Section 13.1.  Notices ...............................................................................................44
    Section 13.2.  Amendments; Waivers ........................................................................45
    Section 13.3.  Assignment and Parties in Interest.....................................................45
    Section 13.4.  Expenses ............................................................................................45
    Section 13.5.  Entire Agreement ...............................................................................46
    Section 13.6.  GOVERNING LAW; VENUE; WAIVER OF JURY TRIAL.................46
    Section 13.7.  No Other Seller Representations and Warranties .................................46
    Section 13.8.  Disclosure Schedule...........................................................................47
    Section 13.9.  Headings ............................................................................................48
    Section 13.10. References..........................................................................................48
    Section 13.11. General Interpretative Provisions .......................................................48
    Section 13.12. Currency............................................................................................48
    Section 13.13. Construction......................................................................................48
    Section 13.14. Severability.......................................................................................48
    Section 13.15. Rights Cumulative .............................................................................49
    Section 13.16. Counterparts ......................................................................................49

Schedule 1.1(a)        Cure Schedule
Schedule 1.1(b)        Titles
Schedule 1.1(c)        Other Expenses
Schedule 1.1(d)        Illustrative Example of Calculation of Net Library Cash Flow
Schedule 1.1(e)        Necessary Contracts
Schedule 2.1(d)        Other Purchased Assets
Schedule 2.3             Other Assumed Liabilities
Schedule 2.9             Illustrative Example of Calculation of Payment at Closing
Schedule 10.3           Other Contracts

Exhibit A               Form of Assignment and Assumption Agreement
Exhibit B               Form of Bill of Sale
Exhibit C               Form of Intellectual Property Assignment Agreement
Exhibit D               Form of Escrow Agreement
Exhibit E               Form of Bidding Procedures Amendment Order

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of October 23, 2018 (the "Execution Date"), by and among (a) Open Road Films, LLC, a Delaware limited liability company ("Open Road"), Open Road Releasing, LLC, a Delaware limited liability company, OR Productions, LLC, a Delaware limited liability company, Briarcliff LLC, a Delaware limited liability company, Open Road International LLC, a Delaware limited liability company, Empire Productions LLC, a Delaware limited liability company (the parties in this clause (a), each, a "Seller Party" and, collectively, the "Seller Parties"), and (b) OR Acquisition Co, LLC, a Delaware limited liability company ("Buyer").   Each of the foregoing may be referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

A.    On September 6, 2018 (the "Petition Date"), each Seller Party commenced voluntary cases (such cases, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.    Each Seller continues in possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession.

C.    The Seller Parties desire to sell to Buyer, and Buyer desires to purchase from the Seller Parties, all of the Purchased Assets, and Buyer desires to assume all of the Assumed Liabilities pursuant to the Sale Order approving such sale, free and clear of all Liens (other than Permitted Liens), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1.    Definitions.  For purposes of this Agreement:

"Acquisition Proposal" means any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) concerning an Alternative Transaction.

"Action" means any action, cause of action, claim, complaint, charge, investigation, suit, arbitration or other proceeding, whether civil or criminal, in Law or in equity, or before any arbitrator or Governmental Agency.

"Adjusted Purchase Price" means an amount in cash equal to (a) the Base Purchase Price, less (b) Net Library Cash Flow.

"<u>Adjustment Holdback Funds</u>" means, at any given time after the Closing, the funds remaining in the escrow account(s) in which the Escrow Agent has deposited the Adjustment Holdback Amount in accordance with the Escrow Agreement.

"<u>Affiliate</u>" means, as to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with, such Person.  As used in this definition, "control" means, directly or indirectly, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"<u>Alternative Transaction</u>" means (a) any transaction involving the direct or indirect sale or sales of all or substantially all or a portion of the Purchased Assets to a Person or Persons other than Buyer or (b) the filing of a chapter 11 plan that does not contemplate the sale of the Purchased Assets to Buyer in accordance with the terms hereof.

"<u>Ancillary Agreements</u>" means each agreement, document, instrument or certificate, other than this Agreement, to be executed and delivered in connection with the consummation of the Transactions, including the Escrow Agreement, the Assignment and Assumption Agreement, the Bill of Sale, the Intellectual Property Assignment Agreement, the Guild Assumption Agreements, bills of sale, any other instruments of transfer as may be agreed upon by the Parties, and the other documentation required by <u>Section 6.1</u>.

"<u>Auction Date</u>" shall have the meaning ascribed to it in the Bidding Procedures Order.

"<u>Assignment and Assumption Agreement</u>" means that certain Assignment and Assumption Agreement, substantially in the form attached hereto as <u>Exhibit A</u>.

"<u>Availabilities Database</u>" means those certain charts entitled SVOD Avails – OpenRoad Library through 12-31-2032 (index number 1.2.1.6.2), Pay TV Avails – OpenRoad Library through 12-31-2032 (index number 1.2.1.6.3), Free TV Avails – OpenRoad Library through 12-31-2032 (index number 1.2.1.6.4) and OpenRoad Visual Avails as of 09-01-2018 (index number 1.2.1.6.5) made available to Buyer in the electronic dataroom established and maintained by or on behalf of the Seller Parties and hosted by Merrill Corporation in connection with the Transaction.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code.

"<u>Base Purchase Price</u>" means $87,500,000.00.

"<u>Bidding Procedures</u>" means the bid procedures approved by the Bankruptcy Court pursuant to the Entered Bidding Procedures Order as amended by the Bidding Procedures Amendment Order.

"<u>Bidding Procedures Amendment Order</u>" means an order substantially in the form attached hereto as <u>Exhibit E</u> of the Bankruptcy Court amending the Entered Bidding Procedures Order to approve, among other things, the Break-Up Fee and the Expense Reimbursement.

"Bidding Procedures Order" means the Entered Bidding Procedures Order as amended by the Bidding Procedures Amendment Order.

"Bill of Sale" means that certain Bill of Sale, substantially in the form attached hereto as Exhibit B.

"Break-Up Fee" means an amount in cash equal to $2,100,000.00.

"Business" means the business of developing, producing, distributing and otherwise Exploiting motion pictures, television programs and other audio visual content as currently conducted by the Seller Parties.

"Business Day" means any day other than a Saturday, Sunday or a day on which banking institutions in the City of New York, New York are authorized or required by law to close.

"Buyer Designee" means any Affiliate of Buyer designated by Buyer to purchase any of the Purchased Assets pursuant to the terms of this Agreement.

"Buyer Related Parties" means any officers, managers, employees, directors, agents, stockholders, equityholders, members, partners, other beneficial owners, controlling persons, subsidiaries, Affiliates, representatives, financial advisors, accountants, lawyers, investment bankers or other consultants of Buyer, or of any of its Affiliates.

"Claim" has the meaning set forth in the Bankruptcy Code.

"Closing Non-P&R Cure Payment Deduction Amount" means the aggregate Non-P&R Cure Amounts reflected on Schedule 1.1(e) actually paid by Buyer.

"Closing P&R Cure Payment Deduction Amount" means the lesser of (a) the amount (if any) by which the aggregate P&R Cure Amounts actually paid by Buyer exceeds the P&R Cap and (b) the P&R Cure Basket.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements or other agreements with any Union.

"Confidentiality Agreement" means that certain Confidentiality and Non-Disclosure Agreement, dated as of March 15, 2018, by and between Raven Capital Management LLC and Tang Media Partners Limited.

"Consent" means any consent, approval, authorization, clearance, exemption, waiver, or similar affirmation by, or filing with or notification to, a Person pursuant to any Contract, Law, Order or Permit.

"Contract" means any written contract, lease, license, agreement, arrangement, understanding, commitment or instrument.

"Cure Amounts" means any amounts necessary to cure any monetary default as required by Section 365 of the Bankruptcy Code with respect to an Assumed Contract, which, for the avoidance of doubt, shall include amounts comprised of Guild Residuals or Participations.

"Cure Reduction Amount" means, without duplication, the sum of (a) Closing Non-P&R Cure Payment Deduction Amount, (b) Closing P&R Cure Payment Deduction Amount, and (c) any Cure Amount the Buyer is required to pay to assume a contract that is not on Schedule 1.1(e) (other than any contract listed on Schedule 10.3) and that is required for the Exploitation of the Purchased Titles after the Closing.

"Cure Schedule" means the schedule set forth on Schedule 1.1(a) of all estimated P&R Cure Amounts and all estimated Non-P&R Cure Amounts.

"Designation Cut-Off Date" means five days before the Auction Date or, with respect to any Available Contract, such other date as may be mutually agreed upon by Open Road and Buyer.

"Disclosure Schedule" means the disclosure schedule, dated as of the Execution Date, provided by the Seller Parties to Buyer in connection with the execution and delivery of this Agreement, as may be updated from time to time prior to the Closing to the extent permitted pursuant to Section 13.8.

"Employment Contract" means any Contract between any employee of a Seller Party, on the one hand, and a Seller Party, on the other hand, memorializing the terms of employment or severance of such employee.

"Entered Bidding Procedures Order" means that certain *Order: (1) Approving Bid and Sale Procedures, (2) Approving Assumption, Assignment and Cure Procedures and Related Notices, (3) Establishing Date for Auction and Approving Related Procedures, (4) Scheduling the Sale Hearing and Related Deadlines, and (5) Granting Related Relief* [Docket No. 160].

"Estimated Purchase Price" means an amount in cash equal to (a) Base Purchase Price, less (b) Estimated Net Library Cash Flow.

"Estimated Net Library Cash Flow" means Open Road's good faith estimate of the amount of Net Library Cash Flow, based on the books and records of the Seller Parties.

"Excluded Contracts" all Contracts to which a Seller Party is a party that are not Assumed Contracts including (a) all Contracts set forth in Section 2.8(a) of the Disclosure Schedule under the heading "Excluded Contracts" and (b) all Contracts deemed to be "Excluded Contracts" pursuant to Section 2.8.

"Expense Reimbursement" means an amount equal to the reasonable and documented out-of-pocket costs, fees and expenses of Buyer (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses) related to the Transactions, which amount shall constitute an administrative expense of the Seller Parties pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code and over any debtor-in-

possession financing obligations; provided, however, that the aggregate amount of the Expense Reimbursement shall not exceed $800,000.00.

"Exploit" means, with respect to a Purchased Title, the exhibition, distribution, reproduction, development, subdistribution, transmission, display, broadcast, performance, dissemination, publication, production, co-production, promotion, publicizing, advertising, reproduction, rental, leasing, subleasing, selling, licensing, sublicensing, transfer, disposal of, commercializing, marketing, usage, trading in, turning to account, dealing with and in and otherwise exploiting such Purchased Title by any and all means, methods, processes, media devices and delivery systems of every kind or character, whether now known or hereafter created, including, without limitation, the right to exercise the ancillary rights relating thereto and to produce and develop such Purchased Titles (including derivative rights therein), to the extent included in the Title Rights.  The meaning of the term "Exploitation" shall be correlative to the foregoing.

"Final Order" means an Order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing is pending or (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the Order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending.

"Final Other Post-Closing Adjustment Notice" means the final Other Post-Closing Adjustment Notice Buyer provides to Open Road during the 180-day period after the Closing, which shall not be subject to the $250,000.00 minimum threshold of Other Post-Closing Adjustment Costs.

"FTC" means the United States Federal Trade Commission.

"Governmental Agency" means (a) any federal, state, county, local or municipal government or administrative agency or political subdivision thereof, (b) any governmental agency, authority, board, bureau, commission, department or instrumentality thereof, (c) any court or administrative tribunal, (d) any non-governmental agency, tribunal or entity that is vested by a governmental agency with applicable jurisdiction or (e) any arbitration tribunal with applicable jurisdiction.

"Guild" means any and all of the Screen Actors Guild, American Federation of Television and Radio Artists, American Federation of Musicians, Directors Guild of America, Writers Guild of America, Motion Picture Industry Pension and Health Plans, International

Alliance of Theatrical Stage Employees, Film Musicians Secondary Markets Fund, British Equity, British Musicians Union, Alliance of Canadian Cinema Television and Radio Artists, Directors Guild of Canada, and all other applicable guilds, unions, trade associations or collectives.

"Guild Assumption Agreements" means, collectively, assumption agreements, in a form agreeable to Buyer and to be negotiated between Buyer and the applicable Guilds in connection with the Transactions or to evidence Buyer's assumption of certain Liabilities under any Collective Bargaining Agreement in place with such Guilds with respect to Guild Titles.

"Guild Residuals" means all amounts required to be paid to third parties pursuant to collective bargaining, union or guild agreements (in all applicable jurisdictions) by reason of, in connection with, as a condition to or arising from the use or Exploitation of the Purchased Titles, or any part thereof, or any use or reuse thereof, in any media, including residuals, supplemental market payments, pension, health and welfare payments, and employer share of Taxes, to the extent the foregoing relates to Guild Titles.

"Guild Titles" means the Purchased Titles listed on Schedule 1.1(b) under the heading "Guild Titles".

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, together with the rules and regulations promulgated thereunder.

"Incentive Fee" means $500,000.00.

"Independent Accountant" means BDO USA, LLP or any other firm of independent accountants of national standing to which Open Road and Buyer agree in writing.

"Intellectual Property" means any or all of the following as they exist in any jurisdiction throughout the world: (a) patents, patent applications, continuations-in-part, divisions or reissues; (b) trade names, d/b/a's, trademarks, service marks and trade dress, logos, and other indicia or origin, and registrations and applications for registration thereof, together with the goodwill connected with the use of and symbolized by any of the foregoing; (c) any and all copyrightable works of authorship, including but not limited to registered copyrights in both published works and unpublished works, unregistered copyrights in both published works and unpublished works, and applications to register copyrightable works of authorship; (d) trade secrets, including, confidential business information, know-how, concepts, methods, processes, specifications, inventions, formulae, reports, data, customer lists, mailing lists, business plans or other material confidential and proprietary information; (e) all registered domain names; and (f) proprietary computer software, including all source code, object code, and documentation related thereto.

"Intellectual Property Assignment Agreement" means that certain Intellectual Property Assignment Agreement, substantially in the form attached hereto as Exhibit C.

"IRS" means the U.S. Internal Revenue Service.

"Laws" means all laws, codes, statutes, common laws, rules, regulations, ordinances and codes of any Governmental Agency.

"<u>Liabilities</u>" means all claims, demands, expenses, commitments and obligations (whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated, arising prior to, at or after the commencement of any bankruptcy proceeding) of or against the Seller Parties or any of the Purchased Assets.

