**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | Chapter 11 |
| OPEN ROAD FILMS, LLC, a Delaware limited liability company, *et al*.,[1] | Case No.:  18-12012 (LSS) |
| Debtors. | (Jointly Administered) |
|  | **Requested Hearing Date:** **October 25, 2018** |
|  | **Requested Objection Deadline:** **At the commencement of the hearing** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING CERTAIN BIDDING PROTECTIONS AND AMENDMENTS TO BID PROCEDURES ORDER, AND GRANTING RELATED RELIEF**

Open Road Films, LLC and its affiliated debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Cases") hereby move the Court (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit 1** (the "Proposed Order"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) authorizing and approving the Debtors' entry into that certain Asset Purchase Agreement, dated as of October 23, 2018 (the "Stalking Horse Agreement"),[2] between the Debtors and OR Acquisition Co, LLC (the "Stalking Horse Bidder"), for the sale of

---

[1]    The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Open Road Films, LLC (4435-Del.); Open Road Releasing, LLC (4736-Del.); OR Productions LLC (5873-Del.); Briarcliff LLC (7304-Del.); Open Road International LLC (4109-Del.); and Empire Productions LLC (9375-Del.).  The Debtors' address is 2049 Century Park East, 4th Floor, Los Angeles, CA 90067.

[2]    The Stalking Horse Agreement is attached to the *Notice of Filing of (I) Stalking Horse Agreement, (II) Summary of Proposed Bid Protections, and (III) Summary of Proposed Amendments to Bid Procedures Order* [Docket No. 216] filed contemporaneously herewith.

substantially all of the Debtors' assets (subject to final approval at the Sale Hearing); (ii) approving certain bidding protections in connection with the Stalking Horse Agreement; (iii) approving certain amendments to the Bid Procedures (as defined below); and (iv) granting related relief.  In support of this Motion, the Debtors respectfully represent as follows:

## I. JURISDICTION

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and Local Rules 2002-1 and 9006-1.

## II. BACKGROUND

4.      On September 6, 2018 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.

5.      The Debtors are authorized to continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To date, no trustee or examiner has been requested or appointed in these Cases.  On September

14, 2018, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") in these Cases.

6.    The Debtors intend to utilize the bankruptcy process to continue and conclude their robust marketing and sale process.  They believe that doing so will ensure that the value of their assets is maximized for the benefit of all stakeholders.

7.    The detailed factual background relating to the Debtors and the commencement of these Cases is set forth in the *Declaration of Amir Agam in Support of First Day Motions* [Docket No. 7] (the "First Day Declaration").

8.    As discussed in the Debtors' *Motion for Orders (A)(I) Establishing Bid and Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into an Asset Purchase Agreement With Stalking Horse Bidder, (III) Establishing and Approving Procedures Relating to the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts and (IV) Scheduling a Hearing to Consider the Proposed Sale and (B)(I) Approving the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, and (III) Granting Certain Related Relief* [Docket No. 9] (the "Bid Procedures Motion"), prior to the Petition Date, the Debtors engaged FTI Consulting, Inc. ("FTI") to provide a Chief Restructuring Officer and supporting staff to explore strategic alternatives.  FTI and the Debtors determined that the most likely and feasible alternative was an orderly bankruptcy sale, which would allow the Debtors to maximize value by enabling a sale of the Debtors' valuable assets free and clear of liens, claims, encumbrances, and other interests.

9.    Since its engagement, FTI has diligently and aggressively marketed the Debtors' assets through a comprehensive sale and marketing process.  FTI has developed a thorough list of potential buyers—both strategic and financial—based on discussions with management and FTI's industry experience and relationships.  FTI has also engaged with other potential buyers who have contacted FTI or other parties in interest since FTI began the marketing process.  As of October 19, 2018, FTI was able to contact approximately 50 potential buyers.  Approximately 36 buyers have signed non-disclosure agreements and 11 buyers have submitted indications of interest for the Debtors' assets.

