# EXHIBIT A

## DISTRIBUTION RIGHTS ACQUISITION AND FINANCING AGREEMENT
### *ALL I SEE IS YOU*

This agreement ("<u>Agreement</u>") is made and entered into as of October 18, 2016 by and between All I See Partners 2015 L.P. ("<u>Producer</u>") and Open Road Films, LLC ("<u>Distributor</u>") with respect to the completed theatrical motion picture currently titled "All I See Is You" ("<u>Picture</u>") directed by Marc Forster starring Blake Lively and Jason Clarke.

1.      Conditions Precedent: The effectiveness of this Agreement is conditioned upon the satisfaction of the following conditions precedent: (a) this Agreement being fully executed by the parties hereto; (b) Distributor's receipt and approval of the chain-of-title to the Picture; and (c) Producer's timely approval of the P&A Budget (defined below) and provision of the Producer P&A Funds (defined below) in accordance with Paragraph 4 below.

2.      Territory: The "<u>Territory</u>" shall mean the United States of America, its territories, possessions, and commonwealths (including, without limitation, Puerto Rico, the U.S. Virgin Islands, the Midway Islands, the Marshall Islands, Wake, Saipan, Guam and American Samoa), all military and diplomatic installations of the United States, wherever situated, common carriers, (e.g. airlines, ships at sea, etc.) that fly the flag of the United States, and industrial installations (e.g. drilling platforms, construction sites, company theatres, etc.) of the United States, wherever situated, and non-exclusively in the Bahamas Islands, and Bermuda.

3.      Rights Granted to Distributor by Producer: Except for the "Reserved Rights" (defined below), Producer hereby grants to Distributor, throughout the Territory and during the Term (defined below), on an exclusive basis, in all languages, all distribution and exploitation rights in and to the Picture of every kind and nature now known or hereafter devised (collectively, the "<u>Rights</u>") for all media and all delivery systems now known or hereafter devised, including, but not limited to, all theatrical, non-theatrical, home video, digital, mobile, internet, interactive, satellite, video-on-demand (all forms including, without limitation, premium and subscription video on demand rights), pay television, pay-per-view, free television, and commercial tie-in rights. The Rights include the exclusive right (throughout the Territory during the Term) to market, promote, advertise, publicize and otherwise turn to account the Picture, excerpts therefrom and elements thereof (marketing, publicity, advertising and promotion to be permitted throughout the universe), by all manner, means and in all media now known or hereafter devised, directly or through subdistributors and/or servicers (<u>provided</u>, that theatrical distribution rights in the continental United States shall not be sub-distributed), and to collect all proceeds from the exploitation of the rights licensed under this Agreement. Producer reserves the following rights (except as concerns Distributor's exploitation of such rights solely for marketing and non-commercial promotional purposes, which shall be permitted) ("<u>Reserved Rights</u>"): (a) all interactive gaming, soundtrack album, stage and subsequent production rights; and (b) merchandising, music publishing, print publication (including ebooks) and theme park rights. Producer shall abide by all reasonable and customary holdbacks and coordinate any exploitation of the Reserved Rights with Distributor (including product art and release schedules) to ensure that there is no material interference with the marketing and distribution campaign for the Picture. Customary unintentional overspill will not be a breach of this Agreement. Distributor will employ industry standard copy protection, security and encryption procedures.

4.      P&A Financing/Marketing/Consultation Rights:

1

(a)    Producer will provide (or cause to be provided) to Distributor a minimum of four million eight hundred ninety one thousand three hundred seventy dollars (U.S. \$4,891,370) ("Producer P&A Funds") to be used by Distributor to pay for theatrical marketing and releasing costs (i.e., so-called "prints and advertising costs") (the "P&A") of the Picture in the Territory. Distributor will prepare and provide Producer with a top sheet budget for the Producer P&A Funds ("P&A Budget") and Distributor shall meaningfully consult with Producer on the P&A, marketing and release plan in connection therewith. The P&A Budget shall be subject to mutual approval, not to be unreasonably withheld, conditioned or delayed. Producer's provision of the Producer P&A Funds is a condition precedent to Distributor's obligations to market, promote, distribute and release the Picture. Producer will deposit the Producer P&A Funds in a segregated account ("Account") in Distributor's name at Bank of America in Los Angeles, California no later than August 3, 2017. Producer P&A Funds shall not be commingled by Distributor with any other monies. Producer shall have a security interest in the Account, but notwithstanding such security interest, Distributor shall be entitled to release and disburse funds from the Account free and clear of such security interest to pay for P&A of the Picture in the Territory in accordance with the P&A Budget.

(b)    Distributor and Producer will have mutual approval (such approval not to be unreasonably withheld, conditioned or delayed and to be exercised on a timely basis to permit Distributor to meet its obligations hereunder) over the key marketing materials (i.e., trailers, teasers and key art) and home video marketing materials (to the extent such materials have been modified from the theatrical marketing materials), home video bonus materials and home video packaging. In addition to the foregoing approval rights, Distributor will meaningfully consult with Producer with respect to any "sneak preview" of the Picture in the Territory; provided, that inadvertent failure by Distributor to so consult shall not be deemed a breach or default hereof. Any material change to the P&A Budget and/or the P&A will require the written mutual approval of the parties; provided, that Producer acknowledges that there may be a variance between actual P&A spending and the P&A Budget due to the difficulty of spending an exact amount of P&A (and aggregate variances within \$300,000 will not be treated as a breach of this Agreement on the part of Distributor). Distributor will only be entitled to release and disburse funds from the Account to pay for marketing, promotional and releasing costs of the Picture in general accordance with the P&A Budget. The parties acknowledge that, in addition to P&A, Distributor will incur non-P&A post-release distribution expenses (e.g., taxes, residuals, checking, collection and home entertainment-related costs) that will be paid out of the Gross Receipts of the Picture (or may be advanced by Distributor and recouped) as "Distribution Expenses" (as defined below). Any rebates or credits received by Distributor with respect to expended P&A on the Picture will be taken as credits and used by Distributor to fund further P&A or offset costs for the Picture. The parties acknowledge that line items of the P&A Budget may change based upon Distributor's good faith allocation and re-allocation of expenses to various aspects of the marketing and promotion of, and distribution campaign for, the Picture. Distributor will keep complete and accurate books of account of all monies received and disbursed from the Account and shall supply monthly reports to Producer regarding same, which monthly reports shall, among other things, compare the P&A Budget line items to actual and committed expenditures. Upon written request, Distributor shall provide one representative of Producer "read only" internet access to the Account at all times.

(c)    Subject to Producer meeting its Picture delivery obligations, Producer P&A Funds financing (i.e. provision of the full \$4,891,370 in Producer P&A Funds to Distributor) and other material obligations hereunder and provided that no Theatrical Force Majeure Event events have occurred, the Picture shall be released theatrically by Distributor simultaneously on no fewer than two hundred fifty (250) screens ("Minimum Screen Commitment"). Producer will have a right of mutual written approval

with Distributor over the initial theatrical release date of the Picture ("ITR") (October 27, 2017 has been selected by both parties as the release date). The Picture will be released in fifteen of the top twenty (20) markets (in consultation with Producer but in any event to include New York, Los Angeles, San Francisco, Boston and Chicago). In connection with the foregoing, Distributor shall use reasonable efforts to release the Picture theatrically on up to four hundred (400) screens, provided that failure to release on more than 250 screens shall not be a breach of this Agreement, and provided that no force majeure events have occurred). "Theatrical Force Majeure Events" means (a) the occurrence of any force majeure event that prevents Distributor from effecting the ITR, (b) the existence of any claim in excess of $750,000 against the Picture that, in Distributor's reasonable good faith judgment, would materially harm Distributor if Distributor were to effect the ITR, which claim is not dismissed or otherwise resolved by the date that is 15 business days prior to the scheduled ITR, (c) the initiation by a third party of an action seeking an injunction or temporary restraining order or other equitable relief that would prevent the full and uninterrupted exploitation by Distributor of the Rights or (d) delivery is materially hampered, impaired, suspended, prevented, delayed, interfered with or interrupted by reason of fire, flood, epidemic, earthquake, explosion, inclement weather, accident, labor dispute or strike, act of God or a public enemy, riot or civil disturbance, war (declared or undeclared) or armed conflict, act of terrorism, the failure of satellite, transponder or technical facilities, any municipal ordinance, any state or federal law, governmental order or regulation, or any other condition or event which is reasonably beyond a party's control and prevents Distributor from engaging in its customary business activities.

(d)    Except as otherwise specified above with respect to the marketing and promotion of the Picture and subject to Producer's meaningful consultation rights provided above, Distributor shall have control over all decisions regarding the marketing, exploitation, advertising, promotion and distribution of the Picture. Producer will exercise its approval and other rights and will perform all of its obligations (which shall be personal and non-delegable) on a timely basis and in good faith so as not to frustrate Distributor's ability to exploit the Rights. Distributor makes no representation or warranty as to the success of the Picture or the amount of Gross Receipts (defined in Exhibit A) the Picture may generate, and Distributor is not required to pay Producer a minimum guaranty hereunder. The parties will mutually agree upon the terms of a press release announcing this Agreement (which the parties acknowledge has already occurred). Producer will not issue publicity in the Territory (other than mention of the Picture in Producer's general corporate publicity) concerning the Picture or this Agreement without coordinating the same with Distributor and obtaining Distributor's prior approval for such publicity. Any license to theaters or TV stations or other similar facility owned and controlled by Distributor will be on an arm's length basis.

5.    Term: The term of this Agreement ("Term") shall commence on the execution of this Agreement by both parties and terminate twenty five (25) years from commencement of the ITR of the Picture in the Territory by Distributor.

