**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>OPEN ROAD FILMS, LLC, a Delaware limited liability company, *et al.*,[1]<br><br>                              Debtors. | Chapter 11<br><br>Case No.: 18-12012 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 9** |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF MOTION TO (I) APPROVE THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) AUTHORIZE THE ASSUMPTION, ASSIGNMENT, AND SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANT RELATED RELIEF**

Open Road Films, LLC ("Open Road Films") and its affiliated debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Cases") hereby reply in support of the *Motion for Orders (A)(I) Establishing Bid And Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into an Asset Purchase Agreement With Stalking Horse Bidder, (III) Establishing and Approving Procedures Relating to the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts and (IV) Scheduling a Hearing to Consider the Proposed Sale and (B)(II) Approving the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, and (III) Granting Certain Related Relief* [Docket No. 9] (the "Motion"). In support of this Reply, the Debtors rely on the *Declaration of Amir Agam* attached hereto as **Exhibit A** (the "Agam Declaration") and respectfully represent as follows:

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Open Road Films, LLC (4435-Del.); Open Road Releasing, LLC (4736-Del.); OR Productions LLC (5873-Del.); Briarcliff LLC (7304-Del.); Open Road International LLC (4109-Del.); and Empire Productions LLC (9375-Del.). The Debtors' address is 2049 Century Park East, 4th Floor, Los Angeles, CA 90067.

01:23878280.3

# I. PRELIMINARY STATEMENT

1. On September 6, 2018 (the "Petition Date"), the Debtors filed the Motion seeking, among other relief, entry of an order approving the proposed sale (the "Sale") of substantially all of the Debtors' assets (the "Purchased Assets") and the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases (collectively, the "Contracts") in connection with the Sale. On October 9, 2018, the Court entered an order [Docket No. 160] (the "Bid Procedures Order") approving certain procedures in connection with the Sale.

2. In accordance with the Bid Procedures Order, on October 12, 2018, the Debtors filed the *Notice of Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 172] (as amended by Docket No. 248, the "Cure Notice"), which identifies the Contracts that the Debtors may assume and assign to the purchaser in connection with the Sale, as well as the estimated amounts the Debtors believe would be required to cure defaults under such Contracts (the "Cure Amounts"). The Bid Procedures Order established November 2, 2018 as the deadline for parties in interest to file and serve any objections to the Sale and for counterparties to the Contracts to file and serve any objections with respect to the assumption and assignment of their respective Contracts (except with respect to the adequate assurance of future performance by the purchaser), including objections to the Cure Amounts. The Debtors agreed to extend this objection deadline for several parties. The Bid Procedures Order established November 7, 2018 as the deadline for counterparties to the Contracts to file and serve any objections with respect to adequate assurance of future performance.

3. On October 23, 2018, the Debtors filed the *Notice of Filing of (I) Stalking Horse Agreement, (II) Summary of Proposed Bid Protections, and (iii) Summary of Proposed Amendments to Bid Procedures Order* [Docket No. 216], attaching, among other things, a copy of the Asset Purchase Agreement (the "APA") by and among the Debtors and OR Acquisitions

01:23878280.3

2

Co, LLC (the "Buyer").  On November 3, 2018, the Debtors filed the *Notice of Filing of Stalking Horse Bidder's Proposed Adequate Assurance of Future Performance* [Docket No. 299] the ("Proposed Adequate Assurance"), setting forth information regarding the qualifications and experience of the Buyer to provide adequate assurance of future performance by the Buyer.

4. Also on November 3, 2018, the Debtors filed the *Notice of (I) Filing of (A) Updated Schedule of Purchased Titles and (B) Stalking Horse Bidder's Schedule of Available Contracts Designated as Assumed Contracts, and (II) Extension of Designation Cut-Off Date* [Docket No. 300] (the "Initial Designation Notice").  The Initial Designation Notice indicates which Contracts the Debtors intend to assume and assign to the Buyer.  On November 16, 2018, the Debtors filed a supplement to the Initial Designation Notice [Docket No. 384] (the "Supplemental Designation Notice" and, together with the Initial Designation Notice, the "Designation Notice").  Those Contracts that are listed on the Designation Notice are collectively referred to herein as the "Assumed Contracts" and those Contracts that are omitted from the Designation Notice are collectively referred to herein as the "Excluded Contracts."

