# **EXHIBIT A**

**Agam Declaration**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>OPEN ROAD FILMS, LLC, a Delaware limited liability company, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.:  18-12012 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 9** |

## <u>DECLARATION OF AMIR AGAM</u>

1.  I am a Senior Managing Director at FTI Consulting, Inc. and I am the Chief Restructuring Officer ("<u>CRO</u>") for Open Road Films, LLC and its affiliated debtors and debtors in possession (the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Cases</u>").  I submit this Declaration in support of the *Debtors' Omnibus Reply in Support of Motion to (I) Approve the Sale of Substantially All of the Debtors' Assets, (II) Authorize the Assumption, Assignment, and Sale of Certain Executory Contracts and Unexpired Leases, and (III) Grant Related Relief* (the "<u>Reply</u>") and in further support of the Motion.[2]

2.  I am familiar with the day-to-day operations and business and financial affairs of the Debtors, having served in my current capacity as CRO for Open Road Films, LLC since August 3, 2018.  All facts set forth in this Declaration are based on my personal knowledge, my communications with other members of the Debtors' senior management, discussions with my colleagues who are also working on this matter, my review of relevant documents, or my opinion, based on my overall professional experience, in light of my personal knowledge of the

---

[1]  The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Open Road Films, LLC (4435-Del.); Open Road Releasing, LLC (4736-Del.); OR Productions LLC (5873-Del.); Briarcliff LLC (7304-Del.); Open Road International LLC (4109-Del.); and Empire Productions LLC (9375-Del.).  The Debtors' address is 2049 Century Park East, 4th Floor, Los Angeles, CA 90067.

[2]  Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Reply.

01:23878280.3

Debtors' operations, business affairs, and financial condition.  If called as a witness, I could and would competently testify to the matters set forth herein based on the foregoing.

3.      The Debtors conducted a robust marketing process in accordance with the Bid Procedures Order.  In total, the Debtors contacted approximately fifty-three (53) potential buyers that might have an interest in acquiring the Debtors' assets.  Approximately thirty-six (36) parties executed confidentiality agreements and accessed diligence materials regarding the Debtors' assets and business and approximately eleven (11) parties ultimately submitted indications of interest for the Debtors' assets.  The Debtors considered the three strongest offers as potential stalking horse bids, and, after final diligence and negotiations, the Buyer's offer was ultimately determined to be strongest.  Accordingly, the Debtors negotiated and documented the APA with the Buyer.

4.      Thereafter, the Debtors published notice of the Sale in accordance with the Bid Procedures Order in the national edition of *USA Today*, as well as the national edition of *Variety*, which is a publication specific to the entertainment industry.  *See* Docket No. 183.  In addition, the Debtors broadly served notice of the Sale in these Cases in accordance with the Bid Procedures Order.  *See* Docket No. 178.  The Debtors also continued the process of marketing the Debtors' assets for sale.  As a result of the foregoing efforts, notice of the Sale was more than adequate and was reasonably calculated to maximize exposure of the Debtors' assets and thereby maximize value for the Debtors' estates.

5.      Nevertheless, no competing offers were submitted that were superior to the Buyer's offer.  The Debtors therefore determined to proceed with the Sale to the Buyer pursuant to the APA.  I believe that the Buyer's offer constitutes a fair and adequate price for the Purchased Assets and reflects fair market value for the Purchased Assets under the circumstances

01:23878280.3

2

presented here.  Moreover, I believe the value from the sale exceeds the value the Debtors would receive if the Purchased Assets were sold in a piecemeal liquidation to multiple purchasers or through some other less orderly and less competitive process.

6.      I believe the Sale process has been conducted in good faith and the APA is the result of good faith, arms' length negotiations between the Debtors and the Buyer.  Both parties have been ably represented by sophisticated legal counsel and the negotiations over the terms of the Sale and the APA reflect hard-fought compromises and significant give and take by both parties.  I believe that the APA, which is the result of a robust marketing process, constitutes the highest and best offer for the Purchased Assets.  For the foregoing reasons, and those set forth in the Reply and the Motion, I believe the Court should approve the Sale to the Buyer pursuant to the APA.

7.      The Debtors' distribution agreement in respect of Sous Chef (without exhibits) is attached hereto as **Exhibit 1**.

8.      My understanding and belief is that the substantive claims asserted by Sous Chef against Open Road Films are meritless.  Sous Chef's asserted claims fall into three general categories, as detailed in a letter sent by Sous Chef to Open Road.  That letter is attached hereto as **Exhibit 2**.  *First*, Sous Chef alleges that Open Road Films unilaterally and without meaningfully consulting Sous Chef chose the *Chef* theatrical release date and the film's overall marketing and distribution strategy in contravention of the Sous Chef Contract.  However, the express terms of the Sous Chef Contract provided Open Road Films, as Distributor, with broad authority over the marketing and distribution of the film.  Section 3 of the Sous Chef Contract provides that "Distributor shall have control over all decisions with respect to the marketing, distribution, and other exploitation of the Picture, and shall have the right to exploit the Picture in

01:23878280.3

its good faith business judgment for films of this stature and type," subject only to an obligation that Open Road Films "meaningfully consult" with Sous Chef.  To my knowledge, Sous Chef has not submitted any evidence in the arbitration proceeding or these Cases to support its assertion that Open Road Films failed to fully satisfy its consultation obligations.  Moreover, Sous Chef's challenge to the May 9, 2014 release date is misguided on its face.  Section 3 of the Sous Chef Contract states that the "initial theatrical release date of the Picture" was "anticipated to be May 9, 2014."

9.    *Second*, Sous Chef alleges that Open Road Films failed to spend the minimum amounts required for print, advertising and releasing costs and that *Chef* was not released on a sufficient number of screens.  The express terms of Section 3 of the Sous Chef Contract required Open Road Films "to spend (or cause to be spent) no less than $5,000,000 in actual, out-of-pocket print, advertising and releasing costs."  Open Road Films exceeded this $5 million minimum, spending over $12 million on print, advertising and releasing costs.  Attached hereto as **Exhibit 3** is a cost report as of April 20, 2015, which shows that Open Road Films spent more than twice what was required on P&A for *Chef*.  Section 3 of the Sous Chef Contract also requires *Chef* to be released on 600 simultaneous screens within the first 12 months.  My understanding and belief is that *Chef* was released on over 900 screens within that time period, and that Open Road has previous provided Sous Chef a flash report evidencing the same.

10.    *Third*, Sous Chef asserts a claim that Open Road Films failed to comply with Sous Chef's audit demands.  I have reviewed Sous Chef's letter to Open Road dated February 12, 2018, as well as an email chain concerning Sous Chef's requested audit information.  While Sous Chef's February 2018 letter stops discussing the status of audit requests in June 2017, the email chain appears to show new audit information requested in July 2017 and information

continuing to be provided from Open Road to Sous Chef's auditors in July and August 2017.  In

August 2017, Open Road Films sent an email to Sous Chef's auditing group to schedule a time

for an in-house field visit for the auditors to review the underlying documentation for the *Chef*

accounting.  Open Road Films received a response via email that the auditors would "reach out

shortly to coordinate a date to come out to your offices for fieldwork."  Attached hereto as

**Exhibit 4** is a true and correct copy of email correspondence between representatives of Open

Road Films and Sous Chef relating to the audit issue.  My understanding and belief is that

following the email response in August 2017, Open Road Films heard nothing regarding the

audit until Sous Chef began to allege that Open Road Films failed to comply with Sous Chef's

audit demands.

11.     By contrast, the Debtors' proposed cure is based on (i) participation statements

evidencing an amount due of $97,351.00 for the period as of September 5, 2018; and (ii) the

Debtors' good-faith estimate of the amount due between September 6, 2018 and November 30,

2018—$11,161.00.  Attached hereto as **Exhibit 5** are (i) participation statements for Sous Chef

identifying an amount due of $97,351.00 for the period as of September 5, 2018; and

(ii) calculations of the Debtors' good-faith estimate of the amount due between September 6,

2018 and November 30, 2018—$11,161.00.

12.     Attached hereto as **Exhibit 6** is a true and correct copy of the Host Film Contract

(without attachments) and its amendment and relevant participation statement.  My

understanding and belief is that, at this time, none of the $2,000,000 Minimum Guarantee under

Paragraph 6.a.(v) of the Host Film Contract has been recouped by Open Road Films.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 19th day of November 2018 at Los Angeles, California.

By  */s/ Amir Agam*
        Amir Agam
        Chief Restructuring Officer

01:23878280.3

## <u>EXHIBIT 1</u>

**Sous Chef Contract**

## DISTRIBUTION RIGHTS ACQUISITION AGREEMENT

This agreement ("Agreement") is made and entered into as of May 20, 2013 by and between Sous Chef, LLC ("Producer") and OPEN ROAD FILMS, LLC ("Distributor") with respect to the theatrical motion picture currently titled *Chef* ("Picture") starring Robert Downey Jr., Scarlett Johansson, Sofia Vergara, John Leguizamo and Jon Favreau and directed by Jon Favreau.

Condition Precedent:  Distributor's obligations under this Agreement are subject to: (a) Distributor's receipt and approval of the chain-of-title to the Picture; (b) Distributor's receipt of the insurance certificates required under Paragraph 10 below; and (c) Distributor's receipt of the copyright mortgage described in Paragraph 13 below.

1.      Territory:  The "Territory" shall mean the United States of America (including but not limited to, Guam, Saipan, Midway Island, the Trust Territory Islands, the Caroline Islands, the Marshall Islands, the U.S. Virgin Islands, Puerto Rico, Bermuda, the Bahamas and American Samoa), its territories, possessions, trusteeships and commonwealths and all military bases and similar venues wherever located in the world, ships at sea, airlines and oil rigs flying the flag of the United States. With respect to Puerto Rico, pay television rights will be non-exclusive in Spanish language.

2.      Rights Granted to Distributor by Producer:  Except for the "Reserved Rights" (defined below), Producer hereby grants to Distributor, throughout  the Territory and during the Term, all distribution and exploitation rights in and to the Picture of every kind and nature now known or hereafter devised (the "Rights"), on an exclusive basis, for all media and all delivery systems now known or hereafter devised, including, but not limited to, all theatrical, non-theatrical, home video, digital, mobile, internet, interactive, satellite, video-on-demand (all forms including without limitation, premium and subscription video on demand rights), pay television, pay-per-view, free television, and all allied, ancillary and subsidiary rights.  The Rights granted to Distributor include the exclusive right to market, promote, advertise, publicize and otherwise turn to account the Picture, excerpts therefrom and elements thereof by all manner, means and in all media now known or hereafter devised (advertising, marketing, publicity and promotion to be permitted throughout the universe), directly or through subdistributors and/or servicers, and to collect all proceeds from the exploitation of the rights granted under this Agreement.  Distributor will have the right to issue and authorize publicity with respect to all persons appearing in the Picture, and to utilize the names, voices, performances and likenesses of such persons in connection with the marketing and distribution of the Picture (subject to customary restrictions disclosed to Distributor in writing as soon as available).  All cast agreements provide for cast to participate in customary publicity for the Picture subject to reasonable and customary contractual requirements.  Producer will inform Distributor of any non-standard publicity restrictions and requirements contained in cast agreements.  Except as concerns Distributor's exploitation of such rights for promotional and advertising purposes, which shall be permitted hereunder, Producer reserves all soundtrack album, theme park, stage, music publishing and subsequent production rights (subject to Paragraph 11 below) (the "Reserved Rights"), provided that Producer shall use commercially reasonable efforts to coordinate exploitation of soundtrack album rights with Distributor (including product art and release schedules) to ensure that there is no interference with the marketing and distribution campaign for the Picture. Producer shall pay to Distributor ("Distributor Ancillary Participation") an amount equal to 15% of 100% of all gross sums received by Producer or its successors and affiliates (i.e., the full rights holder share remitted to Producer from distributors, agents, licensees, wholesalers, retailers and/or fulfillment/service entities, if and as applicable) from the exploitation of soundtrack album, theme park and stage rights in the Territory during the Term.  Producer will account to Distributor for the Distributor Ancillary Participation at the same times that Distributor accounts to Producer with respect to the sums due to Producer hereunder, and Distributor will have annual audit rights with respect to the Distributor Ancillary Participation. Distributor's use of licensed music included in the Picture in out of context marketing and promotional materials, and Distributor's use of other licensed material included in the Picture for marketing and promotion, will be subject to customary limitations set forth in applicable license agreements disclosed by Producer to Distributor in writing as soon as available and no later than delivery of the Picture.  Customary unintentional overspill will not be a breach of this Agreement.

3.      Release Commitment/Consultation Rights:  Subject to and conditioned upon Producer meeting its delivery and other material obligations hereunder and force majeure events, Distributor shall release the Picture theatrically in accordance with the following: (a) Distributor agrees to spend (or cause to be spent) no less than $5,000,000 in actual, out-of-pocket print, advertising and releasing costs in connection with the theatrical release of the Picture in the Territory; and (b) the Picture shall be released on no fewer than 600 screens simultaneously in the Territory within twelve (12) months following complete delivery of the Picture to Distributor in accordance with Paragraph 7 below.  Distributor will meaningfully consult with Producer in advance regarding the initial theatrical release date of the Picture (currently anticipated to be May 9, 2014) the release pattern and the marketing campaign for the Picture, it being understood that Distributor's decision shall be final and binding in all cases.  Producer agrees to exercise its consultation rights in a timely fashion and to act in good faith with respect to such consultations, so as not to frustrate the marketing, distribution and other exploitation of the Picture.  The

"Chef"

Page 2 of 8

parties will mutually agree upon the terms of a press release announcing this Agreement. Producer will not issue publicity in the Territory concerning the Picture or this Agreement without coordinating same with Distributor and obtaining Distributor's prior approval for such publicity. Except as expressly set forth herein, Distributor shall have control over all decisions with respect to the marketing, distribution, and other exploitation of the Picture, and shall have the right to exploit the Picture in its good faith business judgment for films of this stature and type. Distributor makes no representation or warranty as to the success of the Picture or the amount of Gross Receipts the Picture may generate.

4.      Term:

5.      Minimum Guarantee:

6.      Producer Corridor/Waterfall:

b.      "Gross Receipts" shall be defined, accounted for, calculated and paid in accordance with Distributor's standard definitions attached hereto as Exhibit "A" and incorporated herein by this reference. Revenues will be treated as non-fundable for purposes of calculating "Gross Receipts" when Distributor is paid its Distribution Fee for such revenues. "Gross Receipts" for all "Home Entertainment Rights" will be defined, calculated and paid as 100% of the gross receipts actually received by or credited to the account of Distributor (i.e., credited to the account of Distributor as Distributor's share of the revenue of the Picture in lieu of a cash payment otherwise due to Distributor) from Distributor's "Home Entertainment Rights" Subdistributors after deduction of all costs, fees and expenses deducted by such Subdistributors prior to remittance to Distributor) and less any expenses incurred directly by Distributor with respect to the exploitation of "Home Entertainment Rights". "Home Entertainment Rights" shall mean the right to reproduce, transmit and distribute, rent and sell and permit others to reproduce, transmit and/or distribute, rent and sell the Picture, via all forms of videogram, electronic sell through, video on demand, pay per view and any other physical or digital format now known or hereafter devised that is or becomes treated as part of home entertainment rights by major studios. Distributor may not deduct any expense that has already been deducted by a Subdistributor (i.e., no double deduction of the same expense). Any video return reserves shall be the actual reserves borne by Distributor pursuant to Distributor's agreements with its Subdistributor and shall be liquidated on a rolling twelve (12) month basis. Distributor shall not reserve for any expense item that is simultaneously subject to a reserve by a subdistributor (i.e., no double reserves).

c.      Minimums:  The combined payments due to Producer under Paragraphs 5 and 6 above (i.e., the Minimum Guarantee plus any sums paid to Producer under Paragraph 6) shall be no less than the following applicable amounts ("Minimum Payment") if the Picture achieves the applicable corresponding BO levels set forth below (and subject to all of Distributor's rights and remedies in the event of a breach by Producer):

| BO | Minimum Payment |
|---|---|
| | |

In the event that the amounts paid to Producer combined are less than the Minimum Payment due based on the BO levels as set forth above, then Distributor shall pay Producer the amount required to reach the applicable Minimum Payment due ("Minimum Payment True-Up") upon the rendering of the first accounting statement issued by Distributor after Distributor has received the final installment payment due under its principal first cycle free television license agreement for the Territory ("True-Up Date"), provided that in no event shall the True-Up Date fall later than 7 years following initial general theatrical release of the Picture by Distributor in the Territory. If Distributor pays the Minimum Payment True-Up (meaning that Distributor has advanced sums to Producer not earned by Producer hereunder), Distributor shall retain the balance of all sums otherwise due to Producer under this Agreement until Distributor has recouped the Minimum Payment True-Up from Producer's share of Gross Receipts.

