# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OPEN ROAD FILMS, LLC, a Delaware limited liability company, *et al.*,[1] | Case No. 18-12012 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Dkt. Nos. 9, 160, 217, 239, 314** |

**ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AMONG THE DEBTORS AND THE BUYER, (II) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363(b), (f) AND (m), (III) APPROVING ASSUMPTION, ASSIGNMENT AND SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 363 AND 365, (IV) DETERMINING THE AMOUNTS NECESSARY TO CURE SUCH EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (V) GRANTING RELATED RELIEF**

The Court having considered the *Motion for Orders (A)(I) Establishing Bid and Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into an Asset Purchase Agreement with Stalking Horse Bidder, (III) Establishing and Approving Procedures Relating to the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts and (IV) Scheduling a Hearing to Consider the Proposed Sale and (B)(I) Approving the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, and (III) Granting Certain Related Relief* [Docket No. 9] (the "Motion") and the *Motion for Order Authorizing and Approving*

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Open Road Films, LLC (4435-Del.); Open Road Releasing, LLC (4736-Del.); OR Productions LLC (5873-Del.); Briarcliff LLC (7304-Del.); Open Road International LLC (4109-Del.); and Empire Productions LLC (9375-Del.).  The Debtors' address is 2049 Century Park East, 4th Floor, Los Angeles, CA 90067.

*Certain Bid Protections, Amendments to Bid Procedures Order, and Granting Related Relief*

[Docket No. 217],  filed by Open Road Films, LLC and its affiliated debtors and debtors in

possession (the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"),  seeking,

among other things, entry of an order (i) authorizing the sale (the "Sale Transaction") of certain

of the Debtors' assets (the "Purchased Assets"), free and clear of all liens, claims, interests, and

encumbrances, except for the Permitted Liens, pursuant to that certain Asset Purchase

Agreement, dated as of October 23, 2018 (as amended, supplemented or otherwise modified, the

"APA"),[2] by and among the Debtors and OR Acquisition Co, LLC (the "Buyer"), (ii) authorizing

the assumption, assignment, and sale of certain executory contracts and unexpired leases as set

forth in the APA, and (iii) granting related relief; and this Court having entered orders on

October 9, 2018 [Docket No. 160] (the "Bid Procedures Order")[3] and October 26, 2018 [Docket

No. 239] (the "Bid Protections Order") approving, among other things, the Bid Procedures with

respect to and notice of the Sale Transaction; and an Auction having been set for November 7,

2018 in accordance with the Bid Procedures Order; and Buyer having submitted the sole

Qualified Bid; and hearings having been held on November 20 and 27, 2018 and December 13

and 19, 2018 (the "Sale Hearing") to consider approval of the APA and the Sale Transaction; and

the Court having reviewed and considered the Motion, any responsive pleadings filed in

connection with the Motion, the record in the above-captioned Chapter 11 Cases, and the

representations of counsel at the Sale Hearing; and after due deliberation and sufficient cause

appearing therefor;

---

[2]    A true and correct copy of the form of the APA is attached hereto as **Exhibit A**.

[3]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion, in the Bid
Procedures Order, or in the APA, as applicable.

01:23983204.2

**IT HEREBY IS FOUND AND DETERMINED THAT**:[4]

A.    <u>**Jurisdiction and Venue.**</u>  This Court has jurisdiction over this matter and over the property of the Debtors and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O).  Venue of these Chapter 11 Cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and other legal predicates for the relief sought in the Motion and granted herein are Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9008, 9014 and 9019.

B.    <u>**Notice.**</u>  As evidenced by the affidavits of service on file with the Court, due, proper, timely, adequate, and sufficient notice and a reasonable opportunity to object or be heard with respect to the Motion, the Auction, the Sale Hearing, the Sale Transaction, and the assumption and assignment of the Assumed Contracts has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Bid Procedures Order, and the Bid Protections Order to all known interested parties, including to (a) all persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Purchased Assets during the past six (6) months; (b) all entities known by the Debtors to have asserted any lien or interest in the Purchased Assets; (c) all non-debtor parties to the Assumed Contracts; (d) the U.S. Trustee; (e) the Committee and its counsel; (f) any governmental unit known to have a claim in the Chapter 11 Cases; (g) all other known creditors and equity security holders of the Debtors; (h) all persons that have requested special notice in the Chapter 11 Cases; and (i) all other persons as directed by the Court.  In addition, the Debtors caused the Sale Notice to be published in the *USA Today* on October 15, 2018 and in *Variety* on October 16, 2018.

---

[4]    All findings of fact and conclusions of law announced by the Court at the Sale Hearing are hereby incorporated herein to the extent not inconsistent herewith.

Accordingly, except as otherwise set forth herein, no other or further notice of the foregoing or this Order is necessary or required.

C. **Compliance with Bid Procedures Order and Bid Protections Order.** As demonstrated by evidence proffered or adduced and the representations of counsel at the Sale Hearing, the Debtors have conducted an adequate marketing process and a fair and open sale process in compliance with the Bid Procedures Order and Bid Protections Order. The Bid Procedures were substantively and procedurally fair to all parties, were the result of arm's length negotiations, and afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Purchased Assets. The Bid Procedures, the Bid Procedures Order, and the Bid Protections Order have been complied with in all material respects by the Debtors and the Buyer.

D. **Corporate Authority.** The Debtors and the Buyer (i) have full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, (ii) have all necessary power and authority to consummate the Sale Transaction, and (iii) have taken all necessary action to authorize and approve the APA and to consummate the Sale Transaction. No consents or approvals, other than those expressly provided for in the APA, are required for the Debtors to consummate the Sale Transaction.

E. **Business Justification.** Approval of the APA and consummation of the Sale Transaction are in the best interests of the Debtors, the estates, creditors, and other parties in interest. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the sale of the Purchased Assets to the Buyer pursuant to Section 363(b) of the Bankruptcy Code.

F.    **Highest and Otherwise Best Offer.**  The consideration to be provided by the Buyer pursuant to the APA: (i) is fair and reasonable; (ii) is the highest and otherwise best offer for the Purchased Assets; and (iii) constitutes reasonably equivalent value and fair consideration for the Purchased Assets under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any similar applicable laws of the United States, any state, territory, possession thereof, and the District of Columbia.  The terms and conditions set forth in the APA are fair and reasonable under the circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding any creditor of the Debtors under any of the foregoing federal or state laws or any other applicable laws.

G.    **Good Faith Purchaser.**  The APA and the Sale Transaction were proposed, negotiated, and entered into by and among the Debtors and the Buyer without collusion or fraud, in good faith, and at arm's length.  The Buyer is a good faith purchaser within the meaning of Bankruptcy Code Section 363(m) and is therefore entitled to the full protection of that provision with respect to the APA and the Sale Transaction.  There has been no showing that the Debtors or the Buyer have engaged in any action or inaction that would cause or permit the APA or the Sale Transaction to be avoided or any costs or damages to be imposed under Bankruptcy Code Section 363(n).  The Buyer is not an "insider" of the Debtors as that term is defined in Bankruptcy Code Section 101(31).