"<u>Lien</u>" means any charge, lien, Claim, right, demand, mortgage, lease, debt, judgment, penalty, liability, obligation, commitment, assessment, charge, license, sublicense, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, easement, restrictive covenant, right of way, preemptive right, conditional sale, servitude, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), encroachment, encumbrance, third-party interest or other restriction or limitation of any kind, whether imposed by Contract, legal requirement, equity or otherwise.

"<u>Material Adverse Effect</u>" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events, states of fact or occurrences) has had a material adverse change in or material adverse effect on (x) the Purchased Assets or (y) the ability of the Seller Parties to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement, but, with respect to clause (x), excluding (a) any change or effect to the extent that it results from or arises out of (i) the commencement of the Bankruptcy Cases, including the impact thereof on the relationships of the Seller Parties with employees, customers, distributors, financing sources, service providers and other business partners; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the Transactions; (iii) changes in Law or accounting regulation or (iv) any specific action required to be taken by this Agreement or taken at the written request of Buyer after the Execution Date; and (b) any change or effect of economic or political conditions (including acts of terrorism or war) or due to force majeure events to the extent that such conditions or events do not disproportionately affect the Seller Parties, taken as a whole, as compared to other companies in the same industry as the Seller Parties, or the securities or financial markets in any country or region.

"<u>Net Library Cash Flow</u>" means, for the period between July 31, 2018 and the Closing Date, an amount equal to (a) all (i) cash proceeds received by the Seller Parties from the Exploitation of the Title Rights for the Purchased Titles, plus (ii) amounts validly setoff from amounts otherwise due to the Seller Parties from the Exploitation of the Title Rights for the Purchased Titles against expenses incurred by the Seller Parties prior to the Petition Date that do not constitute Cure Amounts or Assumed Liabilities hereunder, <u>less</u> (b) all cash disbursements paid by the Seller Parties for Participations and Guild Residuals arising from the Exploitation of the Title Rights for the Purchased Titles, <u>less</u> (c) all cash disbursements paid by the Seller Parties in respect of the expenses set forth on <u>Schedule 1.1(c)</u> arising from the Exploitation of the Title Rights for the Purchased Titles; provided that the Seller Parties shall not be permitted to revise or amend <u>Schedule 1.1(c)</u> other than to remove expenses included in the original version of such schedule to the extent such items arise under Assumed Contracts later deemed to be Excluded Contracts. <u>Schedule 1.1(d)</u> sets forth an illustrative example of the calculation of Net Library Cash Flow.

"Non-P&R Cure Amount" means any Cure Amounts not comprised of Guild Residuals or Participations for Assumed Contracts in respect of periods prior to September 5, 2018.

"Objection Period" means thirty days after Open Road's receipt of the Post-Closing Statement or of any Other Post-Closing Adjustment Notice, as applicable.

"Order" means any judgment, order, injunction, decree, writ, permit or license issued or entered by a court of competent jurisdiction, including the Bankruptcy Court, whether interlocutory or final.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business, consistent with past practice.

"Organizational Documents" means, with respect to any Person, the articles of incorporation, certificate of incorporation, certificate of formation, certificate of limited partnership, bylaws, limited liability company agreement, operating agreement, partnership agreement and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation or organization of such Person, including any amendments and other modifications thereto.

"Other Post-Closing Adjustment Costs" means, without duplication, (a) any Transaction Costs that are paid by Buyer, other than Transaction Costs that are deducted from the Closing Payment to Open Road, (b) all obligations under Assumed Contracts for Participations and Guild Residuals for periods prior to July 31, 2018 to the extent such obligations (i) arise from any audit initiated or conducted before or after the Closing Date and (ii) cause Buyer's aggregate payments under this Agreement in respect of P&R Cure Amounts to exceed the P&R Cap, (c) any damages resulting from the Seller Parties' failure to list a contract in Schedule 1.1(e) and/or Section 3.6 of the Disclosure Schedules (other than any contract listed on Schedule 10.3) required for the Exploitation of the Purchased Titles after the Closing that, because of such contract not being so listed and designated by Buyer as an Assumed Contract, adversely impacts the Buyer's ability to fully Exploit any portion of the Title Rights after the Closing, (d) all Non-P&R Cure Amounts relating to any Assumed Contract reflected on Schedule 1.1(e) actually paid by Buyer (whether at the Closing or thereafter), other than Non-P&R Cure Amounts reflected on Schedule 1.1(e) that are included in the Cure Reduction Amount, and (e) P&R Cure Amounts on account of Disputed Contracts that are due and paid after the Closing in accordance with Section 2.8 to the extent such obligations cause Buyer's aggregate payments under this Agreement in respect of P&R Cure Amounts to exceed the P&R Cure Cap.

"P&R Cap" means an amount equal to (a) $10,648,779 (i.e., the aggregate amount of estimated P&R Cure Amounts as set forth on the Cure Schedule), less (b) the aggregate amount of P&R Cure Amounts (as determined by the applicable amounts reflected on the Cure Schedule) with respect to Available Contracts that Buyer elects not to "assume" pursuant to Section 2.8 or that is otherwise deemed to be an Excluded Asset pursuant thereto (without duplication of any amounts included in clause (c)), less (c) any amounts paid by Seller Parties in respect of amounts under subsection (a) above prior to the Closing Date.

"<u>P&R Cure Amounts</u>" means (i) any Cure Amounts comprised of Guild Residuals or Participations for Assumed Contracts in respect of periods prior to July 31, 2018, and (ii) with respect to contracts listed on Schedule 10.3 that are ultimately assigned and assumed by Buyer in accordance with <u>Section 2.8</u>, if any, the actual Cure Amounts in respect of periods prior to July 31, 2018 in excess of the estimated Cure Amounts related to such contracts in respect of period prior to July 31, 2018 set forth on Schedule 10.3.

"<u>P&R Cure Basket</u>" means $5,000,000.

"<u>Participations</u>" means, with respect to any Purchased Title, any contractually required amounts (excluding Guild Residuals) payable to or on behalf of any third party involved in the development and/or production of such Purchased Title, including all third parties who rendered services or granted rights in connection with such Purchased Title, which are (a) a contingent amount determined in whole or in part based on the financial performance or other performance of such Purchased Title, including amounts contingent upon or determined by box office receipts, gross receipts, net receipts, or a percentage of such gross receipts or net receipts however defined, denominated or calculated, or are otherwise determined by reference to the performance of the Purchased Title however measured or determined, and are payable in a fixed or allocable amount or as a percentage of such receipts; and/or (b) payable in a fixed amount upon the occurrence of contingent events commencing after the Exploitation of such Purchased Title such as receipt of an award or the sale of a specified number of video devices or the attainment of a specified level of receipts or contingent proceeds from, or other financial performance of the Exploitation of such Purchased Title.  For purposes of clarity, notwithstanding anything in this Agreement to the contrary, "Participations" is not intended to encompass and shall exclude any obligations not customarily considered to constitute "participations" as that term is utilized in the U.S. motion picture distribution industry, and specifically, among other excluded obligations arising under any Assumed Contract, shall not be construed to include obligations: (x) to pay any royalties, master use fees, license fees or any other fees or charges of any nature payable to any Person relating to the synchronization, reproduction, performance or any other use at any time and in any territory of any musical composition or sound recording created for use in or embodied in the soundtrack of or in the score for any Purchased Title or (y) to pay or credit any recoupment or repayment obligation of any Seller Party under any Assumed Contract.

"<u>Permit</u>" means any license, permit, certificate of occupancy, franchise, certificate of authority or approval, or any waiver of the foregoing, required to be issued by any Governmental Agency, in connection with the operation of the Business.

"<u>Permitted Liens</u>" means any Liens (a) with respect to Guild Residuals, (b) with respect to Participations arising under Assumed Contracts the payment of which were secured by properly perfected Liens on the related Purchased Title(s) not otherwise avoided or avoidable in connection with the Chapter 11 Cases, (c) with respect to Assumed Liabilities, and (d) which are mechanic's, materialman's, carrier's, supplier's, vendor's, repairer's or other similar Liens arising in the ordinary course of business and securing amounts that are not delinquent or are being contested in good faith.

"Person" means any individual, partnership, corporation, trust, association, limited liability company, joint venture, an unincorporated organization, a division or operating group of any of the foregoing, a Governmental Agency or any other entity.

"Post-Closing Tax Period" means any taxable period (or portion thereof) beginning after the Closing Date.

"Pre-Closing Tax Period" means any taxable period (or portion thereof) ending on or before the Closing Date.

"Privileged Material" means any information, in written, oral, electronic or other tangible or intangible form, including any communications by, to or otherwise involving attorneys (including attorney-client privileged communications) or memoranda and other materials protected by the work product doctrine, with respect to which any Seller Party, or any Seller Related Party would be entitled to assert or have asserted a privilege or other protection, including the attorney-client and work product privileges, in each case, as such privilege relates to the Excluded Assets or Excluded Liabilities.

"Purchased Intellectual Property" means all Intellectual Property owned by any Seller Party that is primarily related to the Purchased Assets but excluding any Seller Party's rights, title and interest of any kind or nature in and to the Excluded Assets, including the Exploitation rights and Purchased Tangible Materials relating thereto.

"Purchased Tangible Materials" means, with respect to any Purchased Title, collectively, all physical embodiments of such Purchased Title or its elements in whatever state of completion, wherever located (including in any film laboratory or storage facility owned or controlled by a Seller Party or any other Person), in any video, audio or other format, including: (a) all positive, negative, fine grain and answer prints; (b) all exposed or developed film, pre-print materials (including positives, interpositives, negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements), subtitles, special effects, cutouts, stock footage, outtakes, tabs and trims; (c) tapes, discs, hard drives, computer memory, or other electronic media of any nature; (d) all sound and music tracks, audio and video recordings of all types and gauges (whether analog, digital or otherwise) in all languages; and (e) electronic copies of any of the foregoing stored on any media; provided, however, that Purchased Tangible Materials shall not include any such materials that are (i) related to or otherwise the subject of any Excluded Contract or (ii) otherwise not necessary for Buyer's future Exploitation of the Purchased Titles.

"Purchased Titles" means, collectively, the motion pictures set forth in Schedule 1.1(b) under the heading "Purchased Titles".

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Sale Hearing" means the hearing before the Bankruptcy Court to approve this Agreement or the otherwise highest and best bid(s) for the Purchased Assets.

"Sale Order" means an Order of the Bankruptcy Court approving and authorizing the sale of the Purchased Assets to Buyer, free and clear of all Liens (other than Assumed Liabilities and Permitted Liens), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, and the assumption, assignment and sale of the Assumed Contracts, to Buyer on the terms set forth herein, which Order shall otherwise be in form and substance reasonably satisfactory to Buyer, *provided* that such Order shall (without limitation to other customary provisions) specifically provide, unless otherwise waived by Buyer, that (a) any obligations related to Participations and Guild Residuals for the period prior to September 5, 2018 shall not be subject to further claim, dispute or audit, including, without limitation, any claim, dispute or audit based on performance of the Purchased Titles prior to the Closing Date, (b) all Material Contracts designated for assumption and assignment by the Buyer are so assumed and assigned, in full force and effect and not in default, notwithstanding the Buyer not assuming any other Material Contract, (c) the Buyer shall have no liabilities for any Seller Party Employees except liabilities arising for Buyer Employees arising after the Closing Date, (d) the Buyer is deemed to have good and marketable title to the Purchased Assets free and clear of any claims or interests, including, without limitation, any infringement claims arising before the Closing Date, (e) all payments owed to Buyer under Section 2.11(d)(ii) shall be treated as administrative expenses under the Bankruptcy Code, and (f) the Purchased Assets shall be free and clear of any and all Liabilities for Taxes (I) of or imposed on the Seller Parties (or any member or Affiliate of the Seller Parties) or (II) related or attributable to the Purchased Assets or the Business for any pre-Closing tax period.

"Seller Parties' Knowledge" means the actual knowledge of Rob Friedman and Mimi Tseng.

"Seller Related Parties" means any current or former officers, managers, employees, directors, agents, stockholders, equityholders, members, partners, other beneficial owners, controlling persons, subsidiaries, Affiliates, representatives, financial advisors, accountants, lawyers, investment bankers or other consultants of a Seller Party, or of any of their Affiliates.

"Taxes" means all forms of U.S. federal, state, local and non-U.S. taxes, assessments or other government charges, in each case in the nature of a tax, including income, gross receipts, excise, employment, ad valorem, sales, use, transfer, license, payroll, franchise, severance, stamp, withholding, Social Security, unemployment, disability, real property, personal property, registration, alternative or add-on minimum, estimated, admission, amusement or other taxes of any kind whatsoever, including any interest, penalties or additions thereto, imposed by any Taxing Authority.

"Tax Return" means any report, return (including any information return), declaration, notice, form, election, claim for refund or other statement relating to Taxes, including any schedules or attachments thereto and any amendment thereof.

"Taxing Authority" means the IRS and any other Governmental Agency responsible for the administration or collection of any Tax.

"Title Rights" means the following: (a) all right, title and interest of the Seller Parties to the Purchased Titles and any and all versions existing thereof, and all elements thereof (including

the screenplay and story) and all trailers, "bloopers", footage, trims and outtakes thereof (including, without limitation, the director's cut and the final cut and any and all versions of each of the foregoing (in any and all languages), all versions rated by the Motion Picture Association of America or any other rating association and unrated versions of each Purchased Title, "behind the scenes", "making of", and any and all other documentary or short form content concerning each Purchased Title, and all footage, "bloopers", trims and outtakes of each of the foregoing); (b) all right, title and interest of the Seller Parties to the Purchased Tangible Materials; (c) all of the Seller Parties' rights with respect to the Purchased Intellectual Property; (d) all of the Seller Parties' rights to manufacture, distribute, license, exhibit, market, promote, reissue, and otherwise Exploit each Purchased Title, in all languages, by any and all means and devices now known or hereafter devised, and howsoever accessed by the viewer, and to otherwise Exploit each Purchased Title in all media, whether now known or hereafter existing and howsoever accessed; and all of the Seller Parties' rights to license and Exploit each Purchased Title in all ancillary markets; (e) all of the Seller Parties' merchandising rights with respect to each Purchased Title; and (f) all other of the Seller Parties' rights to Exploit each Purchased Title and any and all elements thereof not expressly provided for hereunder.

"Transaction Costs" means (a) Transfer Taxes for which the Sellers Parties are responsible pursuant to Section 6.4(c) and any fees and costs related thereto (without duplication of amounts already paid) and (b) any out of pocket costs and fees, in an aggregate amount over $25,000, incurred by Buyer in respect of the Seller Parties' legal advisors, accountants, investment bankers, financial advisors, valuation firms or similar professionals (which costs and fees, for the avoidance of doubt, the Buyer is not assuming).  For the avoidance of doubt, Transaction Costs shall not include any of Buyer's overhead costs, diligence costs, travel expenses or the costs and fees of any advisors, accountants, investment bankers, financial advisors, valuation firms or similar professionals engaged by or on behalf of Buyer.