10.    On October 9, 2018, in connection with the Bid Procedures Motion, the Bankruptcy Court entered an order [Docket No. 160] (the "Bid Procedures Order"), pursuant to sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, (a) scheduling an auction (the "Auction") for the sale of substantially all of the Debtors' assets (the "Purchased Assets") for November 7, 2018 and a hearing to approve the sale of the Purchased Assets (the "Sale Hearing") for November 9, 2018; (b) approving procedures (the "Bid Procedures") for submitting competing bids for the Purchased Assets, (c) approving the form and manner of the notice of the Auction and the Sale Hearing; and (d) approving procedures for the assumption, assignment and sale of Contracts to any purchaser(s) of the Purchased Assets, and/or to resolve any objections thereto.

11.    The Bid Procedures Order provided, among other things, that:

> The Debtors, in consultation with the Consultation Parties, may enter into a stalking horse agreement (the "Stalking Horse Agreement") for the sale of the Purchased Assets.  If the Debtors enter into an agreement with a stalking horse entity (the "Stalking Horse Purchaser"), no later than two (2) business days after execution of the Stalking Horse Agreement, the Debtors shall (i) file and serve a notice (the "Stalking Horse Agreement Notice") of the proposed Stalking Horse Agreement on all parties who under

this Order are to be served with the Sale Notice, and (ii) file a copy of the Stalking Horse Agreement Notice and the Stalking Horse Agreement on the docket of the Chapter 11 Cases.  The Stalking Horse Agreement Notice will include the type and amount of bid protections, if any, a general description of the assets covered by the Stalking Horse Agreement, and any necessary modifications or amendments to the Bid Procedures.  Notice of the Stalking Horse Agreement shall be good and sufficient, and except as otherwise set forth in this paragraph with respect to any associated bid protections, no other or further notice of the Stalking Horse Agreement shall be required, if given as set forth in this paragraph. The Debtors shall request that the Court set a hearing, to be held no later than five (5) business days after execution of the Stalking Horse Agreement, to consider approval of any associated bid protections.

12.    The Debtors had been negotiating with a number of parties (including the Stalking Horse Bidder) regarding a potential stalking horse transaction both before and after the Petition Date.  On October 23, 2018, these negotiations resulted in the Debtors' entry into the Stalking Horse Agreement with the Stalking Horse Bidder for the purchase of the Purchased Assets for $87.5 million, subject to adjustment.  Pursuant to the Stalking Horse Agreement, subject to the Court's approval, the Debtors have agreed to provide the Stalking Horse Bidder with (a) an expense reimbursement of up to $800,000 for its reasonable and documented out-of-pocket costs, fees and expenses (including reasonable expenses of legal, financial advisory, accounting and similar costs, fees, and expenses) related to the sale, and (b) a break-up fee equal to $2,100,000 in the event that the Debtors close an alternative transaction as provided for in the Stalking Horse Agreement.

13.    The Debtors believe that the Stalking Horse Agreement provides significant value to the Debtors' estates, and are hopeful that the Stalking Horse Agreement will set the floor for a robust bidding and sale process, culminating with an auction on November 7, 2018.  Because the Stalking Horse Agreement is subject to higher and better offers at the auction, the Stalking Horse

Bidder required that the Debtors seek approval of the Bid Protections set forth in the Staking Horse Agreement (and described herein) and certain amendments to the Bid Procedures Order.

14.    As a result of the disclosures made in connection with the Bid Procedures Motion and the disclosures contained herein, the Debtors believe that they have fully complied with Local Rules 6004-1(b)(iv) and 6004-1(c)(i).