6.    Distribution Fees; Waterfall:

(a)    From 100% of all "Gross Receipts" received by or credited to Distributor or "Subdistributors" (as defined in Exhibit A) on a non-refundable basis from the exploitation of the Picture and the Rights therein throughout the Territory, Distributor shall deduct and/or pay the following on a continuing basis and in the following order:

(i)    First, Distributor shall be paid its "Distribution Fee" (as defined below) for all media;

3

   (ii) Second, Distributor shall pay and/or recoup (to the extent already advanced by Distributor) all actual, out of pocket non-P&A "Distribution Expenses" (as defined in Exhibit A) in connection with the Picture, plus an overhead fee to Distributor o:
     :);

   (iii) Third, Producer shall recoup all Producer P&A Funds contributed by or on behalf of Producer to the Picture, plus interest at the annual rate c     ie outstanding balance from the date paid until recouped;

   (iv) Fourth, to Marc Forster ("<u>Forster</u>") in payment of the Forster Corridor (as defined below); and

   (v) Fifth, the balance of Gross Receipts, if any, will be paid

  (b) Distributor shall not be entitled to cross-collateralize the revenues and expenses of the Picture with those of any other motion picture. "Gross Receipts" and "Distribution Expenses" shall be defined, accounted for, calculated and paid in accordance with Exhibit "A" attached hereto and incorporated herein by this reference.

  (c) Distributor's "<u>Distribution Fee</u>" shall equal media (inclusive of subdistribution fees) except for (i) theatrical distribution in Puerto Rico and the U.S. Virgin Islands and for non-theatrical uses (e.g. hotels, airline, ships and military bases, etc.) Distributor's "Distribution Fee" will equal the i distribution fee to Distributor (fc. ........, .... .... . .. ... .... ......... ........ .. ........... .. sub-distributor) and (ii) Home Entertainment Rights Distributor's "Distribution Fee" will equal 'or such media. For the avoidance of doubt, where Distributor subdistributes Home Entertainment Rights the gross receipts of the subdistributor shall not be calculated on a royalty basis but rather at the level of collection by Distributor's primary subdistributor of Home Entertainment Rights (currently Universal Studios Home Entertainment), and the amount received by the primary subdistributor shall be included as "Gross Receipts." "<u>Home Entertainment Rights</u>" shall mean the right to reproduce, transmit and distribute, rent and sell and permit others to reproduce, transmit and/or distribute, rent and sell the Picture, via all forms of videogram or physical unit, electronic sell through, video on demand, digital or physical rentals, pay per view and any other media that come to be treated as home entertainment rights by a major studio.

  (d) The "Forster Corridor" means an amount equal to      d collected by Distributor in the Territory (less the amounts specified in ..... ..... (... "Forster Corridor" )     f the sums previously paid to Marc Forster for directing services shall for the Picture be applicable against the Forster Corridor. For the avoidance of doubt, payment of the Forster Corridor to Forster shall be subject to Distributor's receipt and approval of a correctly completed W-9, W8-BEN, or other required tax form (as applicable).

  (e) As more particularly detailed in the "Gross Receipts" definition:

   (i) Producer shall be entitled to quarterly accountings for 4 years following release (commencing with the first quarter in which Distributor collects Gross Receipts for the Picture), and

US-DOCS\71508223.2

semi-annual accountings thereafter which accountings, together with any payments due to Producer thereunder shall be rendered to Producer within 60 days of the end of the applicable reporting period.

        (ii)    Producer shall be entitled to a detailed summary of all P&A costs incurred in connection with the Picture within (x) 45 days following ITR (it being acknowledged that a full reconciliation of P&A costs may not be possible so soon after ITR due to inconsistent third party invoicing and billing), and (y) 180 days following ITR.

        (iii)    Producer shall have customary annual audit rights.

    (f)    Box Office Bonuses:  Distributor will pay (on Producer's behalf as directed by Producer and upon receipt and approval of a correctly completed W-9, W8-BEN, or other required tax form (as applicable)) the following "Box Office Bonuses."  The Box Office Bonuses, if any, shall be payable forty-five (45) days after the Picture reaches the applicable "DBO" (as defined below) based on the United States theatrical box office receipts as reported by Rentrak or other mutually approved reporting system ("USBO") plus the Canadian theatrical box office receipts as reported by Rentrak or other mutually approved reporting system (collectively, the "DBO") receipts. All Box Office Bonuses shall be recoupable as a Distribution Expense (if paid).

        (i)    To Blake Lively:

| DBO | Box Office Bonus |
| --- | --- |
|  |  |

        (ii)    To Jason Clarke:

| DBO | Box Office Bonus |
| --- | --- |
|  |  |

    (g)    Awards Bonuses:  Distributor agrees to pay (on Producer's behalf as directed by Producer and upon receipt and approval of a correctly completed W-9, W8-BEN, or other required tax form (as applicable)) the following "Awards Bonuses" (if and as earned). All Awards Bonuses shall be recoupable as a Distribution Expense (if paid):

        (i)    To Blake Lively:

5

(ii)    To Jason Clarke:

(f) <u>Payment to Producer</u>:  All payments owed to Producer hereunder shall be paid by wire transfer to the account set forth below upon receipt and approval of a correctly completed W-9 or W8-BENE, or other required tax forms (as applicable).  For the avoidance of doubt, any necessary taxes will be withheld.

7.    <u>Delivery to Distributor</u>: Producer shall deliver the completed Picture to Distributor, fully edited and titled, and in all respects ready and of first class technical quality suitable for first class exhibition and distribution as contemplated herein, at Producer's sole cost and expense, in color, in live action, in the English language, with a running time of not less than 90 minutes and not more than 110 minutes (inclusive of main and end titles), containing the elements described in the preamble of this Agreement and in accordance with Distributor's delivery schedule ("<u>Delivery Schedule</u>") attached hereto as Exhibit "B" on or before August 11, 2017 ("<u>Delivery Date</u>").  Producer shall be solely responsible for funding all costs in connection with the development, pre-production, production, post-production, completion and delivery of the Picture.  The laboratory services for the Picture will be provided by a laboratory facility approved by Distributor (Deluxe is pre-approved).  The Picture shall be delivered to Distributor capable of qualifying for a rating by the M.P.A.A. which is no more restrictive than "R".  Distributor shall have the rights to terminate this Agreement and be reimbursed by Producer for costs incurred by Distributor in connection with the Picture if Producer fails to deliver the Picture as required hereunder on or before the Delivery Date.

8.    Editing/Credits:

9.    Security Interest:

     (a)    In order to secure all of the rights and entitlements granted to Distributor hereunder and the full and timely performance by Producer of all of its obligations hereunder, Producer hereby grants to Distributor a continuing first priority security interest subject to guild liens, if any, and copyright mortgage (collectively, "Distributor's Security Interest") in and to all of the Rights, and the products and proceeds of the Rights (excluding all amounts payable to Producer hereunder net of any deductions and offsets for breach of this Agreement, indemnity and other obligations of Producer to Distributor) and all

7

assets relating to the Picture necessary to exploit the Rights and other entitlements of Distributor hereunder (collectively, the "Collateral"). For the avoidance of doubt, no exercise of Distributor's rights as a secured creditor hereunder shall abrogate, diminish, interfere with, derogate from or disturb any of Producer's right to payment and associated audit and accounting rights related thereto pursuant to this Agreement. Producer agrees to sign and deliver to Distributor all instruments as Distributor shall request and are reasonably required (including a copyright mortgage) and consistent with the terms hereof to perfect, protect, evidence, renew and/or continue Distributor's Security Interest and/or to effectuate the purposes and intents of this Agreement. Producer authorizes Distributor to file, register and/or record all such instruments, as well as financing statements, and to pay all applicable fees relating thereto under (i) the Uniform Commercial Code, and all other similar applicable laws of the State of California and any other jurisdiction where such filing, registration and/or recordation may reasonably be required, and (ii) the United States Copyright Act. If Producer fails to sign any such document following a five (5) business day opportunity to review and comment upon such document, Producer hereby appoints Distributor its irrevocable attorney-in-fact to sign any such document consistent herewith for Producer, and agrees that such appointment constitutes a power coupled with an interest and is irrevocable throughout the Term. Distributor will provide Producer written copies of any documents executed by Distributor pursuant to said power of attorney; provided, that any failure to deliver any such written copies shall not be deemed a breach of this Agreement. Distributor shall have all rights, privileges and remedies available to a secured creditor to the maximum extent permitted by law (including, without limitation, all legal, equitable, administrative and self-help rights and remedies) to enforce its rights hereunder. Distributor will have the right in connection with any current or future financing arrangements, to mortgage, pledge, grant or assign as security, all of Distributor's rights and entitlements hereunder for the benefit of Distributor's lenders and financiers. Producer will enter into such intercreditor, interparty, lab pledgeholder and other security agreements as required by Distributor's lenders and financiers subject to good faith negotiation but in any event consistent with the terms hereof.