5. The Debtors respectfully submit that the Court should approve the Sale pursuant to the APA because the Sale maximizes the value of the Purchased Assets.  The Debtors conducted a robust marketing process that began prior to the Petition Date and continued subsequent to the Petition Date in accordance with the Bid Procedures Order.  Following the conclusion of that process, the Debtors have determined, in an exercise of their reasonable business judgment, that the APA represents the highest and best offer for the Purchased Assets.  Moreover, the APA was negotiated in good faith and at arms' length (with no objections or evidence to the contrary) and the purchase price reflected therein constitutes fair and adequate consideration for the Purchased Assets.  Accordingly, the Sale should be approved.

01:23878280.3

6.      Certain parties in interest (including counterparties to Contracts) filed objections to the Sale (the "Sale Objections"), which are summarized on **Exhibit B** hereto. The Sale Objections generally fall into three categories: (i) objections that request the addition of certain language to the proposed order approving the Sale (the "Sale Order") to address any rights parties may have under Bankruptcy Code section 365(n); (ii) objections regarding audit rights that counterparties may assert under Assumed Contracts; and (iii) objections to the ability of the Debtors to sell free and clear of security interests and contract rights pursuant to Bankruptcy Code section 363(f). The Debtors have negotiated in good faith in an effort to consensually resolve the Sale Objections, and have made significant progress in this regard. In particular, the Debtors and the Buyer have agreed to a revised form of Sale Order which includes language that resolves the first category of Sale Objections regarding section 365(n). For the reasons set forth below and on attached **Exhibit B**, the Debtors respectfully submit that the other arguments set forth in the Sale Objections are without merit and should be overruled.

7.      In addition, several counterparties filed objections to the proposed assumption and assignment of their Contracts (the "Assumption Objections"), which are also summarized on **Exhibit B** hereto. The Assumption Objections generally fall into three categories: (i) objections to assumption and assignment of Excluded Contracts (including on the basis of disputed Cure Amounts, adequate assurance, or other issues); (ii) objections to assumption and assignment of Assumed Contracts on the basis of disputed Cure Amounts and/or adequate assurance; and (iii) other objections to assumption and assignment of Assumed Contracts. The Debtors have negotiated in good faith with counterparties in an effort to consensually resolve the Assumption Objections, and have made good progress in this regard; however, certain of the Assumption Objections have not yet been fully resolved.

8.  The Debtors respectfully submit that the Court should (i) overrule as moot all Assumption Objections regarding Excluded Contracts and (ii) order that with respect to any Assumed Contracts for which no Assumption Objection was timely filed, the Cure Amount shall be the amount set forth in the Debtors' Cure Notice.  With respect to any Assumed Contracts for which an Assumption Objection was timely filed, the Court should either overrule these Assumption Objections for the reasons set forth below and in **Exhibit B** attached hereto or, where requested by the Debtors, defer ruling on these Assumption Objections and order that the Cure Amount shall be the amount to be agreed upon by the Debtors, the Buyer, and the applicable counterparty; *provided that* to the extent the parties are unable to reach a consensual resolution regarding any Cure Amount or any other matter related to the assumption of such an Assumed Contract, and except as otherwise set forth herein or as requested at the Sale Hearing, the Court shall determine the Cure Amount and any related issues after the Sale Hearing.