7.      Delivery to Distributor:  Producer shall deliver the completed Picture to Distributor, fully edited and titled, and in all respects ready and of first class technical quality suitable for first class exhibition and distribution as contemplated herein, at Producer's sole cost and expense, with the creative elements listed above, based on the screenplay dated June 26, 2013, submitted to Distributor, in color, live action, in the English language, with a running time of not less than 90 minutes and not more than 110 minutes (inclusive of main and end titles), in accordance with Distributor's delivery schedule attached hereto as Exhibit "B" (and subject to changes made by mutual agreement following good faith negotiation) ("Delivery Schedule"), with time being of the essence, on or before March 31, 2014 (the "Delivery Date"). The Picture shall be delivered to Distributor having been judged to receive a rating by the MPAA which is no more restrictive than "R" and with an actual cash cost of production (as certified by the Chairman of Aldamisa Productions) of no less than
                                 Distributor shall have the right to terminate this Agreement and be reimbursed by Producer for any actual costs incurred by Distributor in connection with the Picture if Producer fails to deliver the Mandatory Delivery Elements as required on or before the Delivery Date.

"Chef"
Page 4 of 8

8.      Editing/Credits:  Distributor shall have the right to cut, edit, subtract from, arrange, rearrange and revise the completed version of the Picture for distribution thereof within the Territory solely for MPAA rating purposes, to conform with the specifications set forth in this Agreement, to meet television broadcaster standards, practices and timing requirements, to create airline/ship and home entertainment versions of the Picture, to create marketing and promotional materials including wireless/internet "downloads" (e.g., screen grab stills and clip excerpts for promotional purposes), or as required by law, court order, or in settlement of a dispute (or to avoid any claim or dispute).  Without limiting the generality of the foregoing, Distributor shall have the right, but not the obligation, to change the title of the Picture if necessary for legal clearance purposes.  Within the Territory, Distributor (and any subdistributor engaged by Distributor) will be entitled to customary first position (or first and second position where Distributor uses a subdistributor) separate card logo (which may be animated), presentation and releasing credits on the Picture and in all trailers, advertising, publicity and marketing materials in all media.  Producer agrees that (a) no animated logo credit other than those of Distributor (and any subdistributor engaged by Distributor) and Producer will appear on screen on the Picture in the Territory; (b) no logo, production or presentation credits have or will be accorded for use in paid advertising outside of the billing block other than the credits of Distributor (and any Subdistributor) and Producer in the Territory;  and (c) no third party has been or will be accorded credit that would conflict with the first and second position logo and presentation credits accorded to Distributor and any Subdistributor in the Territory.  Producer warrants and represents that the main and end titles of the negative and pre-print materials of the Picture contain all necessary and proper credits for the actors, directors, writers and all other persons appearing in or connected with the production of the Picture who are entitled to receive the same.  Producer shall deliver to Distributor as part of the delivery requirements of the Picture a complete statement in English setting forth the credits as they appear on the screen.  In addition, as soon as available, Producer shall deliver to Distributor a complete statement setting forth the names of all persons to whom Producer is contractually obligated to accord credit and any restrictions on the use of the name and likeness of the cast in any advertising, publicity or exploitation of the Picture. Producer shall include in such statement excerpts from any such agreements defining and describing the form and nature of such required credits or restrictions.  Provided that such credit obligations and restrictions are reasonable and customary, Distributor will honor such credit obligations and restrictions, provided that no casual or inadvertent failure by Distributor, or any failure by any subdistributor, to honor such credit obligations or restrictions shall be deemed a breach of this Agreement by Distributor or entitle Producer to any relief at law, equity, or otherwise.  In the event that Distributor fails to comply with any such credit obligations or restrictions, upon receipt of written notice of such failure, Distributor shall use good faith, reasonable efforts to prospectively cure any failure with respect to prints or advertisements made after receipt of such notice, it being understood that Distributor has no obligation to prepare any subsequent prints or subsequent advertisements.

9.      Holdbacks:  The Picture (which for purposes of this Paragraph will include any linear clips exceeding two minutes in duration) shall not be previewed or otherwise exhibited in the Territory without Distributor's prior, written approval.  The Picture shall not be exhibited theatrically (including at any film festival or market other than customary non-public screenings for prospective international film buyers), whether or not within the Territory, prior to the initial general commercial release of the Picture in the Territory without Distributor's prior written approval.  The Picture shall not be commercially released anywhere in the world in any media other than theatrical (following theatrical release in the Territory) until the initial home video street date for physical units of the Picture in the Territory, provided that the maximum holdback for such home video release will be (i) 150 days following initial general theatrical release of the Picture by Distributor in the Territory for all territories other than France and (ii) as to France, four months following theatrical release of the Picture in France.  The Picture will not be released in any television media (including pay TV or free TV) in Mexico or Canada until 120 days following the home video street date for physical units of the Picture in the Territory.  If Distributor has not released the Picture by the date which is twelve (12) months following Delivery of the Picture as required hereunder (the "Anticipated Release Date"), then the distributors of the Picture outside of the Territory shall be released of their respective holdbacks and can release the Picture.  Producer will use good faith efforts consistent with industry custom and practice to bind its distributors, licensees and assigns outside the Territory to employ industry standard geofiltering, copy protection, security and encryption procedures.

10.      Insurance:

"Chef"
Page 5 of 8

11.    Subsequent Productions:  If at any time within ten (10) years following initial theatrical release of the Picture by Distributor Producer, or any of its licensees or assignees, intends to develop, produce, cause or permit the development or production of, negotiate with any third party with respect to the development or production of, or sell, encumber or otherwise dispose of or limit in any manner any rights to develop or produce any subsequent motion picture or television production related to or based upon the Picture (including, without limitation, all theatrical prequels/sequels/remakes, direct-to-video productions, MOWs, miniseries, and other television productions) (each, a "Subsequent Production"), then the following shall apply:

    a.    First Negotiation:


    b.    Last Refusal:  ′


    c.    Negotiation Elements:  As used herein, the term "Negotiation Elements" shall mean written notice from Producer that includes all of the following (to the extent such elements are known):  (a) a copy of the most recent draft of the script; (b) a list of any and all principal cast and any and all other material attachments (e.g., writer, director and producer attachments, etc.); (c) a copy of the proposed budget of such production; (d) the most recent cut of such production (if applicable); and (e) all other material information concerning the applicable Subsequent Production that Producer shares with a third-party bidder.

    d.    Future Subsequent Productions:  Such rights of first negotiation and last refusal shall continue thereafter for all additional Subsequent Productions, on a rolling basis (e.g., if Distributor does not serve as the distributor for the first theatrical sequel based upon the Picture, it shall not have the right of first negotiation and last refusal with respect to any other subsequent production).

12.    Representations and Warranties:  Producer represents and warrants as of the date hereof and also upon Delivery of the Picture that:  (a) Producer owns or controls all Rights granted to Distributor under this Agreement and that all such Rights are free of all liens (other than customary guild liens and liens subordinated to the interests of Distributor pursuant to intercreditor agreements approved by Distributor), claims, charges, encumbrances, restrictions, and commitments; (b) Producer has all the rights, powers, and authority necessary to enter into and fully perform all of its obligations hereunder; (c) neither the Picture, nor any part thereof, nor any materials contained therein, synchronized therewith and/or provided to Distributor, nor the title thereof, nor the exercise of any right, license or privilege granted to Distributor hereunder, violates or will violate, or infringes or will infringe, any trademark, trade name, service mark, patent, copyright (whether common law or statutory) or the literary, dramatic, musical, artistic, personal, private, civil, "droit moral" or property right or rights of privacy or any other right of any person or

"Chef"
Page 6 of 8

entity whatsoever, or unfairly competes with or slanders or libels (or constitutes a trade disparagement of) any person or entity whatsoever; (d) the non-dramatic public performance rights in the Picture and its contents are either (i) controlled by ASCAP, BMI or SESAC, (ii) in the public domain, or (iii) solely controlled by Producer; (e) Producer has satisfied and will satisfy when due all third party obligations of every kind with respect to the Picture and has produced the Picture in accordance with all applicable laws; (f) there are not, and shall not be, at any time during the Term any liens, claims, charges, encumbrances, restrictions, agreements, commitments or arrangements whatsoever with any person or entity, or any obligation (past, present or future) or any uncured material breaches of contract, which will in any way impair, abrogate or adversely affect the rights granted to Distributor; (g) there are no legal actions or proceedings pending or threatened which would or might affect Distributor's exploitation of the Picture; (h) the Picture has not previously been exploited anywhere in the world; and (i) the copyright in the Picture and the material upon which the Picture is based will be valid and subsisting during the Term. Producer will indemnify, defend and hold Distributor and its parents, subsidiaries, subdistributors, affiliates, licensees, successors, assigns, directors, officers, and employees harmless from and against any and all third-party claims, liabilities, damages, costs or expenses of any kind (including, without limitation, attorneys' fees and costs) (collectively, "Claims") arising out of or related to any breach or alleged breach of Producer's representations, warranties, and covenants under this Agreement. Producer's indemnity obligations shall survive the expiration or earlier termination of this Agreement.

13.    Security Interest/Financing Agreements:

14.    Participations/Residuals: Producer represents and warrants that: (a) the Picture shall not be subject to the jurisdiction of any guild or union except for WGA, DGA, SAG, IATSE, Teamsters and AF of M ("Guilds"); and (b) except as set forth in this Paragraph 14, no other residuals, re-use fees, royalties or other payments (excluding public performance payments for licensed music) of any kind are or will be payable to any third party in connection with Distributor's and its licensees' exploitation of the Rights and the Picture. Provided that Producer supplies all information that Distributor reasonably requires to administer, calculate and pay residuals arising from the distribution and exploitation of the Picture in the Territory during the Term, Distributor will pay such residuals as directed by Producer, will execute customary assumption agreements with the Guilds. Producer shall be responsible for accounting for and paying any and all third-party participations due in connection with the Picture ("Participations"). In no event may a third party audit Distributor's books and records.

15.    Access to Advertising Materials: Distributor shall provide Producer with free access to any and all advertising materials which are used by Distributor in connection with the theatrical exploitation of the Picture (collectively,

"Chef"
Page 7 of 8

"Advertising Materials"), to the extent such access does not interfere with the reasonable needs of Distributor. Producer shall (i) be responsible for obtaining any releases or clearances necessary prior to the use of such Advertising Materials outside the Territory; (ii) pay any and all costs, expenses, fees of any kind in connection with the license, reproduction, use or re-use, delivery and/or shipping of such Advertising Materials outside the Territory and (iii) indemnify Distributor from any and all claims resulting from use of the Advertising Materials outside the Territory. Producer shall not utilize the Distributor's name or logo in connection with the use of any Advertising Materials outside the Territory. Distributor shall use reasonable good faith efforts to clear all materials used in advertising for worldwide use in perpetuity.

16.   Default/Remedies:  In the event of any alleged breach hereunder, each party will have ten (10) days following receipt of written notice from the non-breaching party's notice specifying such alleged breach (reducible to seventy two (72) hours for any alleged breach by Producer which materially impacts Distributor's ability to distribute the Picture or exploit any other rights hereunder without incurring potential legal liability) to cure such alleged breach.  Under no circumstances of any kind, including any breach of this Agreement, shall Producer have any right to seek and/or obtain any injunctive or equitable relief, including any right to terminate, rescind, or cancel this Agreement or Distributor's rights hereunder, or to otherwise enjoin, restrain, or interfere with the development, production, distribution, or other exploitation of the Picture, any rights therein, or any related advertising or publicity.  The rights and remedies of Producer, in all circumstances, including in the event of any breach of this Agreement, shall be limited to Producer's right to recover actual damages, if any, in an arbitration as described herein.

17.   Assignment:  Distributor shall have the right, at any time, to freely sell, transfer, license, assign, hypothecate, sub-distribute, and otherwise deal with, in whole or in part, all or any portion of this Agreement or any or all of its rights or obligations hereunder, to any party. Notwithstanding the foregoing, Distributor will not subdistribute theatrical distribution rights except in Puerto Rico and other non-contiguous portions of the Territory. Producer shall not have the right to assign, and shall not assign, this Agreement or any portion hereof, or any of its duties, rights, and/or obligations under this Agreement, without Distributor's prior written approval (which may be granted or withheld in Distributor's reasonable discretion).  Notwithstanding the foregoing, Producer may assign this Agreement to an affiliate of Producer to which Producer assigns all of its right, title and interest in the Picture and provided that such assignee assumes all of Producer's obligations hereunder in writing.  Producer may assign Producer's right to receive the monies payable to Producer hereunder, provided, however, that (i) any such assignment shall be in writing and in a form and substance satisfactory to Distributor; (ii) Distributor shall not be required to accept or honor any assignment or assignments which would result in requiring Distributor to make payments to more than one (1) party; (iii) in no event shall any party other than Producer have the right to audit Distributor's records by reason of such assignment; and (iv) any such assignment shall at all times be subject to all pertinent laws and governmental regulations and to all of the rights of Distributor hereunder.

18.   Arbitration:  This Agreement shall be construed and interpreted pursuant to the laws of the State of California applied to contracts entered into and performed wholly within California (without regard for conflict of law principles), or, if appropriate, the federal laws of the United States of America.  In the event of any dispute of any kind in connection with this agreement (other than delivery disputes which will be subject to the arbitration provisions of the Delivery Schedule), the existence or validity of this agreement, the Picture, and/or the parties' relationship, such dispute shall be resolved by submission to final, binding, and confidential arbitration in Los Angeles County, California.  Such arbitration shall be initiated and conducted according to the JAMS rules and procedures in effect at the time the request for arbitration is made. The arbitration shall be conducted before a single neutral arbitrator chosen in accordance with such JAMS rules and procedures.  California Code of Civil procedure section 1283.05, which provides for certain discovery rights, shall apply to such arbitration.  Notwithstanding anything to the contrary, the arbitrator may only award actual damages under the law, and the arbitrator shall not have the power to award consequential, punitive, or exemplary damages of any kind.  Either party hereto may bring an action in any court of competent jurisdiction, if necessary, to compel arbitration under this arbitration provision or to enforce an arbitration award that may be entered by the arbitrator.  The parties consent to the exclusive jurisdiction and venue of the Federal and State courts located in Los Angeles, California for purposes of enforcing the arbitration provisions of this Agreement and/or enforcing any arbitration award, and otherwise as to matters held to be non-arbitrable by such courts.