H.    **Legal, Valid, and Binding Transfer.**  The Purchased Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of Section 541(a) of the Bankruptcy Code.  The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets and, except as provided in the APA or

this Order, will vest the Buyer with all right, title, and interest of the Debtors to the Purchased

Assets free and clear of all liens, claims, interests, and encumbrances, unless specifically

assumed by the Buyer pursuant to the APA.  The APA is a valid and binding contract between

the Debtors and the Buyer and shall be enforceable according to its terms.

I.      **Free and Clear.**  The Buyer would not have entered into the APA and would not

consummate the Sale Transaction if the transfer of the Purchased Assets to the Buyer and the

assumption and assignment of the Assumed Contracts to the Buyer were not free and clear of all

liens, claims, interests, and encumbrances as provided for herein.  Subject to the provisions of

this Order and except for Permitted Liens as specifically provided in the APA or this Order, the

Debtors may sell the Purchased Assets free and clear of all liens, claims, interests, and

encumbrances because, in each case, one or more of the standards set forth in Section 363(f)(1)

through (5) of the Bankruptcy Code have been satisfied.  Except for the holders of Permitted

Liens on account of their Permitted Liens, each entity with a lien, claim, interest, or

encumbrance in the Purchased Assets to be transferred on the Closing Date:  (i) has, subject to

the terms and conditions of this Order, consented to the Sale Transaction or is deemed to have

consented; (ii) could be compelled in a legal or equitable proceeding to accept money

satisfaction of such lien, claim, interest, or encumbrance; or (iii) otherwise falls within the

provisions of Bankruptcy Code Section 363(f).  Those holders of liens, claims, interests, and

encumbrances who did not object to the Motion are deemed to have consented to the Sale

Transaction and the relief provided for herein pursuant to Bankruptcy Code Section 363(f)(2).

J.      **Not a *Sub Rosa* Plan.**  The APA and Sale Transaction do not constitute an

impermissible *sub rosa* chapter 11 plan for which approval has been sought without the

protections that a disclosure statement would afford.  The APA and the Sale Transaction neither

impermissibly restructure the rights of the Debtors' creditors nor impermissibly dictate a liquidating plan for the Debtors.

K.     **No Successor Liability.**  The Buyer (i) is not, and shall not be, considered a successor in interest to the Debtors, (ii) has not, *de facto* or otherwise, merged with or into the Debtors, (iii) is not a continuation or substantial continuation of the Debtors or any enterprise of the Debtors, (iv) is not, and shall not be, considered to have acquired the trade or business of any of the Debtors for any purpose under applicable U.S. federal law (including the Bankruptcy Code and the Internal Revenue Code of 1986, as amended), (v) is not, and shall not be, considered to have acquired the workforce in place (including any of the Debtors' employees) or goodwill or trademarks of the Debtors (other than certain incidental and ancillary rights, which have no value, and are necessary for the ownership of or right to use (including further development of) the other Purchased Assets), and (vi) is not holding itself out to the public as a continuation of the Debtors or the Debtors' trade or business.  Except as otherwise specifically provided in the APA, the transfer of the Purchased Assets to the Buyer and assumption by the Debtors and assignment to the Buyer of the Assumed Contracts do not and will not subject the Buyer to any liability whatsoever with respect to the operation of the Debtors' businesses before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of antitrust, successor, transferee, or assignee liability.

L.     **Personally Identifiable Information.**  Notwithstanding anything to the contrary in the APA, personally identifiable information is not a Purchased Asset.

M.    **Assumption of Executory Contracts and Unexpired Leases.**  Notice of the Debtors' assumption and assignment to the Buyer of the Assumed Contracts has been provided to each non-debtor counterparty to an Assumed Contract, together with the amount, if any, to be paid to such non-debtor counterparty to cure any defaults under, and to otherwise comply with the requirements of Section 365(b) of the Bankruptcy Code with respect to each Assumed Contract (the "Cure Amounts").  As to each Assumed Contract, payment of the Cure Amounts set forth on **Exhibit B** hereto (or such other Cure Amounts as agreed, in writing, by the Debtors, the Buyer and the counterparty to the applicable Assumed Contract or ordered by this Court) is sufficient for the Debtors to comply fully with the requirements of Section 365(b) of the Bankruptcy Code.  In addition, the Buyer has provided adequate assurance of its ability to perform its obligations under each of the Assumed Contracts within the meaning of Section 365 of the Bankruptcy Code.  All other requirements and conditions under the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assumed Contracts have been satisfied.  Therefore, subject to the terms of this Order, the Assumed Contracts may be assumed by the Debtors and assigned to the Buyer.

N.    **Prompt Consummation.**  The Sale Transaction must be approved and consummated promptly in order to maximize value for the Debtors' estates.  Time is of the essence in consummating the Sale Transaction.  The Debtors have demonstrated compelling circumstances and good and sufficient cause for the immediate approval and consummation of the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, prior to, and outside of, a chapter 11 plan.

**THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT**:

1.    The Motion is GRANTED as set forth herein.

01:23983204.2

2.      Any objections filed or asserted in response to the Motion and the relief granted herein, to the extent not resolved as set forth herein or on the record at the Sale Hearing, are hereby overruled on the merits in their entirety, except to the extent that such objection is (i) on account of a Cure Amount that is presently subject to the cure resolution process contemplated by Section 2.8(c) of the APA, or (ii) otherwise preserved in Paragraphs 41 and 42 of this Order.

3.      The APA with the Buyer, including all of its terms and conditions, and the Sale Transaction are hereby approved.

4.      Pursuant to Sections 363 and 365 of the Bankruptcy Code, the Debtors are authorized to (i) execute, deliver, perform under, consummate, and implement the APA and the Sale Transaction together with all additional documents as may be reasonably necessary or desirable to implement the APA and the Sale Transaction, and (ii) take any and all actions as they deem necessary, appropriate, or advisable for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer or reducing to possession the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA and the Sale Transaction, including, without limitation, any and all actions reasonably requested by the Buyer which are consistent with the APA and the Sale Transaction.

5.      Pursuant to Sections 105(a), 363(f), and 365(b) of the Bankruptcy Code, upon the Closing of the Sale Transaction:  (a) the transfer of the Purchased Assets to the Buyer pursuant to the APA shall constitute a legal, valid, and effective transfer of the Purchased Assets and shall vest the Buyer with all right, title, and interest in and to the Purchased Assets, and (b) except those specifically assumed by the Buyer pursuant to the APA and for Permitted Liens as specifically provided in the APA and subject to the objection preserved in Paragraphs 41 and 42 of this Order, the Purchased Assets shall be transferred to the Buyer free and clear of all liens,

claims, interests, and encumbrances—including, without limitation, (i) any infringement claims arising before the Closing Date, (ii) liabilities for any Seller Party Employees except liabilities arising for Buyer Employees arising after the Closing Date, and (iii) any and all Liabilities for Taxes (y) of or imposed on the Seller Parties (or any member or Affiliate of the Seller Parties) or (z) related or attributable to the Purchased Assets or the Business for any pre-Closing tax period—with any such liens, claims, interests, and encumbrances of which the Purchased Assets are sold free and clear to attach to the proceeds of the Sale Transaction, in the order of their priority, with the same validity, force, and effect which they had against the Purchased Assets prior to the entry of this Order, subject to any rights, claims, and defenses the Debtors, their estates, and all interested parties may possess with respect thereto; and all persons are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, against Buyer with respect to any such liens, claims, interests, and encumbrances.