"Transactions" means the purchase and sale of the Purchased Assets to Buyer and the assumption by Buyer of the Assumed Liabilities, and all other transactions contemplated by, and set forth and described in, this Agreement and the Ancillary Agreements.

"Transfer Taxes" means any and all sales, use, stamp, transfer, value-added, excise, registration, documentary, recording or similar Taxes, fees or charges and all interest and penalties due in connection therewith imposed on or in connection with the purchase, sale or transfer of the Purchased Assets and the other Transactions (including the assumption by Buyer of the Assumed Liabilities).

"Treasury Regulations" means the United States Treasury Regulations promulgated under the Code, as such regulations may be amended from time to time.

"Union" means any union, works council or labor organization.

"WARN Act" means the Worker Adjustment and Retraining Notification Act or analogous state or local Laws, or any applicable Law regarding the termination or layoff of employees for employees outside the United States.

Section 1.2.    Cross-References.  The following terms have the meanings set forth in the sections set forth below:

Adjustment Holdback Amount ...................................................................................... Section 2.6
Aggregate Purchase Price .......................................................................................... Section 2.7
Agreement ................................................................................................................... Preamble
Allocation Statement ............................................................................................... Section 6.4(e)
Antitrust Division ...................................................................................................... Section 5.6(a)
Assumed Contracts ................................................................................................... Section 2.8(a)
Assumed Liabilities .................................................................................................... Section 2.3
Available Contracts .................................................................................................... Section 2.8(a)
Bankruptcy and Equity Exception ............................................................................... Section 3.1
Bankruptcy Court ........................................................................................................... Recitals
Buyer ............................................................................................................................ Preamble
Buyer Employees ...................................................................................................... Section 5.6(a)
Chapter 11 Cases .......................................................................................................... Recitals
Closing ....................................................................................................................... Section 2.5
Closing Date ............................................................................................................... Section 2.5
Closing Payment to Open Road ................................................................................. Section 2.9(b)
Deposit Escrow Amount ............................................................................................. Section 2.6
Disputed Contracts ................................................................................................... Section 2.8(c)
Disputed Cure Amount .............................................................................................. Section 2.8(c)
End Date .................................................................................................................... Section 11.1(b)
Escrow Agent ............................................................................................................ Section 2.6
Escrow Agreement ..................................................................................................... Section 2.6
Excluded Assets ......................................................................................................... Section 2.2
Excluded Liabilities .................................................................................................... Section 2.4
Execution Date ........................................................................................................... Preamble
Material Contracts ...................................................................................................... Section 3.6
Objection Notice ........................................................................................................ Section 2.11(a)
Open Road .................................................................................................................. Preamble
P&R Objection ........................................................................................................... Section 12.5(a)
Party ............................................................................................................................ Preamble
Periodic Taxes ............................................................................................................ Section 6.4(a)
Petition Date ................................................................................................................. Recitals
Post-Closing Calculation Objection ........................................................................... Section 2.11(a)
Post-Closing Statement ............................................................................................. Section 2.11(a)
Purchased Assets ....................................................................................................... Section 2.1
Registered Purchased Intellectual Property ............................................................... Section 3.5(a)
Requisite Regulatory Approvals ................................................................................. Section 3.2
Seller Party .................................................................................................................. Preamble
Seller Party Employees .............................................................................................. Section 6.2
Straddle Periods ......................................................................................................... Section 6.4(a)
Tax Consideration ...................................................................................................... Section 6.4(e)
Transfer Consent ....................................................................................................... Section 2.8(e)

## ARTICLE II
## PURCHASE AND SALE OF PURCHASED ASSETS AND ASSUMPTIONS AND ASSUMED LIABILITIES

Section 2.1.    <u>Purchase and Sale of Purchased Assets</u>.  Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, the Seller Parties shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, acquire and accept from the Seller Parties, free and clear of all Liens (except for Permitted Liens), all of the Seller Parties' right, title and interest in, to or under the following (collectively, the "<u>Purchased Assets</u>"):

(a)    subject to <u>Section 2.8</u>, all of the Seller Parties' right, title and interest in and to the Title Rights;

(b)    all of the Seller Parties' rights under the Assumed Contracts;

(c)    all rights, claims, causes of action against third parties relating to or arising from the Title Rights or the Assumed Contracts, including claims and Actions of the Seller Parties arising under Sections 544, 547, 548, 549, and 550 of the United States Bankruptcy Code relating to the Purchased Assets, but excluding all claims and Actions (i) of the Seller Parties arising under Sections 544, 547, 548, 549, and 550 of the United States Bankruptcy Code that are not related to the Purchased Assets or (ii) which any Seller Party has or may have against any other Seller Party and any Seller Related Party, any lender or creditor of any Seller Party, Regal Distribution Holdings, LLC, American Multi-Cinema, Inc. and any of its or their respective members, stockholders, other beneficial owners, or Representatives;

(d)    all assets of the Seller Parties listed on <u>Schedule 2.1(d)</u>; and

(e)    except to the extent that any transfer or assignment is prohibited by applicable Law, all books, records, Tax Returns and other information primarily relating to the Purchased Assets and the Assumed Liabilities, in any media such books, records, Tax Returns and other information are stored, including on digital media and on servers; provided, however, that (i) the Seller Parties shall be entitled to retain copies of such books, records, Tax Returns and other information, (ii) the Seller Parties shall have continued access to such books, records, Tax Returns and other information in accordance with Section 6.6 and (iii) nothing in this Section 2.1(e) shall be deemed to include any of the Seller Parties' accounting systems.

Section 2.2.    <u>Excluded Assets</u>.  Nothing contained herein or in any of the Ancillary Agreements shall be deemed to sell, transfer, assign, convey or deliver any assets, properties, interests and rights of the Seller Parties, other than the Purchased Assets (the "<u>Excluded Assets</u>").

Section 2.3.    <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, Buyer shall (a) at the Closing, assume from the Seller Parties and thereafter pay, perform or discharge when due those Liabilities of the Seller Parties (i) arising out of the operation of the Purchased Assets (including the Assumed Contracts) for periods following the Closing Date (including for Periodic Taxes imposed with respect to the Purchased

17

Assets for the portion of a Straddle Period beginning after the Closing Date, pursuant to Section 6.4(a)) and (ii) for or in respect of outstanding Participations, to the extent arising under Assumed Contracts, or Guild Residuals arising from or related to any Title Rights in respect of any period (whether prior to, on or following the Closing Date), and (b) at the Closing, and subject to Section 2.7 and Section 2.9, pay the Cure Amounts associated with the Assumed Contracts in accordance with the provisions of Section 2.8 (collectively, the Liabilities to be assumed pursuant to the foregoing clauses (a) and (b), the "Assumed Liabilities").

Section 2.4.    Excluded Liabilities.  Notwithstanding any provision in this Agreement, Buyer is assuming only the Assumed Liabilities and is not assuming any other Liability of any Seller Party of whatever nature, whether presently in existence or arising hereafter (all such Liabilities not being assumed by Buyer being herein referred to as the "Excluded Liabilities") including, without limitation, all obligations and claims for prints and advertising costs and marketing costs related or attributable to the Purchased Assets or the Business except to the extent constituting Cure Amounts for any of the Assumed Contracts.

Section 2.5.    Closing.  On the terms and subject to the conditions set forth in this Agreement, the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "Closing") shall take place at the offices of Klee, Tuchin, Bogdanoff & Stern LLP at 1999 Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, California commencing at 9:00 a.m. Pacific Time, on a date that is no later than three Business Days after the last of the closing conditions set forth in Article VIII, Article IX and Article X is satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), or at such other location, date or time as Open Road and Buyer may mutually agree in writing.  The date the Closing actually occurs is referred to in this Agreement as the "Closing Date".

Section 2.6.    Escrows.  Buyer, Open Road and Citibank, N.A., as escrow agent (in such capacity, the "Escrow Agent"), will enter into an escrow agreement on the date upon which the Bankruptcy Court enters the Bidding Procedures Amendment Order (the "Escrow Agreement"), in the form attached hereto as Exhibit D, pursuant to which, (a) within one Business Day of the date upon which the Bankruptcy Court enters the Bidding Procedures Amendment Order, Buyer shall deposit $7,000,000.00 (the "Deposit Escrow Amount") in immediately available funds with the Escrow Agent to be held in accordance with the terms hereof and of the Escrow Agreement; and (b) at the Closing, Buyer shall deposit an amount (the "Adjustment Holdback Amount") equal to the P&R Cure Basket, in immediately available funds with the Escrow Agent to be held in accordance with the terms hereof and of the Escrow Agreement.

Section 2.7.    Aggregate Purchase Price.  Subject to Section 2.11 and Section 2.12 of this Agreement, the total purchase price for the Purchased Assets (the "Aggregate Purchase Price") shall be (a) the Adjusted Purchase Price, plus (b) the assumption of the Assumed Liabilities at Closing, less (c) the Cure Reduction Amount, less (d) Transaction Costs.

Section 2.8.    Assumed Contracts; Cure Amount.

(a)    Available Contracts.  Section 2.8(a) of the Disclosure Schedule sets forth a list under the heading "Available Contracts" of all executory Contracts (the "Available

Contracts") primarily relating to the Purchased Assets to which one or more of the Seller Parties are party but excluding the Contracts described in clause (a) of the definition of "Excluded Contracts". No later than the Designation Cut-Off Date, Buyer, in its sole discretion by written notice to the Seller Parties, shall designate in writing which Available Contracts Buyer wishes to "assume" (the "Assumed Contracts"). From and after the time Buyer has designated an Available Contract as an Assumed Contract until the Designation Cut-Off Date, Buyer may determine not to "assume" such Available Contract, and such Contract shall then be an Excluded Contract, *provided* that after the Closing Date the Buyer may also exclude a Disputed Contract (as defined below) in accordance with Section 2.8(c). Unless otherwise agreed by Open Road, all Contracts of the Seller Parties that are listed on Section 2.8(a) of the Disclosure Schedule as of the Designation Cut-Off Date and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Purchased Assets and shall automatically be deemed "Excluded Contracts" (and for the avoidance of doubt, Buyer shall not be responsible for any related Cure Amounts related to any Excluded Contracts). Upon Buyer's reasonable request, the Seller Parties shall provide to Buyer such additional information as may be available to the Seller Parties as to the Liabilities under the Available Contracts sufficient for Buyer to make an assessment whether to accept an assignment and assumption of any of the Available Contracts hereunder.

(b)    Commitment to Cure Amounts. The Seller Parties shall use commercially reasonable efforts to establish and verify all Cure Amounts for the Contracts set forth on Section 2.8(a) of the Disclosure Schedule prior to entry of the Sale Order. The Seller Parties shall use reasonable best efforts to assume, assign and sell the Assumed Contracts to Buyer, including taking actions reasonably required to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code. Buyer agrees to pay all Cure Amounts required to assume the Assumed Contracts pursuant to this Section 2.8 at the Closing; provided, further, that the Cure Amounts applicable to a Disputed Contract (as defined below) shall not be payable until the dispute is resolved in accordance with the provisions of this Agreement.

(c)    Determination of Cure Amounts. Upon objection by the nondebtor Contract counterparty to the Cure Amount asserted by the Seller Parties with regard to any Assumed Contract (such contract, a "Disputed Contract" and the aggregate Cure Amount for such Disputed Contracts as of the Closing, the "Disputed Cure Amount"), the Seller Parties shall either settle the objection of such party or shall litigate such objection under procedures as the Bankruptcy Court shall approve and prescribe; provided, that, (i) with respect to any such objection in connection with any Non-P&R Cure Amounts reflected on Schedule 1.1(e) the Seller Parties shall be responsible for all of the Seller Parties' costs and expenses of litigating any such objection, (ii) with respect to any such objection in connection with any Non-P&R Cure Amounts arising from a contract the Buyer is required to assume that is not on Schedule 1.1(e) (other than any contract listed on Schedule 10.3) and that is required for the Exploitation of the Purchased Titles after the Closing, the Seller Parties shall be responsible for all of the Seller Parties' costs and expenses of litigating any such objection, and (iii) with respect to any such objection in connection with any other Cure Amounts, Buyer shall be responsible for all costs and expenses of litigating any such objection pursuant to a budget that Buyer in its sole discretion establishes and the Seller Parties shall not be required to litigate any such objection unless Buyer advances to the Seller Parties all reasonable costs, fees and expenses (including

reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses) related to litigating such objection.  In no event shall any Cure Amount objection with regard to any Assumed Contract be settled without the express written consent of Buyer and the Seller Parties.  In the event that a dispute regarding the Cure Amount with respect to an Assumed Contract has not been resolved as of the Closing Date, the Parties shall nonetheless remain obligated to consummate the Transactions.  Upon an Order determining any Cure Amount regarding any Disputed Contract before or after the Closing Date, Buyer shall have the option to (x) pay the Cure Amount with respect to such Disputed Contract and assume the Disputed Contract as an "Assumed Contract" or (y) designate the Disputed Contract as an "Excluded Asset", in which case, for the avoidance of doubt, Buyer shall not assume the Disputed Contract and shall not be responsible for the associated Cure Amount.

(d)      Adequate Assurance.  Buyer shall use commercially reasonable efforts to provide the Bankruptcy Court any evidence reasonably necessary to prove adequate assurance of future performance necessary to effect the assumption and assignment of the Assumed Contracts.

(e)      Transfer Consent.  The Seller Parties shall transfer and assign all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from the Seller Parties, as of the Closing Date pursuant to the Sale Order and Section 365 of the Bankruptcy Code.  Except as to Assumed Contracts assigned pursuant to Section 365 of the Bankruptcy Code, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party or Governmental Agency (each, a "Transfer Consent"), would constitute a breach or in any way adversely affect the rights of Buyer or the Seller Parties thereunder after giving effect to the entry of the Sale Order.  Buyer and the Seller Parties shall cooperate together in good faith and use commercially reasonable efforts to obtain such Transfer Consents as soon as reasonably practicable and shall promptly inform each other of any discussions and communications with the counterparties from whom a Transfer Consent is required.   If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of the Bankruptcy Code, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, the Seller Parties and Buyer will cooperate in a mutually agreeable arrangement under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

Section 2.9.      Payment of Aggregate Purchase Price; Escrow Amounts.

(a)      No later than two Business Days before the Closing Date, Open Road shall deliver to Buyer Open Road's calculation of Estimated Purchase Price and of Estimated Net Library Cash Flow, with reasonable supporting detail as to each such calculation.