### III.  RELIEF REQUESTED

15.    By this Motion, the Debtors seek entry of the Proposed Order, which seeks the approval of certain Bid Protections and certain other amendments to the Bid Procedures.  Among other things, the Debtors respectfully request approval of the following:

a)    The Debtors will reimburse the Stalking Horse Bidder up to $800,000 for its reasonable and documented out-of-pocket costs, fees and expenses (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses) related to the sale (the "Expense Reimbursement") and pay the Stalking Horse Bidder a breakup fee equal to $2,100,000 (the "Break-Up Fee" and with the Expense Reimbursement, the "Bid Protections") in the event the Debtors close an alternative transaction under the circumstances mandated by the Stalking Horse Agreement.

b)    The claims associated with the Bid Protections shall be administrative expenses of the Debtors pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

c)    The Stalking Horse Bidder shall be deemed to be a Qualified Bidder, and the Stalking Horse Purchaser's bid shall be deemed a Qualified Bid.

d)    Any Potential Bidder wishing to participate in the Auction must submit a "blacklined" or otherwise marked copy of the Proposed APA reflecting the differences between the Proposed APA and the Stalking Horse Agreement provide in such Potential Bidder's bid for a Base Purchase Price in an amount greater than or equal to the sum of (the "Minimum Initial Overbid Amount") (A) the Base Purchase Price in the Stalking Horse Agreement, (B) the Bid Protections, and (C) $1,000,000 (the "Minimum Overbid").

e)    If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, or receive Qualified Bids on portions of the Purchased Assets which do not have the purchase prices, in the aggregate, equal to or exceeding the Minimum Initial Overbid Amount, the Debtors shall not conduct the Auction with respect to the Purchased Assets, and instead shall seek approval of the sale of the Purchased Assets pursuant to the Stalking Horse Agreement at the Sale Hearing.

f)      Only the Qualified Bidders may bid at the Auction.  Each Qualified Bidder shall appear in person at the Auction, or through a duly authorized representative.  To the extent the Proposed APAs submitted by Qualified Bidders differ in any material respect, the CRO, in consultation with the Consultation Parties, may assign relative values to such differences, taking into account the relative burdens and benefits resulting from such differences, and shall afford a Qualified Bidder the opportunity to further modify such Proposed APA to reduce or eliminate any deduction in value assigned to such Proposed APA.  At the commencement of the Auction, and following the processes described in the preceding sentence, the Debtors shall identify the bid that they have determined to be the highest and best offer, state terms of such bid and the identity of such bidder, and shall permit the Stalking Horse Bidder and all other Qualified Bidders to submit higher and better bids.  Each Qualified Bidder must bid in each round or it shall be disqualified from further bidding at the Auction.  Each subsequent bid must exceed the amount of the preceding bid by not less than $1,000,000 (the "Minimum Overbid") and shall not be modified in a manner that causes it no longer to be a Qualified Bid.  If the Stalking Horse Bidder bids at the Auction, it shall be entitled to a "credit bid" in the amount of the Bid Protections to be counted towards each bid.  All Qualified Bidders shall have the right to, at any time, request the Debtors use reasonable efforts to clarify any and all questions such Qualified Bidder may have regarding the then-current highest and best bid.

g)      any secured creditor or secured creditors that exercise(s) its or their credit bid right(s) shall pay to the Stalking Horse Bidder in cash the Break Up Fee and Expense Reimbursement at the closing of the sale to such Secured Creditor(s) to the extent such amounts are payable under the Stalking Horse Agreement.  Moreover, in the event of any transaction involving the direct or indirect sale or sales of all or substantially all or a portion of the Purchased Assets (as defined in the Stalking Horse Agreement) to a person or persons other than Stalking Horse Bidder, the Break Up Fee and Expense Reimbursement shall be paid from the proceeds of the sale at closing to the extent such amounts are payable under the Stalking Horse Agreement.

h)      Counsel to the Stalking Horse Bidder shall be added as a notice party for competing bids and objections.

16.     The Debtors also request approval of the form of *Amended Sale Notice* attached to the Proposed Order as Exhibit A.

## IV.  BASIS FOR RELIEF

17.     The Stalking Horse Bidder has submitted the highest and best offer to date for the Purchased Assets.  The Debtors believe that it is in the best interests of their estates and all of

their stakeholders to enter into the Stalking Horse Agreement, and thus seek approval of the Bid Protections set forth therein.