(b)     In order to secure all of Distributor's payment obligations to Producer hereunder, Distributor hereby grants to Producer a continuing security interest and copyright mortgage (subordinate in priority to the security interests of Distributor's lenders and applicable guilds and subject to the rights of Distributor's third party subdistributors and licensees (and each of their respective licensees, successors and assigns) under their respective distribution or license agreements in respect of the Picture (including rights to receive delivery materials and have access thereto and to recoup or retain proceeds from the exploitation of the Picture under such distribution or license agreements) and subordinate to any liens that may be granted to any such subdistributor or licensee in such rights and the products and proceeds thereof) ("Producer Security Interest") in and to all of Distributor's right, title and interest in and to (i) the Rights; and (ii) the products and proceeds of the Rights; provided, that (A) Producer shall only be entitled to exercise its rights pursuant to the Producer Security Interest following the occurrence and during the continuance of a Bankruptcy Event (as defined below) of Distributor if, as a result thereof, Distributor fails to make any payments owing to Producer in accordance with the terms of this Agreement (subject to all of Distributor's defenses, rights or remedies hereunder or at law or in equity) and such failure continues unremedied for 30 days and (B) Producer shall not exercise any of its rights as a secured creditor hereunder or otherwise act in any manner that would abrogate, diminish, interfere with, derogate from or disturb (I) the free and unencumbered exercise and quiet enjoyment by Distributor's third party subdistributors and licensees (and each of their respective licensees, successors and assigns) of the rights granted to them under their respective distribution or license agreements in respect of the Picture and (II) Distributor's right to payments due to Distributor under this Agreement (e.g., indemnification payments due from Producer) that may have accrued, be based on, or arise out of circumstances, acts or omissions occurring prior to such exercise and remain unpaid (e.g., if Producer exercises its rights as a secured

8

creditor in accordance with the foregoing, Distributor shall still be due any such payments out of the proceeds of exploitation of the Picture by Producer or Producer's licensees). For purposes hereof, "Bankruptcy Event" means that Distributor has: (i) filed a petition, answer or consent seeking relief or taken other similar action under Title 11 of the United States Code as now constituted or hereafter amended (the "Bankruptcy Code") or any other applicable Federal or State bankruptcy law or other similar law ("Bankruptcy Law"); (ii) consented to or become subject to the institution of proceedings under Bankruptcy Laws or to the filing of any petition thereunder or to the appointment of, or taking possession by, a receiver, liquidator, assignee, trustee, custodian, sequestrator or similar official of it or of any substantial part of its property; (iii) failed generally to pay its debts as they become due or otherwise become insolvent; (iv) taken any corporate action in furtherance of any aforesaid action; (v) become the subject of a decree or order by a court having jurisdiction for relief in respect of it (and such decree or order shall continue unstayed and in effect for a period of sixty (60) consecutive days) under (x) Bankruptcy Laws; (y) appointing a receiver, liquidator, assignee, trustee, sequestrator or similar official of it or of any substantial part of its property; or (z) ordering the winding-up or liquidation of its affairs; (vi) pursuant to Bankruptcy Laws, had its rights hereunder become exercisable by a trustee or debtor-in-possession; or (vii) as assignment for the benefit of creditors as an alternative to the institution of proceedings under Bankruptcy Law and not as provided in Distributor's ordinary course. Distributor agrees to sign and deliver to Producer all instruments as Producer shall reasonably require to better perfect, protect, evidence, renew and/or continue the Producer Security Interest. Distributor authorizes Producer to file, register and/or record all such instruments, as well as financing statements, and to pay all applicable fees relating thereto under (x) the Uniform Commercial Code, and all other similar applicable laws of the State of California and any other jurisdiction where such filing, registration and/or recordation may reasonably be required, and (y) the United States Copyright Act. Producer shall have all rights, privileges and remedies available to a secured creditor to the maximum extent permitted by law (including without limitation all legal, equitable, administrative and self-help rights and remedies) to enforce its rights hereunder, subject at all times to this Paragraph 9(b). Producer will have the right in connection with any current or future financing arrangements, to mortgage, pledge, grant or assign as security, all of Producer's rights and entitlements hereunder for the benefit of Producer's lenders and financiers. Distributor will enter into such intercreditor, interparty and other security agreements as required by Producer's lenders and financiers (and which are acceptable to Distributor's lenders and financiers) provided that same are consistent herewith.

10. Third Party Payments: Producer shall be solely responsible for the preparation of accounting statements for any and all payments to third parties in connection with the Picture, including, without limitation, the payment of all applicable profit participations, guild payments (excluding residuals, and amounts owed to local collection, mechanical and performing rights societies, if any, which shall be treated as Distribution Expenses hereunder), deferments, credit bonuses, corporate and income taxes of Producer and the like derived from the pre-production, production, post-production, and distribution of the Picture. Distributor agrees to pay the Box Office Bonuses and Awards Bonuses if and when earned and shall recoup such payments as a Distribution Expense. Producer agrees that no third parties (other than, for clarity, a duly authorized accounting representative of Producer) shall have the right to audit and/or otherwise examine Distributor's books and records for any purpose whatsoever. It is understood and agreed that Distributor shall pay residuals and sign customary distributor assumption agreements for the Term, Territory and Rights with the applicable guilds as and when requested by Producer; provided, that Producer timely provides Distributor with all necessary information and documentation; provided, further, that any and all such amounts paid shall be deemed recoupable Distribution Expenses hereunder. It is further understood and agreed that Distributor shall have no obligations hereunder with respect to payment of any gross or net participations in the Picture.

9

11.    Holdbacks:

12.    Insurance:  Producer shall maintain and have maintained throughout the development and production of the Picture, customary general liability and errors and omissions insurance policies.  The errors and omissions policy remains in effect and is for no less than :
in the aggregate and issued by a carrier acceptable to Distributor, and Producer will upon execution of this Agreement add Distributor and its parents, subsidiaries, subdistributors, affiliates, licensees, lenders successors, assigns directors, officers and employees as additional named insureds on such policies and provide a certificate of insurance evidencing same.  Such insurance shall specify that it is primary and not contributing coverage, notwithstanding any other insurance which Distributor or its subdistributors and licensees may maintain.  Such policies will require the insurance carrier to give Distributor thirty (30) days prior written notice of any cancellation or non-renewal.

13.    Subsequent Productions:

        (a)    For purposes hereof, the following terms shall have the following meanings:

        (i)    "Negotiation Elements" shall mean, with respect to any given Subsequent Production (defined below), (i) a copy of the most recent draft of the treatment, or, if available, script; (ii) a list of any and all principal cast and any and all other material attachments (e.g., writer, director and producer attachments, etc.); (iii) the anticipated budget amount (provided, that Producer shall not be required to resubmit the Negotiation Elements as a result of a change in the budget or anticipated budget amount unless there is a variance of                    f more); (iv) the most recent cut of such production (if available); and (v) all other material information concerning the applicable Subsequent Production that has been or will be shared with any other third party.

        (ii)    "Right of First Refusal" shall mean the following with respect to each Subsequent Production: Producer shall not be entitled to accept an offer from a third party relating (in whole or in

10

part) to the distribution of such Subsequent Production in the Territory on terms that are less advantageous to Producer than the terms contained in the Final Producer Offer ("Reduced Terms") without first notifying Distributor in writing of such Reduced Terms and offering Distributor the opportunity to enter into an agreement on such Reduced Terms. In such event, Distributor shall have five (5) business days within which to accept or reject such Reduced Terms by providing written notice to Producer. If Distributor accepts such Reduced Terms, the parties will enter into a written agreement with respect thereto as expeditiously as possible. If Distributor rejects such Reduced Terms, or fails to accept such Reduced Terms within such five (5) business day period, Producer shall be free to enter into an agreement with the applicable third party on such Reduced Terms. Each time that Producer makes any change to the Reduced Terms until Producer enters into an agreement with a third party that is consistent with Producer's rights under this paragraph, Producer shall immediately re-submit the revised Reduced Terms to Distributor in writing and Distributor will have an additional five (5) business days within which to accept or reject such revised Reduced Terms.

(iii)    "Subsequent Production" shall mean, with respect to the Picture, any feature-length audiovisual work based in whole or in part on such Picture or any underlying material thereto, its storyline or any one or more of its characters, including, without limitation, all remakes, sequels and prequels of such Picture intended for initial exhibition in theaters, on television, or by means of home video exhibition, electronic sell-through or video-on-demand, or by any other means now or hereafter devised. For the avoidance of doubt, Subsequent Productions shall also include any audiovisual works based in whole or in part on a prior Subsequent Production or any underlying material thereto, its storyline or any one or more of its characters.

(b)    If Producer or any of its affiliates, or any of its or their respective licensees, successors or assigns, intends to seek a distributor to release a Subsequent Production in the Territory, then provided, that (i) Distributor is not in an uncured material breach of the Agreement, and (ii) Distributor is still an active distributor of theatrical motion pictures produced by third parties in the Territory, the following shall apply:

(i)    First Negotiation Right:  Producer shall immediately notify Distributor in writing, including all Negotiation Elements, to the extent then known or available, with respect to the applicable intended Subsequent Production (each, a "Negotiation Elements Notice"). If Distributor so elects to engage in discussions with Producer with respect thereto, Distributor shall notify Producer within five (5) business days following receipt by Distributor of the Negotiation Elements Notice, and Producer shall thereafter negotiate in good faith with Distributor, on an exclusive basis, for a period of fifteen (15) business days with respect to acquiring any or all distribution rights for the Territory with respect to such Subsequent Production (the "First Negotiation Right"). If the parties have not reached agreement with respect to such material terms prior to the expiration of such fifteen (15) business day period, Producer will make an offer in writing to Distributor that details the terms that Producer is willing to accept (the "Final Producer Offer"), and Distributor shall have five (5) business days within which to accept or reject such Final Producer Offer. If Distributor accepts such offer, the parties will enter into a written agreement incorporating the agreed terms as expeditiously as possible. If Distributor rejects such Final Producer Offer, Producer shall be entitled to enter into discussions with third parties with respect thereto, subject at all times to Distributor's rights with respect to changed elements.

(ii)    First Refusal Rights:  Distributor shall have a Right of First Refusal with respect to all Subsequent Productions. Distributor's Right of First Refusal shall revive and apply to each and every further offer which Producer is prepared to accept (including any changes to any prior offers) and shall continue in full force and effect so long as Producer retains any interest in and to the applicable rights.