## II.  REPLY

**A.    The Court Should Approve the Sale**

9.  Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *In re Martin*, 91 F.3d 389 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).  In reviewing a proposed sale, courts typically consider: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a

fair and reasonable price for the property; and (iv) whether the parties have acted in good faith. *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

10. Here, the Debtors have demonstrated that there are sound business justifications for the Sale. The Debtors conducted a robust marketing process for their assets that commenced prior to the Petition Date and continued in accordance with the Bid Procedures Order on a postpetition basis. Agam Decl. ¶ 3. In total, the Debtors contacted approximately fifty-three (53) potential buyers that might have an interest in acquiring the Debtors' assets. *Id.* Approximately thirty-six (36) parties executed confidentiality agreements and accessed diligence materials regarding the Debtors' assets and business and approximately eleven (11) parties submitted indications of interest for the Debtors' assets. *Id.* The Debtors considered the three strongest offers as potential stalking horse bids, and, after final diligence and negotiations, the Buyer's offer was ultimately determined to be strongest. *Id.* Accordingly, the Debtors negotiated and documented the APA with the Buyer. *Id.*

11. Thereafter, the Debtors published notice of the Sale in accordance with the Bid Procedures Order in the national edition of *USA Today*, as well as the national edition of *Variety*, which is a publication specific to the entertainment industry. *See* Docket No. 183. In addition, the Debtors broadly served notice of the Sale in these Cases in accordance with the Bid Procedures Order. *See* Docket No. 178. The Debtors also continued the process of marketing the Debtors' assets for sale. Agam Decl. ¶ 4. As a result of the foregoing efforts, notice of the Sale was more than adequate and was reasonably calculated to maximize exposure of the Debtors' assets and thereby maximize value for the Debtors' estates. *Id.*

12. Nevertheless, no competing offers were submitted that were superior to the Buyer's offer and the Debtors are therefore proceeding with the Sale to the Buyer pursuant to the

01:23878280.3

APA. *Id.* at ¶ 5. The Debtors believe that the Buyer's offer constitutes a fair and adequate price for the Purchased Assets and reflects fair market value for the Purchased Assets under the circumstances presented here. *Id.* Moreover, the value from the sale exceeds the value that the Debtors expect they would have received if the Purchased Assets were sold in a piecemeal liquidation to multiple purchasers or through some other less orderly and less competitive process than that provided for in the Bid Procedures Order. *Id.*

13. Finally, the Sale process has been conducted in good faith and the APA is the result of good faith, arms' length negotiations between the Debtors and the Buyer. *Id.* at ¶ 6. Both parties have been ably represented by sophisticated legal counsel and the negotiations over the terms of the Sale and the APA reflect hard-fought compromises and significant give and take by both parties. *Id.* The APA constitutes the highest and best offer for the Purchased Assets. *Id.* For the foregoing reasons, and those set forth in the Motion, the Debtors respectfully submit that the Court should approve the Sale to the Buyer pursuant to the APA.

**B.     The Court Should Overrule the Sale Objections**

14. As noted above, several parties have filed Sale Objections, including with respect to Bankruptcy Code section 365(n), audit rights that counterparties may assert under Assumed Contracts, and the ability of the Debtors to sell the Purchased Assets free and clear of security interests and contract rights pursuant to Bankruptcy Code section 363(f). The Debtors and the Buyer have worked to resolve some of these issues. The Debtors and the Buyer have agreed to revised language in the Sale Order that acknowledges that the Sale shall not eliminate any rights licensees may have pursuant to Bankruptcy Code section 365(n). Accordingly, the Debtors believe that the Sale Objections with respect to section 365(n) have been resolved.

15. Certain counterparties have argued that they should be permitted to retain any rights they may have under the Assumed Contracts to conduct audits with respect to the period

01:23878280.3

7

prior to the closing of the Sale and to retroactively adjust their respective Cure Amounts if the results of such audits demonstrate that the Cure Amounts were insufficient.  The Cure Amounts are comprised of two portions.  The first portion is the amount owing to each counterparty as of the Petition Date based on the Debtors' books and records and as reflected in accounting statements that have been provided to counterparties.  The Debtors have worked extensively with counterparties since the filing of the Cure Notice to reconcile these amounts and have even conducted expedited audits of these amounts when so requested.  The second portion is the amount that the Debtors estimate has been and/or will be accrued during the period from the Petition Date through November 30, 2018.  The Debtors and the Buyer are willing to permit those counterparties that have specifically objected on this basis to retain any audit rights under their Assumed Contracts solely with respect to the portion of the Cure Amount that constitutes an estimate (*i.e.*, the portion of the Cure Amount relating to the period from the Petition Date through November 30, 2018) and, if warranted as a result of such audits, to permit adjustments of that postpetition portion of the Cure Amount only.[2]  The Debtors respectfully submit that this approach adequately protects the rights of counterparties that have objected on this basis by permitting adjustment of the postpetition portion of the Cure Amount that represents an estimate, while also protecting the Debtors' and the Buyer's legitimate interest in certainty and finality by fixing the prepetition portion of the Cure Amount that is based on actual historical receipts.