19.   Miscellaneous:  Notices and payments due to the parties will be sent to the following addresses:

To Distributor:                                                    To Producer:

Open Road Films, LLC
12301 Wilshire Blvd, Suite 600
Los Angeles, CA 90025

"Chef"
Page 8 of 8
Attention:  General Counsel

With a copy to:

This Agreement is legally binding and reflects the agreement of the parties with respect to all material terms concerning the subject matter hereof.  The parties may enter into a long form agreement which shall include the terms and provisions hereof and additional items not addressed herein.  Unless and until such a more formal agreement is executed by both parties, if ever, this Agreement shall be the entire and binding agreement and understanding of the parties concerning the subject matter hereof and supersedes all prior agreements, arrangements and understandings regarding such subject matter between the parties hereto.  Each party will execute such agreements as are reasonably necessary to effectuate the purposes and intents hereof. The parties acknowledge that no representation or promise not expressly contained in this agreement has been made by any party or any of its agents, employees, representatives, or any other related parties.  This agreement may not be amended except by a written instrument executed by all the parties.  This agreement is binding on the parties' licensees, assignees, and successors.  This agreement may be executed in counterparts (including by facsimile and/or electronic transmission), each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  To the extent of any direct conflict between the principal terms of the Agreement above and the terms of Exhibit "A," the principal terms will govern.

AGREED TO AND ACCEPTED BY:

OPEN ROAD FILMS, LLC ("Distributor")

By: _____
Its: _____
Date: _____

SOUS CHEF, LLC ("Producer")

By: Marina Bespalov
Its: Member
Date: 7/23/13

## **EXHIBIT 2**

**Sous Chef Letter**

April 25, 2018

<u>*Via Service of Process to:*</u>

MARNI RICHMAN
12301 WILSHIRE BLVD STE 600
LOS ANGELES CA 90025

<u>*Via email: dsilverman@openroadfilms.com*</u>
Debra Silverman
Open Road Films, LLC
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
ATITENTION: GENERAL COUNSEL

<u>*Via email: sandriuzzo@openroadfilms.com*</u>
Steven Andriuzzo
Open Road Films, LLC
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025

*Re: Sous Chef, LLC v. Open Road Films, LLC-Chef Demand for Arbitration*

To Whom This Concerns:

Please accept this as Sous Chef, LLC's ("Sous Chef") statement of claims to be submitted to JAMS Arbitration pursuant to Paragraph 18 of the Distribution Rights Acquisition Agreement dated May 20, 2013 (the "Agreement", attached as Exhibit "A") related to the film *Chef*. The claims detailed herein are a direct result of Open Road Films, LLC's ("Open Road") (1) breach of the Agreement, (2) negligence, and (3) fraud.

*Introduction*

Sous Chef entered into the Agreement with Open Road with the goal of maximizing the box office performance of *Chef*, a feature film directed by and starring Jon Favreau, as well as other major talent such as Robert Downy, Jr., Scarlett Johansson, Sofia Vergara and John Leguizamo. As detailed below, and at a minimum, Open Road breached its responsibilities under the Agreement by, among other things: (1) failing to meaningfully consult with Sous Chef regarding *Chef's* theatrical release date, release pattern and marketing campaign; (2) failing to spend the minimum amounts required for print, advertising and releasing costs; and (3) failing to comply with Sous Chef's audit demands (for a more detailed statement of this claim, please see

Demand Letter dated February 12, 2018, attached as Exhibit "B"). Open Road's conduct in this regard also constitutes negligence, as Open Road's unilaterally chosen release pattern and overall marketing and distribution strategy were both negligently devised and executed. Lastly, and most regrettably, Open Road acted fraudulently in both misrepresenting and omitting material facts while executing its strategy to intentionally deflate and stymie *Chef's* box office performance to deprive Sous Chef its guaranteed minimum payments under the Section 6 of the Agreement.

### *Factual Allegations*

Sous Chef financed *Chef* with a budget of approximately $13.5 million dollars and began selling the Film at the 2013 Cannes Film Festival in May 2013. Sous Chef was approached by multiple distributors, in addition to Open Road, which were attracted to *Chef* and recognized the Film's potential. Sous Chef ultimately chose Open Road, which up until September of 2013 had never released a movie on less than 2,124 screens across North America. Sous Chef understood that Open Road was founded and operated by the two of the largest theatre chains in North America, *i.e.* AMC and Regal, and that Open Road was considered to be a 'wide release' distribution company. Indeed, in a NY Times article dated August 19, 2012, Open Road CEO Tom Ortenberg is quoted as saying he prefers films "with wide appeal" and that Open Road was founded and "moved into the vacuum of large scale releases" as the "major studios pared their slates." Based upon Open Road's reputation as a 'wide release' distribution company, and its representatives' affirming statements to Sous Chef's representatives, Sous Chef selected Open Road to distribute and market *Chef*.

In short, Sous Chef desired a wide theatrical release for *Chef*, and was led to believe that Open Road would in fact deliver that wide release. Instead, Open Road completely botched *Chef's* release pattern and overall marketing and distribution strategy. The evidence in this case shows that Open Road, unilaterally and without meaningfully consulting with Sous Chef, chose May 9, 2014 as the Film's release date. Indeed, *Chef* was released on May 9th on only six (6) screens. In Weekend 2, Open Road added sixty-six (66) screens, in Weekend 3 another four hundred twenty-six (426), in Weekend 4 another one hundred twenty-six screens (126) and another six hundred seventy-four (674) screens in Weekend 5, which was it largest number screens throughout its nineteen (19) week theatrical release. This release pattern is negligent on its face, and when viewed in light of the thresholds for the guaranteed payments that were due to Sous Chef under the Agreement, this release pattern is extremely suspect and points to Open Road's fraudulent scheme.

Moreover, and in violation of its contractual duties, Open Road has refused to provide Sous Chef with comprehensive financial information for *Chef*. Based upon what has been

provided, however, it appears that Open Road failed to satisfy its print, advertising and release costs obligations under the Agreement. While this shortcoming is a clear contractual breach, it also supports that, at a minimum, Open Road's print and advertising spend and strategy was devised and executed in a negligent fashion. What is more troubling, however, is that this inadequate spend and spending pattern corroborates Open Road's plan to intentionally stymie *Chef's* box office performance to prevent the film from reaching thresholds that would trigger Sous Chef's guaranteed minimum payments under Section 6 of the Agreement.

What is perhaps most troubling is that Open Road unilaterally pulled *Chef* from all screens in the North American market after Weekend 18 after *Chef* had achieved approximately $31,237,528. At this time, *Chef* still had a per screen average of approximately $900. This is clear evidence that Open Road intentionally stymied *Chef's* performance to avoid reaching the $35,000,000 threshold that would have triggered a $4,500,000 payment to Sous Chef under Section 6 of the Agreement. Indeed, had Open Road faithfully executed in contractual obligations and other duties it owned to Sous Chef, we believe that the evidence shows that *Chef* would have surpassed additional thresholds under Section 6 of the Agreement that would have in turn triggered additional minimum payments to Sous Chef under the Agreement, e.g. the $40,000,000 threshold would have triggered a $6,000,000 minimum payment to Sous Chef, and then the $45,000,000 threshold would have triggered a $7,500,000 minimum payment to Sous Chef and so on.

### Conclusion

Sous Chef has suffered substantial damages as a result of Open Road's conduct. As a result of Open Road's contractual breaches, negligence and fraud, Sous Chef has suffered in excess of seven million five hundred thousand dollars ($7,500,000) of economic damages. The Agreement requires that we submit this matter to Arbitration and we intend to do so. Please allow this letter to serve as the Demand for Arbitration. If you would like to speak with me, please do not hesitate to call me directly.

Sincerely,

/s/: Larry Bassuk

Larry Bassuk

cc: Client

## <u>EXHIBIT 3</u>

**Sous Chef 4/20/15 Cost Report**

**OPEN ROAD FILMS**
MARKETING COST ANALYSIS
**_CHEF_**
BUDGET: $12.2MM
RELEASE DATE: May 9, 2014
GENRE: ROMANTIC COMEDY

A/C No

Updated as of: 4/20/15

| Category | Budget | Changes | (Savings)/Overages | Estimated Final Cost | Paid & Accrued | Commitments | Total Costs to Date | Amount Remaining |
|---|---|---|---|---|---|---|---|---|
| **P&A Budget Summary of Costs** | | | | | | | | |
| Prints | 3,413,850 | (1,822,692) | (95,980) | 1,495,178 | 1,495,178 | - | 1,495,178 | 0 |
| Trailers | 120,500 | (83,203) | (44) | 37,253 | 37,253 | - | 37,253 | 0 |
| Shipping | 37,000 | (36,703) | - | 297 | 297 | - | 297 | (0) |
| Media | 17,012,650 | (9,613,230) | (27,292) | 7,372,128 | 7,372,126 | - | 7,372,126 | 2 |
| **Total** | **20,584,000** | **(11,555,828)** | **(123,316)** | **8,904,856** | **8,904,854** | **-** | **8,904,854** | **2** |
| | | | | | | | | |
| **Soft Costs Summary** | | | | | | | | |
| Publicity | 1,359,000 | (198,632) | (123) | 1,160,245 | 1,160,244 | - | 1,160,244 | 1 |
| Digital Marketing | 341,000 | (139,686) | 15 | 201,329 | 201,329 | - | 201,329 | 0 |
| Creative | 1,875,500 | (503,741) | (9,210) | 1,362,549 | 1,362,548 | - | 1,362,548 | 0 |
| Research | 312,000 | (106,920) | - | 205,080 | 205,080 | - | 205,080 | 0 |
| Other Marketing | 5,000 | 7,977 | - | 12,977 | 12,977 | - | 12,977 | 0 |
| Distribution | 293,000 | (128,590) | (5,872) | 158,538 | 158,038 | 500 | 158,538 | 0 |
| **Total Soft Costs** | **4,185,500** | **(1,069,592)** | **(15,190)** | **3,100,718** | **3,100,215** | **500** | **3,100,715** | **3** |
| | | | | | | | | |
| **Total P&A Costs** | **24,769,500** | **(12,625,420)** | **(138,506)** | **12,005,574** | **12,005,069** | **500** | **12,005,569** | **5** |
| | | | | | | | | |
| Other Distribution | 230,500 | (76,498) | (4,530) | 149,472 | 149,473 | - | 149,473 | (1) |
| | | | | | | | | |
| **Total All-In P&A** | **25,000,000** | **(12,701,918)** | **(143,036)** | **12,155,046** | **12,154,542** | **500** | **12,155,042** | **4** |
| | | | | | | | | |
| **TOTAL AWARDS COSTS** | **248,000** | **-** | **(17,201)** | **230,799** | **230,799** | **-** | **230,799** | **0** |
| | | | | | | | | |
| **TOTAL NET COSTS** | **25,248,000** | **(12,701,918)** | **(160,237)** | **12,385,845** | **12,385,341** | **500** | **12,385,841** | **4** |
| | | | | - | | | | |

4/20/20154:37 PM

**OPEN ROAD FILMS**
MARKETING COST ANALYSIS
*CHEF*
BUDGET: $12.2MM
RELEASE DATE: May 9, 2014
GENRE: ROMANTIC COMEDY

*Updated as of: 4/20/15*

| A/C No | Category | | Budget | Changes | (Savings)/O verages | Estimated Final Cost | Paid & Accrued | Commitments | Total Costs to Date | Amount Remaining |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Summary: Publicity** | | | | | | | | | |
| | **Materials** | | | | | | | | | |
| 130402 | Press Kits | | 3,500 | (250) | | 3,250 | 3,250 | - | 3,250 | - |
| 130401 | EPK/Clips/Video Material | | 10,000 | 13,286 | 34 | 23,320 | 23,320 | - | 23,320 | 0 |
| 130403 | Promo Items | | 25,000 | (25,000) | | - | - | - | - | - |
| 130406 | Still Photography | | 5,000 | (4,541) | | 459 | 459 | - | 459 | 0 |
| 130407 | Shipping/Publicity Supplies | | 10,000 | 7,735 | (85) | 17,650 | 17,650 | - | 17,650 | 0 |
| | **Total Materials** | | 53,500 | (8,770) | (51) | 44,679 | 44,678 | - | 44,678 | 1 |
| | **Promotions** | | | | | | | | | |
| 130422 | Promotions | | 25,000 | (22,000) | | 3,000 | 3,000 | - | 3,000 | - |
| 130423 | National Promotions | | 30,000 | (13,750) | | 16,250 | 16,250 | - | 16,250 | - |
| | **Screenings** | | | | | | | | | |
| 130901 | NY/LA Screenings (Press and Promo) | | 35,000 | 12,443 | (820) | 46,623 | 46,623 | - | 46,623 | 0 |
| 130903 | Regional Screenings (Press and Promo) | | 75,000 | (12,584) | 748 | 63,164 | 63,164 | - | 63,164 | 0 |
| 130910 | Screening Security | | 27,500 | (7,081) | | 20,419 | 20,419 | - | 20,419 | (0) |
| | **Total Screenings** | | 137,500 | (7,222) | (72) | 130,206 | 130,206 | - | 130,206 | 0 |
| | **Publicists** | | | | | | | | | |
| 130701 | Outside Publicists | 4 mos + exp | 68,000 | 12,339 | | 80,339 | 80,339 | - | 80,339 | 0 |
| 130702 | Regional Publicists | | 100,000 | 37,934 | | 137,934 | 137,934 | - | 137,934 | 0 |
| 130703 | Specialty Publicists | | 50,000 | (18,800) | | 31,200 | 31,200 | - | 31,200 | - |
| | **Total Publicists** | | 218,000 | 31,473 | - | 249,473 | 249,473 | - | 249,473 | 0 |
| 131001 | Talent Travel | | 300,000 | 82,283 | | 382,283 | 382,283 | - | 382,283 | - |
| | **Junket/Press Days** | | | | | | | | | |
| 130302 | Junket | | 200,000 | (202,000) | | (2,000) | (2,000) | - | (2,000) | - |
| 130399 | Reimbursements (if applicable) | | - | 6,309 | | 66,309 | 66,309 | - | 66,309 | (0) |
| 130303 | Press Days | | 60,000 | 6,309 | | 66,309 | 66,309 | - | 66,309 | (0) |
| | **Total Junket/Press Days** | | 260,000 | (195,691) | | 64,309 | 64,309 | - | 64,309 | (0) |
| | **Satellites** | | | | | | | | | |
| 130801 | TV | | 25,000 | 28,500 | | 53,500 | 53,500 | - | 53,500 | - |
| | | | 25,000 | 28,500 | - | 53,500 | 53,500 | - | 53,500 | - |
| 130601 | Premiere/Events | | 100,000 | (84,982) | | 15,018 | 15,018 | - | 15,018 | (0) |
| 130201 | Hair & Makeup/Stylist | | 125,000 | (93,964) | | 31,036 | 31,036 | - | 31,036 | (0) |
| 130101,1 | Festivals | | 50,000 | 75,417 | | 125,417 | 125,417 | - | 125,417 | 0 |
| 130602 | Awards/Guilds | | 15,000 | (15,000) | | - | - | - | - | - |
| 130501,1 | Misc & Contingency | | 20,000 | 25,074 | | 45,074 | 45,074 | - | 45,074 | 0 |
| | **Total Publicity** | | 1,359,000 | (198,632) | (123) | 1,160,245 | 1,160,244 | - | 1,160,244 | 2 |