6.      Any Debtor obligations related to Guild Residuals for the period prior to September 6, 2018, in connection with Purchased Titles for which such Guild Residuals are paid pursuant to the APA, shall not be subject to further claim, dispute or audit, including, without limitation, any claim, dispute, or audit based on performance of the Purchased Titles prior to the Closing Date, except to the extent provided for in Section 2.8 of the APA, and except as may otherwise be expressly set forth herein, this Order shall not cut off or be deemed to waive audit rights, if any, based on performance of the Purchased Titles for the time period between the Petition Date and the Closing Date.

7.      Any obligations related to Participations for the period prior to September 6, 2018 shall not be subject to further claim, dispute, or audit, including, without limitation, any claim, dispute, or audit based on performance of the Purchased Titles prior to the Petition Date.

8.      For the avoidance of doubt, except as may otherwise be expressly set forth herein, this Order shall not cut off or be deemed to waive audit rights, if any, based on performance of the Purchased Titles for the time period between the Petition Date and the Closing Date.

9.      On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Purchased Assets or a bill of sale transferring good and marketable title in the Purchased Assets.

10.      This Order is and shall be effective as a determination that all liens, claims, interests, and encumbrances (other than those expressly assumed by the Buyer or permitted to survive under this Order or the APA, including the Permitted Liens) shall be and are, without further action by any person or entity, unconditionally released, discharged, and terminated with respect to the Purchased Assets as of the Closing Date, except as may otherwise be set forth in the APA or this Order.  The provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of all liens, claims, interests, and encumbrances shall be self-executing, and notwithstanding the failure of the Debtors, the Buyer, or any other party to execute, file, or obtain releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and/or implement the provisions hereof, all liens, claims, interests, and encumbrances (other than those expressly assumed by the Buyer or permitted to survive under this Order or the APA, including the Permitted Liens) on or against such Purchased Assets, if any, shall be deemed released, discharged, and terminated.

11.     Except as otherwise provided herein or in the APA, on the Closing Date, the

Debtors' creditors are authorized to execute such documents and instruments and to take all other

actions as may be reasonably necessary to document and effectuate the release of their liens,

claims, interests, entitlements, and encumbrances in the Purchased Assets (other than those

expressly assumed by the Buyer or permitted to survive under the APA, including the Permitted

Liens), if any, as such liens, claims, interests, and encumbrances may have been recorded or may

otherwise exist.  If any such creditor fails to execute any such documents or instruments or take

any such actions, the Buyer is authorized to execute such documents and instruments and to take

such actions on behalf of the creditor so as to document and effectuate the release of such liens,

claims, interests, entitlements, and encumbrances.

12.     The Buyer and its successors and assigns shall not be deemed, as a result of any

action taken in connection with the transfer of the Purchased Assets, (i) to be a successor to the

Debtors or their estates, (ii) have, de facto or otherwise, merged or consolidated with or into the

Debtors or their estates, (iii) be a continuation or substantial continuation of the Debtors or any

enterprise of the Debtors, (iv) to have acquired the trade or business of any of the Debtors for

any purpose under applicable U.S. federal law (including the Bankruptcy Code and the Internal

Revenue Code of 1986, as amended), (v) to have acquired the workforce in place (including any

of the Debtors' employees) or goodwill or trademarks of the Debtors (other than certain

incidental and ancillary rights, which have no value, and are necessary for the ownership of or

right to use (including further development of) the Purchased Assets, or (vi) to be held out to the

public as a continuation of the Debtors or the Debtors' trade or business, and the Buyer shall

have no successor, transferee, or vicarious liability of any kind or character, including, but not

limited to, under any theory of foreign, federal, state, or local antitrust, environmental, successor,

tax, ERISA, assignee, or transferee liability, labor, product liability, employment, de facto

merger, substantial continuity, or other law, rule, or regulation, whether known or unknown as of

the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or

contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the

Debtors arising prior to the Closing Date.  Except as otherwise provided herein or in the APA,

the transfer of the Purchased Assets to the Buyer pursuant to the APA shall not result in the

Buyer or the Purchased Assets having any liability or responsibility for, or being required to

satisfy in any manner, whether in law or in equity, whether by payment, setoff, or otherwise,

directly or indirectly, any claim against the Debtors or against any insider of the Debtors or any

liens, claims, interests, or encumbrances.

13.      All payments owed to Buyer under Section 2.11(d)(ii) of the APA shall be

deemed administrative expenses under Sections 503 and 507 of the Bankruptcy Code.

14.      Upon the Closing, and except as otherwise expressly provided herein and in the

APA with respect to Assumed Liabilities, the Buyer shall not be liable for any claims against,

and liabilities of, the Debtors or any of the Debtors' predecessors or affiliates.

15.      Pursuant to Section 365 of the Bankruptcy Code, the Debtors are authorized to

assume the Assumed Contracts designated in the APA and this Order, make or cause to be made

the Cure Amounts set forth on **Exhibit B** hereto (or such other Cure Amounts as agreed, in

writing, by the Debtors, the Buyer and the counterparty to the applicable Assumed Contract or

ordered by this Court), and assign the Assumed Contracts to the Buyer.  Without limiting the

foregoing, the Material Contracts that are scheduled to be assumed shall be in full in full force

and effect and not in default, notwithstanding the Buyer not assuming any other Material

Contract or any contract listed on Schedule 10.3.  The Buyer shall pay the undisputed portion of

the Cure Amounts set forth on **Exhibit B** hereto (or such other Cure Amounts as agreed, in writing, by the Debtors, the Buyer and the counterparty to the applicable Assumed Contract or ordered by this Court) within one (1) business day of the Closing, or reasonably promptly thereafter.  Additionally, with respect to Awesomeness Distribution, LLC and Fox 2000 Pictures, a division of Twentieth Century Fox Film Corporation; Redrover Co, Ltd.; The Film Musicians Secondary Markets Fund; Endgame Releasing Co., LLC; Endgame Releasing Funding, LLC; Happy Pill Distribution, LLC; the Guilds; and Studiocanal S.A.S, unless otherwise agreed to between the Buyer and the respective counterparty, Buyer shall pay to counterparties to Assumed Contracts the difference between the estimated Cure Amounts for the period between September 6, 2018 through and including November 30, 2018 (the "Relevant Period") listed in the Cure Notice [Dkt No. 172, as amended by Dkt. No. 248] and the actual Cure Amounts due and owing for the Relevant Period.  For the period from December 1, 2018 through and including the Closing Date, the Buyer shall pay in the ordinary course those Participations and Residuals that come due post-Closing on account of Assumed Contracts.

16.     The Buyer has provided adequate assurance of future performance under the Assumed Contracts within the meaning of Section 365 of the Bankruptcy Code.

17.     The Assumed Contracts, consistent with the provisions contained herein, shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in Section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to Section 365(k) of the Bankruptcy Code, following payment of the Cure Amounts set forth on **Exhibit B** hereto (or such other Cure Amounts as agreed, in writing, by the Debtors, the Buyer and the counterparty to the applicable

Assumed Contract or ordered by this Court), the Debtors shall be relieved from any further liability with respect to the Assumed Contracts after such assignment and sale to the Buyer.