(b)      At the Closing, Buyer shall pay

(i)      to Open Road by wire transfer of immediately available funds, to an account designated in writing by Open Road at least two Business Days prior to the Closing, an amount equal to (such amount, the "Closing Payment to Open Road") (A) the Estimated Purchase Price, plus (B) the Incentive Fee (if earned pursuant to Section 2.13), less (C) the Deposit Escrow Amount, less (D) the

Adjustment Holdback Amount, <u>less</u> (E) the Cure Reduction Amount, <u>less</u> (F) Transaction Costs paid by Buyer at or prior to the Closing; and

(ii)    to the Escrow Agent, by wire transfer of immediately available funds to the account designated in the Escrow Agreement, the Adjustment Holdback Amount.

(c)    At the Closing, each of Buyer and Open Road shall duly execute and deliver to one another, and the Escrow Agent, a joint instruction to the Escrow Agent (in the form exhibited to the Escrow Agreement) instructing the Escrow Agent to pay to Open Road the Deposit Escrow Amount by wire transfer of immediately available funds in accordance with the Escrow Agreement.

(d)    At the Closing, Buyer shall pay to the non-debtor counterparty to each Assumed Contract, the Cure Amounts applicable to such Assumed Contract; provided that the Cure Amounts applicable to a Disputed Contract shall not be payable until the dispute is resolved in accordance with the provisions of this Agreement.

(e)    <u>Schedule 2.9</u> sets forth an illustrative example of the calculation of the payments to be made at Closing pursuant to this Section 2.9.

Section 2.10.  <u>Closing Deliverables</u>.

(a)    At the Closing, Open Road shall deliver, or cause to be delivered to Buyer:

(i)    a duly executed counterpart to each Ancillary Agreement to which a Seller Party is a party; and

(ii)    a certificate dated as of the Closing Date and executed by a duly authorized representative of Open Road, certifying that the conditions set forth in <u>Section 10.1</u> and <u>Section 10.2</u> have been satisfied.

(b)    At the Closing, in addition to compliance in full with the payment and delivery obligations of Buyer set forth in <u>Section 2.9</u>, Buyer shall deliver to Open Road:

(i)    a duly executed counterpart to each Ancillary Agreement to which Buyer is a party; and

(ii)    a certificate dated as of the Closing Date and executed by a duly authorized representative of Buyer, certifying that the conditions set forth in <u>Section 9.1</u> and <u>Section 9.2</u> have been satisfied.

Section 2.11.   Post-Closing Purchase Price Adjustment.

(a)      As promptly as practicable, but in no event later than 60 days following the Closing Date, Buyer shall prepare and deliver to Open Road a statement (the "Post-Closing Statement") setting forth Net Library Cash Flow and the Adjusted Purchase Price, including, in each case, the calculation thereof in reasonable detail.  The calculations set forth in the Post-Closing Statement shall be final and binding on all Parties unless Open Road gives Buyer written notice of its objections thereto (an "Objection Notice"), with reasonable supporting detail as to each such objection (each, a "Post-Closing Calculation Objection"), within the Objection Period. In the event Open Road fails to give Buyer an Objection Notice prior to the expiration of the Objection Period or otherwise earlier notifies Buyer that Open Road has no objections to the calculations set forth in the Post-Closing Statement, the Post-Closing Statement shall be deemed final and binding on all Parties, and all payments to be made in accordance with Section 2.11(d) shall be derived therefrom.  Any component of the calculations set forth in the Post-Closing Statement that is not the subject of a timely delivered Objection Notice by Open Road shall be final and binding on all Parties except to the extent such component could be affected by other components of the calculations set forth in the Post-Closing Statement.  Throughout the period following the Closing Date until the components of the calculations set forth in the Post-Closing Statement are deemed final and binding pursuant to this Section 2.11, each Party shall permit the other Party and its representatives reasonable access (with the right to make copies), during business hours upon reasonable advance notice, to the financial books and records of such Party and its subsidiaries for the purposes of the review and objection right contemplated herein.

(b)      The Parties shall use reasonable efforts to resolve any dispute arising under Section 2.11(a); provided, that if such Parties are unable to do so within 15 days following Open Road's delivery to Buyer of an Objection Notice, then by notice from either such Party to the other such Party, the disagreement with respect to such Post-Closing Calculation Objections may be submitted for resolution to the Independent Accountant. If a dispute is submitted to the Independent Accountant for resolution, the Parties shall enter into a customary engagement letter with, and to the extent necessary each Party to this Agreement will waive and cause its controlling Affiliates to waive any conflicts with, the Independent Accountant at the time such dispute is submitted to the Independent Accountant and shall cooperate with the Independent Accountant in connection with its determination pursuant to this Section 2.11.  Within ten Business Days after the Independent Accountant has been retained, each such Party shall furnish, at its own expense, to the Independent Accountant and the other Party a written statement of its positions with respect to each matter in dispute.  Within ten Business Days after the expiration of such ten-day period, each such Party may deliver to the Independent Accountant and to each other its response to the other's position on each matter in dispute.  With each submission, each such Party may also furnish to the Independent Accountant such other information and documents as it deems relevant or such information and documents as may be requested by the Independent Accountant with copies being given to the other such Party substantially simultaneously.  The Independent Accountant may, at its discretion, conduct a conference concerning the disagreement and each such Party shall have the right to present additional documents, materials and other information and to have present its Representatives.  No Party or its Representatives shall be permitted to engage in any ex parte communications with the Independent Accountant.

22

(c)    The Independent Accountant shall be directed to promptly, and in any event within 30 days after its appointment pursuant to Section 2.11(b), render its decision on the disputed Post-Closing Calculation Objections.  The Independent Accountant's determination as to each Post-Closing Calculation Objection in dispute shall be set forth in a written statement delivered to each such Party, which shall include the Independent Accountant's determination as to the calculation of the disputed Post-Closing Calculation Objections, all of which shall be final and binding on all Parties absent manifest error; provided, that the Parties may seek a determination from the Bankruptcy Court concerning any failure by the other Party or Parties to comply with the requirements of this Section 2.11.  In resolving any disputed Post-Closing Calculation Objection, the Independent Accountant may not assign a value to such Post-Closing Calculation Objection greater than the greatest value for such Post-Closing Calculation Objection claimed by Buyer in its Post-Closing Statement or by Open Road in its Objection Notice or less than the lowest value for such item claimed by Buyer in its Post-Closing Statement or by Open Road in its Objection Notice.  The fees and expenses of the Independent Accountant pursuant to this Section 2.11 shall be allocated between Buyer and Open Road based upon the percentage which the portion of the contested amount not awarded to each such Party bears to the amount actually contested by such Party.

(d)    Within five Business Days after the date that the Post-Closing Statement becomes final and binding in all respects pursuant to this Section 2.11 (whether by a determination rendered by the Independent Accountant or the mutual agreement of the Parties):

(i)    if the amount of the Adjusted Purchase Price (as finally determined pursuant to this Section 2.11) exceeds the amount of the Estimated Purchase Price, Buyer shall pay, or cause to be paid, to Open Road, by wire transfer of immediately available funds, an amount equal to such excess; or

(ii)    if the amount of the Estimated Purchase Price exceeds the Adjusted Purchase Price (as finally determined pursuant to this Section 2.11), Buyer and Open Road shall duly execute and deliver to one another and to the Escrow Agent a joint instruction to the Escrow Agent (in the form exhibited to the Escrow Agreement) instructing the Escrow Agent to disburse an amount equal to such excess from the Adjustment Holdback Funds, if any, to Buyer. Notwithstanding anything to the contrary herein, the Parties agree that, following the Closing, (x) the Seller Parties shall have no, and Buyer hereby waives and releases any, obligation or liability with respect to any amounts due to Buyer pursuant this Section 2.11(d) in excess of the Adjustment Holdback Funds, and (y) the Adjustment Holdback Funds shall be the sole source of funds available to Buyer in connection with any payment due under this Section 2.11(d); provided, however, that the foregoing waiver and release shall be null and void and the limitation provided in clause (y) of this sentence shall be of no effect if there is fraud, willful misconduct, or gross negligence in the Seller Parties' calculation of the Estimated Net Library Cash Flow.

(e)     With respect to any Adjustment Holdback Funds remaining in escrow following the adjustment contemplated by Section 2.11(d) (including, for the avoidance of doubt, if the amount of the Adjusted Purchase Price (as finally determined pursuant to this Section 2.11) equals the amount of the Estimated Purchase Price), (I) the lesser of (x) the actual amount of the remaining Adjustment Holdback Funds and (y) $2,500,000 plus the then outstanding Disputed Cure Amount, shall continue to be held in escrow by the Escrow Agent until disbursed in accordance with the terms of Section 2.12 hereof and the Escrow Agreement; and (II) if applicable, Buyer and Open Road shall duly execute and deliver to one another and to the Escrow Agent a joint instruction to the Escrow Agent (in the form exhibited to the Adjustment Escrow Agreement) instructing the Escrow Agent to disburse to Open Road the amount by which the remaining Adjustment Holdback Funds exceed the amount to remain in escrow pursuant to clause (I), if any.

(f)     All payments pursuant to this Section 2.11 shall be treated as adjustments to the Adjusted Purchase Price for Tax purposes unless otherwise required by Law.

Section 2.12.    Release of Adjustment Holdback Funds.  The Adjustment Holdback Funds shall be released to the Parties from time to time after the Closing in accordance with the following:

(a)     If, at Closing or during the 180-day period after the Closing, the Buyer pays any Other Post-Closing Adjustment Costs (in each case, without duplication of any amounts included in the Cure Reduction Amount or otherwise deducted from the Closing Payment to Open Road), at any time during such period so long as any Adjustment Holdback Funds exist, Buyer may provide from time to time written notice to Open Road of such event(s) and provide reasonable supporting detail (each, an "Other Post-Closing Adjustment Notice").  Open Road shall have the right to give Buyer written notice of its objections to any such Other Post-Closing Adjustment Notice, with reasonable supporting detail as to each such objection (each, an "Post-Closing Cost Objection Notice"), within the Objection Period.  For the avoidance of doubt, the Buyer can provide Seller Parties with one or more Other Post-Closing Adjustment Notices during such 180-day period, including within the sixty day period following the Closing Date, each of which notices shall represent a separate and independent claim hereunder; provided, however, that, with the exception of the Final Other Post-Closing Adjustment Notice, Buyer may not provide an Other Post-Closing Adjustment Notice unless the Post-Closing Adjustment Costs claimed therein exceed $250,000.00.   Buyer shall permit the Seller Parties and their representatives reasonable access (with the right to make copies), during business hours upon reasonable advance notice, to the financial books and records of Buyer and its subsidiaries for the purposes of the review and objection right contemplated herein.

(b)     In the event Open Road fails to give Buyer a Post-Closing Cost Objection Notice prior to the expiration of the Objection Period for any individual Other Post-Closing Adjustment Notice or otherwise earlier notifies Buyer that Open Road has no objections, the Other Post-Closing Adjustment Cost amount referenced in such Other Post-Closing Adjustment Notice shall be deemed final and binding on all Parties and all payments to be made in accordance with Section 2.12(d) shall be derived therefrom.

(c)      The Parties shall use reasonable efforts to resolve any dispute arising under Section 2.12(a); provided, that if such Parties are unable to do so within 15 days following Open Road's delivery to Buyer of a Post-Closing Cost Objection Notice, then by notice from either such Party to the other such Party, the disagreement with respect to such objections may be submitted for resolution to (i) an Independent Accountant if the Other Post-Closing Adjustment Cost is on account of audit obligations for Participations and Guild Residuals and (ii) the Bankruptcy Court for any Other Post-Closing Adjustment Costs not on account of audit obligations for Participations and Guild Residuals.  If a dispute is submitted to the Independent Accountant for resolution, the Parties shall follow the same procedure set forth in Section 2.11(b) and Section 2.11(c).

(d)      Within five Business Days after the date that the Other Post-Closing Adjustment Cost amount referenced in the Other Post-Closing Adjustment Notice becomes final and binding in all respects pursuant to this Section 2.12 (whether in accordance with Section 2.12(b), by a determination rendered by the Independent Accountant, by the Bankruptcy Court and/or the mutual agreement of the Parties): the Buyer and Open Road shall duly execute and deliver to one another and to the Escrow Agent a joint instruction to the Escrow Agent (in the form attached to the Escrow Agreement) instructing the Escrow Agent to disburse to (x) Buyer an amount equal to the lesser of (A) the amount of the Other Post-Closing Adjustment Costs, and (B) the then-remaining Adjustment Holdback Funds, if any; and to (y) Open Road any remaining Adjustment Holdback Funds after taking into account any payment due to Buyer pursuant to clause (x).  If there are no Adjustment Holdback Funds remaining, no payments shall be made to Buyer pursuant to this Section 2.12(d) (whether from the escrow account established by the Escrow Agent to hold the Adjustment Holdback Funds, from the Seller Parties or otherwise).  Any Adjustment Holdback Funds remaining after the expiration of the 180-day period after the Closing shall be promptly released to Open Road by the Escrow Agent; provided that any amounts that are subject to an unresolved dispute in respect of Other Post-Closing Adjustment Costs for which an Other Post-Closing Adjustment Notice was timely provided by Buyer within such 180 day period shall be retained by the Escrow Agent until the final resolution of such dispute in accordance with this Section 2.12.  For the avoidance of doubt, if an Other Post-Closing Adjustment Notice is timely provided by Buyer within such 180 day period, such notice shall be deemed "an unresolved dispute" and any amounts reflected in such notice shall held in escrow pending resolution of such dispute in accordance with this Section 2.12.

(e)      Notwithstanding anything to the contrary herein, the Parties agree that, following the Closing, Buyer's sole and exclusive remedy with respect to Other Post-Closing Adjustment Costs and any other matters related to Guild Residuals and Participations included in the Assumed Liabilities shall be pursuant to the adjustment mechanism set forth in this Section 2.12, and Buyer acknowledges and agrees that it shall have no right to (and shall not, and shall cause its Affiliates and Representatives not to) claim, demand or otherwise seek or receive the payment of any amounts whatsoever included in the Assumed Liabilities or Other Post-Closing Adjustment Costs from the Seller Parties.

(f)      All payments pursuant to this Section 2.12 shall be treated as adjustments to the Adjusted Purchase Price for Tax purposes unless otherwise required by Law.