18.    Approval of the Expense Reimbursement and Break-Up Fee are governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F. 3d 527 (3d Cir. 1999).  In *O'Brien*, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must benefit a debtor's estate.  *Id.* at 533.

19.    The Third Circuit identified at least two instances in which bidding incentives may benefit the estate.  First, benefit may be found if "assurance of break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Id.* at 537.  Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.*

20.    In *In re O'Brien*, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee or expense reimbursement: (a) the presence of self-dealing or manipulation in negotiating the break-up fee; (b) whether the fee harms, rather than encourages, bidding; (c) the reasonableness of the breakup fee relative to the purchase price; (d) whether the "unsuccessful bidder place[d] the estate property in a sales

configuration mode to attract other bidders to the auction"; (e) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (f) the correlation of the fee to a maximization of value of the debtor's estate; (g) the support of the principal secured creditors and creditors' committee of break-up fee; (h) the benefits of the safeguards to the debtor's estate; and (i) the "substantial adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee." *See In re O'Brien*, 181 F.3d at 536.

21.    Under the standards adopted by the Third Circuit in *O'Brien*, the Expense Reimbursement and Break-Up Fee should be approved.  Paying a Break-Up Fee of 2.4% of the Base Purchase Price is reasonable and customary in this type of transaction (and indeed is below the typical 3-5% range).  Additionally, payment of the Expense Reimbursement (which is less than 1% of the Base Purchase Price and low when considering the amount of work that has been done and will need to be done) and Break-Up Fee will not diminish the Debtors' estates.  The Debtors will not incur the obligation to pay the Break-Up Fee or the Expense Reimbursement unless a higher and better bid is accepted and such transaction closes, or as otherwise set forth in the Stalking Horse Agreement.

22.    Most importantly, absent approval of the Expense Reimbursement and the Break-Up Fee, as well as the other amendments to the Bid Procedures necessitated by entry into the Stalking Horse Agreement, the Debtors may lose the opportunity to obtain the highest and best offer for the Assets.  Providing the Stalking Horse Bidder with the Bid Protections has promoted and will promote more competitive bidding by inducing the Stalking Horse Bidder's bid. Furthermore, the relief requested herein has induced the Stalking Horse Bidder to submit a bid that will serve as a minimum bid on which other bidders and the Debtors can rely.  If this Motion

is not approved, the Stalking Horse Bidder will not go forward with the Stalking Horse Agreement.

23.     The Bid Protections and other amendments to the Bid Procedures were negotiated at arm's-length and in good faith.

24.     In light of the foregoing, the Debtors request that the Court grant the relief requested herein.

## V.  REQUEST FOR WAIVER OF BANKRUPTCY RULE 6004(H)

25.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).

26.     The Debtors submit that cause exists to justify a waiver of the fourteen (14) day stays under Bankruptcy Rules 6004(h), as promptly closing the Sale is of critical importance and the approval of the Bid Protections are a critical element to ensuring that occurs.  The Debtors therefore request that the Bid Protections Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h).

## VI.  NOTICE

27.     The Debtors will provide notice of this Motion to: (i) the U.S. Trustee; (ii) proposed counsel to the Committee; (iii) the Agent (as defined in the First Day Declaration); (iv) all other parties who were served with the Bid Procedures Motion; and (v) all parties who, as of the filing of the Motion, have filed a notice of appearance and request for service of papers in these Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## VII.  CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that this Court enter the Proposed Order, granting the relief requested in the Motion and such other and further relief as is just and proper.

Dated:  October 23, 2018

*/s/ Robert F. Poppiti, Jr.*

Michael R. Nestor, Esq. (Bar No. 3526)
Robert F. Poppiti, Jr., Esq. (Bar No. 5052)
Ian J. Bambrick, Esq. (Bar No. 5455)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253

and

Michael L. Tuchin, Esq.
Jonathan M. Weiss, Esq.
Sasha M. Gurvitz, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN  LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:    (310) 407-4000
Fax:    (310) 407-9090

*Counsel to Debtors and Debtors in Possession*