11

Such Right of First Refusal shall continue thereafter for all additional Subsequent Productions (whether based on the Picture or any prior Subsequent Productions, or any elements thereof), on a rolling but dependent basis (e.g., if Distributor does not serve as the distributor for the first theatrical sequel based upon the Picture it shall not have the First Negotiation Right and Right of First Refusal with respect to any other Subsequent Production).

(iii)   Changed Elements: Without limiting the foregoing, Distributor's First Negotiation Right and Right of First Refusal shall revive and apply each and every time one of the Negotiation Elements changes in any material respect or a new Negotiation Element is determined (unless the Negotiation Element(s) change after a binding, arms-length agreement with a third party has been agreed in accordance with the terms hereof; provided, that such First Negotiation Right and Right of First Refusal, shall be reinstated (even following execution of an agreement with a third party) if any Subsequent Production rights revert to any Subsequent Productions rights holder or any of their respective affiliates, or any of their respective licensees, successors or assigns (e.g., pursuant to a turnaround provision)).

14.   Representations and Warranties:  Producer represents and warrants that: (a) Producer owns or controls all Rights granted to Distributor under this Agreement and that all such Rights are (and will as of delivery be) free of all liens (other than customary guild and laboratory liens and liens subordinated to the interests of Distributor pursuant to the intercreditor agreements or non-disturbance agreements approved by Distributor), claims, charges, encumbrances, restrictions, and commitments that in any way will interfere with, impair, abrogate, increase the expense and/or time necessary to, or adversely or otherwise affect Distributor's enjoyment or use of any of the rights granted to Distributor under the Agreement; (b) Producer has all the rights, powers and authority to enter into and fully perform all of its obligations hereunder; (c) neither the Picture, nor any part thereof, nor any materials contained therein or synchronized therewith and/or supplied to Distributor, nor the title thereof, nor the exercise of any right, license or privilege granted to Distributor hereunder, violates or will violate, or infringes or will infringe, any trademark, trade name, service mark, patent, copyright (whether common law or statutory) or the literary, dramatic, musical, artistic, personal, private, civil, "droit moral" or property right or rights of privacy or any other right of any person or entity whatsoever, or unfairly competes with or slanders or libels (or constitutes a trade disparagement of) any person or entity whatsoever; (c) the non-dramatic public performance rights in the Picture and its contents are either (i) controlled by ASCAP, BMI or SESAC; (ii) in the public domain; or (iii) solely controlled by Producer; (d) Producer has satisfied and will satisfy when due all third party obligations of every kind with respect to the Picture and has produced and will produce the Picture in accordance with all applicable laws; (e) there are not, and shall not be, at any time during the Term any liens, claims, charges, encumbrances, restrictions, agreements, commitments or arrangements whatsoever with any person or entity, or any obligation (past, present or future) or any uncured material breaches of contract, which will in any way impair, abrogate or adversely affect the rights granted to Distributor; (f) there are no legal actions or proceedings pending or, to the best of Producer's knowledge in the exercise of its reasonable prudence, threatened which would or might affect Distributor's exploitation of the Picture; (g) as of the date hereof, the Picture has not previously been exploited anywhere in the world, and (h) the copyright in the Picture and the material upon which the Picture is based will be valid and subsisting during the Term.  Producer will indemnify, defend and hold Distributor and its parent companies, subsidiaries, affiliates, successors, licensees and assigns and the directors, officers, agents, consultants and representatives of the foregoing harmless from any third party claims arising from a breach or alleged breach of Producer's representations, warranties and covenants under this Agreement, unless resulting from a breach of this Agreement by Distributor or any claim for which Distributor must indemnify Producer pursuant to this paragraph.  Distributor will indemnify,

12

defend and hold Producer and its parent companies, subsidiaries, affiliates, successors, licensees and assigns, and the directors, officers, agents, consultants and representatives of the foregoing harmless from any third party claims arising from a breach or alleged breach of Distributor's representations, warranties and covenants under this Agreement and Distributor's own acts and omissions in its distribution, advertising or promotion of the Picture (provided, that Distributor will have no such indemnity obligation if Producer's misconduct, provision of incorrect information or breach or alleged breach of its representations, warranties or obligations caused such claim). The indemnity obligations of the parties will survive the expiration of this Agreement.

15.    Default/Remedies:  In the event of any alleged breach hereunder, each party will have ten (10) business days following receipt of written notice from the non-breaching party specifying such alleged breach (reducible to seventy-two (72) hours for any alleged breach by Producer which materially impacts Distributor's ability to effectively distribute the Rights in the Territory or exploit any other Rights hereunder) to cure such alleged breach.  In the event Producer fails to advance the balance of the Producer P&A Funds in accordance with the terms set forth herein and such breach is not cured within the foregoing cure period, in addition to any other rights and remedies Distributor may have against the Producer, Distributor shall be entitled to retain any unused portion of the Deposit.  Under no circumstances of any kind, including any breach of this Agreement, shall Producer have any right to seek and/or obtain any injunctive or equitable relief, including any right to terminate, rescind, or cancel this Agreement or Distributor's rights in the Territory hereunder, or to otherwise enjoin, restrain, or interfere with the production, distribution, or other exploitation of the Picture, any rights therein, or any related advertising or publicity, in the Territory.  The rights and remedies of Producer, in all circumstances, including in the event of any breach of this Agreement, shall be limited to Producer's right to recover actual damages, if any, in an arbitration as described herein.

16.    Assignment:  Distributor shall have the right, at any time, to freely sell, transfer, license, assign, hypothecate, sub-distribute, and otherwise deal with, in whole or in part, all or any portion of this Agreement or any or all of its rights or obligations hereunder, to: (a) a person or entity into which Distributor merges or is consolidated; (b) a person or entity which acquires all or substantially all of Distributor's business and assets; or (c) following the initial theatrical run of the Picture, any third party that is financially responsible and capable of performing Distributor's then-current executory obligations to Producer and assumes all of Distributor's executory obligations under this Agreement in writing. Notwithstanding the foregoing, Distributor will not subdistribute theatrical distribution rights in the continental United States.  Producer shall not have the right to assign, and shall not assign, this Agreement or any portion hereof, or any of its duties, rights, and/or obligations under this Agreement, without Distributor's prior written approval (which may be granted or withheld in Distributor's reasonable discretion).  Notwithstanding the foregoing, (x) Producer may assign this Agreement to (a) an affiliate of Producer to which Producer assigns all of its right, title and interest in the Picture and provided, that such assignee is capable of performing Producer's obligations hereunder and assumes all of Producer's obligations hereunder in writing, (b) to a person or entity into which Producer merges or is consolidated; or (c) a person or entity which acquires all or substantially all of Producer's business and assets, (y) Producer may assign Producer's right to receive the monies payable to Producer hereunder to one or more entities; provided, that (A) Producer shall designate a single agent or collection account to act as payee for all such entities and each such entity shall execute a customary irrevocable payment instruction in form and substance acceptable to Distributor, and (B) only one assignee shall be assigned the audit and reporting/accounting rights provided to Producer hereunder, and (z) Producer may collaterally assign its rights hereunder to a financier, which assignment and financier shall be subject to the terms hereof.

13

17.    Arbitration: This Agreement shall be construed and interpreted pursuant to the laws of the State of California applied to contracts entered into and performed wholly within California (without regard for conflict of law principles), or, if appropriate, the federal laws of the United States of America. In the event of any dispute of any kind in connection with this Agreement, the existence or validity of this Agreement, the Picture, and/or the parties' relationship (other than delivery disputes which shall be subject to the arbitration provisions of the Delivery Schedule), such dispute shall be resolved by submission to final, binding, and confidential arbitration in Los Angeles County, California. Such arbitration shall be initiated and conducted according to the JAMS rules and procedures in effect at the time the request for arbitration is made. The arbitration shall be conducted before a single neutral arbitrator chosen in accordance with such JAMS rules and procedures. California Code of Civil Procedure section 1283.05, which provides for certain discovery rights, shall apply to such arbitration. Notwithstanding anything to the contrary, the arbitrator may only award actual damages under the law and reimbursement for reasonable outside attorneys fees and costs and expenses (at the election of the arbitrator), and the arbitrator shall not have the power to award consequential, punitive, or exemplary damages of any kind. The Arbitrator shall be entitled to compel payment by the losing party of the arbitrator's and any court reporter's fees, as well as the fees (including reasonable outside attorneys' fees), costs and expenses incurred by the prevailing party in the arbitration. Either party hereto may bring an action in any court of competent jurisdiction, if necessary, to compel arbitration under this arbitration provision or to enforce an arbitration award that may be entered by the arbitrator. The parties consent to the exclusive jurisdiction and venue of the Federal and State courts located in Los Angeles, California for purposes of enforcing the arbitration provisions of this Agreement and/or enforcing any arbitration award, and otherwise as to matters held to be non-arbitrable by such courts. EACH OF THE PARTIES HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY DISPUTE OF ANY KIND IN CONNECTION WITH THIS AGREEMENT.

18.    Rights in Bankruptcy:

(a)    Retention of Rights: All rights and licenses granted under or pursuant to this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code. The parties agree that Distributor, as a licensee of such rights under this Agreement, shall retain and may fully exercise all of its rights and elections under the U.S. Bankruptcy Code in the event a case is commenced by or against Producer under the Bankruptcy Code and Producer rejects this Agreement pursuant to Bankruptcy Code Section 365, including, without limitation, the right of Distributor to elect under Bankruptcy Code Section 365(n)(1)(B) to retain all of its rights and licenses granted by Producer that are in existence immediately before the commencement of such case, including, without limitation, any rights granted to Distributor with respect to works of authorship protected under the law of any foreign jurisdiction; provided, however, that nothing herein shall be deemed to constitute a present exercise of such rights and elections.