16.    Finally, certain counterparties have argued that the Debtors should not be permitted to sell the Purchased Assets free and clear of security interests pursuant to Bankruptcy

---

[2]    For those counterparties to Assumed Contracts that did not specifically preserve their rights to conduct an audit and retroactively seek an adjustment of their Cure Amounts despite the Cure Notice clearly and unambiguously stating that the Debtors intended to request that the Court order that audit rights not be preserved and that such relief could be granted absent an objection from the counterparty, the Debtors submit that no such post-closing adjustment of their Cure Amounts is warranted.  These parties were afforded an opportunity to object to such relief and chose not to do so.

01:23878280.3

Code section 363(f). These objections miss the mark and should be overruled. Specifically, perfected producer liens are "Permitted Liens" under the APA,[3] and the APA provides that the Sale of the Purchased Assets to the Buyer shall be "free and clear of all Liens (*except for Permitted Liens*)." APA § 2.1 (emphasis added). Thus the APA and the revised form of Sale Order do not provide for the Sale to be free and clear of such liens. Moreover, as set forth in the Motion, the Debtors have satisfied the standard under section 363(f) for approval of the Sale free and clear of any asserted security interests that do not constitute Permitted Liens, because, among other reasons, the Debtors believe that any parties holding such liens could be compelled to accept a monetary satisfaction of such interests. *See* 11 U.S.C. § 363(f)(v).

17. For the foregoing reasons, as well as those set forth on attached **Exhibit B**, the Debtors submit that the Court should overrule the Sale Objections and approve the Sale.

C. **The Court Should Overrule the Assumption Objections for Excluded Contracts and Approve Assumption and Assignment for the Assumed Contracts**

18. Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract … of the debtor." 11 U.S.C. § 365(a). The decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the debtor. *Sharon Steel Corp.*, 872 F.2d at 39-40 ("propriety of trustee's decision to reject contract measured under traditional 'business judgment test'" (citing *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)); *see also Delightful Music Ltd. v. Taylor (In re Taylor)*, 913 F.2d 102, 107 (3d Cir. 1990);

---

[3] "Permitted Liens" are defined in the APA as "any Liens (a) with respect to Guild Residuals, (b) with respect to Participations arising under Assumed Contracts the payment of which were secured by properly perfected Liens on the related Purchased Title(s) not otherwise avoided or avoidable in connection with the Chapter 11 Cases, (c) with respect to Assumed Liabilities, and (d) which are mechanic's, materialman's, carrier's, supplier's, vendor's, repairer's or other similar Liens arising in the ordinary course of business and securing amounts that are not delinquent or are being contested in good faith."

01:23878280.3

*Computer Sales Int'l, Inc. v. Fed. Mogul (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003).

19.     To assume a contract, the Bankruptcy Code requires that a debtor "cures, or provides adequate assurance that the [debtor] will promptly cure" defaults under the contract, 11 U.S.C. § 365(b)(1)(A), "compensates, or provides adequate assurance that the [debtor] will promptly compensate, [the non-debtor counterparty] for any actual pecuniary loss to such party resulting from such default," 11 U.S.C. § 365(b)(1)(B), and "provides adequate assurance of future performance under such contract, 11 U.S.C. § 365(b)(1)(C).  When a debtor seeks to assign an executory contract, then the counterparty is also entitled to "adequate assurance of future performance by the assignee of such contract." 11 U.S.C. § 365(f)(2)(B).