**OPEN ROAD FILMS**
MARKETING COST ANALYSIS
*CHEF*
BUDGET: $12.2MM
RELEASE DATE: May 9, 2014
GENRE: ROMANTIC COMEDY

Updated as of: 4/20/15

| A/C No | Category | | Budget | Changes | (Savings)/Overages | Estimated Final Cost | Paid & Accrued | Commitments | Total Costs to Date | Amount Remaining |
|--------|----------|---|--------|---------|--------------------|-----------------------|-----------------|-------------|---------------------|-------------------|
| | **Summary: Digital Marketing** | | | | | | | | | |
| | **Social** | | | | | | | | | |
| 131102 | Social Media Outreach | 6 mos @ $5000 | 30,000 | (12,500) | | 17,500 | 17,500 | - | 17,500 | - |
| 115612 | Social Listening Research | | 20,000 | (9,000) | | 11,000 | 11,000 | - | 11,000 | - |
| 115613 | Social Asset Creation | | 25,000 | (13,000) | | 12,000 | 12,000 | - | 12,000 | - |
| | **Total Social** | | 75,000 | (34,500) | - | 40,500 | 40,500 | - | 40,500 | - |
| | **Creative** | | | | | | | | | |
| 115601 | Facebook Application | | 60,000 | (51,000) | | 9,000 | 9,000 | - | 9,000 | - |
| 115699 | Internet/Website Other | | 30,000 | (20,195) | 15 | 9,820 | 9,820 | - | 9,820 | (0) |
| 115602 | Website Design | | 40,000 | 19,006 | | 59,006 | 59,006 | - | 59,006 | (0) |
| 115604 | Digital Ad Creative | | 50,000 | (15,000) | | 35,000 | 35,000 | - | 35,000 | - |
| | **Total Creative** | | 180,000 | (67,189) | 15 | 112,826 | 112,826 | - | 112,826 | (0) |
| | **Hosting** | | | | | | | | | |
| 115606 | Web Hosting Data Charges | | 20,000 | (13,110) | | 6,890 | 6,890 | - | 6,890 | 0 |
| 115611 | Banner Hosting Data Charges | | 15,000 | (15,000) | | - | - | - | - | - |
| | **Total Hosting** | | 35,000 | (28,110) | - | 6,890 | 6,890 | - | 6,890 | 0 |
| 131101 | Digital PR | 6 mos @ $7000 | 42,000 | (6,987) | | 35,013 | 35,013 | - | 35,013 | 0 |
| 131103 | Online Giveaways - Shipping | | 2,500 | (2,500) | | - | - | - | - | - |
| 115610 | Online Clip Creation | | 1,500 | (700) | | 800 | 800 | - | 800 | - |
| 115607 | Digital Custom Shoot | | - | | | - | - | - | - | - |
| 115608 | Mobile Promotions | | - | 5,000 | | 5,000 | 5,000 | - | 5,000 | - |
| 115609 | Digital Press Events/Travel | | - | | | - | - | - | - | - |
| 115605 | Digital Miscellaneous | | 5,000 | (4,700) | | 300 | 300 | - | 300 | - |
| | **Total Digital Marketing** | | 341,000 | (139,686) | 15 | 201,329 | 201,329 | - | 201,329 | 0 |

**OPEN ROAD FILMS**
MARKETING COST ANALYSIS
*CHEF*
BUDGET: $12.2MM
RELEASE DATE: May 9, 2014
GENRE: ROMANTIC COMEDY

*Updated as of: 4/20/15*

| A/C No | Category | | Budget | Changes | (Savings)/O verages | Estimated Final Cost | Paid & Accrued | Commitments | Total Costs to Date | Amount Remaining |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Summary: Creative - Print** | | | | | | | | | |
| | **One Sheet/Horizontal Banner** | | | | | | | | | |
| 110201 | Art Direction Fees | | 100,000 | 83,263 | | 183,263 | 183,263 | - | 183,263 | - |
| 110203 | Mechanical & Prod. | | 12,000 | (12,000) | | - | - | - | - | - |
| 110207 | Retouching | | - | | | - | - | - | - | - |
| 110202 | Copy writing | | 4,500 | (3,000) | | 1,500 | 1,500 | - | 1,500 | - |
| 110208 | Photo Shoot | | 15,000 | (15,000) | | - | - | - | - | - |
| 110205 | One Sheet Printing | | 25,000 | 3,277 | | 28,277 | 28,277 | - | 28,277 | (0) |
| 110204 | Mini Poster Printing | | 12,000 | 11,331 | | 23,331 | 23,331 | - | 23,331 | 0 |
| 110206 | Postcards | | - | | | - | - | - | - | - |
| 110299 | Other One-Sheet | | - | | | - | - | - | - | - |
| | **Total One Sheet** | | 168,500 | 67,871 | | 236,371 | 236,371 | - | 236,371 | 0 |
| | | | | | | | | | | |
| | **Teaser One Sheet** | | | | | | | | | |
| 110701 | Teaser One Sheet Art Direction Fees | | | | | - | - | - | - | |
| 110703 | Teaser One Sheet Mechanical & Prod. | | | | | - | - | - | - | |
| 110704 | Teaser One Sheet Retouching | | | | | - | - | - | - | |
| 110702 | Teaser One Sheet Copy writing | | | | | - | - | - | - | |
| 110705 | Teaser One Sheet Printing | | | | | - | - | - | - | |
| 110706 | Teaser One Sheet Mini Poster Printing | | | | | - | - | - | - | |
| 110799 | Teaser One Sheet Other | | | | | - | - | - | - | |
| | **Total One Sheet** | | - | - | - | - | - | - | - | - |
| | | | | | | | | | | |
| | **Outdoor Print** | | | | | | | | | |
| 110401 | Art Direction Fees | | - | | | - | - | - | - | |
| 110402 | Mechanical & Prod. | | - | | | - | - | - | - | |
| 110403 | Retouching | | - | | | - | - | - | - | |
| 110404 | Copy writing | | - | | | - | - | - | - | |
| | **Total Outdoor Print** | | - | - | - | - | - | - | - | |
| | | Cost Per | # | | | | | | | |
| | **Standees** | | | | | | | | | |
| 110601 | Art Direction Fees | | - | | | - | - | - | - | |
| 110602 | Mechanical & Prod. | | - | | | - | - | - | - | |
| 110603 | Retouching | | - | | | - | - | - | - | |
| 110604 | Standee Printing | | 75,000 | (53,074) | | 21,926 | 21,926 | - | 21,926 | - |
| | **Total Standees** | | 75,000 | (53,074) | - | 21,926 | 21,926 | - | 21,926 | - |
| | | Cost Per | # | | | | | | | |
| 110502 | Review Blow Ups | | | | | - | - | - | - | |
| | | | | | | | | | | |
| 110101 | Banners | | | | | - | - | - | - | |
| | | | | | | | | | | |
| | **Other Printed Materials** | | | | | | | | | |
| | Art Direction Fees | | - | | | - | - | - | - | |
| | Mechanical & Prod. | | - | | | - | - | - | - | |
| | Retouching | | - | | | - | - | - | - | |
| | Other Materials Printing | | - | | | - | - | - | - | |
| | **Total Other Printed Materials** | | - | - | - | - | - | - | - | |
| | | | | | | | | | | |
| 110501 | Print Ads Prod | | 10,000 | 18,215 | | 28,215 | 28,215 | - | 28,215 | |
| | | | | | | | | | | |
| | Misc. Materials - Artwork (non-vendor) | | | | | - | - | - | - | |
| 110102 | Misc. Materials - Artwork | | 8,000 | (7,666) | | 334 | 334 | - | 334 | (0) |
| | **Total Creative Print** | | 261,500 | 25,346 | - | 286,846 | 286,846 | - | 286,846 | (0) |

**OPEN ROAD FILMS**
**MARKETING COST ANALYSIS**
**_CHEF_**
BUDGET: $12.2MM
RELEASE DATE: May 9, 2014
GENRE: ROMANTIC COMEDY

Updated as of: 4/20/15

| A/C No | Category<br>Summary: Creative - Audio/Visual | Budget | Changes | (Savings)/O verages | Estimated Final Cost | Paid & Accrued | Commitments | Total Costs to Date | Amount Remaining |
|---|---|---|---|---|---|---|---|---|---|
| | **Teaser Trailer** | | | | | | | | |
| 115201 | Creative & Supervisory | - | | | - | - | - | - | |
| 115202 | Graphics | - | | | - | - | - | - | |
| 115203 | Copy | - | | | - | - | - | - | |
| 115204 | Finish Fee | - | | | - | - | - | - | |
| 115205 | Sound Finishing | - | | | - | - | - | - | |
| 115206 | Narration | - | | | - | - | - | - | |
| | Elements | - | | | - | - | - | - | |
| 115209 | Picture Finishing | - | | | - | - | - | - | |
| 115210 | Transfers | - | | | - | - | - | - | |
| 115211 | Delivery to Distribution | - | | | - | - | - | - | |
| 110117 | Production Materials | - | | | - | - | - | - | |
| 115213 | Teaser Trailer Screening | - | | | - | - | - | - | |
| | **Total Teaser Trailer** | - | - | - | - | - | - | - | - |
| | | | | | | | | | |
| | **Trailer** | | | | | | | | |
| 115101 | Creative & Supervisory | 190,000 | 56,375 | | 246,375 | 246,375 | - | 246,375 | |
| 115102 | Graphics | 35,000 | 13,188 | | 48,188 | 48,188 | - | 48,188 | 1 |
| 115103 | Copy | - | | | - | - | - | - | |
| 115104 | Finish Fee | 5,000 | (2,000) | | 3,000 | 3,000 | - | 3,000 | - |
| 115105 | Sound Finishing | 24,000 | (1,000) | (2,215) | 20,785 | 20,786 | - | 20,786 | (1) |
| 115106 | Narration | 5,000 | (5,000) | | - | - | - | - | - |
| 115108, | Delivery to Creative Vendors | - | 12,048 | | 12,048 | 12,048 | - | 12,048 | 1 |
| 115109 | Picture Finishing | 80,000 | (22,199) | | 57,801 | 57,801 | - | 57,801 | 0 |
| 115110 | Misc. Transfers | - | | | - | - | - | - | |
| 115111 | Delivery to Distribution | 16,000 | (15,017) | 103 | 1,086 | 1,086 | - | 1,086 | 0 |
| 115112 | Production Materials | 4,000 | (65) | (2,623) | 1,312 | 1,313 | - | 1,313 | (1) |
| 115113 | Trailer Screening | - | | | - | - | - | - | |
| | **Total Trailer** | 359,000 | 36,330 | (4,735) | 390,595 | 390,594 | - | 390,594 | 1 |
| | | | | | | | | | |
| | **TV Spots** | | | | | | | | |
| 115301 | Creative | 390,000 | (183,957) | | 206,043 | 206,043 | - | 206,043 | 0 |
| 115302 | Graphics | 70,000 | (23,859) | (766) | 45,375 | 45,375 | - | 45,375 | (0) |
| 115303 | Copy | - | | | - | - | - | - | - |
| 115304 | Narration | 105,000 | (74,703) | (297) | 30,000 | 30,000 | - | 30,000 | - |
| 115305 | Sound Finishing | - | | | - | - | - | - | - |
| 115306 | Finish Fee | 40,000 | (24,588) | (3,412) | 12,000 | 12,000 | - | 12,000 | - |
| 115307 | Picture Finishing/Sound Finishing | 150,000 | (51,916) | | 98,084 | 98,084 | - | 98,084 | - |
| 115308 | Delivery to Creative Vendors | - | 820 | | 820 | 820 | - | 820 | - |
| 115309 | Delivery to Web and Other Media | - | | | - | - | - | - | - |
| 115310 | Shipping (Media Buy) | 188,000 | (153,615) | | 34,385 | 34,385 | - | 34,385 | 0 |
| 115311 | Shipping - Media Vu | 12,000 | (599) | | 11,401 | 11,401 | - | 11,401 | (0) |
| | **Total TV Spots** | 955,000 | (512,417) | (4,475) | 438,108 | 438,108 | - | 438,108 | (0) |
| | | | | | | | | | |
| 115401 | Music Fees | 250,000 | (33,000) | | 217,000 | 217,000 | | 217,000 | - |
| | | | | | | | | | |
| | **Digital & Publicity Content** | | | | | | | | |
| 115801 | Creative | 50,000 | (20,000) | | 30,000 | 30,000 | - | 30,000 | - |
| 115802 | Finishing | - | | | - | - | - | - | |
| | **Total Digital & Publicity Content** | 50,000 | (20,000) | (4,475) | 30,000 | 30,000 | - | 30,000 | - |
| | | | | | | | | | |
| | **Radio Spots** | | | | | | | | |
| 115501 | Creative | - | | | - | - | | - | - |
| 115502 | Finish & Mix | - | | | - | - | - | - | - |
| | **Total Radio Spots** | - | - | - | - | - | - | - | - |
| | | | | | | | | | |
| | **Total Creative A/V** | 1,614,000 | (529,087) | (9,210) | 1,075,703 | 1,075,702 | - | 1,075,702 | 1 |
| | **Total Creative Print (from prior page)** | 261,500 | 25,346 | | 286,846 | 286,846 | - | 286,846 | (0) |
| | **Total Creative** | 1,875,500 | (503,741) | (9,210) | 1,362,549 | 1,362,548 | - | 1,362,548 | 0 |

**OPEN ROAD FILMS**
MARKETING COST ANALYSIS
*CHEF*
BUDGET: $12.2MM
RELEASE DATE: May 9, 2014
GENRE: ROMANTIC COMEDY

*Updated as of: 4/20/15*

| A/C No | Category | Cost Per | # | Budget | Changes | (Savings)/Overages | Estimated Final Cost | Paid & Accrued | Commitments | Total Costs to Date | Amount Remaining |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Summary: Research** | | | | | | | | | | |
| | | | | | | | | | | | |
| 140101 | TV Spot Testing | $ 11,700 | 14 | 176,400 | (129,600) | | 46,800 | 46,800 | - | 46,800 | - |
| 140102 | Trailer Testing | 11,700 | 6 | 75,600 | 53,100 | | 128,700 | 128,700 | - | 128,700 | - |
| | | | | | | | | | | | |
| | **Recruited Screenings** | 9,800 | 2 | | | | | | | | |
| 140203 | Screenings Fee | | | 20,000 | 3,267 | | 23,267 | 23,267 | - | 23,267 | (0) |
| 140202 | Screenings Expenses | | | 5,000 | (3,687) | | 1,313 | 1,313 | - | 1,313 | 0 |
| 140201 | Film maker travel | | | - | | | - | - | - | - | - |
| | **Total Recruited Screenings** | | | 25,000 | (420) | - | 24,580 | 24,580 | - | 24,580 | 0 |
| | | | | | | | | | | | |
| 140103 | Focus Groups | 9,800 | | - | | | - | - | - | - | - |
| 140104 | Tracking - NRG | 24,935 | | 25,000 | (25,000) | | - | - | - | - | - |
| 140105 | Exit Surveys | 5,000 | 2 | 10,000 | (5,000) | | 5,000 | 5,000 | - | 5,000 | - |
| | **Total Research** | | | 312,000 | (106,920) | - | 205,080 | 205,080 | - | 205,080 | 0 |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | **Summary: Other Marketing** | | | | | | | | | | |
| | | Cost Per | # | | | | | | | | |
| | Consultants | | | - | | | - | - | - | - | - |
| | Promo Items | | | - | | | - | - | - | - | - |
| | Media Promotion | | | - | | | - | - | - | - | - |
| 190101 | Misc. Travel | | | 5,000 | 7,977 | | 12,977 | 12,977 | - | 12,977 | 0 |
| | **Other Marketing Total** | | | 5,000 | 7,977 | - | 12,977 | 12,977 | - | 12,977 | 0 |