18.     All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in Section 365(b)(2) of the Bankruptcy Code) shall be deemed cured, upon payment of the Cure Amounts set forth on **Exhibit B** hereto (or such other Cure Amounts as agreed, in writing, by the Debtors, the Buyer and the counterparty to the applicable Assumed Contract or ordered by this Court), and the Buyer shall have no liability arising or accruing under the Assumed Contracts on or prior to the Closing, except as otherwise expressly provided in the APA or this Order.  The non-debtor counterparties to the Assumed Contracts are barred from asserting against the Debtors, their estates, the Buyer, and their respective successors and assigns, any default or unpaid obligation allegedly arising or occurring before the Closing, any pecuniary loss resulting from such default, or any other obligation under the Assumed Contracts arising or incurred prior to the Closing, other than the Cure Amounts set forth on **Exhibit B** hereto (or such other Cure Amounts as agreed, in writing, by the Debtors, the Buyer and the counterparty to the applicable Assumed Contract or ordered by this Court).

19.     The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions or of the right of the Debtors or the Buyer, as the case may be, to enforce every term and condition of the Assumed Contracts.  The validity of the assumption, assignment, and sale of the Assumed Contracts to the Buyer shall not be affected by any existing dispute between any of the Debtors and any non-debtor counterparty to such Assumed Contract.  Any party that may have had the

right to consent to the assignment of any Assumed Contract is deemed to have consented for the purposes of Section 365 of the Bankruptcy Code.

20.     To the extent a non-debtor counterparty to an Assumed Contract failed to timely object to a Cure Amount set forth on **Exhibit B** hereto, such Cure Amount shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount at any time.

21.     The consideration provided by the Buyer under the APA constitutes (i) reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Voidable Transactions Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable Laws of the United States, any state, territory or possession thereof, or the District of Columbia.  The consideration provided by the Buyer for the Purchased Assets under the APA is fair and reasonable and may not be avoided under Section 363(n) of the Bankruptcy Code.

22.     The APA and the Sale Transaction are undertaken by the Buyer without collusion and in good faith, as that term is used in Section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the APA and the Sale Transaction shall not affect the validity of the sale of the Purchased Assets to the Buyer, unless this Order is duly stayed pending such appeal.  The Buyer is a good faith Buyer of the Purchased Assets and is entitled to all of the benefits and protections afforded by Section 363(m) of the Bankruptcy Code.

23.     All persons that are in possession of some or all of the Purchased Assets as of or after the Closing are hereby directed to surrender possession of such Purchased Assets to the

Buyer as of the Closing or at such time thereafter as the Buyer may request.  The Debtors agree to exercise commercially reasonable efforts to assist the Buyer in assuring that all persons that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets in which the Debtors hold an interest will surrender possession of the Purchased Assets either to (i) the Debtors before the Closing Date, or (ii) the Buyer on or after the Closing Date.

24.     This Order is and shall be binding upon and shall govern acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Buyer is the assignee and owner of the Purchased Assets free and clear of all liens, claims, interests, and encumbrances (other than those expressly assumed by the Buyer or permitted to survive under the APA) (all such entities being referred to as "Recording Officers").  All Recording Officers are authorized to strike recorded liens, mortgages, claims, interests, collateral assignments, and encumbrances against the Purchased Assets recorded prior to the date of this Order unless the APA expressly provides that the Buyer is acquiring the Purchased Assets subject to such liens, mortgages, claims, interests, collateral assignments, and encumbrances.

25.     Following the Closing, no holder of any liens, mortgage, claims, interests, entitlements, or encumbrances on or arising from the Purchased Assets (other than those expressly assumed by the Buyer or permitted to survive under the APA, including the Permitted Liens, or this Order) or other party in interest may interfere with the Buyer's use and enjoyment of the Purchased Assets based on or related to such liens, claims, interests, entitlements, and

01:23983204.2

encumbrances, or any actions that the Debtors may take in their Chapter 11 Cases, and no party may take any action to prevent, interfere with, or otherwise enjoin consummation of the Sale Transaction. Without limiting the foregoing, all Notices of Consent and Irrevocable Assignments, Notices of Assignment, Interparty Agreements, payment direction letters, and collection account management agreements and any similar or analogous documents, instruments or agreements that direct any proceeds of the Purchased Assets to any accounts maintained at Bank of America, N.A., in its capacity as Agent (as defined below) under the Senior Secured Credit, Agreement (as defined below), or to any party or person other than the Buyer or its designees that are not expressly assumed shall be deemed rejected and all payment instructions, consent rights, approval rights and benefits of any nature arising thereunder in favor of the Agent and/or any such parties or persons (other than Buyer) shall be immediately inoperative and ineffective immediately and automatically upon the Closing without further notice or consent by any third party. Notwithstanding the foregoing, the rights in favor of the other parties to assumed agreements shall remain in full force and effect. The Agent has not objected to the Buyer's delivery of notice to counterparties to all such agreements and documents to direct proceeds on account of the Purchased Assets to an account designated by Buyer and has agreed to execute and deliver to the relevant account debtors, collection account managers, and other third parties, any notices reasonably requested by Buyer to advise and confirm to such relevant account debtors, collection account managers, and other third parties that all proceeds on account of the Purchased Assets shall be directed to an account designated by Buyer instead of an account maintained by the Agent, in each case upon Buyer's reasonable request and at Buyer's expense. If after any such reasonable request the Agent (at Buyer's expense) fails to execute any such documents or notices or take any such actions, the Buyer is authorized to

execute such documents and notices and to take such actions on behalf of the Agent solely so as to document and effectuate the termination of its interests, entitlements to receipt of such proceeds and to redirect such proceeds to an account designated by Buyer.  Further, parties to assumed Notices of Consent and Irrevocable Assignments, Notices of Assignment, Interparty Agreements, payment direction letters, collection account management agreements, and any similar or analogous documents, instruments or agreements that reflect or provide for the making of a payment to a counterparty to a rejected contract shall not be permitted to make such payment, provided that such parties have been sent a notice directing payment to an account specified by Buyer and/or directing such parties that such payments arising under such rejected contract are no longer payable to the counterparty.

26.     If, after the Closing Date, the Debtors receive any proceeds of the Purchased Assets (including, without limitation, payments that are cash proceeds of Assumed Contracts credited or deposited to any of Debtors' bank accounts maintained by the Agent), the Debtors will (i) hold such proceeds in constructive trust for the benefit of the Buyer, (ii) immediately notify the Buyer of such receipt, (iii) immediately (and not more than two (2) business days after receipt) transfer, convey, and pay over such proceeds to an account designated by Buyer, and (iv) take any and all actions reasonably requested by the Buyer in order to change the payment instructions with respect to such Assumed Contracts such that proceeds therefrom are payable solely to the account designated by Buyer. For the avoidance of doubt, (a) the foregoing does not apply for proceeds that constitute Excluded Assets (b) neither the Agent nor any lender under the Senior Secured Credit Agreement is required to take any action, or refrain from taking any action, pursuant to this Paragraph 26 or any other provision of this Order other than at Buyer's sole cost and expense, and (c) nothing in this Order shall limit the right of any party to the Senior

Secured Credit Agreement, acting in its capacity as a depository with respect to any account referenced in this Order or any account containing any Purchased Asset (or the proceeds thereof), to payment (including, without limitation, by setoff) of any fees, expenses, or other amounts to which such party may be entitled in its capacity as a depository.