Section 2.13.  Incentive Fee.  If, prior to the Closing, the Seller Parties shall have obtained or procured an Order of the Bankruptcy Court providing that all Material Contracts designated for assumption and assignment by the Buyer are so assumed and assigned, in full force and effect and not in default, notwithstanding the Buyer not assuming any of the contracts listed in Schedule 10.3 and any other Material Contract, then the Buyer shall pay to Open Road by wire transfer of immediately available funds, to an account designated in writing by Open Road an amount equal to the Incentive Fee.  The Buyer shall pay, pursuant to a budget that the Buyer in its sole discretion establishes, for the Seller Parties' reasonable legal fees related to the Seller Parties responding to an objection from counterparties listed on Schedule 10.3 to the Seller Parties seeking the relief contained in this Section 2.13.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER PARTIES

Except for the exceptions and disclosures set forth on the Disclosure Schedule, and subject to the limitations in Section 13.8, as of the execution of this Agreement and as of the Closing Date, the Seller Parties hereby represent and warrant to Buyer as follows:

Section 3.1.  Corporate Organization, Qualification, Power and Authority.  Each Seller Party is duly formed and validly existing under the Laws of its jurisdiction of incorporation or formation, as applicable.  Except for such authorization as is required from the Bankruptcy Court, each Seller Party has the requisite limited liability company power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution and delivery by each Seller Party of this Agreement and the Escrow Agreement and, at the Closing each Ancillary Agreement to which it is a party and the performance by it of its obligations hereunder and thereunder, and the consummation by each Seller Party of the Transactions, have been (or at the Closing will be) duly and validly authorized by each Seller Party, and no other requisite corporate proceeding on the part of any Seller Party is (or at the Closing, will be) necessary to authorize the execution, delivery or performance hereof or thereof or to consummate the Transactions.  This Agreement and each Ancillary Agreement to which any Seller Party is a party has been (or when delivered, will be) duly and validly executed and delivered by such Seller Party and, assuming this Agreement and the Ancillary Agreements constitute the valid and binding agreement of the other parties hereto or thereto, and the entry of the Bidding Procedures Order and Sale Order, constitutes the valid and binding agreement of such Seller Party, enforceable against such Seller Party in accordance with its terms, except as such enforcement may be limited by (a) applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Laws now or hereinafter in effect relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity) (the "Bankruptcy and Equity Exception").

Section 3.2.  Consents and Approvals; No Violations.  Except for (a) the filing of notification and report forms with the FTC and the Antitrust Division under the HSR Act and the expiration or termination of any applicable waiting period thereunder, (b) the issuance of Consents of such applications by such agencies, if required, and the expiration or termination of any applicable waiting periods thereunder and (c) the entry of the Bidding Procedures Order and

Sale Order, no applications, notices to, Consents of, or filings with, any Governmental Agency are necessary in connection with the execution and delivery by the Seller Parties of this Agreement and the Ancillary Agreements or the consummation by the Seller Parties of the Transactions, except where failure to provide, obtain or make, as applicable, any such any applications, notices, Consents or filings, would individually or in the aggregate, not be reasonably likely to have a Material Adverse Effect.  The notices, notifications, filings, Consents, and expirations or terminations of waiting periods referred to in Section 3.2(a), Section 3.2(b) and Section 3.2(c) are hereinafter referred to as the "Requisite Regulatory Approvals".

Section 3.3.    No Conflict.  Subject to obtaining the Requisite Regulatory Approvals, the execution, delivery and performance by the Seller Parties of this Agreement and the consummation of the transactions contemplated hereby do not and will not violate in any material respect (i) any provision of law, statute, rule or regulation, (ii) any applicable Order of any court or any rule, regulation or Order of any Governmental Agency, where any such conflict, violation, breach or default could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (iii) any provision of or result in the termination of any Material Contract without consent from the counter-party to such Material Contract, except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

Section 3.4.    Title to Assets.  The Seller Parties own, have, and upon delivery to Buyer at Closing of the Ancillary Agreements (other than the Escrow Agreement) and in accordance with the terms of the Sale Order, the Seller Parties will transfer to Buyer, good and valid title to, or, in the case of property leased or licensed by the Seller Parties, a valid leasehold interest in, or license to use, all Purchased Assets (except as sold or disposed of subsequent to the Execution Date not in violation of this Agreement), free and clear of all Liens other than Permitted Liens.  Other than the Excluded Assets and subject to payment of any applicable Cure Amounts, (a) the Purchased Assets are sufficient to derive the full economic value from the Purchased Assets and (b) the Title Rights include the rights necessary to Exploit the Purchased Titles, in the case of each of clause (a) and (b), after the Closing in a manner consistent with past practice of the Seller Parties and the Business as conducted immediately prior to the Petition Date.

Section 3.5.    Intellectual Property.

(a)    Section 3.5(a) of the Disclosure Schedule sets forth a list of all applications, assignments, registrations and filings for Purchased Intellectual Property that have been registered, filed, certified or otherwise perfected or recorded or are the subject of a pending application for such, with or by any Governmental Agency (other than in connection with any internet domain names), by or on behalf of or in the name of any Seller Party, excluding any items that are cancelled, expired, abandoned, withdrawn, or finally refused (without right of appeal) (the listed Purchased Intellectual Property, the "Registered Purchased Intellectual Property").  The Registered Purchased Intellectual Property is owned exclusively by Seller Parties, is valid and subsisting and in full force and effect except where such failure to be so valid and subsisting and in full force and effect would not be material to the Purchased Assets taken as a whole.

(b)     Each item of Registered Purchased Intellectual Property is and at all times has been in material compliance with all Laws and all filings, payments, disclosures and other actions required to be made or taken to maintain any such item of Registered Purchased Intellectual Property in full force and effect have been made by the applicable deadline. Each item of Registered Purchased Intellectual Property is valid, subsisting, in full force and effect and, except with respect to applications, enforceable.

(c)     No Seller Party has received any written notice of infringement or misappropriation from any third party with respect to any Purchased Intellectual Property. To the Seller Parties' Knowledge, there has been no infringement or misappropriation by any Person of any Purchased Intellectual Property, and no Seller Party has made or asserted any written complaint or written claim alleging any such infringement or misappropriation has occurred since January 1, 2018.

(d)     None of the Seller Parties, the Title Rights, nor the conduct of the Business infringes, misappropriates or otherwise violates, or has infringed, misappropriated or otherwise violated, the Intellectual Property, moral rights or neighboring rights of any third party. No interference, opposition, cancellation, reissue, reexamination, review or other Action is or has been pending or, to the Seller Parties' Knowledge, threatened, in which the ownership, scope, validity or enforceability of any Purchased Intellectual Property or the Title Rights is being, has been, or would reasonably be expected to be contested or challenged, and there are no specific facts that would form a reasonable basis for a Claim with respect to the foregoing. At Closing, Buyer will be able to fully Exploit all Purchased Intellectual Property and all other Title Rights without infringing or otherwise violating any Intellectual Property, moral rights or neighboring rights owned or controlled by any Seller Party.

Section 3.6.     Material Contracts.  Section 3.6 of the Disclosure Schedule sets forth a list of all material Available Contracts primarily related to the Purchased Assets to which a Seller Party is a party or by which any of them or any of the Purchased Assets are bound (but excluding Contracts that are Excluded Assets and excluding this Agreement) (collectively, the "Material Contracts"). Each Material Contract is, in all material respects, (a) in full force and effect and is a valid and binding obligation of the applicable Seller Party which is a party thereto and (b) enforceable against the applicable Seller Party, and, to the Seller Parties' Knowledge, enforceable against the other party or parties thereto, in accordance with its terms (except that the enforcement thereof may be limited by the Bankruptcy and Equity Exception). Notwithstanding anything contrary in this Agreement, the Seller Parties may not amend the Material Contract schedule without written consent from the Buyer.

Section 3.7.     Audits.  Except as set forth on Section 3.7 of the Disclosure Schedule, since January 1, 2017, no Guild nor any other Person from whom any Seller Party acquired rights to Exploit the Title Rights have commenced, given written notice of an intention to commence, or, to Seller Parties' Knowledge otherwise threatened to commence, any audit of the Seller Parties' or their Affiliates' books and records. No Seller Party has waived or modified any of the audit rights provided for in the Assumed Contracts giving rise to the Participations with respect to audit periods that remain contestable as of the Closing Date.

Section 3.8.    Purchased Tangible Materials.    Section 3.8 of the Disclosure Schedule lists each Person (other than the Seller Parties) that is in possession of any of the Purchased Tangible Materials.  With respect to any Purchased Tangible Materials in the possession of each such Person, (i) the Seller Parties, subject to payment in full of any applicable Cure Amounts, have access to such Purchased Tangible Materials, (ii) the Seller Parties are party to customary Contracts for such access and (iii) each such access Contract constitutes an Available Contract. The Purchased Tangible Materials, which include an original negative or digital master of each of the Purchased Titles, are in first class technical and present commercial quality and condition, sufficient to permit Buyer's Exploitation of the Purchased Titles and the Title Rights in a manner consistent with the present commercial Exploitation thereof.

Section 3.9.    Cure Schedule. The Cure Schedule reflects the Seller Parties' good faith estimates as of the Execution Date of the P&R Cure Amounts and estimated Non-P&R Cure Amounts. The Seller Parties have made available to Buyer in the electronic data room established and maintained by or on behalf of the Seller Parties and hosted by Merrill Corporation in connection with the Transaction, the agreements, documents and information setting forth in all material respects the Seller Parties' obligations with respect to Participations or Guild Residuals in connection with the Exploitation of the Purchased Titles pursuant to the Title Rights.  Notwithstanding anything contrary in this Agreement, the Seller Parties may not amend the Cure Schedule without the prior written consent from the Buyer.

Section 3.10.    Availabilities.    Open Road has provided to Buyer the Availabilities Database which sets forth the pay television and free television "availabilities" (as such term is commonly understood in the U.S. motion picture industry) of each of the Purchased Titles, which Availabilities Database is to the Seller Parties' knowledge true and correct in all material respects with respect to such rights in the Purchased Titles.

Section 3.11.    Brokers and Finders.    No investment banker, broker, finder or intermediary or other Person in connection is or will be entitled to any investment banking, brokerage, finder's, financial advisory or similar fee or commission in connection with this Agreement, any Ancillary Agreement or the Transactions as a result of any arrangement made by any Seller Party, except as set forth on Section 3.10 of the Disclosure Schedule.

Section 3.12.    Taxes.    None of the Purchased Assets is a "United States real property interest," within the meaning of Section 897(c)(1).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Seller Parties as follows:

Section 4.1.    Corporate Organization, Qualification, Power, Authority.    Buyer is a limited liability company duly formed and validly existing and in good standing under the Laws of Delaware.  Buyer has the requisite entity power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the Transactions.  The execution and delivery by Buyer of this Agreement and the Escrow Agreement, and at the Closing each

Ancillary Agreement to which Buyer will be a party and the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the Transactions, have been (or at the Closing will be) duly and validly authorized by the governing body of Buyer, and no other requisite corporate proceeding on the part of Buyer is (or at the Closing, will be) necessary to authorize the execution, delivery and performance hereof or thereof or to consummate the Transactions. This Agreement and each Ancillary Agreement to which Buyer is a party has been (or when delivered, will be) duly and validly executed and delivered by Buyer and, assuming this Agreement and the Ancillary Agreements constitute the valid and binding agreement of the other parties hereto or thereto, and the entry of the Bidding Procedures Order and Sale Order, constitutes the valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, except as such enforcement may be limited by the Bankruptcy and Equity Exception.

Section 4.2.    Consents and Approvals; No Violations.  Subject to the giving of notices and obtaining the Requisite Regulatory Approvals and the entry of the Bidding Procedures Order and Sale Order, no applications, notices to, Consents of, or filings with, any Governmental Agency, self-regulatory authority or third party are necessary in connection with the execution and delivery by Buyer of this Agreement and the Ancillary Agreements or the consummation by Buyer of the Transactions.  Neither the execution, delivery or performance of this Agreement and the Ancillary Agreements by Buyer, nor the consummation by Buyer of the Transactions, does or will (a) violate in any material respect, or result in any material breach of any material provisions of the Organizational Documents of Buyer; (b) violate in any material respect, result in or constitute a material default under, any of the material terms, conditions or provisions of any material Contract to which Buyer is a party or by which it or any of its properties or assets may be bound; (c) violate in any material respect, or result in or constitute a material default under, any of the material terms, conditions or provisions of any Permit applicable to Buyer; or (d) subject to giving the notices and obtaining the Requisite Regulatory Approvals, and the entry of the Bidding Procedures Order and Sale Order, violate in any material respect any material Law applicable to Buyer or any of its material properties or assets.

Section 4.3.    Financial Capability.  Buyer has (a) sufficient funds available to pay the Aggregate Purchase Price payable in cash and any expenses incurred by Buyer in connection with the transactions contemplated by this Agreement, (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (c) not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

Section 4.4.    Brokers and Finders.    No investment banker, broker, finder or intermediary or other Person is or will be entitled to any investment banking, brokerage, finder's, financial advisory or similar fee or commission in connection with this Agreement, the Ancillary Agreements or the Transactions as a result of any arrangement made by or on behalf of Buyer.

Section 4.5.    Solvency.  Buyer shall (a) be able to pay its debts as they become due and shall own property which has a fair saleable value greater than the amounts required to pay their respective debts (including a reasonable estimate of the amount of all contingent Liabilities) and (b) have adequate capital to carry on its business as contemplated to be conducted following the Closing.  No transfer of property is being made and no obligation is being incurred in connection

with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Buyer.

Section 4.6.    <u>Condition of the Purchased Assets</u>.  Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that the Seller Parties are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Seller Parties in Article III (as modified by the Disclosure Schedules), and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis.  Buyer acknowledges that, in making the determination to proceed with the Transactions, Buyer has relied on the results of its own independent investigation of the Purchased Assets.

Section 4.7.    <u>Other Agreements</u>.    Other than this Agreement and the Ancillary Agreements, there are no Contracts, nor any agreement, arrangement or understanding (whether oral or written) to enter into any Contracts, between, on the one hand, Buyer or any Buyer Related Party, and, on the other hand, the Seller Parties and/or any Seller Related Party, (a) that relate to the Transactions, (b) pursuant to which any Seller Party or any Seller Related Party would be entitled to receive consideration with respect to the Transactions (other than as may be expressly provided in this Agreement), (c) pursuant to which any Seller Party or any Seller Related Party has agreed to approve this Agreement or the Transactions or (d) pursuant to which any Seller Party or any Seller Related Party has agreed to provide, directly or indirectly, consideration to Buyer or any Buyer Related Party to finance, in whole or in part, the Transactions.

**ARTICLE V**
**PRE-CLOSING COVENANTS AND AGREEMENTS**

Section 5.1.    <u>Affirmative Covenants</u>.  The Parties covenant and agree that, after the Execution Date and prior to the Closing Date, the Parties shall use their respective reasonable best efforts not to take or agree to or commit to assist any other Person in taking any action (a)  that would reasonably be expected to result in a failure of any of the conditions to the Closing or (b) that would reasonably be expected to impair the ability of the Parties to consummate the Closing in accordance with the terms hereof or to materially delay such consummation, in each case except (i) as contemplated by the Bidding Procedures Order or (ii) any actions with respect to any Acquisition Proposal.