(b)    Access to Picture: The parties further agree that, in the event of the commencement of a bankruptcy proceeding by or against Producer under the U.S. Bankruptcy Code, Distributor shall be entitled to a complete duplicate of (or complete access to, as appropriate) any such "intellectual property" (as defined under Section 101 or the U.S. Bankruptcy Code) and all embodiments of such "intellectual property," which "intellectual property" (and all embodiments thereof), if not already in Distributor's possession, shall be delivered to Distributor (i) upon any such commencement of a bankruptcy proceeding, upon Distributor's written request, unless Producer elects to continue to perform all of its obligations under this Agreement; or (ii) promptly after the later rejection of this Agreement by or on

14

behalf of Producer (unless previously delivered to Distributor pursuant to (i) above, upon Distributor's written request therefor.

19.     Notices: Unless otherwise provided under this Agreement all notices shall be in writing, and shall be sent to the addresses set forth below (subject to changes of which the parties are notified in writing). Failure to provide notice to all "copy to" parties set forth below shall not be a breach of this Agreement. Notices shall be given by personal delivery, overnight courier, facsimile, email or by registered or certified mail (postage prepaid), and shall be deemed given on the date delivered, faxed or emailed, one (1) business day after a notice is sent by overnight courier, or three (3) business days after the date mailed. The time to respond to notices given during the week between Christmas Eve and New Year's Day shall be tolled until five (5) business days following New Year's Day. Until further notice, the addresses of the parties shall be as follows:

PRODUCER                                    DISTRIBUTOR

All I See Partners 2015 L.P.                Open Road Films, LLC

Copy to:

Craig Baumgarten

Graham Taylor at WME

Michael Selby

20.     Federal Corrupt Practices Act ("FCPA"): In the event that either party provides any services under this Agreement outside of the United States, each party acknowledges that such party is familiar with the requirements of the FCPA and that a violation of any of the provisions of the FCPA constitutes a criminal offense. Each party represents and warrants that such party has not and will not (a) make, authorize or promise any offer, payment or gift of anything of value to any person, (b) with the knowledge that all or a portion of it will be offered, given or promised, directly or indirectly, to any government agency or official, political party, leader or candidate for government or political office in a foreign country, (c) in order to influence any such official, party, leader or candidate to assist either party (or any related company) to obtain, retain or direct business or unduly affect a decision.

21.     Remedies Cumulative; Waiver of Provisions: Except as may be otherwise expressly provided in this Agreement, (a) the rights, obligations and remedies created by this Agreement are cumulative and in addition to any other rights, obligations or remedies otherwise available at law or in equity; and (b) nothing in this Agreement shall be considered an election of remedies. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision,

15

whether or not similar, nor shall any waiver of any of the provisions of this Agreement constitute a continuing waiver of that same provision. No waiver shall be binding unless executed, in writing, by the waiving party.

22.     Survival: The following provisions (including any provisions of this Agreement required to implement or establish the meaning of such surviving provisions) will survive the expiration or termination of this Agreement indefinitely or for such shorter period of time as may be set forth in any such provision:   Paragraph 14 ("Representations and Warranties"), Paragraph 17 ("Arbitration"), Paragraph 18 ("Rights in Bankruptcy").

23.     Miscellaneous: This Agreement is legally binding and reflects the agreement of the parties with respect to all material terms concerning the subject matter hereof. This Agreement shall be the entire and binding agreement and understanding of the parties concerning the subject matter hereof and supersedes all prior agreements, arrangements and understandings (whether written or oral) regarding such subject matter between the parties hereto. Each party will execute such agreements as are reasonably necessary to effectuate the purposes and intents hereof. The parties acknowledge that no representation or promise not expressly contained in this Agreement has been made by any party or any of its agents, employees, representatives, or any other related parties. This Agreement may not be amended except by a written instrument executed by all the parties. This Agreement is binding on the parties' licensees, assignees, and successors. This Agreement may be executed in counterparts (including by facsimile and/or electronic transmission), each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. The parties have participated jointly in the negotiation and drafting of this Agreement, and if an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.

*[signatures on next page]*

US-DOCS\71508223.2

**AGREED TO AND ACCEPTED BY:**

Open Road Films, LLC ("Distributor")          All I See Partners 2015 L.P. ("Producer")

Authorized Signature                          Authorized Signature

Date                                          Date

Reference is made to Paragraph 13 of the above Agreement. The undersigned jointly control the "Subsequent Production" rights to the Picture. As an inducement to Open Road Films, LLC to enter into the Agreement, the undersigned agree to be bound by the terms and conditions and to comply with the provisions of the said Paragraph 13 if and when any such "Subsequent Production" rights are exercised on the same basis as Producer (as if each of Marc Forster and SC International Pictures, LTD. were Producer).

Acknowledged and Agreed:

Marc Forster

SC International Pictures, LTD.

By:
Craig Baumgarten

AGREED TO AND ACCEPTED BY:

Open Road Films, LLC ("Distributor")       All I See Partners 2015 L.P. ("Producer")

_____              _____
Authorized Signature                      Authorized Signature

_____              _____
Date                                      Date

Reference is made to Paragraph 13 of the above Agreement. The undersigned jointly control the "Subsequent Production" rights to the Picture. As an inducement to Open Road Films, LLC to enter into the Agreement, the undersigned agree to be bound by the terms and conditions and to comply with the provisions of the said Paragraph 13 if and when any such "Subsequent Production" rights are exercised on the same basis as Producer (as if each of Marc Forster and SC International Pictures, LTD. were Producer).

Acknowledged and Agreed:

_____
Marc Forster

SC International Pictures, LTD.

By:_____
Craig Baumgarten

**EXHIBIT "A"**
**ACCOUNTING PROVISIONS**

**OPEN ROAD FILMS, LLC**

1.  Definitions: As used in this Exhibit, the following terms shall mean:

      A.    "Participant" or "Producer": The party to the Underlying Agreement to which this Exhibit is attached (hereafter, "Underlying Agreement).

      B.    "Distributor": **OPEN ROAD FILMS, LLC** and its subsidiaries and divisions engaged in the business of distributing motion pictures, but shall not include any other persons, firms or corporations licensed or granted rights by Distributor or providing services on behalf of Distributor, including without limitation a Subdistributor, to distribute and/or exhibit motion pictures in any part of the Territory. Without limitation of the foregoing, the term Distributor shall not include: exhibitors (including without limitation Regal and AMC) or others who may actually exhibit, transmit, rent, license or sell the Picture to the public in any form now known or hereafter devised, including without limitation, radio or television broadcasters; cable or satellite operators; internet service providers; manufacturers, wholesalers or retailers of home video devices and delivery systems (physical and electronic); providers of mobile or wireless devices, services or content; on demand, pay-per-use and other digital rights wholesalers, retailers or service providers; book or music publishers (physical and electronic); phonograph record or disc producers or distributors; merchandisers, retailers, etc., whether or not any of the foregoing are subsidiaries, parents, divisions or affiliates of Distributor or the entities comprising or controlling Distributor.

      C.    "Subdistributor": A "Subdistributor" means a party to whom Distributor has directly licensed, granted or sublicensed exploitation rights in the Picture for the distribution of the Picture for particular time periods, media and/or countries who, pursuant to its license from Distributor, has an obligation to report its receipts and expenses with respect to the Picture to Distributor. Where Distributor subdistributes rights, the gross receipts and expenses of such Subdistributor(s) accounted to Distributor shall be treated as Gross Receipts and Distribution Expenses of Distributor. If a Subdistributor uses another person or entity as its subdistributor, reportable gross receipts shall be the amounts that remain after the Subdistributor deducts distribution fees and distribution expenses paid or payable to its subdistributor.

2.  Gross Receipts: "Gross Receipts" for accounting purposes shall mean, subject to the terms and conditions hereof, the aggregate of the following amounts to the extent actually received by Distributor:

      A.  All film rentals pursuant to licenses from Distributor directly to exhibitors of the right to exhibit the Picture to members of the public in theatres and on "Television" (defined for purposes of this paragraph as all forms of television transmission including free television, pay television, basic cable, and satellite, but specifically excluding sums derived from home video rights as set forth in Paragraph 2.C. below).

      B.  Net receipts received by Distributor from its non-theatrical licensees. A non-theatrical licensee is a person or entity licensed by Distributor to distribute the Picture in non-theatrical venues such as hospitals, oil rigs and similar installations, planes, ships and other means of travel, or government bases and installations, anywhere in the world. Such licensee is not a Subdistributor of Distributor and the receipts and expenses of such non-theatrical licensees are not the Gross Receipts or Distribution Expenses of Distributor.

C.  The gross receipts of Distributor's home video Subdistributors actually received by or accounted to Distributor from physical home video (such as DVD) and from electronic sell through, pay per view, video on demand and digital or electronic rental of the Picture.

D.  If Canada is part of the Territory, the gross receipts of Distributor's Subdistributors in Canada actually received by Distributor.

E.   Where Distributor licenses or grants Television rights to a Subdistributor, the gross receipts of Distributor's Subdistributors (when actually received and earned and excluding reimbursements) from such Subdistributor.

F.  All sums when actually received and earned by Distributor from the following net of all distribution fees charged to Distributor by third parties: (i) outright sales or licenses of theatrical distribution rights in and to the Picture for a flat sum; (ii) sales or licenses of exhibition or distribution rights in the Picture other than those referred to in Subparagraphs 2.A., B., C., D. and E.; (iii) the lease of positive prints of the Picture (as distinguished from the licensing thereof for a film rental); or (iv) licenses to exhibit trailers of the Picture; and (v) recoveries (net of actual expenses) by Distributor or any Subdistributor for infringement of copyright of the Picture and claims against exhibitors or other licensees in connection with the Picture for breach of contract and/or mutilation or damage of prints, or the interference by any party with any rights, the receipts from which would be includable in Gross Receipts hereunder.