20.     ***First***, as a preliminary matter, the Debtors submit that the Court should overrule as moot all Assumption Objections filed in respect of Excluded Contracts.  The Debtors' obligation to promptly cure defaults under Bankruptcy Code section 365(b)(1)(A) plainly applies only to Contracts that the Debtors intend to assume.  Because the Debtors are not assuming the Excluded Contracts, the Debtors are not required to pay any associated Cure Amounts, and all Assumption Objections filed by counterparties to the Excluded Contracts are now moot.

21.     ***Second***, the Debtors submit that the Cure Amount set forth in the Cure Notice (as amended) should be approved as the requisite Cure Amount with respect to the Assumed Contracts (unless otherwise agreed to by the Debtors, the Buyer, and the applicable counterparty) for all Assumed Contracts for which no Assumption Objection was timely filed.  This result is warranted, as the Cure Notice clearly provides that counterparties that fail to timely file an Assumption Objection "shall be forever barred from objecting to the assignment, assumption and sale of the Contract and/or the cure amounts set forth in [the Cure Notice] … including, without

01:23878280.3

10

limitation, the right to assert any additional cure or other amounts with respect to the Contract arising or relating to any period prior to such assumption."

22. ***Third***, for those Assumed Contracts for which an Assumption Objection was timely filed, the Debtors submit that the Cure Amount should be (i) the amount agreed to by the Debtors, the Buyer, and the applicable counterparty or (ii) to the extent the parties do not reach an agreement regarding any Cure Amount or any other matter related to assumption, and except as otherwise set forth herein or as requested at the Sale Hearing, the Court shall determine the Cure Amount and any related issues after the Sale Hearing. The Debtors and the Buyer have been working in good faith to reconcile disputes regarding Cure Amounts and related issues and will continue to do so after the Sale Hearing. The Debtors are optimistic that they will be able to consensually resolve these Assumption Objections. Counterparties will not be prejudiced by the relief requested herein because to the extent the parties are not able to reach a consensual resolution, the Court shall determine the Cure Amounts and any related issues regarding assumption and assignment of such Assumed Contracts after the Sale Hearing.

23. ***Fourth***, with respect to those Assumption Objections that raise adequate assurance of future performance under the applicable Assumed Contracts as an issue, the Debtors submit that the Proposed Adequate Assurance is more than sufficient to satisfy the Bankruptcy Code's requirement that counterparties receive "adequate assurance of future performance by the assignee." Specifically, the Proposed Adequate Assurance identifies the Buyer as an entity managed by Raven Capital Management LLC ("Raven Capital") and describes Raven Capital's relevant qualifications and experiences. The Proposed Adequate Assurance details, among other things, Raven Capital's experience managing the entertainment library interests of another media company, including the day to day management of various rights across approximately 400 titles,

as well as experience financing independent films. The Proposed Adequate Assurance also identifies key personnel, confirms that Raven Capital has completed its diligence and obtained all necessary approvals to consummate the Sale, describes how Raven Capital, on behalf of the Buyer, intends to fund the acquisition, and provides contact information in the event counterparties wish to obtain additional information. This showing is more than adequate.

24. *Finally*, some of the Assumption Objections raise additional issues specific to the particular Assumed Contracts. Some of those Assumption Objections are addressed in more detail in the following section of this Reply. The other contract-specific issues raised by counterparties to Assumed Contracts are summarized with appropriate responses and requests for relief from the Debtors in **Exhibit B** attached hereto. The Debtors submit that the Court should either overrule these Assumption Objections for the reasons set forth in **Exhibit B** or, where requested by the Debtors, defer ruling on these Assumption Objection so as to give the parties time to negotiate a consensual resolution of the Cure Amount and related issues.[4]

### D. The Court Should Overrule the Assumption Objections Filed by Sous Chef, LLC and Silver Reel Entertainment Mezzanine Fund, L.P.

25. The Assumption Objections filed by Sous Chef, LLC and Silver Reel Entertainment Mezzanine Fund, L.P. should be overruled on the merits at the Sale Hearing.

#### 1. The Sous Chef, LLC Assumption Objection

26. A motion to assume an executory contract pursuant to Bankruptcy Code section 365 is "a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."