**OPEN ROAD FILMS**
**MARKETING COST ANALYSIS**
***CHEF***
BUDGET: $12.2MM
RELEASE DATE: May 9, 2014
GENRE: ROMANTIC COMEDY

Updated as of: 4/20/15

| A/C No | Category<br>Summary: Media | Budget | Changes | (Savings)/O verages | Estimated Final Cost | Paid & Accrued | Commitments | Total Costs to Date | Amount Remaining |
|---|---|---|---|---|---|---|---|---|---|
| | **Media Budget Week 1 (5/9/14)** | | | | | | | | |
| 120105 | Newspaper | - | 257,640 | | 257,640 | 257,640 | - | 257,640 | 0 |
| | Television / Radio Advertising | 16,662,650 | (16,662,650) | | - | - | - | - | |
| 120101 | Network | | | | - | - | - | - | |
| 120102 | Cable | | 112,340 | | 112,340 | 112,339 | - | 112,339 | 1 |
| 120111 | Cable Production | | | | - | - | - | - | |
| 120103 | Hispanic | | | | - | - | - | - | |
| 120104 | Spot TV | | 113,241 | (11,726) | 101,515 | 101,515 | - | 101,515 | 0 |
| 120108 | Magazine Advertising | | | | - | - | - | - | |
| 120109 | Trade Advertising | | | | - | - | - | - | |
| 120106 | Internet Advertising - Digital | - | 180,500 | (7,207) | 173,293 | 173,293 | - | 173,293 | 0 |
| 120107 | Outdoor Advertising | | | | - | - | - | - | |
| 120110 | Media Buy Radio | | | | - | - | - | - | |
| 120900 | Media - Other | | 25,000 | | 25,000 | 25,000 | - | 25,000 | |
| 121112 | In Theatre Media | 350,000 | (350,000) | | - | - | - | - | |
| | **Week 1 Media Total** | 17,012,650 | (16,323,929) | (18,933) | 669,788 | 669,787 | - | 669,787 | 2 |
| | **Media Budget Week 2 (5/16/14)** | | | | | | | | |
| 120205 | Newspaper | | 252,627 | | 252,627 | 252,627 | - | 252,627 | 0 |
| | Television / Radio Advertising | | | | - | - | - | - | |
| 120201 | Network | | | | - | - | - | - | |
| 120202 | Cable | | 537,343 | | 537,343 | 537,343 | - | 537,343 | 0 |
| 120211 | Cable Production | | | | - | - | - | - | |
| 120203 | Hispanic | | | | - | - | - | - | |
| 120204 | Spot TV | | 340,117 | | 340,117 | 340,117 | - | 340,117 | 0 |
| 120206 | Internet Advertising - Digital | | 79,500 | | 79,500 | 79,501 | - | 79,501 | (1) |
| 120207 | Outdoor Advertising | | | | - | - | - | - | |
| 120210 | Media Buy Radio | | | | - | - | - | - | |
| | **Week 2 Media Total** | - | 1,209,587 | - | 1,209,587 | 1,209,587 | - | 1,209,587 | 0 |
| | **Media Budget Week 3 (5/23/14)** | | | | | | | | |
| 120305 | Newspaper | | 292,871 | | 292,871 | 292,871 | - | 292,871 | (0) |
| | Television / Radio Advertising | | | | - | - | - | - | |
| 120301 | Network | | 291,156 | (7,875) | 283,281 | 283,281 | - | 283,281 | (0) |
| 120302 | Cable | | 920,253 | | 920,253 | 920,253 | - | 920,253 | (0) |
| 120311 | Cable Production | | | | - | - | - | - | |
| 120303 | Hispanic | | | | - | - | - | - | |
| 120304 | Spot TV | | 529,246 | | 529,246 | 529,246 | - | 529,246 | 0 |
| 120306 | Internet Advertising - Digital | | 355,289 | | 355,289 | 355,289 | - | 355,289 | 0 |
| 120307 | Outdoor Advertising | | | | - | - | - | - | |
| 120310 | Media Buy Radio | | | | - | - | - | - | |
| | **Week 3 Media Total** | - | 2,388,815 | (7,875) | 2,380,940 | 2,380,940 | - | 2,380,940 | (0) |
| | **Media Budget Week 4 (5/30/14)** | | | | | | | | |
| 120405 | Newspaper | | 205,011 | | 205,011 | 205,011 | - | 205,011 | (0) |
| | Television / Radio Advertising | | | | - | - | - | - | |
| 120401 | Network | | | | - | - | - | - | |
| 120402 | Cable | | | | - | - | - | - | |
| 120411 | Cable Production | | | | - | - | - | - | |
| 120403 | Hispanic | | | | - | - | - | - | |
| 120404 | Spot TV | | | | - | - | - | - | |
| 120406 | Internet Advertising - Digital | | 61,000 | | 61,000 | 61,000 | - | 61,000 | 0 |
| 120407 | Outdoor Advertising | | | | - | - | - | - | |
| 120410 | Media Buy Radio | | | | - | - | - | - | |
| | **Week 4 Media Total** | - | 266,011 | - | 266,011 | 266,011 | - | 266,011 | 0 |
| | **Media Budget Week 5 (6/6/14)** | | | | | | | | |
| 120505 | Newspaper | | 200,801 | | 200,801 | 200,801 | - | 200,801 | (0) |
| | Television / Radio Advertising | | | | - | - | - | - | |
| 120501 | Network | | 759,151 | | 759,151 | 759,150 | - | 759,150 | 1 |
| 120502 | Cable | | 715,419 | | 715,419 | 715,419 | - | 715,419 | (0) |
| 120511 | Cable Production | | | | - | - | - | - | |
| 120503 | Hispanic | | | | - | - | - | - | |
| 120504 | Spot TV | | 492,284 | | 492,284 | 492,284 | - | 492,284 | 0 |
| 120506 | Internet Advertising - Digital | | 275,974 | | 275,974 | 275,974 | - | 275,974 | (0) |
| 120507 | Outdoor Advertising | | | | - | - | - | - | |
| 120510 | Media Buy Radio | | | | - | - | - | - | |
| | **Week 5 Media Total** | - | 2,443,629 | - | 2,443,629 | 2,443,628 | - | 2,443,628 | 1 |
| | **Media Budget Week 6+ (6/13/14)** | | | | | | | | |
| 120605 | Newspaper | | 381,938 | | 381,938 | 381,938 | - | 381,938 | (0) |
| 120604 | Spot TV | | 20,719 | (484) | 20,235 | 20,235 | - | 20,235 | (0) |
| | **Week 6+ Media Total** | - | 402,657 | (484) | 402,173 | 402,173 | - | 402,173 | (0) |
| | **Media Total** | 17,012,650 | (9,613,230) | (27,292) | 7,372,128 | 7,372,126 | - | 7,372,126 | 2 |

**OPEN ROAD FILMS**
**MARKETING COST ANALYSIS**
**_CHEF_**
BUDGET: $12.2MM
RELEASE DATE: May 9, 2014
GENRE: ROMANTIC COMEDY

_Updated as of 4/20/15_

| A/C No | Category | Cost Per | # | Budget | Changes | (Savings)/Overages | Estimated Final Cost | Paid & Accrued | Commitments | Total Costs to Date | Amount Remaining |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Summary: Distribution** | | | | | | | | | | |
| 200101 | Trade Screenings | | | 8,000 | (347) | | 7,653 | 7,653 | - | 7,653 | - |
| 200102 | Marquees/Banners | | | 30,000 | 15,993 | (976) | 45,017 | 45,017 | - | 45,017 | (0) |
| 200103 | Trailer/Theatre Checks | | | 25,000 | (2,500) | | 22,500 | 22,500 | - | 22,500 | - |
| 200104 | One Sheet / Standee Installment | | | 40,000 | (37,582) | (1,528) | 890 | 890 | - | 890 | - |
| 200105 | Fulfillment (incl Mktg & Promo Items) | | | 130,000 | (50,827) | (2,219) | 76,954 | 76,454 | 500 | 76,954 | 0 |
| 200106 | Trailer Fulfillment - 35 mm | | | 35,000 | (35,000) | | - | - | - | - | - |
| 200504 | Promotional Items | | | 15,000 | (10,068) | (1,149) | 3,783 | 3,783 | - | 3,783 | 0 |
| 200198 | Other Distribution-Distribution | | | 10,000 | (8,259) | | 1,741 | 1,741 | - | 1,741 | (0) |
| | **Total Distribution Expenses** | | | 293,000 | (128,590) | (5,872) | 158,538 | 158,038 | 500 | 158,538 | 0 |
| | **Summary: Prints** | | | | | | | | | | |
| 200301 | Digital Negative (to be delivered) | | | - | | | - | - | - | - | - |
| 200302 | Intermediates (to be delivered) | | | - | | | - | - | - | - | - |
| 200303 | Captions for DCP | | | 1,600 | 4,072 | | 5,672 | 5,672 | - | 5,672 | (0) |
| 200304 | Audio Q.C. | | | 500 | (500) | | - | - | - | - | - |
| 200321 | Hearing Impaired Mix | | | 3,500 | (2,325) | | 1,175 | 1,175 | - | 1,175 | - |
| 200323 | Narrative Description | | | 4,000 | 917 | | 4,917 | 4,917 | - | 4,917 | 0 |
| 200305 | Digital Master | | | 16,000 | (7,817) | | 8,183 | 8,183 | - | 8,183 | (0) |
| 200306 | Digital Copies (All-In) | | | 280,500 | 6,927 | (445) | 286,982 | 286,982 | - | 286,982 | (0) |
| | Key Fee | | | 57,750 | (57,750) | | - | | | | |
| 200307 | Additional Key Fee - Multiple Screens | | | 3,500 | (2,500) | (1,000) | - | - | - | - | - |
| 200308 | VPF (Virtual Print Fee) | | | 2,790,000 | (1,511,311) | (94,535) | 1,184,154 | 1,184,153 | - | 1,184,153 | 0 |
| | Secondary VPF runs | | | 30,000 | (30,000) | | - | | | | |
| 200309 | Non-release Prints | | | - | | | - | - | - | - | - |
| 200310 | 35mm Prints | | | 210,000 | (210,000) | | - | | | | |
| 200318 | 35mm Print Storage | | | 1,000 | (1,000) | | - | | | | |
| 200320 | Spanish Subtitles | | | 10,440 | (6,305) | | 4,095 | 4,095 | - | 4,095 | 0 |
| 200314 | Optical Sound Tracks (to be de... | | | - | | | - | - | - | - | - |
| 200315 | Check Print | | | 2,000 | (2,000) | | - | | | | |
| 200316 | DTS License | | | - | | | - | - | - | - | - |
| 200317 | Quality Control DCP & VM | | | 1,500 | (1,500) | | - | | | | |
| 200319 | 3-D Glasses | | | - | | | - | - | - | - | - |
| 200399 | Miscellaneous Print Costs | | | 1,600 | (1,600) | | - | | | | |
| | **Total Print** | | | 3,413,850 | (1,822,692) | (95,980) | 1,495,178 | 1,495,178 | - | 1,495,178 | 0 |
| | **Summary: Trailer/Teaser Trailer Printing** | | | | | | | | | | |
| 200201 | Digital Trailer to Theatres | | | 40,000 | (2,703) | (44) | 37,253 | 37,253 | - | 37,253 | 0 |
| 200202 | Teaser Trailer/Trailer Printing | | | - | | | - | - | - | - | - |
| 200203 | Trailer Printing | | | 80,000 | (80,000) | | - | | | | |
| 200204 | Trailer Check Print | | | 500 | (500) | | - | | | | |
| | **Total Trailer Printing** | | | 120,500 | (83,203) | (44) | 37,253 | 37,253 | - | 37,253 | 0 |
| | **Summary: Shipping** | | | | | | | | | | |
| 200401 | Print Shipping | | | 27,000 | (27,000) | | - | - | - | - | - |
| 200402 | Non-release Print Shipping | | | - | | | - | - | - | - | - |
| 200403 | Secure Shipping | | | - | | | - | - | - | - | - |
| 200404 | Shipping | | | 10,000 | (9,703) | | 297 | 297 | - | 297 | (0) |
| | **Total Shipping** | | | 37,000 | (36,703) | - | 297 | 297 | - | 297 | (0) |
| | **DISTRIBUTION OTHER** | | | | | | | | | | |
| 200501 | Anti-Piracy | | | 28,800 | (16,035) | (2,594) | 10,171 | 10,171 | - | 10,171 | (0) |
| 200505 | TV Editing | | | 20,000 | (20,000) | | - | | | | |
| 200506 | Netflix | | | 3,200 | | (2,057) | 1,143 | 1,144 | - | 1,144 | (1) |
| 200507 | Universal Delivery | | | 10,000 | (3,287) | | 6,713 | 6,713 | - | 6,713 | (0) |
| 200508 | Paramount | | | 4,000 | (2,293) | | 1,707 | 1,708 | - | 1,708 | (1) |
| 200509 | Swank | | | 4,000 | (4,000) | | - | | | | |
| 200510 | Legal Fees | | | 30,000 | 47,060 | | 77,060 | 77,060 | - | 77,060 | - |
| 200511 | Gross Tracking (Rentrak) | | | 25,000 | (16,667) | | 8,333 | 8,333 | - | 8,333 | (0) |
| 200512 | Distribution Tracking (TDS) | | | 40,000 | (39,700) | | 300 | 300 | - | 300 | - |
| 200513 | Insurance-Errors & Omissions | | | 10,000 | 3,640 | | 13,640 | 13,640 | - | 13,640 | - |
| 200514 | MPAA Rating | | | 15,000 | (15,000) | | - | | | | |
| 200518 | Completion Bond | | | 10,000 | (10,000) | | - | | | | |
| 200199 | Other Distribution-Music Clearances | | | 12,000 | 3,824 | | 15,824 | 15,824 | - | 15,824 | - |
| 200599 | Other Distribution | | | 3,500 | 1,898 | 121 | 5,519 | 5,519 | - | 5,519 | - |
| 200516 | Taxes Remittances (Use Tax) | | | 15,000 | (5,938) | | 9,062 | 9,062 | - | 9,062 | - |
| | **Total Other Distribution** | | | 230,500 | (76,498) | (4,530) | 149,472 | 149,473 | - | 149,473 | (1) |