27.     No account debtor, licensee, bank, collection account manager, or other person or entity honoring a notice or direction given by the Debtors, the Buyer, and/or the Agent to pay the proceeds of any Purchased Asset (including any Assumed Contract) to an account designated by the Buyer shall be liable for any claim for double payment of such sum due to such person being a party to any Notices of Consent and Irrevocable Assignments, Notices of Assignment, Interparty Agreements, payment direction letters, collection account management agreements, or any similar or analogous documents, instruments, or agreements that direct any proceeds of the Purchased Assets to any accounts maintained at Bank of America, N.A. or to any party or person other than the Buyer or its designees that are not expressly assumed by Buyer.

28.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions authorized herein, including the APA and the Sale Transaction.

29.     Notwithstanding any provision in this Order or the APA to the contrary, the assumption and assignment to the Buyer of any Assumed Contracts to which Entertainment One Films Canada, Inc. ("eOne Canada"), Entertainment One UK Limited ("eOne UK"), and/or Entertainment One Benelux BV ("eOne Benelux" and together with eOne Canada and eOne UK, "eOne") are a party (collectively, the "eOne Agreements"), shall in each case be conditioned upon, and subject to, all of the terms of the eOne Agreements, including (i) eOne's exclusive distribution rights in the motion pictures that are the subject thereof, and (ii) eOne's rights to adjustments and refunds of minimum guarantees or other recoupable amounts from the Buyer, in

each case as provided for under the eOne Agreements, and all such rights are, and will remain, governed by the specific terms of the applicable eOne Agreement.

30.     This Order shall be binding in all respects upon the terms and provisions of the APA and this Order shall inure to the benefit of the Debtors, their estates, all creditors, all account debtors, all licensors and licensees of rights in Purchased Assets, all holders of equity interest in the Debtors, any holders of liens, claims, interests, or encumbrances against or on all or any portion of the Purchased Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Buyer and its affiliates, successors, and assigns, and any subsequently appointed estate representative in the Chapter 11 Cases.  The APA, the Sale Transaction, and this Order shall be enforceable against and binding upon, and shall not be subject to rejection or avoidance by, any chapter 7 or chapter 11 trustee appointed in the Chapter 11 Cases.  Further, nothing contained in any plan of reorganization (or liquidation) confirmed in these Chapter 11 Cases or any order confirming any plan of reorganization (or liquidation) or any other order entered in these Chapter 11 Cases shall conflict with or derogate from the provisions of the APA or the terms of this Order.

31.     The APA and any related agreements, documents, or other instruments contemplated thereby may be amended by the Debtors and the Buyer in a writing signed by such parties without further order of the Court, provided that any such amendment does not have an adverse effect on the Debtors or the Debtors' estates or to creditors and contract counterparties.

32.     *The Loft.*  Pursuant to that certain Distribution Rights Acquisition and Financing Agreement, dated as of August 14, 2014 (as amended, the "Loft Acquisition Agreement") between Loft International N.V. ("Loft International") and Debtor Open Road Films, LLC ("ORF"), Loft International licensed to ORF certain rights and interests in the film, *The Loft* (the

"Loft Licensed Rights").  Loft International has agreed to sell the Loft Licensed Rights as well as its interests in, to and under the Loft Acquisition Agreement to Buyer or its designee (collectively, "Loft SPV") for consideration as agreed to between the parties, payable as follows: (i) Buyer to pay to the Guilds the Cure Amount owing on account of Guild Residuals for *The Loft*, and (ii) Loft SPV to make a lump-sum payment to Loft International for the remaining balance.  The definitive documentation necessary to implement this Paragraph will be finalized prior to the Closing.  At Closing, (a) ORF will assume the Loft Acquisition Agreement and assign it to the Buyer pursuant to Section 365 of the Bankruptcy Code, and (b) Loft International will assign the Loft Acquisition Agreement and the Loft Licensed Rights to the Loft SPV.  In the event that definitive documentation is not finalized, the Buyer may, in its discretion, remove from the schedule of Assumed Contracts any contract related to the Exploitation of *The Loft*, and upon removal such contract shall be deemed an Excluded Asset.  The parties shall work in good faith to consummate the transactions contemplated by this Paragraph.   For the avoidance of doubt, upon the assumption and assignment of the Loft Acquisition Agreement, the Cure Amount (if any) owing under such agreement shall be the sole obligations of Buyer (with such obligation of Buyer subject in all respects to the agreements between Buyer, Loft SPV, and Loft International, including providing for waiver of such Cure Amounts), and any definitive documentation between the parties may not provide for any claim against the estates.

33.    At Closing, the Debtors will turn over to Redrover Co., Ltd. ("Redrover") (and the Buyer will assert no rights in) all funds in the account held by ORF in Bank of America Account No. ending with 9017 (the "Spark P&A Funds"), provided that such turnover shall be net of a $670.73 payment to be made by the Debtors from the Spark P&A Funds to a third-party P&A vendor.

34.    *Film Musicians Secondary Markets Fund*. The Assumption Agreements in favor of the Film Musicians Secondary Markets Fund in connection with the films *Machete Kills* and *Side Effects* shall be Assumed Contracts (on a go forward basis) and are being assumed and assigned hereunder subject to payment of the Cure Amounts referenced on **Exhibit B** and as provided in this Order.

35.    *Showtime*. Pursuant to that certain Exclusive Theatrical Output Agreement between Showtime Networks, Inc. ("Showtime") and Debtor ORF, dated as of August 2013 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, and including all Exhibits and Schedules thereto, the "Showtime Output Agreement"), ORF licensed to Showtime certain of its rights and interests to certain films.  In resolution of Showtime's limited objection and reservation of rights to the Sale Motion and supplement thereto [Docket Nos. 305, 347], Showtime and Buyer have agreed to an amendment to the Showtime Output Agreement (the "Showtime Amendment").   The Showtime Amendment will be finalized prior to the Closing.  At Closing, provided that the Showtime Amendment in a form reasonably acceptable to the Debtors, Buyer, and Showtime, is executed, ORF will assume the Showtime Output Agreement (as amended) and assign it to the Buyer pursuant to Section 365 of the Bankruptcy Code.  This Court will retain jurisdiction over resolution of Showtime's objections and the Debtors' responses thereto, all of which are reserved pending such finalization.  Assumption and assignment of the Showtime Output Agreement shall be effective only upon the execution by all parties of the Showtime Amendment. The parties shall work in good faith to consummate the transactions contemplated by this Paragraph.

36.    *Redrover*. The following agreements between ORF and Redrover relating to the films *The Nut Job* and *The Nut Job 2,* shall be assumed by ORF and assigned to the Buyer at the

Closing pursuant to Section 365 of the Bankruptcy Code (collectively, the "Redrover-Nut Job Agreements"): (i) Short Form Amended and Re-stated Distribution Rights Acquisition and Financing Agreement dated July 16, 2013, (ii) First Amendment to Short Form Amended and Re-stated Distribution Rights Acquisition and Financing Agreement dated October 16, 2013, (iii) Second Amendment to Short Form Amended and Re-stated Distribution Rights Acquisition and Financing Agreement dated October 27, 2013, (iv) Distribution Rights Acquisition and Financing Agreement dated August 11, 2016, and (v) Amendment No. 1 to Distribution Rights Acquisition and Financing Agreement dated March 15, 2017. The Buyer shall pay the Cure Amounts for the Redrover-Nut Job Agreements within one (1) business day of the Closing. Redrover withdraws its *Limited Objection to Sale Motion and Notice of Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 344].