Section 5.2.    <u>Negative Covenants</u>.  The Seller Parties will not, without the prior written consent of the Buyer (which consent shall not be unreasonably withheld, conditioned or delayed):

(a)    sell, lease, license or otherwise dispose of any Purchased Assets except (i) pursuant to pre-existing contracts or commitments or (ii) as required by Law;

(b)    assume, reject or assign any Assumed Contract other than pursuant to <u>Section 2.8</u>;

(c)    enter into, renew, amend or modify any Material Contract without the approval of the Bankruptcy Court in accordance with section 363(b) of the Bankruptcy Code; or

31

(d)     agree or commit to do any of the foregoing.

Section 5.3.    Permitted Pre-Closing Actions.

(a)     Notwithstanding anything to the contrary in Section 5.1, Section 5.2 or any other provision of this Agreement, from the Execution Date until the Closing Date, the Seller Parties shall have the sole and absolute discretion to take any or all of the following actions: (i) actions required to comply with applicable Law, the Orders of the Bankruptcy Court or the Bankruptcy Code, (ii) actions required to comply with the agreement entered into by the Seller Parties for post-petition financing, (iii) actions contemplated by this Agreement or (iv) paying any management fees, consulting fees, service fees, director's fees or professional advisor's fees in the Ordinary Course of Business or as approved by the Bankruptcy Court.

(b)     For the avoidance of doubt, the terms and conditions of this Section 5.3 are in addition, and without prejudice, to the right of the Seller Parties to take any actions not otherwise prohibited by Section 5.2.

Section 5.4.    Access; Books and Records.  Subject to (a) non-disclosure of information that is Privileged Material and (b) applicable Law, during the period from and after the Execution Date and continuing until the earlier of the Closing Date and a Party's receipt of a notice in connection with Section 11.1 notifying a Party hereto of the termination of this Agreement, upon reasonable prior written notice, the Seller Parties shall permit Buyer and a reasonable number of Buyer's attorneys, accountants, representatives and agents to have reasonable access, at Buyer's sole expense, during normal business hours at a location determined at the reasonable discretion of Open Road, in such manner as to not disrupt or interfere with the normal operation of the Business, to the books, records, Tax Returns and other information with respect to the Purchased Assets and the Assumed Liabilities, and to the then current officers and employees of the Seller Parties, as Buyer may from time to time reasonably request.  All information provided or obtained pursuant to the preceding sentence shall be deemed to be "Proprietary Information" under the Confidentiality Agreement and held by Buyer in accordance with, and subject to the terms of, the Confidentiality Agreement; it being understood that the terms of the Confidentiality Agreement are incorporated by reference herein in their entirety, with each of the Seller Parties being deemed, and having all of the rights of, a "Disclosing Party" under the Confidentiality Agreement.

Section 5.5.    Notice of Developments.  Prior to the Closing, each Party shall notify, as promptly as is reasonably practicable, the other Party, in writing, of any events, circumstances, facts and occurrences arising subsequent to the Execution Date which would result in the impossibility of the satisfaction of any such Party's conditions precedent to Closing; provided, nothing set forth in this Section 5.5 shall require any Party to provide any notice if such notice would reasonably be expected to contravene applicable Law or any Seller Party to provide any notice if such notice would reasonably be expected to (a) jeopardize any Privileged Material or (b) result in the disclosure of any Privileged Material.

Section 5.6.    <u>Competition Filings</u>.

(a)    If the Buyer determines (after consulting in good faith with Open Road) that a filing under the HSR Act is required, Open Road and Buyer shall, as promptly as practicable but in any event not more than five Business Days after entry of an order that identifies the Buyer as the "stalking horse" for the Purchased Assets, file, or cause to be filed, all required notification and report forms under the HSR Act with the FTC and the Antitrust Division of the United States Department of Justice (the "<u>Antitrust Division</u>") in connection with the Transactions, file requests for early termination and shall use their respective reasonable best efforts to respond as promptly as practicable to all inquiries received from the FTC or the Antitrust Division for additional information or documentation and to cause the waiting period under the HSR Act to terminate or expire at the earliest possible date (and, in any event, prior to the End Date).  Buyer shall pay 100% of all filing fees payable in respect of any such filings.

(b)    The Seller Parties, on the one hand, and Buyer, on the other hand, will each furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filings or submission that necessary under the provisions of the HSR Act; <u>provided</u> that each of Open Road and Buyer shall have the right to review and comment in advance on any such filings or submissions made by the other Party; <u>provided</u>, <u>however</u>, that any of the foregoing information may be redacted as necessary to address reasonable privilege, contractual or confidentiality concerns.  Open Road and Buyer shall keep each other apprised on a reasonably current basis of the status and content of any communications with, and any inquiries or requests for additional information from, any Governmental Agency (<u>provided</u> that neither the Seller Parties nor Buyer shall have any substantive contact with any Governmental Agency with respect to any filing or proceeding contemplated by this <u>Section 5.6</u> unless it consults with the other Party in advance and, to the extent permitted by such Governmental Agency, gives the other Party opportunity to participate).  In furtherance of and not in limitation of the foregoing, each of the Seller Parties and Buyer shall not, absent the prior written agreement of the other Party, extend any waiting period or comparable period under the HSR Act or enter into any agreement with any Governmental Agency not to consummate the Transactions.

(c)    In furtherance of and without limiting the generality of <u>Section 5.6(a)</u>, if any objections are asserted with respect to the transactions contemplated hereby under the HSR Act or if any suit is threatened or instituted by any Governmental Agency or any private party challenging any of the transactions contemplated hereby as violative of the HSR Act, Buyer shall use commercially reasonable efforts to resolve such objections or challenges as such Governmental Agency or private party may have to such transactions, including to vacate, lift, reverse, or overturn any order, whether temporary, preliminary, or permanent, so as to permit consummation of the transactions contemplated by this Agreement as soon as practicable and in any event on or prior to the End Date.

Section 5.7.    <u>Reasonable Best Efforts</u>.  Without limiting any other provision of this Agreement, upon the terms and subject to the conditions of this Agreement, each of the Parties shall act in good faith and use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable, consistent with applicable Law, to consummate the Transactions as soon as reasonably practicable, including

such actions or things as, with respect to any of the Seller Parties, Buyer, and with respect to Buyer, Open Road, may reasonably request to satisfy any of the conditions to such other Party's (or Parties', as applicable) obligation to consummate the Transactions.

## ARTICLE VI
## POST-CLOSING COVENANTS AND AGREEMENTS

Section 6.1.    Guild Matters.    Following the Closing, Buyer shall assume obligations under any Collective Bargaining Agreement between any Seller Party and a Guild with respect to Guild Titles; provided that Buyer will do so: (a) as a new company, and shall not be deemed to be a successor employer of any Seller Party; and (b) only as to Collective Bargaining Agreements associated with the Guild Titles that are Purchased Titles.    Buyer shall, within a reasonably practicable time following any request by Open Road or any Guild, as applicable, engage in discussions with the corresponding Guild regarding entering into a Guild Assumption Agreement.

Section 6.2.    Employee Matters.    From the Execution Date until the Closing Date, Buyer may (but shall be under no obligation to) make offers of employment to any individuals who are employed by any Seller Party (as to the individuals, the "Seller Party Employees"), in each case subject to Open Road's prior written consent (such consent not to be unreasonably withheld).    The Seller Parties shall terminate all such Seller Party Employees immediately prior to the Closing that accepts such an offer from Buyer.    Those employees who are offered and accept such offers of employment with Buyer based on the terms and conditions set by Buyer will be considered "Buyer Employees" for purposes of this Agreement.    The Buyer shall have no liabilities for any Seller Party Employees except liabilities arising for Buyer Employees arising after the Closing Date.

Section 6.3.    WARN.    With respect to Buyer Employees, Buyer shall be solely responsible for compliance with and Liabilities relating in any way to the WARN Act arising from and after the Closing.    With respect to Seller Party Employees, but excluding any individuals that become Buyer Employees, the Seller Parties shall be solely responsible for compliance with and Liabilities relating in any way to the WARN Act for any act or omission of any Seller Party after the Closing.

Section 6.4.    Certain Tax Matters.

(a)    Liability for Taxes.    Personal property taxes, ad valorem taxes, and franchise fees or taxes (that are imposed on a periodic basis (as opposed to a net income basis)) (collectively, "Periodic Taxes") shall be prorated for the Purchased Assets between Seller Parties on the one hand, and Buyer on the other hand, for any taxable periods beginning on or prior to, and ending after, the Closing Date (such taxable periods, "Straddle Periods") in the method set forth in Section 6.4(b).    The amount of all such prorations shall be settled and paid on the Closing Date; provided, however, that final payments with respect to prorations that are not able to be calculated on the Closing Date shall be calculated and paid as soon as practicable thereafter.

(b)    Straddle Periods.  In the case of any Straddle Period, all Periodic Taxes with respect to the Purchased Assets for any such period shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period by multiplying such Taxes by a fraction the numerator of which is the number of days in such taxable year or period and the denominator of which is the number of days in the entire Straddle Period.

(c)    Transfer Taxes.  Buyer shall pay when due and be responsible for up to $25,000 of Transfer Taxes.  Seller Parties shall pay when due and be responsible for all Transfer Taxes in excess of $25,000.  The Party required by applicable Law shall prepare and timely file any Tax Returns or other filing related to Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes, provided that Buyer and the Seller Parties shall, and shall cause their respective Affiliates to, cooperate to provide reasonable assistance in connection therewith to the preparing Party.

(d)    Tax Cooperation.  Buyer and the Seller Parties shall cooperate fully, as and to the extent reasonably requested by Buyer or the Seller Parties, as applicable, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Transfer Taxes or Taxes otherwise relating to the Business or the Purchased Assets.  Such cooperation shall include the retention and (upon the request of, with respect to any of the Seller Parties, Buyer, and with respect to Buyer, Open Road) the provision of records and information that are reasonably relevant to the preparation of any such Tax Return or any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Buyer and the Seller Parties further agree, upon request, to use their reasonable best efforts to obtain any certificate or other document from any Taxing Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed on the Business or with respect to the Purchased Assets (including with respect to the Transactions).

(e)    Purchase Price Allocation.  Within 30 days after the date that the Post-Closing Statement becomes final and binding on the parties hereto pursuant to Section 2.11(d), Buyer shall prepare and deliver to Open Road a statement allocating the sum of the Aggregate Purchase Price (and all other amounts comprising the "seller's consideration" as such term is defined in Treasury Regulations Section 1.1060-1(c)(1)) among the Purchased Assets (the "Tax Consideration") in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provisions of state, local or foreign Law) and Exhibit F (such statement, the "Allocation Statement").  If within 30 days after the delivery of the initial Allocation Statement, Open Road notifies Buyer in writing that Open Road objects to the initial Allocation Statement, Buyer and Open Road shall use reasonable best efforts to resolve such dispute within 20 days.  In the event that Buyer and Open Road are unable to resolve such dispute within 20 days, Buyer and Open Road shall jointly retain the Independent Accountant to resolve only such items that remain in dispute; provided, that the Independent Accountant's sole authority and task shall be to ensure that the Allocation Statement is prepared in accordance with Exhibit F.  Upon resolution of the disputed items, the Allocation Statement shall be adjusted to reflect such resolution.  The costs, fees and expenses of the Independent Accountant shall be borne by Open Road and Buyer in the manner set forth in Section 2.11(c).  The Allocation Statement shall become final upon mutual agreement of the Parties or as determined by the Independent Accountant pursuant to this Section 6.4(e).  Thereafter, Buyer shall prepare and

35

deliver to Open Road from time to time a revised proposed Allocation Statement updated to reflect any adjustments to the Tax Consideration requiring any adjustment to the Allocation Statement.  Such revised allocation statement shall become the Allocation Statement subject to review and dispute resolution rights allowable to the initial proposed Allocation delivered to Buyer pursuant to this <u>Section 6.4(e)</u>.  If the IRS or any other taxing authority proposes a different allocation, Open Road or Buyer, as the case may be, shall promptly notify the other Party of such proposed allocation.  Open Road or Buyer, as the case may be, shall provide the other Party with such information and shall take such actions (including executing documents and powers of attorney in connection with Tax proceedings) as may be reasonably requested by such other Party to carry out the purposes of this <u>Section 6.4(e)</u>.  Except as otherwise required by any Law or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by this Agreement shall be reported for all Tax purposes in a manner consistent with the final Allocation Statement; and (ii) the Parties shall follow the final Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position inconsistent therewith in any Tax Return, in any refund claim, in any Tax litigation or otherwise.  Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Purchased Assets or the allocation of the value of the Purchased Assets in any plan or reorganization or liquidation that may be proposed.

Section 6.5.    <u>Further Assurances</u>.  Following the Closing, from time to time, subject to the terms and conditions of this Agreement, each Party shall, at the other's reasonable request and expense, (a) furnish such further information, (b) execute and deliver such other documents, and (c) do such other acts and things, all as the other may reasonably request for the purpose of carrying out the intent of this Agreement and the Ancillary Agreements; <u>provided</u>, <u>however</u>, that subject to the terms and conditions of this Agreement, none of the foregoing shall require any Party to take any action it reasonably believes would increase its Liabilities or responsibility, or adversely affect its rights under this Agreement, any Ancillary Agreement or applicable Law.  Without limiting the foregoing, until the date that is ninety (90) days after the Closing Date, Open Road shall use commercially reasonable efforts to provide Buyer reasonable access, at Buyer's costs and expense, during ordinary hours and upon prior notice, in such manner as not to disrupt or interfere with the normal operations of the business of Open Road and its Affiliates or the administration of the Chapter 11 Cases, to the Seller Parties' books, records or other information (or supporting documents) held by the Seller Parties that is reasonably related to the Purchased Assets or otherwise reasonably necessary to Exploit the Purchased Titles pursuant to the Title Rights; <u>provided</u>, that the Seller Parties shall not be required to disclose (i) any information if such disclosure is prohibited by applicable Law or contractual obligations or (ii) any Privileged Material.