G.  All net sums when actually received and earned by Distributor from the receipts of the Picture where Distributor or any Subdistributor has taken over the operation of the theater (i.e., so-called "four wall deals") specifically for exhibition of the Picture. Distributor or any Subdistributor shall deduct from Gross Receipts all costs and expenses incurred or paid by Distributor or a Subdistributor in connection with the operation of the theaters and any payments made to and/or shares of receipts retained by or allowed to such theaters. The costs and expenses referred to in the preceding sentence shall include, but not be limited to, all costs and expenses of hiring and/or operating such theaters (including theater rental and salaries of theater help), checking four wall engagements, and all advertising attributable to such four wall engagements (whether such advertising expenses represent amounts paid or incurred directly by Distributor or any Subdistributor, or reimbursements or allowances to exhibitors or Subdistributors).

H.  All sums received by Distributor as advances and/or royalties from the licensing of soundtrack recording rights with respect to the Picture, after deducting therefrom the aggregate of the following, to the extent not absorbed by the record company: (i) any distribution or service fees borne by Distributor; (ii) reuse and/or new use fees and costs; (iii) costs incurred for re-editing, re-recording, music preparation, mixing and the like ("Conversion Costs"); (iv) all direct, out-of-pocket costs incurred in connection with the title song  or any additional songs for the Picture, if any; (v) payments to music publishers or composers for the right to use such music in or in connection with the Picture, and (vi) any payments to third party participants, including a reserve for third party record royalties which require Distributor to make out-of-pocket payments prior to receipt by Distributor of royalties from the record company.

I.  Provided that Distributor is vested with 100% ownership and control of the exploitation and administration rights in and to the music contained in the soundtrack of the Picture ("Music Publishing Rights") and the full publisher's share thereof, all sums actually received by Distributor from the grant or license of Music Publishing Rights to a publishing company with respect to the music and lyrics written specifically for the Picture and synchronized in the Picture as released and included in the soundtrack album therefor (the "Musical Material"). The "Publisher's Share," as used above, shall be the royalties, fees and other monies earned by the Musical Material actually received by the Publisher in the United States, net of all collection or

-2-

other fees retained by or paid to societies, agents, administrators, distributors and subpublishers (including, without limitation, subpublishers outside the United States that are subsidiaries, divisions or affiliates of Publisher and/or Distributor), and after deduction of (i) an administration fee equal to _____ .ts; (ii) any and all royalties, participations and other amounts payable with respect to the Musical Material by Distributor (or by the Publisher on behalf of Distributor) to composers, lyricists, authors, co-owners and other third parties and (iii) all direct costs and expenses incurred by Distributor or any Publisher in administering the Musical Material, and in the collection of such royalties, fees and other monies.

J.  Provided that Distributor is vested with merchandising rights in and to the Picture, an amount equal to all license fees earned from the actual sale of merchandising items and actually received by Distributor directly as a result of the exercise of such merchandising rights, less the aggregate of (i) an administration fee _____ h sums paid to Distributor and (ii) all royalties, participations and costs borne by Distributor in connection with the exercise of such rights.

K.  Provided that Distributor is vested with novelization publishing rights with respect to the Picture, an amount equal to all net sums when earned and actually received by Distributor from the publisher from the publication of novelizations of the screenplay of the Picture, after the deduction therefrom of (i) an administration fee _____ :h sums paid to Distributor and (ii) all royalties, participations and costs borne by Distributor in connection with the exercise of such rights.

Gross Receipts shall be determined after all refunds, rebates, credits, discounts, allowances and adjustments accepted by Distributor. Returnable advance payments and guarantees attributable directly to the Picture shall not be included in Gross Receipts until earned by the exhibition of the Picture or forfeited.

Gross Receipts shall not include (i) any portion thereof which is contributed to charitable organizations; (ii) any sums paid or payable to, or derived by, Distributor for, in connection with or as a result of (a) Distributor's production and/or exploitation of any theatrical, television, home video or any other production which is a remake of, prequel or sequel to, or is otherwise derived from the Picture, or the sale, transfer or assignment of all or any part of Distributor's right to produce and/or exploit same and/or (b) Distributor's inclusion of advertising or promotional material for products and/or services prior to, during and/or after the Picture in any and all media; (iii) salvage value or sums received from the disposition of print stocks, stock footage, stills (other than monies received with respect to still photographs licensed in connection with the exercise of merchandising rights, in which case such monies shall be treated as provided in Paragraph 2.J. above); (iv) any sums paid or payable to Distributor or any company comprising Distributor or any of its or their subsidiaries, divisions or affiliates for, in connection with or as the result of their furnishing, supplying, rendering, procuring, arranging for or making available any materials, equipment, facilities or services in connection with the production, completion and delivery of the Picture; (v) any amounts derived from any so-called "sneak preview" of the Picture that are allocated to the motion picture that is otherwise playing at the applicable theater at the time of the sneak preview; (vi) receipts of exhibitors (including without limitation Regal and AMC) or others who may actually exhibit, transmit, rent, license or sell the Picture to the public in any form now known or hereafter devised, including without limitation, radio or television broadcasters; cable or satellite operators; internet service providers; manufacturers, wholesalers or retailers of home video devices and delivery systems (physical and electronic); providers of mobile or wireless devices, services or content; on demand, pay-per-use and other digital rights wholesalers, retailers or service providers; book or music publishers (physical and electronic); phonograph record or disc producers or distributors; merchandisers, retailers, etc., whether or not any of the foregoing are subsidiaries, parents, divisions or affiliates of Distributor or the entities comprising Distributor; (vii) amounts collected as taxes or for a payment of taxes such as admission, sales, use or value added taxes; (viii) amounts collected or

- 3 -

credited from barter arrangements, commercial tie-ins, and product placements; or from regulatory or administrative agencies for secondary television transmissions; (ix) any value attributable to "bonus materials", abbreviated versions of stories, highlights and other content (including music) used to promote the Picture or add value for the consumer without separate charge to the consumer for the product.

3.   Distribution Expenses:   Distribution expenses shall mean and include all costs, charges and expenses incurred, paid, payable or accrued by Distributor or any Subdistributor (or at the request of Distributor or such Subdistributor), in connection with the distribution, exhibition, advertising, promotion, exploitation and turning to account of the Picture, or in the exercise of any of distribution rights in the Picture, of whatever kind or nature, or which are customarily treated as distribution expenses in connection with customary accounting procedures in the motion picture industry, including, without limitation, all costs, charges and expenses for or in connection with any of the following:

A.   All negatives, digital masters, video masters, soundtracks, audio masters, prints (physical and virtual) and other physical properties now or hereafter utilized in connection with the distribution, reproduction and/or preservation of the Picture, and all services and facilities rendered or utilized in connection with such properties.

B.   All advertising, promoting, exploiting and publicizing (hereinafter collectively referred to as "advertising") the Picture in any way, including, without limitation, all costs of cooperative, theatre or joint advertising in connection with exhibition of the Picture in theatres or other places, which Distributor or any Subdistributor pays or is charged with, and a pro rata portion of the cost of group advertising; tours and personal appearances; audience testing and market research; creation, preparation and testing of advertising and marketing materials; fees (fixed or contingent) paid to exhibitors, networks, search engines, internet service providers and similar outlets for advertising, promotion or placement; premieres and screenings; salaries, living costs and traveling expenses of regular employees of Distributor or any Subdistributor where such employees are assigned to render services in connection with the advertising of the Picture, appropriately allocated to the Picture (provided that salaries paid to permanent employees in Distributor's Advertising and Publicity Department shall not be deducted hereunder but shall be deemed included in advertising overhead); trailers, including, without limitation, the cost of production thereof.

C.   All costs of preparing and delivering the Picture for distribution, including, without limitation, all costs incurred in connection with shipping; the cost of film cases, cans, containers, packaging, transportation, virtual print costs, storage, and all duties, customs, taxes, fees, insurance and imports in connection therewith; screenings; the production of foreign language versions of the Picture, whether dubbed, superimposed or otherwise; all costs and expenses in connection with changing the title of the Picture for release in any part of the Territory or for exhibition on television or other media, or in order to conform to the peculiar national or political prejudices likely to be encountered in any part of the Territory; or for any other purpose or reason.