---

[4] For the avoidance of doubt, the Debtors reserve the right to submit further briefing in connection with any Assumption Objections for which resolution is deferred until after the Sale Hearing.

01:23878280.3

*Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098–99 (2d Cir. 1993); *see also In re S.A. Holding Co., LLC*, 357 B.R. 51, 56 (Bankr. D.N.J. 2006) (same). Moreover, when "the motion is an integral part of a § 363 sale, the requirement for expedited adjudication is even more apparent" because in such circumstances, the "potential of collateral litigation chilling the sale process and the use of such claims to unfairly leverage dubious legal positions by presenting impediments to a bona fide sale is real." *In re White Glove*, 1998 Bankr. LEXIS 1303, at *14–15 (Bankr. E.D. Pa. Oct. 14, 1998).

27.     Therefore, in deciding issues related to a debtor's motion to assume a contract, courts apply a preliminary likelihood of success standard whereby the "bankruptcy court preliminarily determines [whether] there is a debtor default under a subject contract [and] the likely existence, extent and impact of that default." *In re F.W. Rest. Assocs., Inc.*, 190 B.R. 143, 149 (Bankr. D. Conn. 1995) (emphasis omitted). Although it is the debtor's burden to show that the requirements of Bankruptcy Code section 365 have been met, the nondebtor counterparty bears the burden of proving the existence of any defaults under the contract. *Id.* at 147; *see also In re Cellnet Data Sys.*, 313 B.R. 604, 608 (Bankr. Del. 2004) (same).

28.     Here, Sous Chef, LLC ("Sous Chef") filed a two page Assumption Objection [Docket No. 282] (the "Sous Chef Objection") objecting to assumption of the Distribution Rights Acquisition Agreement, dated May 20, 2013 (as amended by Amendment No. 1, dated February 14, 2014 (the "Sous Chef Contract") (attached without exhibits to the Agam Declaration as **Exhibit 1**) and the $108,512 Cure Amount set forth in the Cure Notice. Without a shred of evidence, Sous Chef demands a Cure Amount of $7,500,000 arising from breach of contract, negligence, and fraud claims Sous Chef has alleged against Open Road Films in a pending arbitration. The Sous Chef Objection does not include any factual allegations in support of the

01:23878280.3

asserted Cure Amount or the arbitration claims.  Indeed, Sous Chef has not provided, in either the Sous Chef Objection or in the referenced arbitration proceeding, any *evidence* to substantiate its extravagant seven-figure Cure Amount or otherwise support its claims against Open Road Films.  As such, Sous Chef has plainly failed to meet its burden to establish any default under the Sous Chef Contract, other than the default in the payment of participations under the Sous Chef Contract, which the Debtors have identified and to which the Debtors' proposed Cure Amount relates (and to which Sous Chef has not specifically objected, other than to say, in a conclusory fashion, that the Cure Amount should be $7,500,000).  A counterparty must meet a minimum evidentiary threshold for establishing a default under its contract, and Sous Chef simply has not satisfied (or event attempted to satisfy) its burden here.

29.     In addition to the total lack of evidence in its objection, the underlying claims Sous Chef has asserted are meritless.  Sous Chef's asserted claims, laid out in a letter to the Debtors that is attached to the Agam Declaration as **Exhibit 2**, fall into three general categories.  *First*, Sous Chef alleges that Open Road Films unilaterally and without meaningfully consulting Sous Chef chose the *Chef* theatrical release date and the film's overall marketing and distribution strategy in contravention of the Sous Chef Contract.  However, Sous Chef fails to acknowledge that the express terms of the Sous Chef Contract provided Open Road Films, as Distributor, with broad authority over the marketing and distribution of the film. Section 3 of the Sous Chef Contract provides that "Distributor shall have control over all decisions with respect to the marketing, distribution, and other exploitation of the Picture, and shall have the right to exploit the Picture in its good faith business judgment for films of this stature and type," subject only to an obligation that Open Road Films "meaningfully consult" with Sous Chef.  Sous Chef has not submitted any evidence in the arbitration proceeding or these Cases to support its bald assertion

that Open Road Films failed to fully satisfy its consultation obligations. Moreover, Sous Chef's challenge to the May 9, 2014 release date is misguided on its face. Section 3 of the Sous Chef Contract explicitly states that the "initial theatrical release date of the Picture" was "anticipated to be May 9, 2014."