**OPEN ROAD FILMS**
**MARKETING COST ANALYSIS**
*CHEF*
BUDGET: $12.2MM
RELEASE DATE: May 9, 2014
GENRE: ROMANTIC COMEDY

Updated as of: 4/20/15

| A/C No | Category | Budget | Changes | (Savings)/Overages | Estimated Final Cost | Paid & Accrued | Commitments | Total Costs to Date | Amount Remaining |
|---|---|---|---|---|---|---|---|---|---|
| | **AWARDS Summary of Costs** | | | | | | | | |
| | **Summary of Costs** | | | | | | | | |
| | Advertising | 50,000 | 15,000 | 9,000 | 74,000 | 74,000 | - | 74,000 | - |
| | Screeners | 99,000 | 20,560 | (588) | 118,972 | 118,971 | - | 118,971 | 0 |
| | Talent | 12,500 | (11,116) | | 1,384 | 1,384 | - | 1,384 | - |
| | Hard Goods | | | | - | | - | - | - |
| | HFPA/Golden Globes | 30,000 | (2,642) | (3,276) | 24,082 | 24,082 | - | 24,082 | (1) |
| | Screenings | 16,000 | (11,334) | (3,791) | 875 | 875 | - | 875 | - |
| | Awards Shows | 10,500 | | (10,500) | - | - | - | - | - |
| | Events | | | | - | | | - | - |
| | Awards Agency | 25,000 | (10,467) | (6,199) | 8,334 | 8,333 | - | 8,333 | 0 |
| | Submission Fees | 3,000 | | (369) | 2,631 | 2,631 | - | 2,631 | 0 |
| | Reimbursements (if applicable) | | | | - | | | - | - |
| | Misc and Contingency Funds | 2,000 | | (1,478) | 522 | 522 | - | 522 | 0 |
| | **Total AWARDS Costs** | **248,000** | **-** | **(17,201)** | **230,799** | **230,799** | **-** | **230,799** | **0** |
| | **AWARDS** | | | | | | | | |
| | **Advertising** | | | | | | | | |
| 132001 | Media Costs - Print | 37,500 | (13,500) | | 24,000 | 24,000 | - | 24,000 | |
| 132002 | Media Costs - Online | 6,000 | (6,000) | | - | | - | - | |
| 132010 | Media Costs - TV | | | | - | | | - | |
| 132011 | Media Costs - Trade Ads | | 24,000 | 9,000 | 33,000 | 33,000 | - | 33,000 | |
| 132008 | Media Costs - Radio | | | | - | | | - | |
| 132007 | Media Costs - Outdoor | | | | - | | | - | |
| 132005 | Media Buy-Shipping | | | | - | | | - | |
| 132006 | Finish Fee | | | | - | | | - | |
| 132003 | Creative Costs | 6,500 | 10,500 | | 17,000 | 17,000 | - | 17,000 | |
| | **Total Advertising** | **50,000** | **15,000** | **9,000** | **74,000** | **74,000** | **-** | **74,000** | |
| | **Screeners** | | | | | | | | |
| 132101 | Production of Screeners | 9,000 | 11,334 | | 20,334 | 20,334 | - | 20,334 | |
| 132102 | Shipping of Screeners | 85,000 | 10,467 | (588) | 94,879 | 94,879 | - | 94,879 | 0 |
| 132103 | Mailing Lists | 5,000 | (1,242) | | 3,758 | 3,758 | - | 3,758 | |
| | **Total Screeners** | **99,000** | **20,560** | **(588)** | **115,213** | **118,971** | **-** | **118,971** | **0** |
| | **Talent** | | | | | | | | |
| 132202 | Talent Travel | 7,500 | (6,616) | | 884 | 884 | - | 884 | - |
| 132203 | Hair & Makeup/Stylist | 5,000 | (4,500) | | 500 | 500 | - | 500 | - |
| | **Total Talent** | **12,500** | **(11,116)** | | **1,384** | **1,384** | **-** | **1,384** | **-** |
| | **Hard Goods** | | | | | | | | |
| 132301 | Screenplays | - | | | - | - | - | - | - |
| 132302 | "Color" mailers | - | | | - | - | - | - | - |
| | **Total Hard Goods** | **-** | **-** | | **-** | **-** | **-** | **-** | **-** |
| | **HFPA/Golden Globes** | | | | | | | | |
| 132401 | HFPA Screenings | - | | | - | | | - | - |
| 132402 | HFPA Events | - | | | - | | | - | - |
| 132403 | HFPA Mailings/Gifts | 10,000 | | (918) | 9,082 | 9,082 | - | 9,082 | (0) |
| 132404 | HFPA Agency (Nadia Bronson & Assoc) | 20,000 | (2,642) | (2,358) | 15,000 | 15,000 | - | 15,000 | (0) |
| | **Total HFPA/Golden Globes** | **30,000** | **(2,642)** | **(3,276)** | **24,082** | **24,082** | **-** | **24,082** | **(1)** |
| | **Screenings** | | | | | | | | |
| 132501 | Pre-nomination Screenings | - | | | - | | | - | - |
| 132502 | Guild Screenings | 15,000 | (11,334) | (2,791) | 875 | 875 | - | 875 | - |
| 132503 | Screenings Special Events | - | | | - | | | - | - |
| 132504 | Trade Screenings (Variety Screening, genres, etc) | - | | | - | | | - | - |
| 132505 | Moderator Fees | 1,000 | | (1,000) | - | | | - | - |
| | **Total Screenings** | **16,000** | **(11,334)** | **(3,791)** | **875** | **875** | **-** | **875** | **-** |
| | **Awards Shows** | | | | | | | | |
| 132601 | Award Shows-Tables (NBR, Golden Globes) | 10,000 | | (10,000) | - | - | - | - | - |
| 132602 | Award Shows-Tickets | 500 | | (500) | - | - | - | - | - |
| | **Total Awards Shows** | **10,500** | **-** | **(10,500)** | **-** | **-** | **-** | **-** | **-** |
| 132701 | **Events** | - | | | - | - | - | - | - |
| 132801 | **Awards Agency** | 25,000 | (10,467) | (6,199) | 8,334 | 8,333 | - | 8,333 | 0 |
| 132901 | **Submission Fees** | 3,000 | | (369) | 2,631 | 2,631 | - | 2,631 | 0 |
| 132951 | **Reimbursements (if applicable)** | - | | | - | | | - | - |
| 132999 | **Misc and Contingency Funds** | 2,000 | | (1,478) | 522 | 522 | - | 522 | 0 |
| | **Total AWARDS** | **248,000** | **-** | **(17,201)** | **227,041** | **230,799** | | **230,799** | **0** |

**<u>EXHIBIT 4</u>**

**Sous Chef Email Correspondence on Audit Issue**

**From:** Ryan Dunner <rdunner@greenhassonjanks.com>
**Sent:** Tuesday, August 15, 2017 5:40 PM
**To:** Linda Garris <IMCEAEX-
_o=ExchangeLabs_ou=Exchange+20Administrative+20Group+20+28FYDIBOHF23SPDLT+29_cn=Recipients_cn=72dcaba44cfa44989a3835510941be72-
lgarris+40openroadfilms+2Ecom@namprd05.prod.outlook.com>
**Cc:** Peter Klass <pklass@greenhassonjanks.com>; Alexa Platt <aplatt@openroadfilms.com>; Irene Verdiyan <iverdiyan@openroadfilms.com>
**Subject:** Re: Chef Participation Audit at Open Road

Linda,

Thank you for the requested data, I will review and reach out should I have any questions. I will also reach out shortly to coordinate a date to come out to your offices for fieldwork.  Thanks in advance for your help.

Regards,
Ryan

On Aug 15, 2017, at 4:37 PM, Linda Garris <lgarris@openroadfilms.com> wrote:

> Hi Ryan,
>
> The documents requested in Req 3A will be available for you to inspect during fieldwork.
>
> Regarding Req 3B, please see the attached.
>
> In response to Req 3C, the TDS report represents all of the actual cash paid to us for the theatrical film rental and there are no charges netted against these gross revenues.  That said, we did deduct the AMC credit card fees described in Req 3B from the amounts originally billed to AMC because we did not receive that cash.  The overall settlement rate for *Chef* is reasonable based on the 18-week run of this title.
>
> Please let us know when you would like to schedule fieldwork to begin for the *Chef* audit, or if you have any additional questions.
>
> **LINDA GARRIS**
> CONTROLLER
> 12301 Wilshire Blvd. Suite 600
> Los Angeles, CA 90025
> General (310) 696-7575  Direct (310) 696-7524
> <image001.jpg><image002.jpg><image003.jpg>
>
> **From:** Ryan Dunner [mailto:rdunner@greenhassonjanks.com]
> **Sent:** Thursday, July 13, 2017 2:20 PM
> **To:** Linda Garris
> **Cc:** Peter C. Klass
> **Subject:** RE: Chef Participation Audit at Open Road
>
> Linda,
>
> Attached is the updated request list for "Chef" to reflect what has been provided and what is currently outstanding.  Note new requests 3A, 3B, 3C that have been added.  Please let me know should you have any questions.  Thanks in advance for all your help.
>
> Regards,
> Ryan
>
> **Ryan Dunner**
> Supervising Senior Associate
> Contract Compliance & Forensics
>
> **Green Hasson Janks**
> 10990 Wilshire Boulevard, 16th Floor
> Los Angeles, CA 90024
> www.greenhassonjanks.com
>
> 310.873.1691 T
> 310.873.6600 F

rdunner@greenhassonjanks.com

*An Independent Member of HLB International*

**From:** Linda Garris [mailto:lgarris@openroadfilms.com]
**Sent:** Thursday, June 29, 2017 4:35 PM
**To:** Ryan Dunner <rdunner@greenhassonjanks.com>
**Cc:** Peter C. Klass <pklass@greenhassonjanks.com>
**Subject:** RE: Chef Participation Audit at Open Road

Attached.

**LINDA GARRIS**
CONTROLLER
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
General (310) 696-7575  Direct (310) 696-7524
<image001.jpg><image002.jpg><image003.jpg>

**From:** Ryan Dunner [mailto:rdunner@greenhassonjanks.com]
**Sent:** Thursday, June 29, 2017 1:04 PM
**To:** Linda Garris
**Cc:** Peter C. Klass
**Subject:** RE: Chef Participation Audit at Open Road

Linda,

Can you kindly provide the raw data dump of Film Rental by Theatre for Chef?

Regards,
Ryan

**Ryan Dunner**
Supervising Senior Associate
Contract Compliance & Forensics

**Green Hasson Janks**
10990 Wilshire Boulevard, 16th Floor
Los Angeles, CA 90024
www.greenhassonjanks.com

310.873.1691 T
310.873.6600 F
rdunner@greenhassonjanks.com

*An Independent Member of HLB International*

**From:** Linda Garris [mailto:lgarris@openroadfilms.com]
**Sent:** Wednesday, June 28, 2017 10:49 AM
**To:** Ryan Dunner <rdunner@greenhassonjanks.com>
**Cc:** Peter C. Klass <pklass@greenhassonjanks.com>
**Subject:** RE: Chef Participation Audit at Open Road

Ryan,
It is our policy not to provide Box Office by Theatre or Settlement % by Theatre.  We have already provided Box Office by Branch which is the greatest level of detail we will supply.  We can provide you the information that we have already given you (Film Rental by Theatre) in the form of the raw data from TDS dumped directly into Excel, but then it will not be sorted and totaled by branch as you had requested.  Please let me know if you want the raw data dump of Film Rental by Theatre for *Chef* (in Excel format).

**LINDA GARRIS**
CONTROLLER
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
General (310) 696-7575  Direct (310) 696-7524
<image001.jpg><image002.jpg><image003.jpg>

**From:** Ryan Dunner [mailto:rdunner@greenhassonjanks.com]
**Sent:** Thursday, June 22, 2017 2:51 PM
**To:** Linda Garris
**Cc:** Peter C. Klass

**Subject:** RE: Chef Participation Audit at Open Road

Linda,

Thank you for the providing the schedule of Box Office Receipts by Branch.  Unfortunately the theatrical support we are requesting is the Inception to Date report supplied directly from TDS (not summarized in Excel) that includes all theatrical runs of Chef at all exhibited theatres to date and includes the following information: Branch, Circuit, Theatre, City, Playdate, Gross, Settlement %, Film Rental Paid. If this level of detail is deemed too confidential to provide over email, we would be more than happy to review at your offices.

Please let me know should you have any questions.  Thanks in advance for all of your help.

Regards,
Ryan


**Ryan Dunner**
Supervising Senior Associate
Contract Compliance & Forensics

**Green Hasson Janks**
10990 Wilshire Boulevard, 16th Floor
Los Angeles, CA 90024
www.greenhassonjanks.com

310.873.1691 T
310.873.6600 F
rdunner@greenhassonjanks.com

*An Independent Member of HLB International*

**From:** Linda Garris [mailto:lgarris@openroadfilms.com]
**Sent:** Tuesday, June 20, 2017 4:59 PM
**To:** Ryan Dunner <rdunner@greenhassonjanks.com>
**Cc:** Peter C. Klass <pklass@greenhassonjanks.com>
**Subject:** RE: Chef Participation Audit at Open Road

Hi Ryan & Peter,
Attached please find a listing of Box Office Receipts by Branch.  This is the highest level of Box Office detail we will provide.

**LINDA GARRIS**
CONTROLLER
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
General (310) 696-7575  Direct (310) 696-7524
<image001.jpg><image002.jpg><image003.jpg>

**From:** Ryan Dunner [mailto:rdunner@greenhassonjanks.com]
**Sent:** Monday, June 19, 2017 3:23 PM
**To:** Linda Garris
**Cc:** Peter C. Klass
**Subject:** RE: Chef Participation Audit at Open Road

Linda,

After reviewing the support provided on Friday, it appears we are still missing the box office numbers for all the runs.  Can you kindly let us know when we can expect those?

Thanks in advance for all your help.

Regards,
Ryan


**Ryan Dunner**
Supervising Senior Associate
Contract Compliance & Forensics

**Green Hasson Janks**
10990 Wilshire Boulevard, 16th Floor
Los Angeles, CA 90024
www.greenhassonjanks.com

310.873.1691 T
310.873.6600 F
rdunner@greenhassonjanks.com

*An Independent Member of HLB International*

**From:** Linda Garris [mailto:lgarris@openroadfilms.com]
**Sent:** Friday, June 16, 2017 6:10 PM
**To:** Peter C. Klass <pklass@greenhassonjanks.com>
**Cc:** Ryan Dunner <rdunner@greenhassonjanks.com>
**Subject:** RE: Chef Participation Audit at Open Road

Hi Peter & Ryan,
Attached please find an excel file containing the detailed list of theatrical receipts by branch and theatre that you had requested.  Once you have made selections from these cash receipts, we will obtain the backup and then we should schedule an appointment for you to come to our offices and review all the documents we have accumulated for you.

**LINDA GARRIS**
CONTROLLER
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
General (310) 696-7575  Direct (310) 696-7524
<image001.jpg><image002.jpg><image003.jpg>

**From:** Peter C. Klass [mailto:pklass@greenhassonjanks.com]
**Sent:** Friday, June 09, 2017 4:27 PM
**To:** Linda Garris
**Cc:** Ryan Dunner
**Subject:** RE: Chef Participation Audit at Open Road

Thanks very much Linda. I am going on a business trip to Europe and will be back on the 21st. I will be active on email and perhaps Ryan can address.

Regards, Peter

**From:** Linda Garris [mailto:lgarris@openroadfilms.com]
**Sent:** June 09, 2017 4:07 PM
**To:** Peter C. Klass
**Subject:** FW: Chef Participation Audit at Open Road

Hi Peter,
I have all the requested materials gathered but unfortunately Alexa was not able to review them prior to her departure for a business trip from which she will return on Thurs 6/15/17.  Once she gets back and reviews them I will send them to you immediately.

I imagine you will also want to make selections from the cash receipts, and then it shouldn't take more than a few days for us to get that documentation assembled.  Then we can set a date for you to review everything at once.

Apologies for the delay.

**LINDA GARRIS**
CONTROLLER
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
General (310) 696-7575  Direct (310) 696-7524
<image001.jpg><image002.jpg><image003.jpg>

**From:** Linda Garris
**Sent:** Tuesday, June 06, 2017 6:54 PM
**To:** 'Peter C. Klass'
**Cc:** Alexa Platt; Felicia Douglass; Steven Sills
**Subject:** RE: Chef Participation Audit at Open Road

I'll get back to you within a couple of days on this.

**LINDA GARRIS**
CONTROLLER
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
General (310) 696-7575  Direct (310) 696-7524
<image001.jpg><image002.jpg><image003.jpg>

**From:** Peter C. Klass [mailto:pklass@greenhassonjanks.com]
**Sent:** Tuesday, June 06, 2017 9:20 AM
**To:** Linda Garris
**Cc:** Alexa Platt; Felicia Douglass; Steven Sills
**Subject:** FW: Chef Participation Audit at Open Road

Hi Linda,

Any update? Please note I will be out of the country on business from 6/11 to 6/21. Please advise when I can expect to receive the requested information and set up a date to review the agreements in your office.