37.     *Silver Reel/The Host*. Silver Reel Entertainment Mezzanine Fund, L.P. for itself and on behalf of The Host Film Holding LLC (collectively "Silver Reel"), the Buyer and the Debtors have resolved Silver Reel's objections to the Motion [Docket No. 284] (the "Silver Reel Objection") by settling on a Cure Amount of $100,000 in full and final satisfaction of: (i) the Cure Amount of $31,894.33 identified in that certain *Notice of Filing of Schedule of Contracts with Amended Cure Amounts* [Docket No. 248], and (ii) the amount of $120,000 asserted in the Silver Reel Objection as due under Amendment #1 dated December 4, 2012.

38.     *Chef*. Sous Chef, LLC ("Sous Chef"), the Buyer and the Debtors have resolved Sous Chef's objections to the Motion [Docket Nos. 282 and 385] (collectively, the "Sous Chef Objection") by agreeing on a Cure Amount of $600,000, which is comprised of (i) $108,512 for amounts owing under the Distribution Agreement referred to in the Sous Chef Objection (referred to herein as the "Sous Chef Distribution Agreement") and (ii) $491,488, in full and

final satisfaction and resolution of any and all claims asserted against the Debtors in connection with the demanded arbitration referred to in the Sous Chef Objection (referred to herein as the "Sous Chef Arbitration"), which claims are deemed liquidated and fixed in such amount. Sous Chef, the Buyer and the Debtors agree that (i) such Cure Amount is inclusive and payment in full of any and all amounts due to Sous Chef under the Sous Chef Distribution Agreement through and including November 30, 2018 (with any and all audit, dispute, or similar rights for all time periods prior to September 6, 2018 waived in accordance with Paragraph 7 hereof), (ii) such Cure Amount resolves in full the Sous Chef Arbitration, and (iii) neither the Buyer nor the Debtors shall have any further liability with respect to the Sous Chef Arbitration or any claims raised thereby, which are hereby released. Payment of the Cure Amount shall be made by check to Sous Chef's Delaware counsel for deposit into counsel's client trust account.

39.     *Spotlight*. Spotlight Film, LLC ("Spotlight"), the Buyer and the Debtors have resolved Spotlight's objections to the Motion [Docket No. 338] (the "Spotlight Objection") by settling on a Cure Amount consisting of the following amounts, in full payment of any and all amounts due to Spotlight under the Distribution Agreement referred to in the Spotlight Objection (the "Spotlight Distribution Agreement") for the period on or before November 30, 2018: (i) in respect of the audit conducted by Spotlight in respect of the period ending on June 30, 2018, $200,000 (which payment, for the avoidance of doubt, resolves any and all rights of Spotlight to dispute or audit any amounts due on or before June 30, 2018), and (ii) in respect of participations owing through and including November 30, 2018, $120,000.  For the avoidance of doubt, any audit rights under the Spotlight Distribution Agreement shall be subject to Paragraph 7 of this Order.

40.  *AISP*. The assumption and assignment to the Buyer of that certain Distribution Rights Acquisition and Financing Agreement (the "AISP Distribution Agreement") between Debtor ORF, as distributor, and All I See Partners 2015 L.P. ("AISP"), as producer and licensor, relating to the feature film titled *All I See Is You* (the "Picture"), and the final resolution of the Opposition and Reservation of Rights filed by AISP [Docket No. 288], shall be conditioned upon and subject to the following provisions: (a) subject to Paragraph 7 of this Order, AISP shall retain any and all rights, claims, and interests under the AISP Distribution Agreement, including the right to audit the revenues and expenses, including any P&A (as defined in the AISP Distribution Agreement) expenses, and recover any amounts shown due and owing under the AISP Distribution Agreement for the period on and after September 6, 2018, (b) on and after the Closing, Buyer shall be obligated to perform any and all obligations that become due and owing under the AISP Distribution Agreement, including, without limitation, the obligations to facilitate and pay any amounts shown due and owing on account of any audit for the period on and after September 6, 2018, and (c) payment of the following Cure Amounts to AISP: (i) within two (2) business days of the entry of this Order, the Debtors shall return, pay and turn over to AISP (and Buyer shall assert no right in or to) the sum of $147,736.66 comprising AISP's funds held in the prints and advertising account (Bank of America account number ending with 0179) for prints and advertising expenses in connection with the Picture, and (ii) within one (1) business day of the Closing, the Debtors or Buyer shall pay to AISP (and Buyer shall assert no right in or to) the sum of $27,740.00.

41.    *Endgame/Happy Pill Objection*:[5]  Endgame Releasing Co., LLC and Endgame

Releasing Funding, LLC (collectively, "Endgame"), Happy Pill Distribution, LLC and Happy

Pill, LLC (collectively, "Happy Pill", and together with Endgame, the "Endgame Parties"), the

Buyer, the Debtors and Bank of America, N.A., as administrative agent (in such capacity, the

"Agent") for itself and the other lender parties to the Senior Secured Credit Agreement[6]

(together, and for all purposes of the release provisions herein solely in their respective

capacities as lender parties to the Senior Secured Credit Agreement, the "Prepetition Lenders"),

and as L/C Issuer under and as defined in the Senior Secured Credit Agreement, the Prepetition

Lenders and the other Secured Parties as defined in the Senior Secured Credit Agreement

(together with the Prepetition Lenders, the L/C Issuer and the Agent, the "Prepetition Secured

Parties"), have agreed to resolve the Endgame Objection[7] and the Happy Pill Objection[8]

---

[5] *Endgame/Happy Pill Objection:*  The objections filed by Endgame Releasing Co., LLC and Endgame Releasing Funding, LLC (collectively, "Endgame"), and Happy Pill Distribution, LLC (together with Happy Pill, LLC, collectively, "Happy Pill", and together with Endgame, the "Endgame Parties") [Docket Nos. 333, 334], and all of the Endgame Parties' rights, remedies, liens, claims and encumbrances as are more particularly described in the Endgame/Happy Pill Objection, are expressly preserved and, for the avoidance of doubt, the sale shall be subject to the Endgame Parties' liens, claims, interests and encumbrances pending satisfaction of the Endgame Closing Conditions (defined herein) or resolution of the Endgame/Happy Pill Objection, including liquidation of the Cure Amounts with respect to the Endgame/Happy Pill-related contracts.

[6]    As defined in the *Final Order, Pursuant to Sections 105(a), 361, 362, 363(c), 505(b), and 507(b) of the Bankruptcy Code, (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection, and (III) Granting Related Relief*, entered at Docket No. 135 in the chapter 11 cases of Open Road Films, LLC, and its affiliated debtors, jointly administered in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case No. 18-12012 (the "Chapter 11 Cases").

[7]    The "Endgame Objection" is the *Objection and Reservation of Rights of Endgame Releasing Co., LLC, and Endgame Releasing Funding, LLC to Debtors' Motion for an Order (I) Approving the Sale of Substantially all of the Debtors' Assets and (II) Authorizing the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases* [Docket No. 334 in the Chapter 11 Cases].