Section 6.6.    <u>Access to Books and Records for the Seller Parties</u>.  Notwithstanding anything to the contrary in this Agreement, until the third anniversary of the Closing Date (or, in the case of any Tax Returns (and books and records and other documents relating thereto), the seventh (7th) anniversary of the Closing Date), Buyer shall provide each Seller Party or any duly-authorized estate representative and a reasonable number of their respective attorneys, accountants, Representatives and agents, at the Seller Parties' or their estates' cost and expense, during ordinary business hours and upon reasonable prior notice, at a location determined at the

reasonable discretion of Buyer, in such manner as to not disrupt or interfere with the normal operation of the business by Buyer, with reasonable access to the books, records, Tax Returns and other information (including supporting documents) of the Business or the Purchased Assets relating to all periods through the Closing (including periods commencing prior to and concluding after the Closing) to the extent reasonably requested for accounting, audit, compliance with legal, Tax or reporting matters (including any reporting obligations with respect to the Chapter 11 Cases), or performing any of the Seller Parties' obligations under this Agreement or any Ancillary Agreement; provided, that Buyer shall not be required to disclose any information if such disclosure would violate applicable Law.  All information provided or obtained pursuant to the preceding sentence shall be held by the Seller Parties or estate representative in accordance with the provisions of Section 13.9.  If, at any time within three years after the Closing Date (or within seven years after the Closing Date with respect to Tax Returns (and books and records and other documents relating thereto)), Buyer proposes to dispose of any of such books or records (including supporting documents), Buyer shall first offer to deliver the same to the Seller Parties (or their respective estate representatives) at the sole cost and expense of the Seller Parties.

Section 6.7.    Announcements.  Neither the Seller Parties nor Buyer shall, nor shall any such Party authorize or permit any of its Affiliates or representatives to, orally or in writing publicly disclose, issue any press release or make any other public statement, or otherwise communicate with the media, concerning the existence of this Agreement, any Ancillary Agreement or any of the Transactions, concerning Buyer or the Seller Parties, as applicable, or any of their respective current, future or former officer, directors or employees, or the terms or subject matter of any of the foregoing, without obtaining the prior written approval of, with respect to any of the Seller Parties, Buyer, and with respect to Buyer, Open Road (which approval may be granted or withheld in the applicable Party's sole discretion); provided that no Party nor any of its Affiliates or representatives shall be prevented from issuing any press release or making any public disclosure that it is required, in such Party's sole discretion, to make under any applicable Law (which the Parties agree they shall provide an opportunity for the other(s) to review in advance of such disclosure to the extent practicable and permitted by applicable Law) or with respect to any filing by or on behalf of such Party with the Bankruptcy Court (or any other court or administrative tribunal).  The Seller Parties may freely communicate with any employees or officers regarding this Agreement and the sale of the Purchased Assets.

Section 6.8.    No Obligation to Continue Existence.    Notwithstanding anything contained in this Agreement or any Ancillary Agreement to the contrary, following the Closing nothing set forth herein or therein shall, nor shall be deemed to, prohibit any of the Seller Parties from dissolving, liquidating, winding-up or otherwise ceasing their respective existence and taking any actions deemed reasonably necessary by any Seller Party in connection therewith.

Section 6.9.    Certain Claims and Actions.    Effective as of immediately after the Closing, Buyer shall waive and release any and all claims and Actions of the Seller Parties arising under Sections 544, 547, 548, 549, and 550 of the United States Bankruptcy Code that are included in the Purchased Assets pursuant to Section 2.1(c).

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

Section 7.1.    <u>Alternative Transactions</u>.    The Parties acknowledge and agree that this Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller Parties and the Bankruptcy Court of higher and otherwise better Alternative Transaction.    The Seller Parties and Buyer acknowledge that to obtain such approval, the Seller Parties must demonstrate that they have taken reasonable steps to obtain the highest and best offer possible for the Purchased Assets.    Without limiting the immediately preceding sentence, the Seller Parties may, directly or indirectly, (a) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (b) enter into discussions or negotiations with any Person concerning a possible Acquisition Proposal; or (c) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal or Alternative Transaction.

Section 7.2.    <u>Stalking Horse Approval</u>.    The Seller Parties shall obtain entry of an order no later than five Business Days after the Execution Date that identifies the Buyer as the "stalking horse" for the Purchased Assets, and that approves the Break Up Fee, Expense Reimbursement and other matters customary for a "stalking horse" bidder, <u>provided</u> <u>further</u>, that such order shall provide that (a) any secured creditor that exercises its credit bid right shall pay to the Buyer in cash the Break Up Fee and Expense Reimbursement at the closing of the sale to such secured creditor to the extent such amounts are payable hereunder, and (b) in the event of any transaction involving the direct or indirect sale or sales of all or substantially all or a portion of the Purchased Assets to a Person or Persons other than Buyer, the successful purchaser shall pay in cash to the Buyer the Break Up Fee and Expense Reimbursement at the closing of the sale to the extent such amounts are payable hereunder.

Section 7.3.    <u>Sale Order</u>.    Buyer shall use its commercially reasonable efforts take such actions as are reasonably requested by the Seller Parties to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.    From and after the Execution Date, Buyer shall not take any action that is intended to result in or might reasonably be expected to result in, or fail to take any action the intent of which failure to act would result in, or might reasonably be expected to result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order.

Section 7.4.    <u>Bankruptcy Filings</u>.    The Seller Parties agree to use commercially reasonable efforts to obtain the entry of the Sale Order.    In the event the entry of the Sale Order shall be appealed, the Seller Parties shall use their reasonable best efforts to defend such appeal. The Seller Parties shall comply with all notice requirements (a) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (b) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

## ARTICLE VIII
## CONDITIONS TO OBLIGATIONS OF THE SELLER PARTIES AND BUYER

The respective obligations of the Seller Parties and Buyer to consummate the Transactions shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by each of Open Road (on behalf of all of the Seller Parties) and Buyer (in Open Road's and Buyer's respective sole discretion):

Section 8.1.    No Injunction.  No Law shall have been enacted, entered, or promulgated and remain in effect that would prohibit, enjoin or otherwise restrain the consummation of the Transactions.

Section 8.2.    HSR Waiting Period.  The waiting period (and any extensions thereof) under the HSR Act shall have expired or been terminated.

Section 8.3.    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Bidding Procedures Order and Sale Order and such Orders shall be in effect and shall not have been reversed, modified, amended or stayed.

## ARTICLE IX
## CONDITIONS TO OBLIGATIONS OF THE SELLER PARTIES

In addition to the conditions set forth in Article VIII, the obligation of the Seller Parties to consummate the Transactions is further subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by Open Road (in its sole discretion):

Section 9.1.    Representations and Warranties of Buyer.   The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date with the same effect as though made on and as of the Closing Date (except that representations and warranties which speak as of a specified date or period of time shall be true and correct in all material respects only as of such date or period of time).

Section 9.2.    Performance of the Obligations of Buyer.  Buyer shall have performed or complied in all material respects with all obligations, agreements and covenants required under this Agreement and each Ancillary Agreement to be performed or complied with by it on or before the Closing Date (except for such obligations, agreements and covenants that by their nature may only be performed at the Closing, but subject to the performance of such obligations, agreements and covenants).

## ARTICLE X
## CONDITIONS TO OBLIGATIONS OF BUYER

In addition to the conditions set forth in Article VIII, the obligation of Buyer to consummate the Transactions is further subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by Buyer (in its sole discretion):

Section 10.1.  <u>Representations and Warranties of the Seller Parties</u>.  The representations and warranties of the Seller Parties contained in this Agreement shall be true and correct at and as of the Closing Date with the same effect as though made on and as of the Closing Date (except that representations and warranties which speak as of a specified date or period of time shall be true and correct only as of such date or period of time); provided, however, that all representations and warranties of the Seller Parties shall be deemed to be true and correct unless the failure or failures of such representations and warranties to be so true and correct, without regard to any "material", "materiality" or "Material Adverse Effect" qualifiers set forth therein, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect.

Section 10.2.  <u>Performance of the Obligations of the Seller Parties</u>.  The Seller Parties shall have performed or complied in all material respects with all obligations, agreements and covenants required under this Agreement to be performed or complied with by any of them at or prior to Closing (except for such obligations, agreements and covenants that by their nature may only be performed at the Closing, but subject to the performance of such obligations, covenants and agreements).

Section 10.3.  <u>Treatment of Certain Contracts</u>.  The Seller Parties shall have obtained or procured either (a) an Order of the Bankruptcy Court providing that all Material Contracts designated for assumption and assignment by the Buyer are so assumed and assigned, in full force and effect and not in default, notwithstanding the Buyer not assuming one or more of the contracts listed in <u>Schedule 10.3</u>, or (b) an Order of the Bankruptcy Court or a stipulation or settlement agreement enforceable against the non-Seller Party counterparties to each of the contracts listed on <u>Schedule 10.3</u> providing that in no event will such counterparties be entitled to receive amounts in excess of the portions of "Gross Receipts" (as defined in such contracts) due to such counterparties under the "Waterfalls" (as defined in such contracts) specified in such contracts even if the aggregate portion received by such counterparties is less than the total amount of funds provided by such counterparties to the Seller Parties under such contracts, whether by cure, claim or otherwise.  Notwithstanding anything contrary in this Agreement, the Seller Parties may not amend <u>Schedule 10.3</u> without written consent from the Buyer.

## ARTICLE XI
## TERMINATION

Section 11.1.  <u>Conditions of Termination</u>.  Notwithstanding anything to the contrary contained herein, this Agreement may be terminated, and the Transactions abandoned at any time prior to the Closing Date by written notice from the terminating Party to the other Party only as follows:

(a)    by mutual written agreement of Open Road and Buyer;

(b)    by Open Road or Buyer if (i) any court of competent jurisdiction or other Governmental Agency shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the Transactions, and such Order shall have become final and nonappealable; <u>provided</u>, <u>however</u>, that the Party seeking to terminate this Agreement pursuant to this clause (i) shall have used all reasonable best efforts to have such Order vacated; or (ii) Closing shall not have occurred before December 5, 2018 (the "<u>End Date</u>"); <u>provided</u>,

40

however, that the right to terminate this Agreement under clauses (i) or (ii) above shall not be available to any Party whose breach or failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to be consummated by the End Date;

(c)     by Buyer, if the Seller Parties (i) shall have breached in any material respect any of their respective representations or warranties or shall have breached or failed to perform or comply with any of their respective covenants or agreements in this Agreement in any material respect, (ii) such breach or failure cannot be cured or has not been cured within 30 days after the giving of written notice by Buyer to Open Road specifying such breach or failure, and (iii) such breach or failure, individually or in the aggregate together with all other such breaches and failures by the Seller Parties, makes or will make the satisfaction of one or more of the conditions in Article VIII and Article X impossible; provided, Buyer may not terminate this Agreement pursuant to this Section 11.1(c) if Buyer is then in breach of this Agreement in any material respect;

(d)     by Open Road, if (i)(A) Buyer shall have breached in any material respect any of its representations or warranties or shall have breached or failed to perform or comply with any of its covenants or agreements in this Agreement in any material respect, (B) such breach or failure cannot be cured or has not been cured within 30 days after the giving of written notice by Open Road to Buyer specifying such breach or failure, and (C) such breach or failure, individually or in the aggregate together with all other such breaches and failures by Buyer, makes or will make the satisfaction of one or more of the conditions in Article VIII and Article IX impossible; provided, Open Road may not terminate this Agreement pursuant to this clause (i) if any Seller Party is then in breach of this Agreement in any material respect; (ii)(W) Buyer makes a general assignment for the benefit of its creditors, (X) Buyer commences a voluntary case or proceeding under any applicable bankruptcy, insolvency or reorganization law seeking to be adjudicated bankrupt or insolvent, (Y) Buyer consents to the entry of an Order for relief in respect of Buyer in an involuntary case or proceeding under any applicable bankruptcy, insolvency or reorganization Law or (Z) a court of competent jurisdiction enters an Order, which Order remains unstayed and in effect for 60 days, under any Law relating to bankruptcy, insolvency or reorganization that is for relief against Buyer in an involuntary case, that appoints a custodian of Buyer or for a substantial part of its property or that orders the winding up or liquidation of Buyer; or (iii) if Buyer fails to deposit the Deposit Escrow Amount with the Escrow Agent within one Business Day of the date upon which the Bankruptcy Court enters the Bidding Procedures Amendment Order;

(e)     by Buyer if any of the Chapter 11 Cases is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of the Seller Parties is appointed in the Chapter 11 Cases; or

(f)     by Buyer or the Seller Parties upon (i) any announcement by the Seller Parties at an auction held in accordance with the Bidding Procedures Order that the final bid of Buyer at such auction is not the successful bid (unless such bid by Buyer is the backup bid in accordance with the Bidding Procedures Order), or (ii) the consummation of an Alternative Transaction.

Section 11.2.  Effect of Termination.  In the event of the termination of this Agreement, this Agreement shall become void and have no further force and effect, and the Transactions shall be abandoned without any further action or Liabilities of any Party; provided, however, the following provisions shall survive such termination, subject to any limitations set forth therein: this Section 11.2, Section 12.1, Section 12.3, Section 12.4 and Article XIII and any related definitions set forth in Section 1.1.

## ARTICLE XII
## REMEDIES

Section 12.1.  Non-Survival of Representations, Warranties, Covenants and Agreements; Remedies.  The Parties agree that the representations and warranties of the Parties contained in this Agreement shall expire automatically and immediately upon the Closing Date.  None of the covenants and agreements of the Parties contained in this Agreement shall survive the Closing, other than the covenants and agreements contained in Section 2.8, Article VI, this Article XII and Article XIII.  For the avoidance of doubt, the Parties agree that the remedies specified in Section 12.2, Section 12.3, Section 12.4 and/or the termination of this Agreement in accordance with the provisions of Article XI shall be the sole and exclusive remedy of the Seller Parties (if the breaching party is Buyer) or Buyer (if the breaching party is a Seller Party) under this Agreement for any breach of representation and warranty made or any covenant or agreement to be performed on or prior to Closing.

Section 12.2.  Specific Performance.  The Parties agree that irreparable damage for which monetary damages (including, without limitation, any damages to which the Seller Parties are entitled pursuant to Section 12.3(b)), even if available, would not be an adequate remedy, would occur in the event that any Party does not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate the Transactions) in accordance with its specified terms or otherwise breaches such provisions.  It is accordingly agreed that Buyer shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by the Seller Parties and to enforce specifically the terms and provisions hereof, and the Seller Parties shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by Buyer and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which a non-breaching Party is entitled at Law or in equity, including without limitation, any damages to which the Seller Parties are entitled pursuant to Section 12.3(b).

Section 12.3.  Release of Deposit Escrow Amount.