D.   All sales, turnover, use, receipts, gross rentals, percentage of gross rentals, excise, remittance, value added property and other taxes, duties and/or fees (however denominated) to any governmental or taxing authority imposed, measured by and/or assessed upon or with respect to, the negatives, duplicate negatives, prints, sound records, cassettes, discs or other physical or virtual property of the Picture, or upon the use or distribution of the Picture, or upon the revenues and/or gross film rentals derived therefrom, or any part thereof; any and all sums paid or accrued on account of duties, customs and imposts, costs of acquiring permits, and any similar authority to secure the entry, licensing, exhibition, performance, use or televising of the Picture in any country or part thereof, regardless of whether such payments or accruals are assessed against the Picture or the proceeds thereof or against a group of motion pictures in which the Picture may be included or the proceeds thereof. Nothing herein contained shall be deemed to permit Distributor, its subsidiaries or any

- 4 --

Subdistributor to recoup any part of its net income, corporate franchise, excess profits or other similar corporate taxes imposed upon Distributor, its subsidiaries and/or any Subdistributor, as corporate entities (as distinguished from taxes [denominated "in lieu of income taxes" or otherwise denominated] imposed upon Distributor, its subsidiaries and/or any Subdistributor, in respect of the gross film rentals derived from the distribution of the Picture which shall be deductible hereunder). In no event shall the recoupable amount of any such tax (however denominated) imposed upon Distributor or any Subdistributor be decreased (nor the Gross Receipts increased) because of the manner in which such taxes are elected to be treated by Distributor or any Subdistributor in filing net income, corporate, franchise, excess profits or similar tax returns. Subject to the foregoing, Participant shall not be required to pay or participate in (i) Distributor's or any Subdistributor's United States Federal and State income taxes and franchise taxes based on Distributor's or such Subdistributor's net income: or (ii) any income tax payable to any country or territory by Distributor or any Subdistributor based on the net earnings of Distributor or such Subdistributor in such country or territory. Notwithstanding anything to the contrary contained in this Exhibit or elsewhere in the Underlying Agreement, Participant shall have no right to inspect or copy any tax return(s) of Distributor or any of its subsidiaries or affiliates or of any Subdistributor or to require Distributor or any of its subsidiaries, affiliates, or Subdistributors to produce any such tax return(s) or any information contained therein. Distributor or a Subdistributor shall be entitled to claim and receive, and in no event shall Participant be entitled, directly or indirectly, to claim, share or participate in or otherwise receive or derive, any and all tax or other benefits of any kind or nature arising out of, in connection with or otherwise accruing in respect of any and all taxes (however denominated) described in this Subparagraph D., including, without limitation, any and all tax credits or deductions directly or indirectly attributable thereto or based thereon. Expenses of transmitting to the United States any funds accruing to Distributor from the Picture in foreign countries, such as cable expenses, or any discounts from such funds taken to convert such funds directly or indirectly into U.S. dollars and the cost of contesting or settling any of the matters described in this Paragraph shall similarly be deducted. To the extent any taxes are deducted by Distributor hereunder and subsequently refunded, an appropriate adjustment in distribution expenses shall be made in the accounting period during which such refund is received.

E.    All copyright, patent and trademark expenses; royalties payable to manufacturers of sound recording and reproducing equipment; fees, dues, assessments and other costs of the Motion Picture Association of America or other associations or bodies, including payments for the support of the Academy of Motion Picture Arts and Sciences, legal fees payable to outside counsel (including, without limitation, in connection with piracy actions), censorship fees, and any and all other expenses in addition to those referred to herein incurred by Distributor or a Subdistributor in connection with the licensing of the Picture for exhibition or for other uses of the Picture.

F.    All costs and expenses (including reasonable attorneys' fees payable to outside counsel and the costs of arbitration tribunals and appeals), incurred by Distributor or a Subdistributor in connection with any action taken by Distributor or a Subdistributor (whether by litigation or otherwise) in enforcing collection of Gross Receipts; or (on a pro rata basis) for checking attendance and exhibitors' receipts; or to prevent unauthorized exhibition or distribution of the Picture; or to prevent any impairment of, encumbrance on or infringement upon the rights of Distributor or a Subdistributor in and to the Picture; or in connection with the auditing of books and records of any exhibitor, Subdistributor or licensee; or to recover monies due pursuant to any agreement relating to the distribution or exhibition of the Picture.

G.    All costs and expenses incurred by Distributor or a Subdistributor pursuant to Distributor's operation of a theatre (i.e., so-called "four-wall deals") or guarantee of a minimum payment to the exhibitor, to the extent either of the foregoing is not recovered from four-wall receipts.

H.    All payments due or payable to third parties as participations (however characterized), bonuses or other amounts payable out of Gross Receipts, and all payments paid or payable pursuant to applicable collective bargaining agreements by reason of any exhibition of the Picture or by reason of, or as a condition for, any use, reuse or re-run thereof for any purpose or in any manner whatsoever (herein called "residuals"), and all taxes, pension fund contributions, and other costs and payments computed on or payable in respect of any such residuals or participations in the gross receipts of the Picture to any person, firm, corporation, guild, union, trustee or fund (other than Distributor); provided, however, that if Participant, or any principal stockholder of Participant, or any heirs, executors, administrators, successors or assigns of Participant, or any such stockholder are entitled, either directly or by way of participation in any pension fund, to any such residuals, the amount payable on account thereof shall be deducted under this Subparagraph H.

I.    All insurance (to the extent not included in the cost of production) covering or relating to the Picture, including, but not limited to, errors and omissions insurance and insurance on negatives, positive prints, sound recordings and other physical property; provided, however, that Distributor shall not be obligated to take out or maintain any such insurance.

J.    With respect to distribution by a Subdistributor or a licensee thereof, all items deducted by such Subdistributor or licensee thereof as distribution expenses and/or distribution fees (including without limitation all costs and distribution fees deducted from Gross Receipts accountable under Paragraphs 2.C. and 2.D. above in respect of Canadian subdistribution and subdistribution of home video, electronic sell through, video on demand, and related rights), and which Distributor accepts for the purposes of its accountings with each such Subdistributor, shall be treated as Distributor's expenditure.

K.    All costs including, without limitation, reasonable attorneys fees of outside counsel, incurred by reason of claims asserted by third parties which arise out of the production, distribution, exhibition and/or exploitation of the Picture (including, without limitation, claims of infringement, unfair competition, violation of any right of privacy, defamation or breach of contract) and reasonable reserves established by Distributor or any Subdistributor as reasonably necessary to protect against the possibility of ultimate expense, loss, damage or liability as to claims Distributor or any Subdistributor determines to be of sufficient merit as to warrant such reserves. Distributor or any Subdistributor shall have the right, in its sole discretion, to settle and pay any such claims.

If Distributor or any Subdistributor shall elect to itself provide any service or material that is otherwise deductible pursuant to this Paragraph in connection with the production, distribution, advertising and/or exploitation of the Picture, Distributor or any Subdistributor shall have the right to deduct hereunder a reasonable allocation of Distributor's or any sub-distributor's costs and expenses (including, but not limited to, overhead) in connection therewith.

4.    Interest: Interest shall mean interest on aggregate distribution expenses computed and charged from the date the applicable expenditure is incurred and continue until the close of the accounting period with regard to which such expenditure is to be recouped by Distributor.

5.    Allocations; Reserves: Whenever Distributor or any Subdistributor (i) makes any expenditures or incurs any liability in respect of a group of motion pictures, which includes the Picture, (ii) actually receives and earns from any licensee either a flat sum or a percentage of the receipts, or both, for any right to a group of motion pictures, which includes the Picture, under any agreement (whether or not the same shall provide for the exhibition, sale, lease or delivery of positive prints of any of said motion pictures) which does not specify what portion of the license payments apply to the respective motion pictures in the group (or to such prints or other material, if any, as may be supplied), or (iii) otherwise incurs a liability and/or actually earns and receives a Gross Receipts item which is not 100% attributable to the Picture, then, in any and all such situations, Distributor or any Subdistributor shall include in, or deduct from, the Gross Receipts, as the case

may be, such sums as may be reasonable and consistent with Distributor's policies in such matters; provided, Distributor's or any Subdistributor's determination in such matters shall be final.

If Distributor reasonably anticipates retroactive wage adjustments, taxes, residuals, uncollectible accounts, or other reasonably anticipated costs, expenses or losses relating to the Picture, which, if and when incurred, will be properly deductible hereunder, Distributor may set up appropriate reserves therefor. Distributor agrees to liquidate any such reserves within a reasonable time.

6.    Statements and Payments: Distributor shall have the right to report on a cash, accrual or billing basis, or a cash basis for Distribution Expenses and a billing basis for Gross Receipts or vice versa or any combination in whole or in part of cash, accruals and billing and to make changes from time to time of any such basis on a prospective but not retroactive basis. Commencing with Distributor's quarterly accounting period in which Gross Receipts are first actually received and earned by Distributor with respect to the Picture, but not later than the first quarterly accounting period following the initial general U.S. theatrical release of the Picture, Distributor shall render statements in its customary form to Participant showing the Gross Receipts, the deductions from the Gross Receipts and the amount, if any, due to Participant hereunder. The amount due, if any, shall be paid concurrently with the rendition of the respective statement. Until the expiration of the fourth calendar year following (and inclusive of) the calendar year in which the Picture is first generally released in any country or territory, statements will be rendered quarterly based on said calendar year, within sixty (60) days after the end of each quarterly period. After the expiration of the fourth calendar year following (and inclusive of) the year in which the Picture is first generally released in the U.S., statements will be rendered semi-annually within sixty (60) days after the end of each semi-annual period; provided, however, that if the Picture is reissued generally the quarterly statements will be resumed for one year after such reissue commences. No statements need be rendered for any period during which there are no Gross Receipts. Statements rendered by Distributor may be changed from time to time to give effect to adjustments or to items overlooked, to correct errors and for similar purposes. Should Distributor make any overpayment to Participant hereunder because of adjustments as between reports, or for any other cause or reason, Distributor shall have the right to deduct and retain for its own account an amount equal to any such over-payment from any sums that may be due or payable by Distributor to Participant pursuant to the Underlying Agreement or any other agreement, or may demand repayment from Participant, in which event Participant agrees to repay the same within ten (10) days following Distributor's demand therefor. Distributor shall use due and diligent efforts to collect any outstanding obligations with respect to the Picture, but shall not be obligated to bring or maintain any suit or proceeding for the collection thereof and shall have the right to make such settlements or adjustments and to grant such releases with respect to unpaid obligations as it may consider reasonable or advisable.