30. *Second*, Sous Chef alleges that Open Road Films failed to spend the minimum amounts required for print, advertising, and releasing costs and that *Chef* was not released on a sufficient number of screens. Sous Chef's assertions are simply untrue. The express terms of Section 3 of the Sous Chef Contract required Open Road Films "to spend (or cause to be spent) no less than $5,000,000 in actual, out-of-pocket print, advertising and releasing costs." Open Road Films far exceeded this $5 million minimum, spending over $12 million on print, advertising, and releasing costs. Attached to the Agam Declaration as **Exhibit 3** is a cost report as of April 20, 2015, which shows that Open Road Films spent more than twice what was required on P&A for *Chef*. Section 3 of the Sous Chef Contract also requires *Chef* to be released on 600 simultaneous screens within the first 12 months. *Chef* was released on over 900 screens.

31. *Third*, Sous Chef asserts a meritless claim that Open Road Films failed to comply with Sous Chef's audit demands. To the contrary, following Sous Chef's audit request, Open Road Films sent an email to Sous Chef's auditing group to schedule a time for an in-house field visit for the auditors to review the underlying documentation for the *Chef* accounting. Open Road Films received a response via email that the auditors would "reach out shortly to coordinate a date to come out to your offices for fieldwork." Attached to the Agam Declaration as **Exhibit 4** is a true and correct copy of email correspondence between representatives of Open Road Films and Sous Chef relating to the audit issue. Following the email response in August 2017, Open Road Films heard nothing regarding the audit until Sous Chef began to allege that

Open Road Films failed to comply with Sous Chef's audit demands. The evidentiary record, however, is clear that Open Road Films promptly responded to Sous Chef's audit demand and was ready and willing to make the appropriate documentation available to Sous Chef's auditors.

32. Because Sous Chef is not likely to succeed with respect to its claims, the Debtors have reasonably exercised their business judgment in determining to assume the Sous Chef Contract. In addition, even if Sous Chef were likely to prevail, the negligence and fraud claims Sous Chef has asserted therein are not defaults under the Sous Chef Contract that require cure under Bankruptcy Code section 365(b). Rather, they are torts arising from alleged prepetition conduct that would only give rise to general unsecured claims against Open Road Films. *Cf. Gil v. Mansano*, 121 Cal. App. 4th 739, 743 (Cal. Ct. App. 2004) ("A tort claim does not enforce a contract."); *Exxess Electronixx v. Heger Realty Corp.*, 64 Cal. App. 4th 698, 709 (Cal. Ct. App. 1998) (concluding claim for fraud was not brought to enforce the terms of a lease).

33. Finally, Section 18 of the Sous Chef Contract expressly provides that in any dispute, "the arbitrator may only award actual damages under the law, and the arbitrator shall not have the power to award consequential, punitive, or exemplary damages of any kind." Nevertheless, the damages asserted by Sous Chef in the arbitration are "lost profits" that constitute consequential damages (also known as special damages) under applicable law. *See, e.g.*, *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified School Dist.*, 102 P.3d 257, 266 (Cal. 2004) ("Lost profits, if recoverable, are more commonly special rather than general damages."). Thus, even if Sous Chef could prove its claims in arbitration and even if those claims gave rise to defaults under the Sous Chef Contract that required cure under section 365(b), Sous Chef would *still* not be entitled to recover its asserted lost profit damages because the clear terms of the Sous Chef Contract prohibit recovery of consequential damages.

34. The Debtors respectfully submit that the Court should not permit Sous Chef to hold this Sale hostage and jeopardize the Debtors' chapter 11 efforts on the basis of a naked Assumption Objection, with no evidence whatsoever of any defaults that would give rise to additional Cure Amounts beyond that which the Debtors are already proposing to cure.