Kind regards,
Peter

**From:** Peter C. Klass
**Sent:** May 22, 2017 9:25 AM
**To:** 'Linda Garris'
**Cc:** Alexa Platt (aplatt@openroadfilms.com); Felicia Douglass (fdouglass@openroadfilms.com); Steven Sills; Kyle Kazanjian-Amory
**Subject:** RE: Chef Participation Audit at Open Road

Hi Linda,

Thank you for the information, the updated the request list is attached. Please note I have made further requests (highlighted in yellow) along with transactional selections in the subsequent tabs.

Also, I wanted to schedule a date to review the contracts at your office. I think half a day will suffice. My availability as follows: 5/26, 5/31, 6/1. Please advise if these dates work.

If you have comments/questions please don't hesitate to contact me.

Kind regards,
Peter


**Peter Klass,** CFE
Senior Manager - Entertainment & Media

**Green Hasson Janks**
310.873.6708 T
pklass@greenhassonjanks.com

**From:** Linda Garris [mailto:lgarris@openroadfilms.com]
**Sent:** May 05, 2017 5:10 PM
**To:** Peter C. Klass
**Cc:** Alexa Platt; Felicia Douglass; Steven Sills
**Subject:** RE: Chef Participation Audit at Open Road

Hi Peter,

Please find attached our responses to your Requests #1, #2, #3 and #6.  Note that there may be one or more worksheets in the excel files.

Requests #4 and #5, for the Netflix and Universal contracts, will be made available for your perusal when you are at our offices.

Please let me know if you have questions.


**LINDA GARRIS**
CONTROLLER
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
General (310) 696-7575  Direct (310) 696-7524
<image001.jpg><image002.jpg><image003.jpg>

**From:** Peter C. Klass [mailto:pklass@greenhassonjanks.com]
**Sent:** Friday, April 28, 2017 1:34 AM
**To:** Linda Garris
**Cc:** Alexa Platt; Felicia Douglass; Steven Sills
**Subject:** RE: Chef Participation Audit at Open Road

Hi Linda,

Please let me know when I can expect to receive information for the initial requests (attached) that I have submitted some time ago. You mentioned 4/25 previously as a day to kickoff fieldwork which in the past included sending over the initial business records.

I am looking forward to hearing from you as I would like to update the client on the status.

Regards,
Peter

**From:** Peter C. Klass
**Sent:** April 20, 2017 9:32 AM
**To:** 'Linda Garris'
**Cc:** Alexa Platt; Felicia Douglass
**Subject:** RE: Chef Participation Audit at Open Road

Hi Linda,

I checked with the client, April 25th works to commence the review for the period from inception to 12/31/16. Can please clarify that you will be sending items 2,3, and 6 (per the initial request list attached sent on 2/23/17). I presume, 4/25, we would start off by you sending me the source data upon which we would submit our sample selections and visit your office to review the requested agreements. Or will you send me the requested data ahead of time?

Please let me know. Thank you,
Peter

**From:** Linda Garris [mailto:lgarris@openroadfilms.com]
**Sent:** April 11, 2017 7:24 PM
**To:** Peter C. Klass
**Cc:** Alexa Platt; Felicia Douglass
**Subject:** RE: Chef Participation Audit at Open Road

Hi Peter,
Attached is a copy of the fully executed NDA.  Also a copy of the 12/31/16 participation statement for *Chef*.

I'd like to schedule for Tues April 25th if that works for you.  Please advise.

**LINDA GARRIS**
CONTROLLER
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
General (310) 696-7575  Direct (310) 696-7524
<image001.jpg><image002.jpg><image003.jpg>

**From:** Peter C. Klass [mailto:pklass@greenhassonjanks.com]
**Sent:** Wednesday, April 05, 2017 7:23 AM
**To:** Linda Garris
**Subject:** FW: Participation Audits (Chef and ▮▮▮ at Open Road

Hi Linda,

Any update on Chef? Our client, Sergei Bespalov, is asking for a status; I previously told him that we would start in late March after the 12/16 statement was issued.

Thanks,
Peter

**From:** Peter C. Klass
**Sent:** March 21, 2017 12:23 AM
**To:** 'Linda Garris'
**Cc:** Perfecto Lopez; Alexa Platt; Steven Sills; Kyle Kazanjian-Amory
**Subject:** RE: Participation Audits (Chef and ▮▮▮ at Open Road

Linda,

Attached please find the signed NDA for "Chef". Will you send me a fully executed copy?

When you get a chance please let me know the timing of the initial records that I have requested. I understand you are waiting for the 12/16 statement to be issued; once it is issued to the participant, please send me a copy.

Thank you, Peter

**Peter Klass**, CFE
Senior Manager - Entertainment & Media

**Green Hasson Janks**
310.873.6508 T
pklass@greenhassonjanks.com

---

**From:** Linda Garris [mailto:lgarris@openroadfilms.com]
**Sent:** February 16, 2017 10:58 AM
**To:** Peter C. Klass
**Cc:** Perfecto Lopez; Alexa Platt
**Subject:** Participation Audits (Chef and ██████ at Open Road

Hi Peter,
Please find attached the NDAs for the participation audits of both *Chef* and ██████████

Both films are currently receiving participation statements on a semi-annual schedule. Therefore the "most current" statement dates for the audits would be those dated 12/31/16 for each film.

**LINDA GARRIS**
ASSISTANT CONTROLLER
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
General (310) 696-7575  Direct (310) 696-7524
<image001.jpg><image002.jpg><image003.jpg>

---

**From:** Linda Garris
**Sent:** Wednesday, February 15, 2017 6:24 PM
**To:** 'Peter C. Klass'
**Subject:** RE: Audits at Open Road

Hi Peter,
For both the *Chef* and ██████████ audits I will send you the NDA tomorrow.
The *Chef* audit can begin mid-March, and the ██████████ audit will be in the queue after *Chef* has completed fieldwork.
Please send us your initial document request list for *Chef* at your convenience so we can begin assembling those documents.

Thanks.

**LINDA GARRIS**
ASSISTANT CONTROLLER
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
General (310) 696-7575  Direct (310) 696-7524
<image001.jpg><image002.jpg><image003.jpg>

---

**From:** Peter C. Klass [mailto:pklass@greenhassonjanks.com]
**Sent:** Friday, February 10, 2017 1:22 PM
**To:** Linda Garris
**Subject:** RE: Audits at Open Road

Hi Linda – Any update? Thanks

---

**From:** Linda Garris [mailto:lgarris@openroadfilms.com]
**Sent:** February 08, 2017 10:35 AM
**To:** Peter C. Klass
**Cc:** Alexa Platt
**Subject:** RE: Audits at Open Road

Hi Peter,
Let me get back to you on these questions tomorrow.

**LINDA GARRIS**
ASSISTANT CONTROLLER
12301 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
General (310) 696-7575  Direct (310) 696-7524
<image001.jpg><image002.jpg><image003.jpg>

**From:** Peter C. Klass [mailto:pklass@greenhassonjanks.com]
**Sent:** Wednesday, February 08, 2017 10:28 AM
**To:** Steven Andriuzzo; Linda Garris
**Subject:** RE: Audits at Open Road

Hi Steven and Linda,

Just following up on our call from January.

- ████████ report was issued to Omnilab – I will follow up with the client regarding submission to you
- Chef – The estimated commencement date of this limited review was mid to late February, is that still the case? Can you please send the NDA, if required. Also, please advise on the review period and if you need anything from us at this time (initial information request list)?
- ████████████ – please send the NDA and let me know when we can expect to kickoff. Also, please advise on the review period and if you'd like me to submit the initial information request list.

Thank you,
Peter

**From:** Peter C. Klass
**Sent:** January 04, 2017 11:56 AM
**To:** 'Steven Andriuzzo'
**Subject:** Audits at Open Road

Hi Steven,

Hope you had pleasant holidays.

I was wondering if you had time for a quick chat regarding several projects that are in-process or in-queue. Specifically timing of starting Chef and ████████████

Also, wanted to check-in on ██████ as there was the WH tax and payment issues that put the audit on hold.

Please let me know if you are available for a quick call today or if we can schedule something for later in the week.

Thank you and regards,
Peter

**Peter Klass**, CFE
Senior Manager - Entertainment & Media Practice

**Green Hasson Janks**
310.873.6708 T
pklass@greenhassonjanks.com

This email and any files transmitted with it are confidential and intended solely for the person or entity to whom they are addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you have received this email in error please contact the sender and delete the material from any computer.
<Req No 3B - AMC Credit Card Fees.xlsx>

**<u>EXHIBIT 5</u>**

**Sous Chef Cure Documentation**



**Sous Chef, LLC**
**ACCOUNTING STATEMENT FOR THE PERIOD ENDED:  June 30, 2018**

## *CHEF*

| | | Prior Period Through 12/31/17 | Current Period 01/01/18-06/30/18 | Inception To Date |
|---|---|---|---|---|
| **RELEASE DATE: 05/09/2014** | | | | |
| **Gross Receipts (GR)** | | | | |
| Theatrical Receipts | | 12,449,055 | 688 | 12,449,743 |
| Home Entertainment [1] | | 11,516,208 | 65,318 | 11,581,526 |
| Pay Television | | 7,694,061 | - | 7,694,061 |
| Free Television/ Network | | 314,240 | 665,678 | 979,918 |
| Non-theatrical | | 507,805 | 3,407 | 511,212 |
| Less: Residuals | | (2,038,566) | (98,690) | (2,137,257) |
| Less: Taxes | | (9,062) | - | (9,062) |
| **Total Gross Receipts** | | $   30,433,741 | $   636,401 | $   31,070,142 |
| | | | | |
| **Producer Gross Corridor [2]** | | | | |
| *10% of Gross Receipts* | 10.0% | 3,043,374 | 63,640 | 3,107,014 |
| | | | | |
| **Minimum Guarantee** | | 2,600,000 | - | 2,600,000 |
| | | | | |
| **Balance** | | $   443,374 | $   63,640 | $   507,014 |
| Less: Previously Paid / (Unrecouped) | | (443,374) | - | (443,374) |
| **Balance Due to Producer / (Unrecouped)** | | $   - | $   63,640 | $   63,640 |

---

Note 1:  Home Entertainment Gross Receipts and Distribution Expenses as reported by Subdistributor to Open Road Films after deduction of all costs, fees and expenses  deducted by such Subdistributor. Home Entertainment rights defined per Distribution Rights Acquisition Agreement section 6.b.

Note 2:  Producer Gross Corridor breakdown defined per Distribution Rights Acquisition Agreement section 6.(ii) and as amended per Amendment #1 to Agreement section 5.



**Sous Chef, LLC**
**ACCOUNTING STATEMENT FOR THE PERIOD ENDED:  September 05, 2018**

## *CHEF*

|  |  | Prior Period | Current Period | Inception To |
|---|---|---|---|---|
| **RELEASE DATE: 05/09/2014** |  | Through 06/30/18 | 07/01/18-09/05/18 | Date |
| **Gross Receipts (GR)** |  |  |  |  |
| Theatrical Receipts |  | 12,449,743 | 138 | 12,449,881 |
| Home Entertainment [1] |  | 11,581,526 | 43,454 | 11,624,980 |
| Pay Television |  | 7,694,061 | - | 7,694,061 |
| Free Television/ Network |  | 979,918 | 333,769 | 1,313,687 |
| Non-theatrical |  | 511,212 | 1,213 | 512,425 |
| Less: Residuals |  | (2,137,257) | (41,467) | (2,178,723) |
| Less: Taxes |  | (9,062) | - | (9,062) |
| **Total Gross Receipts** |  | $       31,070,142 | $       337,107 | $       31,407,249 |
| **Producer Gross Corridor [2]** |  |  |  |  |
| *10% of Gross Receipts* | 10.0% | 3,107,014 | 33,711 | 3,140,725 |
| **Minimum Guarantee** |  | 2,600,000 | - | 2,600,000 |
| **Balance** |  | $       507,014 | $       33,711 | $       540,725 |
| Less: Previously Paid / (Unrecouped) |  | (443,374) | - | (443,374) |
| **Balance Due to Producer / (Unrecouped)** |  | $       63,640 | $       33,711 | $       97,351 |

Note 1:  Home Entertainment Gross Receipts and Distribution Expenses as reported by Subdistributor to Open Road Films after deduction of all costs, fees and expenses  deducted by such Subdistributor. Home Entertainment rights defined per Distribution Rights Acquisition Agreement section 6.b.
Note 2:  Producer Gross Corridor breakdown defined per Distribution Rights Acquisition Agreement section 6.(ii) and as amended per Amendment #1 to Agreement section 5.

Estimates for 9-6-18 through 11-30-18:

| Film Rental | Physical | EST/VOD | SVOD/Pay | Free TV | Foreign Receipt | Other Receipt | Total |
|---|---|---|---|---|---|---|---|
| - | 48,939 | 47,801 | - | 48,253 | - | - | 144,992 |

## **EXHIBIT 6**

**Host Film Contract**

# DISTRIBUTION RIGHTS ACQUISITION AGREEMENT

This agreement ("Agreement") is made and entered into as of July 1, 2011 by and between The Host Film Holdings, LLC ("Producer") and OPEN ROAD FILMS, LLC ("Distributor") with respect to the theatrical motion picture titled "The Host" based on the novel of the same name written by Stephenie Meyer ("Picture") to star Saoirse Ronan in the role of "Mel/Wanda," and to be directed by Andrew Niccol.

Conditions Precedent:  Distributor's obligations under this Agreement are subject to (a) Distributor's receipt and approval of the chain-of –title to the Picture; and (b) Distributor's receipt of the executed copyright mortgage and instrument of transfer attached hereto. The chain-of-title will be approved or rejected by Distributor within 15 business days following execution of this Agreement by Producer.  If Distributor rejects the chain of title, Distributor and Producer will work in good faith together to remedy deficiencies, and if such deficiencies are not remedied by the delivery date under Paragraph 7 below, Distributor shall have the option to terminate this Agreement.

1.  Territory:  The "Territory" means and includes the United States of America (including but not limited to, Guam, Saipan, Midway Island, the Trust Territory Islands, the Caroline Islands, the Marshall Islands, the U.S. Virgin Islands, Puerto Rico, Bermuda, the Bahamas (provided that all television rights in the Bahamas shall be on a non-exclusive basis) and American Samoa) and its/their territories, possessions, trusteeships and commonwealths and all military bases and similar venues wherever located in the world, ships at sea, airlines and oil rigs flying the flag of, registered in or owned or operated by entities whose principal office for licensing rights is located in the foregoing.