(collectively, the "Endgame/Happy Pill Objection").  For consideration agreed to by and between Endgame, Happy Pill and Buyer including, among other things, payment by Buyer to Endgame or its designee in an amount agreed to by Buyer, Endgame and Happy Pill (the "Endgame Payment"), and in consideration of resolving the Endgame/Happy Pill Objection (including and subject to the releases in the following Paragraph) and upon satisfaction of the Endgame Closing Conditions (defined below):  (i) Endgame will sell to Buyer on an "as is, where is" basis all of Endgame's rights under the loan agreements, interparty agreements and certain related agreements entered into by Endgame and certain producers and other parties, related to the following films: *Side Effects*, *Jobs*, and *A Haunted House*, (ii) Endgame will sell to Buyer on an "as is, where is" basis all of Endgame's rights, solely as against any third party other than any Debtor Releasing Party and any Lender Release Party (in their capacities as such), under the financing agreements, intercreditor agreements and certain related agreements for the following films: *Snowden*, *The Nut Job*, *A Haunted House 2*, *The Gunman*, *and Homefront*; and (iii) Happy Pill will sell and assign to Buyer on an "as is, where is" basis all of its rights, title and interests in and to the film, *Side Effects* (the "Side Effects Rights") under that certain Distribution Rights Acquisition Agreement, dated as of April 6, 2012 (as amended, the "Side Effects Acquisition Agreement") between Happy Pill and ORF, and Buyer will assume all obligations of Happy Pill with respect to the Side Effects Rights and Side Effects Acquisition Agreement including payment to the Guilds owing on account of Guild Residuals for *Side Effects*.  At Closing, ORF will assume the Side Effects Acquisition Agreement and assign it to the Buyer pursuant to

---

8    The "Happy Pill Objection" is the Objection and Reservation of Rights of Happy Pill Distribution, LLC to Debtors' *Debtors' Motion for an Order (I) Approving the Sale of Substantially all of the Debtors' Assets and (II) Authorizing the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases* [Docket No. 333 in the Chapter 11 Cases].

Section 365 of the Bankruptcy Code; provided, that the assumption and assignment of the Side Effects Acquisition Agreement are subject to the terms of this Paragraph.  Upon the latter of the Closing or satisfaction of the Endgame Closing Conditions, (a) Happy Pill will assign the Side Effects Acquisition Agreement and the Side Effects Rights to the Buyer, and (b) Buyer will pay to Endgame or its designee the Endgame Payment.  The definitive documentation necessary to implement this Paragraph as is mutually agreed upon by the Endgame Parties and the Buyer (the "Endgame/Raven Transaction Documents") will be finalized prior to the Closing.  The Endgame/Happy Pill Objection and all of the Endgame Parties' rights, remedies, liens, claims and encumbrances as are more particularly described in the Endgame/Happy Pill Objection are expressly preserved pending satisfaction of all of the following conditions: (i) the Bankruptcy Court's entry of this Order, (ii) Buyer and the Endgame Parties' execution of the Endgame/Raven Transaction Documents, and (iii) receipt by Endgame or its designee of the Endgame Payment from the Buyer (the "Endgame Closing Conditions"); for the avoidance of doubt, and notwithstanding anything to the contrary in this Order, the sale shall be subject to the Endgame Parties' liens, claims, interests and encumbrances pending satisfaction of the Endgame Closing Conditions, except as otherwise Ordered by the Court in connection with the resolution of the Endgame/Happy Pill Objection.  Endgame, Happy Pill, the Debtors and the Buyer shall work in good faith to consummate the transactions contemplated by this Paragraph.

42.    Endgame/Happy Pill Objection Release Provisions

a.    Prepetition Secured Party Releases.

i.    Bank of America, N.A., as administrative agent (in such capacity, the "Agent") for itself and the other lender parties to the Senior Secured Credit Agreement[9]

---

[9]    As defined in the *Final Order, Pursuant to Sections 105(a), 361, 362, 363(c), 505(b), and 507(b) of the Bankruptcy Code, (I) Authorizing Debtors to Use Cash Collateral, (II)*

(together, and for all purposes of the release provisions herein solely in their respective capacities as lender parties to the Senior Secured Credit Agreement, the "Prepetition Lenders"), and as L/C Issuer under and as defined in the Senior Secured Credit Agreement, the Prepetition Lenders and the other Secured Parties as defined in the Senior Secured Credit Agreement (together with the Prepetition Lenders, the L/C Issuer and the Agent, the "Prepetition Secured Parties"), on behalf of themselves, and each of their respective predecessors, successors, assigns, representatives, agents, shareholders, members, officers, directors, subsidiaries, affiliates, partners, insiders and related entities (each a "Lender Release Party" and collectively, the "Lender Release Parties"), do by the agreement embodied in this Order fully and forever waive, remise, release and discharge Endgame Releasing Co., LLC, Endgame Releasing Funding, LLC, Happy Pill Distribution, LLC and Happy Pill, LLC and each of their respective predecessors, successors, assigns, representatives, agents, shareholders, members, officers, directors, investors, subsidiaries, affiliates, partners, insiders and related entities (each an "Endgame Release Party" and collectively, the "Endgame Release Parties") from any and all sums of money, accounts, claims, demands, contracts, actions, debts, controversies, agreements, liabilities, obligations, damages and causes of action whatsoever, of whatever kind or nature, whether known or unknown, fixed or contingent, matured or unmatured, or suspected or unsuspected which any of the Lender Release Parties now owns, holds, has or claims to have, or at any prior time owned, held, had or claimed to have against any of the Endgame Release Parties at any time from the beginning of time up through and including the date of Closing, in each case arising under or related to any intercreditor agreements, interparty agreements, or any other agreements entered into by and between any of the Endgame Release Parties and the Lender Release Parties in connection with any loans or prints and advertising financing agreements related to any of the following films: Snowden, The Nut Job, A Haunted House 2, The Gunman, Homefront, Side Effects, Jobs, and A Haunted House (each an "Endgame Picture" and collectively, the "Endgame Pictures") or any other matters related thereto or otherwise arising in connection with the Chapter 11 Cases.  Without limiting the generality of the foregoing, the Lender Release Parties further waive, remise, release, and discharge each of the Endgame Release Parties from any claims related to any payments made by the Buyer to any of the Endgame Release Parties pursuant to this Order and any transactions between the Buyer and any Endgame Release Parties as may be agreed to by the Buyer Parties and any of the Endgame Release Parties in connection

---

*Granting Adequate Protection, and (III) Granting Related Relief*, entered at Docket No. 135 in the chapter 11 cases of Open Road Films, LLC, and its affiliated debtors, jointly administered in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case No. 18-12012 (the "Chapter 11 Cases").