(a)    In the event that, prior to the Closing, Buyer has complied in all respects with all agreements, obligations and covenants to be performed by or on its behalf through the date of termination of this Agreement and this Agreement is validly terminated pursuant to Section 11.1(a), Section 11.1(b), Section 11.1(c), Section 11.1(e) or Section 11.1(f), then Open Road shall promptly, and in any event within two Business Days of Buyer's request, duly execute and deliver to Buyer and the Escrow Agent an authorization instructing the Escrow Agent to disburse (in accordance with the terms and conditions of the Escrow Agreement) to Buyer the Deposit Escrow Amount.

(b)     In the event that, prior to the Closing, this Agreement is validly terminated by the Seller Parties pursuant to Section 11.1(d), without prejudice to the Seller Parties' right to seek an injunction or other equitable relief pursuant to Section 12.2, Buyer acknowledges and agrees that the Seller Parties will suffer substantial economic damages and losses of types which are impossible to compute and ascertain with certainty as a basis for recovery by Seller Parties of actual damages and that the Deposit Escrow Amount is a fair, reasonable and appropriate approximation of damages and is not intended as a penalty.  Accordingly, in the event of any termination of this Agreement described in the immediately preceding sentence, the Seller Parties shall be entitled to receive, and the Seller Parties shall be entitled to unilaterally instruct the Escrow Agent in writing to disburse (in accordance with the terms and conditions of the Escrow Agreement) to Open Road, as liquidated damages (without the Seller Parties being required to present any evidence of the amount or character of actual damages sustained by reason thereof) and not as a penalty, the Deposit Escrow Amount.  The Parties acknowledge and agree that the agreements contained in this Section 12.3(b) are an integral part of the Transactions and that without these agreements the other Parties would not enter into this Agreement.

Section 12.4.   Expense Reimbursement and Break-Up Fee.

(a)     The Seller Parties shall pay (or cause to be paid) the Break-Up Fee to Buyer if (i) Buyer has complied, in all material respects, with all agreements, obligations and covenants to be performed by or on its behalf through the date of termination of this Agreement, (ii) the Bidding Procedures Order was approved by the Bankruptcy Court, (iii) this Agreement is terminated pursuant to Section 11.1(c) or Section 11.1(f) and (iv) an Alternative Transaction is consummated.  The Seller Parties shall pay to Buyer the Break-Up Fee by wire transfer of immediately available funds no later than three (3) Business Days following the consummation of such Alternative Transaction.  The obligations of the Seller Parties to pay the Break-Up Fee shall be administrative expenses of the Seller Parties pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

(b)     The Seller Parties shall pay (or cause to be paid) the Expense Reimbursement to Buyer if (i) Buyer has complied, in all material respects, with all agreements, obligations and covenants to be performed by or on its behalf through the date of termination of this Agreement, (ii) the Bidding Procedures Order was approved by the Bankruptcy Court, and (iii) this Agreement is validly terminated pursuant to Section 11.1(c) or Section 11.1(f).  The Seller Parties shall pay to Buyer the Expense Reimbursement by wire transfer of immediately available funds no later than three (3) Business Days following such termination of this Agreement.  The obligations of the Seller Parties to pay the Expense Reimbursement shall be administrative expenses of the Seller Parties pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

(c)     The Parties acknowledge and agree that any payment of the Break-Up Fee and the Expense Reimbursement described in this Section 12.4 shall be the sole and exclusive remedy of Buyer and any other Person against the Seller Parties for any and all losses or damages suffered or incurred in connection with this Agreement and the transactions contemplated hereby.  The Parties acknowledge and agree that the agreements contained in this Section 12.4 are an integral part of this Agreement and the transactions contemplated hereby.

**ARTICLE XIII**
**MISCELLANEOUS PROVISIONS**

Section 13.1. <u>Notices</u>.    All notices, requests, demands, waivers and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service if served personally on the Party to whom notice is to be given, (b) on the day of transmission if sent via email (with proof of delivery which may be electronic) prior to 5:00 P.M. in the place of receipt on a Business Day, and otherwise on the next succeeding Business Day, (c) on the Business Day after timely delivery to a reputable next-day courier service if next Business Day delivery is properly requested, or (d) on the third day after mailing by first class mail, registered or certified, postage prepaid, to the Party as follows:

<table>
<tr><td>If to Buyer:</td><td>OR Acquisition Co, LLC<br>c/o Raven Capital Management, LLC<br>110 Greene Street, Suite 9G<br>New York, NY 10012<br>Attn: James Masciello<br>Email: james@ravencm.com</td></tr>
<tr><td>With copies to:<br>(which shall not constitute<br>notice)</td><td>Greenberg Traurig, LLP<br>MetLife Building<br>200 Park Avenue<br>New York, NY 10166<br>Attn: Nathan A. Haynes, Esq.<br>Email: haynesn@gtlaw.com<br><br>and:<br><br>DLA Piper LLP (US)<br>2000 Avenue of the Stars<br>Suite 400 North Tower<br>Los Angeles, CA 90067<br>Attn: Robert J. Sherman, Esq.<br>Email: robert.j.sherman@dlapiper.com</td></tr>
<tr><td>If to any Seller Party:</td><td>Open Road Films, LLC<br>2049 Century Park East<br>4th Floor<br>Los Angeles, CA 90067<br>Attn: Chief Restructuring Officer<br>Email: amir.agam@fticonsulting.com</td></tr>
<tr><td>With a copy to:<br>(which shall not constitute</td><td>Klee, Tuchin, Bogdanoff & Stern LLP<br>1999 Avenue of the Stars</td></tr>
</table>

notice)                              39th Floor
                                     Attn: Michael L. Tuchin, Justin D. Yi
                                     Email: mtuchin@ktbslaw.com,
                                     jyi@ktbslaw.com

Any Party may change its address or email for the purpose of this <u>Section 13.1</u> by giving the other Parties written notice of its new address or email address, as applicable, in the manner set forth above.  The Parties acknowledge and agree that any notice that is timely delivered to the then current address of a particular Party prior to the receipt of a notice of change of contact information in accordance with this <u>Section 13.1</u> shall be deemed to have been duly given in accordance with this <u>Section 13.1</u>.

Section 13.2.   <u>Amendments; Waivers</u>.   This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, in the case of an amendment or modification, only by a written instrument executed by Open Road and Buyer, or, in the case of a waiver by any Seller Party, by Open Road and, in the case of a waiver by Buyer, Buyer; <u>provided</u>, <u>however</u>, that no amendment or waiver shall be permitted or have any effect unless and until it is approved in writing by the Agent.  No other course of dealing between the Parties or any delay in exercising any rights pursuant to this Agreement shall operate as a waiver of any rights of any Party.  Any waiver by Buyer or the Seller Parties, as applicable, of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 13.3.   <u>Assignment and Parties in Interest</u>.

(a)     No Party shall be entitled to assign this Agreement or any rights or obligations hereunder without the prior written consent of, with respect to any assignment by Buyer, Open Road, and, with respect to any assignment by any Seller Party, Buyer, which consent may be withheld by the applicable Party in its sole and absolute discretion, and any such attempted assignment without such prior written consent shall be void and of no force and effect, <u>provided</u>, <u>however</u>, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior written consent of the Seller Parties so long as prior to such assignment such Buyer Designee agrees in writing in favor of the Seller Parties to be bound by the provisions of this Agreement, it being agreed that no such assignment shall relieve Buyer of any of its obligations hereunder.

(b)     This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.   Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, obligations, or Liabilities under or by reason of this Agreement.

Section 13.4.   <u>Expenses</u>.   Except as otherwise set forth in this Agreement, each Party shall bear all of its legal, accounting, investment banking and other costs, fees and expenses

(including all brokerage and finder's fees) incurred by it or on its behalf in connection with the execution and negotiation of this Agreement, any Ancillary Agreement and the consummation of the Transactions, whether or not such Transactions are consummated.

Section 13.5.  <u>Entire Agreement</u>.    This Agreement (including the Exhibits, the Disclosure Schedule and the other Schedules), the Confidentiality Agreement and the Ancillary Agreements (including any exhibits or schedules thereto) constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede and are in full substitution for any and all prior agreements and understandings between them relating to such subject matter, and no Party shall be liable or bound to any other Party in any manner with respect to such subject matter by any warranties, representations, indemnities, covenants, or agreements except as specifically set forth herein or therein.  For the avoidance of doubt, the existence and the terms of this Agreement, the Ancillary Agreements and the Transactions shall constitute "Proprietary Information" under the Confidentiality Agreement.  The Exhibits, the Annexes, the Disclosure Schedule and the other Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 13.6.  <u>GOVERNING LAW; VENUE; WAIVER OF JURY TRIAL</u>.

(a)    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF DELAWARE SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

(b)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY AGREEMENT; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN DELAWARE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(c)    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.7.  <u>No Other Seller Representations and Warranties</u>.  Buyer has conducted its own independent review and analysis of the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities and otherwise in connection with the Transaction and has relied solely on its own review and analysis in determining to proceed with the Transactions.  Buyer acknowledges that, without limiting the generality of any other exclusion or

qualification set forth in this Agreement, (a) none of the Seller Parties nor any Seller Related Party, is making, has made, or shall be deemed to make, at or as of any past, current or future date, any representation or warranty of any kind, express or implied, at Law or in equity, to Buyer or any Buyer Related Party, with respect to the Seller Parties or any of their respective Affiliates, or any Seller Related Party, the Business, the Transactions, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or any other matter (including with respect to any information or materials made available to Buyer or its representatives (in any format) during the course of their due diligence investigation of the Seller Parties, including any budget, projection, forecast or plans whether before or after the Closing), except for the representations and warranties specifically set forth in <u>Article III</u> of this Agreement (as modified by the Disclosure Schedule), (b) there are no, Buyer has not relied on any, and the Seller Parties hereby expressly disclaim any such other, representation or warranty of any kind, expressed or implied, at Law or in equity, whether by a Seller Party or any Seller Related Party and (c) Buyer is willing to accept the Purchased Assets at the Closing "as is", "where is" and "with all faults".

Section 13.8.    <u>Disclosure Schedule</u>.    The exceptions and disclosures set forth in the Disclosure Schedule are arranged in sections corresponding to the Section numbers contained in Article III for convenience only and Buyer acknowledges and agrees that each such exception and disclosure in any particular section of the Disclosure Schedule shall be deemed to be disclosed in (and otherwise qualify) each other section of the Disclosure Schedule to which the applicability of such disclosure or exception to such other section of the Disclosure Schedule is reasonably apparent.    The inclusion of information in the Disclosure Schedule shall not be construed as, and shall not constitute, an admission or agreement that a violation, right of termination, default, Liabilities or other obligation of any kind exists with respect to any item, nor shall it be construed as, or constitute, an admission or agreement that such information is material to the Seller Parties or any Seller Related Party.    In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule.    Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.    Neither the specifications of any dollar amount in any representation, warranty or covenant contained in this Agreement, nor the inclusion of any specific item in the Disclosure Schedule, is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no Person shall use the fact of the setting forth of any such amount, or the inclusion of any such item, in any dispute or controversy involving any of the Parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is, or is not, material for purposes of this Agreement.    Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no Person shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy involving any of the Parties as to whether any obligation, item or matter not described herein, or included in the Disclosure Schedule, is, or is not, in the ordinary course of business for purposes of this Agreement.    Subject to <u>Section 3.6</u>, <u>Section 3.</u>9, and <u>Section 10.3</u> of the Agreement and the definition of "Net Library Cash Flow", from the date hereof until the date on or before five Business Days before entry of the Sale Order, the Parties agree that the Seller Parties may update the Disclosure Schedule as necessary upon written notice to Buyer, and the applicable representation and warranty shall thereafter be deemed amended for all

purposes by such updated Disclosure Schedule; *provided*, *however* that no such amendment shall (i) serve to cure any breach of the related covenant, representation and warranty and/or other provision that such schedule relates to or is provided pursuant to, and (ii) limit or otherwise affect Buyer's rights and remedies arising from any misrepresentation or misstatement that any such update or modification to the Disclosure Schedule addresses.

Section 13.9.    <u>Headings</u>.  The headings and subheadings in this Agreement are included for convenience and identification only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any of its provisions.

Section 13.10. <u>References</u>.    All references to "Articles", "Sections", "Exhibits", "Annexes", "Schedules" or the "Disclosure Schedule" shall be references to the Articles, Sections, Exhibits, Annexes, Schedules and Disclosure Schedule to this Agreement, as may be amended, modified, supplemented or restated from time to time.

Section 13.11. <u>General Interpretative Provisions</u>.  Terms for which meanings are defined in this Agreement shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine and feminine forms. Words such as "herein", "hereafter", "hereto", "hereby" and "hereunder", when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.  The words "include", "includes", "included", "including" and "such as" shall be construed as if followed by the phrase "without limitation".  No distinction in interpretation shall be made between the terms "shall" and "will".  A reference to a particular gender means a reference to any gender.  A reference to any Person shall include such Person's successors and permitted assigns, unless expressly provided to the contrary.  Unless the context of this Agreement otherwise requires, references to agreements and other documents shall be deemed to include all subsequent amendments and other notifications thereto.

Section 13.12. <u>Currency</u>.  All sums of money expressed in this Agreement are in the lawful money of the United States of America.

Section 13.13. <u>Construction</u>.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party.

Section 13.14. <u>Severability</u>.  The invalidity, illegality or unenforceability of any provision of this Agreement shall not affect the validity, legality or enforceability of any other provisions of this Agreement, each of which shall remain in full force and effect.  In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect.  Furthermore, in lieu of any such invalid, illegal or unenforceable term or provision, the Parties intend that there shall be substituted as a part of this Agreement a provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible that will be valid, legal and enforceable.

Section 13.15. <u>Rights Cumulative</u>.  All rights, powers and privileges conferred hereunder upon the Parties, unless otherwise provided, shall be cumulative and shall not be restricted to those given by Law.  Failure to exercise any power given any Party or to insist upon strict compliance by any other Party shall not constitute a waiver of any Party's right to demand exact compliance with the terms hereof.

Section 13.16. <u>Counterparts</u>.    This Agreement may be executed in two or more counterparts (including by means of PDF or other electronic transmission), each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

[*Signature page follows.*]

IN WITNESS WHEREOF, the Seller Parties and Buyer have executed and delivered this Agreement as of the Execution Date.

**SELLER PARTIES:**

OPEN ROAD FILMS, LLC
OPEN ROAD RELEASING, LLC
OR PRODUCTIONS, LLC
BRIARCLIFF LLC
OPEN ROAD INTERNATIONAL LLC
EMPIRE PRODUCTIONS LLC

By: _____
Name: Amir Agam
Title: Chief Restructuring Officer

**BUYER:**

OR ACQUISITION CO, LLC

BY: RAVEN CAPITAL MANAGEMENT
LLC, ITS MANAGER

By: _____

Name:      Joshua A. Green

Title:       Managing Member
             President & CIO