7.    Distribution Records; Litigation: Distributor shall keep true and correct books of account with respect to the distribution of the Picture, showing in reasonable detail the Gross Receipts and deductions from Gross Receipts, including expenses of distribution. Such books of account shall be kept at such place or places as may from time to time be customary with Distributor in accordance with its ordinary business practices. Participant shall have the right to have such records audited and inspected at its own cost by a firm of certified public accountants approved by Distributor (such approval not to be unreasonably withheld) at reasonable times during business hours, but not more than once annually and for not more than one consecutive thirty (30) day period during each annual period (provided that such thirty (30) day period may be extended for up to an additional sixty (60) days, only if such audit is conducted expeditiously and on a continuous and consecutive basis), and provided, further, that the same records may not be audited more than once. The right of audit and inspection herein given is limited solely and exclusively to Distributor's records pertaining to the Picture, and under no circumstances shall Participant be entitled to audit or examine records pertaining to any other picture or pictures, or any records of any Subdistributor or licensee for purposes of comparison or otherwise. Such audit may be made only at the place or places where such records are kept; in no event shall Distributor be required to make such records available at any other place or places. No claim on the part of the Participant with respect to any such records or with respect to the transactions reflected therein shall be maintained unless made in writing within twenty four (24) months after the date on which

Distributor renders the statement in which the item is first accounted for and could have been discovered or investigated by audit, and unless suit therefor is filed against Distributor within twelve (12) months (or within the applicable statute of limitations period established by law, whichever is later) after the expiration of such twenty four (24) month period, nor shall the Participant have the right to audit any such records unless such audit is completed within twenty four (24) months from the date on which Distributor renders the statement in which the respective transaction is first reflected and could have been discovered or investigated by audit. Said records need not be retained by Distributor after the expiration of said twenty four (24) month period and may be destroyed thereafter unless Participant duly objects and files suit with respect thereto as herein provided.

Subject to the provisions of this Paragraph, the Participant shall not be entitled to bring any action, suit or proceeding of any nature against the Distributor, whether at law or in equity or otherwise, based upon or arising from, in whole or in part, any claim that Distributor has not reported, credited, accounted for, remitted or paid any Gross Receipts, or that Distributor has made charges for expenses of distribution or other deductions from the Gross Receipts in violation of the provisions of this Agreement, unless: (i) the action is brought within the period specified in the preceding grammatical paragraph; (ii) the Participant gives Producer and Distributor a written statement specifying in detail the basis of such claim; (iii) an audit shall have been made in accordance with the provisions of this Paragraph (except in a case in which the nature of the claim is such that it can be established by the Participant without an audit); (iv) until at least ninety (90) days shall have elapsed after a true and complete copy of the audit report shall have been delivered to Distributor, and (v) unless such claim, demand or cause of action shall specifically be set forth in and supported by such audit report (it being agreed, however, that none of the figures, statements, conclusions or other matters contained in any such audit report shall be binding upon Distributor or constitute evidence as against Distributor of the fact, truth or accuracy thereof). No waiver by any party of any breach of this Exhibit and/or the Underlying Agreement shall be deemed to be a waiver of any preceding or succeeding breach. The Participant's sole remedy hereunder shall be an action for an accounting and actual damages (without interest), and in no event shall the Participant have the right to terminate or rescind the Underlying Agreement or challenge the validity of this Exhibit, nor shall any rights acquired by the Producer or Distributor under the Underlying Agreement and/or this Exhibit be subject to revocation, termination, diminution or injunction because of any breach of contract by the Distributor.

8.    Holding of Funds: Distributor shall not be considered a trustee, pledgeholder, fiduciary or agent of Participant by reason of anything done or any money collected by it and shall not be obligated to segregate receipts of the Picture from its other funds.

9.    Ownership: Participant shall not have any lien, security interest, or other rights in or to the receipts of the Picture, it being understood that the references thereto are intended solely for the purpose of determining the time, manner and amount of payments, if any, due to Participant hereunder.

10.    Policies: Distributor or any Subdistributor shall have complete authority to license, market and exploit the Picture and all rights therein, or to refrain from so doing, in accordance with such methods, policies and terms as it may determine, in its reasonable good faith business judgment. Distributor or any Subdistributor shall not be required itself to exercise any of its rights but may license, sublicense or assign any or all thereof, as it may elect, to any licensee, sublicensee, subdistributor or assignee (including, without limitation, any of Distributor's subsidiaries, divisions or affiliates). Distributor or any Subdistributor may modify, amend, cancel, adjust and alter all agreements, exhibition licenses, rental terms, sales methods and policies relating to the distribution, exhibition and exploitation of the Picture and any other of its rights as it may deem advisable; adjust, increase or decrease the amount of any allowance to any exhibitor or licensee for advertising and exploitation whether or not included in any theretofore existing agreement or license; license the distribution and exhibition of the Picture (or other rights) upon percentage rental or flat rentals, or both, and jointly with other motion pictures or separately, as it shall deem desirable. Distributor or any Subdistributor shall have the right, in its sole discretion, to license the Picture for television and/or other types of exhibition at any time, and to cause or permit any such television or other exhibition to be on a sponsorship, sustained or other basis.

- 8 -

Distributor or any Subdistributor may, but shall not be required to, release, reissue or re-release the Picture in any part of the Territory as may be consistent with the business policies of Distributor or any Subdistributor, and Distributor or any Subdistributor in its sole discretion may determine for any reason, and in respect of any part of the Territory, when, where and whether the Picture should be released, rereleased or reissued and the duration of any such release, rerelease or reissue. If the number of motion pictures which may be distributed by Distributor or any Subdistributor in any country or territory shall be limited by government, industry or self-limitation, the selection of motion pictures to be distributed by Distributor or any Subdistributor therein shall be by Distributor or any Subdistributor in its sole discretion. Participant shall be bound by the terms, provisions and conditions of any agreements heretofore or hereafter made by Distributor or any Subdistributor (or its subsidiaries) pursuant to any resolution of the Motion Picture Export Association (or similar organization) or made by Distributor or any Subdistributor alone with any government or governmental agency relating to any particular country or territory. Nothing contained in this Paragraph 10 shall be deemed to, nor shall it, limit or restrict Distributor's or any Subdistributor's rights under Paragraph 12 hereof.

11. Licenses to Controlled Facilities; No Warranties: If Distributor licenses the exhibition of the Picture to any theatre or television station or other facility owned or controlled by Distributor or in which Distributor has an interest, directly or indirectly, Distributor shall do so upon market rate terms. Distributor has not made any express or implied representation, warranty, guarantee or agreement (i) as to the amount of Gross Receipts which will be derived, or proceeds which will be received, from the distribution of the Picture, or (ii) that there will be any sums payable to Participant hereunder, or (iii) that the Picture will be favorably received by exhibitors or by the public, or will be distributed or that any such distribution will be continuous, or (iv) that it now has or will have or control any theatres or other facilities in the United States or elsewhere, or (v) that any Subdistributor or licensee or sublicensee will make payment of any sums payable pursuant to any agreement between such entity and Distributor, it being expressly understood that Distributor's obligations hereunder are limited to accounting only for such sums as may be actually received and earned by Distributor. In no event shall Participant have the right to make any claim that Distributor or any Subdistributor has failed to realize receipts or revenues which should or could have been realized in connection with the Picture or any of Distributor's rights therein.

12. Sale of Picture: Distributor shall have the right, at any time, to sell, transfer, assign or hypothecate any or all of its right, title and interest in and to the Picture and the negative and copyright thereof; provided that any such sale, transfer, assignment or hypothecation shall be subject to Participant's rights hereunder. Upon the purchaser, transferee or assignee assuming performance of Distributor's obligations hereunder in place and stead of Distributor, Distributor shall, provided that such purchaser, transferee or assignee is at the time of its assuming performance a financially responsible party, be released and discharged of and from any further liability or obligation hereunder and none of the monies or other consideration received by, or paid or payable to, Distributor shall constitute Gross Receipts hereunder, and Participant shall have no rights in respect of any thereof.

13. Assignments: Participant shall not have the right, prior to the completion and delivery of the Picture and satisfaction of all their obligations pursuant to the Underlying Agreement, to sell, assign, transfer or hypothecate (all hereinafter referred to as "assign") all or any part of Participant's right to receive the monies payable to Participant hereunder. Thereafter, Participant may assign Participant's said right; provided, however, that (i) Distributor shall not be required to accept or honor any assignment or assignments which would result in requiring Distributor to make payments to more than one (1) party; (ii) Distributor shall not be required to accept or honor any such assignment(s) requiring Distributor to make payments to any party other than Participant unless pursuant to a signed, written irrevocable letter of direction in a form reasonably approved by Distributor; (iii) in no event shall any party other than Participant have the right to audit Distributor's records by reason of such assignment; and (iv) Distributor shall have the right to exercise any and all rights and/or remedies Distributor may have with respect to Participant in connection with the third party assignee including, without limitation, the right of set-off. Any such assignment shall at all times be subject to all pertinent laws and governmental regulations and to all of the rights of Distributor hereunder.

14.     Taxes on Participant's Share:  Should any amounts payable to the Participant hereunder be subject to tax withholdings or other government fees or levies in any part of the world, Distributor or any Subdistributor shall have the right to make such deductions and withholdings and to pay the same to the governmental agency concerned in accordance with its interpretation in good faith of such laws and regulations and shall not be liable to the Participant therefor, it being agreed that the Participant shall make and prosecute any and all claims which it may have with respect to the same directly with the governmental agency having jurisdiction in the premises.

15.     No Agency:  Nothing in this Exhibit or in the Underlying Agreement to which it is attached shall be construed so as to make any party hereto an agent or partner of any other.  None of the parties hereto shall hold themselves out contrary to the terms of this paragraph and none of said parties shall become liable by or because of any representation, act or omission of any other party contrary to the provisions hereof.

16.     Law Governing Contract:  The validity, effect and operation of this Exhibit and the Underlying Agreement shall be determined according to the laws of the State of California applicable to agreements made and performed in that State.  This Exhibit and the Underlying Agreement constitute the entire agreement between the parties hereto and may be modified only by written instrument duly executed by each of the parties hereto.  This Exhibit and the Underlying Agreement have not been executed in reliance upon any representation or agreement not specifically set forth or referred to herein.