35. By contrast, the Debtors' proposed cure is based on (i) participation statements evidencing an amount due of $97,351.00 for the period as of September 5, 2018; and (ii) the Debtors' good-faith estimate of the amount due between September 6, 2018 and November 30, 2018—$11,161.00. The documents evidencing this amount are attached to the Agam Declaration as **Exhibit 5**. The Debtors have provided all of this material to Sous Chef, and Sous Chef has not identified any flaw in the calculations nor any other objection to these amounts.

### 2.   Silver Reel Entertainment Mezzanine Fund, L.P. Assumption Objection

36. Silver Reel Entertainment Mezzanine Fund, L.P. ("Silver Reel") filed an Assumption Objection [Docket No. 284] (the "Silver Reel Objection")[5] on behalf of itself and The Host Film Holdings, LLC ("Host Film Holdings" and together with Silver Reel, the "Host Parties") objecting to assumption of the Distribution Rights Acquisition Agreement, dated July 1, 2011 (as amended by Amendment No. 1, dated December 4, 2012 (the "Host Film Contract") and the $31,894.33 Cure Amount set forth in the Cure Notice. The Silver Reel Objection asserts that the proper Cure Amount for the Host Film Contract is $151,894.33, which amount is comprised of the $31,894.33 Cure Amount proposed by the Debtors, plus an additional $120,000 that Silver Reel asserts is owed under the Host Film Contract. A copy of the Host Film Contract and its Amendment and participation statement are attached as **Exhibit 6** to the Agam Declaration.

---

[5]   The Silver Reel Objection also constitutes a Sale Objection with respect to Bankruptcy Code section 363(f), which the Debtors believe should be overruled for the reasons set forth in section II. B *supra*.

01:23878280.3

17

37. The Debtors believe that the $120,000 portion of the Cure Amount asserted by Silver Reel is not yet due and owing under the Host Film Contract. Specifically, paragraph 2 of the Amendment to the Host Film Contract provides that "from and after the point (if ever) at which [Open Road Films] has recouped the first $2,000,000 of the Minimum Guarantee under Paragraph 6.a.(v) of the [Host Film Contract], [Open Road Films] will, on a pro rata and pari passu basis, pay Silver Reel 50% of the next $240,000 of Gross Receipts paid to [Open Road Films]." At this time, as attested to in the Agam Declaration, none of the $2,000,000 Minimum Guarantee under Paragraph 6.a.(v) of the Host Film Contract has been recouped. Therefore, no portion of the $120,000 identified by Silver Reel (*i.e.*, 50% of $240,000) is due to Silver Reel at this time, and the Cure Amount proposed by the Debtors for the Host Film Contract is correct.

[*Remainder of Page Intentionally Left Blank*]

### III. CONCLUSION

WHEREFORE, for the reasons set forth herein and in the Motion and the Agam Declaration, the Debtors request that the Court enter the Sale Order and grant the Debtors such other and further relief as is just and proper.

Dated:  November 19, 2018                          */s/ Robert F. Poppiti, Jr.*
                                                                    Michael R. Nestor, Esq. (Bar No. 3526)
                                                                    Robert F. Poppiti, Jr., Esq. (Bar No. 5052)
                                                                    Ian J. Bambrick, Esq. (Bar No. 5455)
                                                                    YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                                                    Rodney Square, 1000 North King Street
                                                                    Wilmington, Delaware 19801
                                                                    Tel: (302) 571-6600  Fax: (302) 571-1253

                                                                    and

                                                                    Michael L. Tuchin, Esq. (*pro hac vice*)
                                                                    Jonathan M. Weiss, Esq. (*pro hac vice*)
                                                                    Sasha M. Gurvitz, Esq. (*pro hac vice*)
                                                                    KLEE, TUCHIN, BOGDANOFF & STERN LLP
                                                                    1999 Avenue of the Stars, 39th Floor
                                                                    Los Angeles, CA 90067
                                                                    Tel: (310) 407-4000  Fax: (310) 407-9090

                                                                    *Counsel to the Debtors*