2.  Rights Granted to Distributor by Producer:  Producer hereby grants to Distributor, throughout the Territory and during the Term, all distribution and exploitation rights in and to the Picture of every kind and nature now known or hereafter devised (the "Rights"), on an exclusive basis, for all media and all delivery systems now known or hereafter devised, including, but not limited to, all theatrical, non-theatrical, home video, digital, mobile, internet, interactive, satellite, video-on-demand (all forms including without limitation, premium and subscription video on demand rights), pay television, pay-per-view, free television and commercial tie-in rights.  The Rights granted to Distributor include the exclusive right to market, promote, advertise, publicize and otherwise turn to account the Picture, excerpts therefrom and elements thereof (marketing, publicity, advertising and promotion to be permitted throughout the universe) by all manner, means and in all media now known or hereafter devised, directly or through subdistributors and/or servicers, and to collect all proceeds from the exploitation of the rights granted under this Agreement.  Distributor will have the right to issue and authorize publicity with respect to all persons appearing in the Picture, and to utilize the names, voices and likenesses of such persons in connection with the marketing and distribution of the Picture (subject to customary restrictions disclosed to Distributor, which Distributor will honor and the specific rights of Stephenie Meyer set forth in the SPEG Option Agreement).  Customary unintentional overspill will not be a breach of this Agreement. Producer reserves all rights not granted hereunder including without limitation merchandising, soundtrack album, print publication and music publishing rights (collectively, the "Reserved Rights") and the rights reserved by SPEGS, LLC f/s/o Stephenie Meyer ("SPEG") pursuant to the option agreement between SPEG, on the one hand, and Chockstone Pictures LLC ("Chockstone") and NVW, Inc. ("NVW"), on the other hand, dated May 1, 2009 ("SPEG Option Agreement") provided that: (a) Distributor shall be entitled to exploit the Reserved Rights (other than those reserved by SPEG pursuant to the SPEG Option Agreement") for purposes of marketing, advertising and promotion of the Picture;(b) Producer shall abide by all holdbacks and coordinate any exploitation of the Reserved Rights with Distributor (including product art and release schedules) to ensure that there is no interference with the marketing and distribution campaign for the Picture; and (c) Producer shall pay to Distributor ("Distributor Ancillary Participation") an amount equal to 10% of 100% of all gross sums received by Producer or its successors and affiliates (i.e., the full rights holder share remitted to Producer from distributors, agents, licensees, wholesalers, retailers and/or fulfillment/service entities, if and as applicable) from the exploitation of such Reserved Rights in the Territory during the Term.  Producer will account to Distributor for the Distributor Ancillary Participation at the same times that Distributor accounts to Producer with respect to the sums due to Producer hereunder, and Distributor will have annual audit rights with respect to the Distributor Ancillary Participation.

3.  Marketing/Consultation Rights:  Unless otherwise agreed between Producer and Distributor, subject to Producer meeting its delivery and other material obligations hereunder and to force majeure events: (a) Distributor agrees to spend (or cause to be spent) no less than                                in connection with the theatrical release of the Picture in the Territory ("P&A Commitment"); (b) the Picture shall be released in the Territory no later than May 31, 2013 ("Outside Theatrical Release Date"); and (c) Distributor will, on a timely basis, meaningfully consult with Producer regarding the release date, release pattern and the theatrical and television marketing campaigns (including the theatrical P&A budget and anticipated timing of the P&A spend) for the Picture, and will engage an independent marketing consultant with respect to the Picture at Distributor's cost (which shall be treated as a Distribution Expense).  Distributor agrees that it will spend or incur no less

"The Host"
Page 2

than ⦂     ⦂ of the P&A Commitment prior to initial commercial general theatrical release of the Picture in the Territory, and will reserve a reasonable amount for post-opening advertising support.  Even though Producer shall have the aforesaid consulting rights, Distributor shall have final control over all decisions regarding the marketing and distribution of the Picture.  Producer will exercise its consultation rights (which shall be personal and non-delegable) on a timely basis and in good faith so as not to frustrate Distributor's ability to exploit the Rights.  Producer shall promptly provide to Distributor all materials reasonably requested by Distributor for the purposes of marketing and publicizing the Picture.  Distributor makes no representation or warranty as to the success of the Picture or the amount of Gross Receipts the Picture may generate.

4.   Term: The term of this Agreement ("Term") shall commence on the execution of this Agreement and terminate 20 years from the earlier of (a) initial general commercial theatrical release of the Picture in the Territory by Distributor; and (b) six months following complete delivery of the Picture to Distributor (and Distributor's acceptance) in accordance with the terms of this Agreement. Distributor shall have a right of first negotiation (for a period of 15 business days commencing on Distributor's receipt of Producer's written notice of its intent to commence such negotiations) and a right of last refusal with respect to any exploitation of the Picture after the Term.  Within 120 days following expiration of the Term, Distributor shall either deliver to Producer (at Producer's sole cost) remaining inventory of physical materials controlled by Distributor or destroy such material as elected by Producer by written notice to Distributor.

5.   Minimum Guarantee:

6.   Distribution Fees; Waterfall:

a.   From 100% of all "Gross Receipts" received by or credited to Distributor on a non-refundable basis from the exploitation of the Picture and the Rights therein in all media throughout the Territory, Distributor shall be entitled to deduct and/or pay the following on a continuing basis and in the following order:

(i)   First, Distributor shall be paid its Distribution Fee (as defined below) for all media;

(ii)   Second, Distributor shall pay any residuals, taxes, checking and collection costs, which shall be treated as "Distribution Expenses" hereunder.

(iii)   Third, Distributor shall pay Producer an amount equal to 10% of 100% of Gross Receipts actually received by Distributor ("Gross Corridor").  The Gross Corridor shall commence and be calculated from first dollar

-2-

of Gross Receipts and continue until the Minimum Guarantee is first recouped by Distributor under Paragraph 6.a.(v) below, after which time the Gross Corridor will terminate and any further Box Office Bonuses payable to Producer will apply against and in reduction of Producer's share of Gross Receipts under Paragraph 6.a.(vi) below. For the avoidance of doubt, the Producer will be entitled to the greater of the Gross Corridor or the Box Office Bonuses, but not both. The Minimum Guarantee and the Box Office Bonuses paid to Producer pursuant to Paragraph 6.d. below will be applicable against the Gross Corridor with the Box Office Bonuses to be applied first in order of priority for accounting purposes before the Minimum Guarantee is applied.

(iv)    Fourth, Distributor shall recoup all actual out of pocket verifiable costs of marketing, promoting, advertising, distributing, exploiting and turning to account the Picture, including, without limitation Distributor's overhead fee ("Overhead Fee") in an amount equal to $250,000 (collectively, "Distribution Expenses") plus Interest on all such Distribution Expenses excluding the Overhead Fee. Interest shall be recouped first in order of priority before Distribution Expenses.

(v)     Fifth, Distributor shall recoup the unrecouped portion of the Minimum Guarantee plus Interest. Interest shall be recouped first in order of priority before the Minimum Guarantee. For the avoidance of doubt, only the unrecouped portion of the Minimum Guarantee (i.e., the portion of the Minimum Guarantee not previously applied against the sums payable to Producer under subparagraph 6.a.(iii) above and 6.d. below) shall be recoupable under this subparagraph.

(vi)    Sixth, the balance of Gross Receipts, if any, shall be paid          to Producer and          to Distributor.

## AMENDMENT #1 TO AGREEMENT

THIS AMENDMENT ("Amendment") is made as of December 4, 2012 by and between The Host Film Holdings, LLC ("Producer") and Open Road Films, LLC ("Distributor").

### WITNESSETH:

WHEREAS, the parties have entered into that certain Distribution Rights Acquisition Agreement (the "Agreement") regarding the motion picture "The Host" (the "Picture") dated as of July 1, 2011; and

WHEREAS, the parties have agreed to make certain changes to the terms of the Agreement and the parties find it desirable to set forth these new terms in this Amendment. All capitalized words used herein have the same meanings as set forth in the Agreement.

NOW THEREFORE, in consideration of the foregoing and of the mutual promises herein, receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    **MINIMUM GUARANTEE:** The parties acknowledge and agree that the Minimum Guarantee under Paragraph 5 of the Agreement shall increase from $2,000,000 to $2,200,000 with the added $200,000 to be paid by Distributor directly to Gradient Effects and other vendors as consideration for additional visual effects services in connection with the Picture. In addition to Distributor's recoupment of the Minimum Guarantee under the Distribution Agreement, Distributor will be paid an additional $40,000 (i.e., an amount equal to 20% of the increase to the Minimum Guarantee) out of Gross Receipts in the same position and on the same basis as though such $40,000 had been added to the Minimum Guarantee.

2.    **SILVER REEL CONTRIBUTION/RECOUPMENT:** Within five business days following execution of this Amendment, Silver Reel Entertainment Mezzanine Fund, L.P. ("Silver Reel") will pay $100,000 to Distributor (representing an amount equal to one-half of the increase to the Minimum Guarantee). The parties agree that, from and after the point (if ever) at which Distributor has recouped the first $2,000,000 of the Minimum Guarantee under Paragraph 6.a.(v) of the Agreement, Distributor will, on a pro rata and pari passu basis, pay Silver Reel 50% of the next $240,000 of Gross Receipts paid to Distributor in recoupment of the $200,000 increase to the Minimum Guarantee plus the additional $40,000 as set forth in Paragraph 1 above (the intention of the parties being that Silver Reel is advancing to Distributor one half of the increase to the Minimum Guarantee and will be recouping such sums plus one-half of the $40,000 premium on a pro rata and pari passu basis with Distributor out the Minimum Guarantee recoupment corridor under Paragraph 6.a.(v) of the Agreement after Distributor has recouped the first $2,000,000 of the Minimum Guarantee).

3.    **MULTIPLE COUNTERPARTS.** This Amendment may be executed in counterparts and transmitted by facsimile or electronic copy, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. Except as set forth herein, the Agreement shall remain in full force and effect without modification.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

1

OPEN ROAD FILMS, LLC

By: _____
Title: _CEO_
Print Name: _Tom Ortenberg_

THE HOST FILM HOLDINGS, LLC

By: _____
Title: _____
Print Name: _____

Silver Reel Entertainment Mezzanine Fund, L.P. ("Silver Reel") hereby acknowledges, accepts and agrees to the terms and conditions set forth above as same concern Silver Reel and agrees that it is bound by and will perform under the terms of this Amendment as same concern Silver Reel.

SILVER REEL ENTERTAINMENT MEZZANINE FUND, L.P.

By: Directors of Silver Reel GP Ltd., as general partner of Silver Reel Entertainment Mezzanine Fund, L.P.

By: _____       _____

Title:       Director                          Director

Print Name:  Roger Hanson                     Ronan Guilfoyle

2

OPEN ROAD FILMS, LLC

By:_____
Title:_____
Print Name:_____


THE HOST FILM HOLDINGS, LLC

By:_____
Title:_____Manager_____
Print Name:____Bill Johnson____

Silver Reel Entertainment Mezzanine Fund, L.P. hereby acknowledges, accepts and agrees to the terms and conditions set forth above as same concern Silver Reel and agrees that it is bound by and will perform under the terms of this Amendment as same concern Silver Reel.

SILVER REEL ENTERTAINMENT MEZZANINE FUND, L.P.

By: Directors of Silver Reel GP Ltd., as general partner of Silver Reel Entertainment Mezzanine Fund, L.P.

By:              _____        _____

Title:           Director                    Director

Print Name:      Roger Hanson                Ronan Guilfoyle

2

OPEN ROAD FILMS, LLC

By:_____
Title:_____
Print Name: _____


THE HOST FILM HOLDINGS, LLC

By:_____
Title:_____
Print Name: _____


Silver Reel Entertainment Mezzanine Fund, L.P. hereby acknowledges, accepts and agrees to the terms and conditions set forth above as same concern Silver Reel and agrees that it is bound by and will perform under the terms of this Amendment as same concern Silver Reel.

SILVER REEL ENTERTAINMENT MEZZANINE FUND, L.P.

By: Directors of Silver Reel GP Ltd., as general partner of Silver Reel Entertainment Mezzanine Fund, L.P.

By:    _____        _____

Title:    Director                Director

Print Name:    Roger H. Hanson            Ronan Guilfoyle

2



**The Host Film Holdings, LLC**
**ACCOUNTING STATEMENT FOR THE PERIOD ENDED:  September 05, 2018**

Page 2

## *THE HOST*

RELEASE DATE: 03/29/2013

| | | Prior Period Through 12/31/17 | Current Period 01/01/18-09/05/18 | Inception To Date |
|---|---|---|---|---|
| **North America Box Office** | | $ 26,627,201 | $ - | $ 26,627,201 |
| U.S. Box Office | | 23,844,301 | - | 23,844,301 |
| **Gross Receipts** | | | | |
| Theatrical | | 10,066,475 | - | 10,066,475 |
| Home Entertainment [1] | | 16,118,323 | 30,899 | 16,149,222 |
| Pay Television | | 6,450,678 | - | 6,450,678 |
| Free Television/ Network | | 1,258,046 | 300,000 | 1,558,046 |
| Non-theatrical | | 188,687 | 42 | 188,729 |
| **Total Gross Receipts** | | **34,082,210** | **330,941** | **34,413,151** |
| **Distribution Fees** | | | | |
| Theatrical | 15.0% | (1,509,971) | - | (1,509,971) |
| Home Entertainment [2] | 18.0% | (2,901,298) | (5,562) | (2,906,860) |
| Home Entertainment [2] (at $50M Home Entertainment GR) | 17.5% | - | - | - |
| Pay Television | 15.0% | (967,602) | - | (967,602) |
| Free Television/ Network | 15.0% | (188,707) | (45,000) | (233,707) |
| Non-theatrical | 15.0% | (28,303) | (6) | (28,309) |
| **Total Distribution Fees** | | **(5,595,881)** | **(50,568)** | **(5,646,449)** |
| **Net Receipts** | | **28,486,329** | **280,373** | **28,766,702** |
| **Distribution Expenses** | | | | |
| Interest on Distribution Expenses [3] | | (658,841) | - | (658,841) |
| Overhead Fee [4] | | (250,000) | - | (250,000) |
| Theatrical Advertising | | (16,103,282) | - | (16,103,282) |
| Theatrical Prints & Distribution | | (4,329,938) | (21,094) | (4,351,032) |
| Theatrical Marketing & Other | | (6,302,951) | - | (6,302,951) |
| P&A Subtotal | | (26,736,171) | (21,094) | (26,757,265) |
| Home Entertainment [1] | | (3,121,134) | (5,534) | (3,126,668) |
| Other Expenses | | (84,613) | (6,896) | (91,509) |
| Residuals [5] | | (1,354,606) | (19,197) | (1,373,804) |
| Taxes | | (10,547) | - | (10,547) |
| **Total Distribution Expenses** | | **(32,215,912)** | **(52,721)** | **(32,268,633)** |
| **Subtotal** | | **(3,729,583)** | **227,652** | **(3,501,931)** |
| **Less:** | | | | |
| Producer Box Office Bonuses | | (300,000) | - | (300,000) |
| Interest on Unrecouped Minimum Guarantee | | (442,668) | (80,914) | (523,582) |
| Minimum Guarantee [3] | | (2,200,000) | - | (2,200,000) |
| Fee on Minimum Guarantee Increase [3] | | (40,000) | - | (40,000) |
| Assumed Third Party Contingent Compensation: [7] | | - | | |
| Assumed Meyer Contingent Compensation | | (318,849) | (8,658) | (327,507) |
| Saoirse Ronan | | - | - | - |
| **Subtotal** | | **(3,301,517)** | **(89,572)** | **(3,391,089)** |
| **Balance** | | **(7,031,100)** | **138,080** | **(6,893,020)** |
| **Producer Share** | 82.5% | - | - | - |
| **Distributor Share** | 17.5% | - | - | - |
| | | - | - | - |

Note 1:  Home Entertainment Gross Receipts and Distribution Expenses as reported by Sub-distributor to Open Road Films.
        Home Entertainment rights defined per Distribution Rights Acquisition Agreement section 6.a
Note 2:  Home Entertainment Distribution Fee defined per Distribution Rights Acquisition Agreement section 6.b
Note 3:  Interest calculated per Distribution Rights Acquistion Agreement Exhibit A section 4
Note 4:  Overhead recoupable per Distribution Rights Acquisition Agreement section 6.a.(iv)
Note 5:  Residuals calculated per Distribution Rights Acquistion Agreement section 14.(b)
Note 6:  Recoupment of Minimum Guarantee and interest per Distribution Rights Acquisition Agreement section 6.a.(v)
Note 7:  Assumed Third Party Contingent Compensation defined per Distribution Rights Acquisition Agreement section 6.a