with the Endgame Release Parties' resolution of the Happy Pill Objection[10] and the Endgame Objection.[11]

        b.    <u>Endgame / Happy Pill Releases</u>.  The Endgame Release Parties do by the agreement embodied in this Order fully and forever waive, remise, release and discharge the Lender Release Parties and the Debtor Releasing Parties (as defined below) from any and all sums of money, accounts, claims, demands, contracts, actions, debts, controversies, agreements, liabilities, obligations, damages and causes of action whatsoever, of whatever kind or nature, whether known or unknown, fixed or contingent, matured or unmatured, or suspected or unsuspected which any of the Endgame Release Parties now owns, holds, has or claims to have, or at any prior time owned, held, had or claimed to have against any of the Lender Release Parties or the Debtors Releasing Parties at any time from the beginning of time up through and including the date of Closing, including, without limitation, in each case arising under or related to any intercreditor agreements, interparty agreements, or any other agreements entered into by and between any of the Endgame Release Parties and either the Debtor Releasing Parties or the Lender Release Parties in connection with any loans or prints and advertising financing agreements related to any of the Endgame Pictures or any other matters related thereto or otherwise arising in connection with the Chapter 11 Cases, including, without limitation, any claims against the Debtors or their bankruptcy estates. Without limiting the generality of the foregoing, the Endgame Release Parties further waive, remise, release, and discharge each of the Lender Release Parties from any claims related to any payments made to the Lender Release Parties from the proceeds of sale pursuant to this Order.

        c.    <u>Debtor Releases</u>.[12] Except as to those obligations created by or expressly reserved under this Order (if any), the Debtors, on behalf of themselves, and their respective predecessors, successors, assigns, representatives and bankruptcy estates, (the "<u>Debtor Releasing Parties</u>"), do by the agreement embodied in this Order fully and forever remise, release, waive, and discharge the Endgame Release Parties from any and all sums of money, accounts, claims, demands, contracts, actions, debts, controversies, agreements, liabilities, obligations, damages and causes of action whatsoever, of whatever kind or nature, whether known or unknown, fixed

---

[10]   The "<u>Happy Pill Objection</u>" is the Objection and Reservation of Rights of Happy Pill Distribution, LLC to Debtors' *Debtors' Motion for an Order (I) Approving the Sale of Substantially all of the Debtors' Assets and (II) Authorizing the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases* [Docket No. 333 in the Chapter 11 Cases].

[11]   The "<u>Endgame Objection</u>" is the *Objection and Reservation of Rights of Endgame Releasing Co., LLC, and Endgame Releasing Funding, LLC to Debtors' Motion for an Order (I) Approving the Sale of Substantially all of the Debtors' Assets and (II) Authorizing the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases* [Docket No. 334 in the Chapter 11 Cases].

[12]   For purposes of the Debtor Releases only in this Paragraph 42c., the Endgame Release Parties shall mean Endgame Releasing Co., LLC, Endgame Releasing Funding, LLC, Happy Pill Distribution, LLC and Happy Pill, LLC and each of their respective predecessors, successors, assigns, and representatives.

or contingent, matured or unmatured, or suspected or unsuspected by them which any of them now owns, holds, has or claims to have, or at any prior time owned, held, had or claimed to have against any of the Endgame Release Parties related to the Debtors or their bankruptcy estates at any time from the beginning of time up through and including the date of Closing including, without limitation, any claims (i) that the Debtor Releasing Parties have or may assert under Chapter 5 of the Bankruptcy Code, and (ii) related to any payments made by the Buyer or its designee to any of the Endgame Release Parties pursuant to this Order and any transactions as may be agreed to by the Buyer and the Endgame Release Parties in connection with the Endgame Release Parties' resolution of the Endgame/Happy Pill Objection. Without limiting the generality of the foregoing, the Debtor Releasing Parties waive and release their rights to challenge the validity, amount, or priority of any liens, claims, interests or encumbrances asserted by the Endgame Release Parties under any loan agreements, prints and advertising agreements or other agreements entered into by and between any of the Debtor Releasing Parties and the Endgame Releasing Parties related to the Endgame Pictures.

        d.    <u>Waiver of Unknown Claims</u>.  The Endgame Release Parties, on the one hand, and the Lender Release Parties and the Debtor Releasing Parties, on the other hand, each of them acknowledge that there is a risk that subsequent to entry of this Order, one or more of them will discover facts or will discover, claims, debts, liabilities, demands, obligations, costs, expenses, attorney's fees, actions or causes of action which were unknown or unanticipated at the time this Order is entered which may have materially affected their respective decisions to give the releases set forth herein (collectively the "<u>Unknown Claims</u>"). Despite this knowledge and understanding, and except as is otherwise set forth in this Order or any documents contemplated hereunder, the Lender Release Parties and the Debtor Releasing Parties, on the one hand, and the Endgame Release Parties, on the other hand, understand and agree: (a) that they are assuming the risk of each and every Unknown Claims, and (b) that they are releasing all claims of every kind or nature whatsoever, known or unknown, matured or unmatured, suspected or unsuspected, and that arise under or relate to any intercreditor agreements, interparty agreements, or any other agreements entered into by and between any of the Endgame Release Parties, on the one hand, and the Debtor Releasing Parties and the Lender Release Parties, on the other hand, in connection with any loans or prints and advertising financing agreements related to the Endgame Pictures, and in connection herewith, each of the Debtor Releasing Parties and the Lender Release Parties, on the one hand, and the Endgame Release Parties, on the other hand, expressly waives all rights under applicable law including, without limitation, Section 1542 of the Civil Code of California, which provides as follows:

        **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MIGHT HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

    43.    The foregoing Paragraph 42 shall be effective only upon satisfaction of the

Endgame Closing Conditions.

44.     Notwithstanding any other provision in this Order, non-Debtor licensees that are parties to executory contracts not being assumed shall maintain their rights pursuant to Section 365(n) of the Bankruptcy Code (if any), provided however that, except for payments that were already paid to Debtors prior to the Closing Date pursuant to the terms of such rejected contracts, any payments due and payable on account of the Exploitation of any of the Purchased Titles under any such rejected contracts, including royalty payments under Section 365(n)(2)(B) of the Bankruptcy Code, shall be deemed Purchased Assets and such payments shall be due and payable directly to the Buyer.

45.     The failure to include specifically any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

46.     To the extent of any inconsistency between the provisions of this Order, the APA, and any documents executed in connection therewith, the provisions contained in the Order, the APA, and any documents executed in connection therewith shall govern, in that order.

47.     Notwithstanding the provisions of Bankruptcy Rule 6004(g) and 6006(d), this Order shall be effective and enforceable immediately and shall not be stayed.

48.     Pursuant to that certain Distribution Rights Acquisition Agreement, dated as of December 9, 2016 (as amended, the "Promise Acquisition Agreement") between Promise Acquisition, LLC ("PALLC"), as successor by assignment from Promise Distribution, LLC, and Debtor ORF, and in connection with the assumption and assignment of the Promise Acquisition Agreement to Buyer, the Free TV Rights granted to ORF pursuant to Promise Acquisition Agreement are assigned by ORF, free of any and all liens, to PALLC upon the Closing pursuant

to Section 365 of the Bankruptcy Code, and the Promise Acquisition Agreement shall be amended to exclude the Free TV Rights.

49.     This Court shall retain exclusive jurisdiction and power to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Sale Transaction, and the APA, all amendments thereto and any waivers and consents thereunder, and each of the agreements executed in connection therewith and the transactions contemplated thereby; provided, however, the Court shall not retain jurisdiction regarding the Resolved Acquisition Agreements.

**Dated: December 19th, 2018**
**Wilmington, Delaware**

**LAURIE SELBER SILVERSTEIN**
**UNITED STATES BANKRUPTCY JUDGE**