**THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

</div>

| | |
|---|---|
| In re:<br><br>OPEN ROAD FILMS, LLC, a Delaware limited liability company, *et al.*[1],<br><br><div align="right">Debtors.</div> | Chapter 11<br><br>Case No.: 18-12012 (LSS)<br><br>(Jointly Administered) |

<div align="center">

**DISCLOSURE STATEMENT FOR**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY**
**DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

</div>

| | |
|---|---|
| Michael R. Nestor, Esq. (Bar No. 3526)<br>Robert F. Poppiti, Jr., Esq. (Bar No. 5052)<br>Ian J. Bambrick (Bar No. 5455)<br>YOUNG CONAWAY STARGATT & TAYLOR, LLP<br>Rodney Square, 1000 North King Street<br>Wilmington, Delaware 19801<br>Tel: (302) 571-6600<br>Fax: (302) 571-1253 | Michael L. Tuchin, Esq.<br>Jonathan M. Weiss, Esq.<br>Sasha M. Gurvitz, Esq.<br>KLEE, TUCHIN, BOGDANOFF & STERN LLP<br>1999 Avenue of the Stars, 39th Floor<br>Los Angeles, CA 90067<br>Tel: (310) 407-4000<br>Fax: (310) 407-9090 |
| *Counsel for the Debtors* ||
| Robert J. Feinstein (NY Bar No. 1767805)<br>Maxim B. Litvak (CA Bar No. 215852)<br>Colin R. Robinson (DE Bar No. 5524)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>919 Market Street, 17th Floor | P.O. Box 8705<br>Wilmington, Delaware  19899-8705<br>Tel:  (302) 652-4100<br>Fax:  (302) 652-4400 ||
| *Counsel for the Official Committee of Unsecured Creditors* ||

---

[1]  The Debtors and the last four digits of their taxpayer identification numbers include:  Open Road Films, LLC (4435-Del.); Open Road Releasing, LLC (4736-Del.); OR Productions LLC (5873-Del.); Briarcliff LLC (7304-Del.); Open Road International LLC (4109-Del.); and Empire Productions LLC (9375-Del.).  The Debtors' address is 1800 Century Park East, Suite 600, Los Angeles, CA 90067.

## DISCLAIMER

THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS THAT THE DEBTORS AND THE COMMITTEE ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT.  THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.    APPROVAL  OF  THIS  DISCLOSURE  STATEMENT  DOES  NOT CONSTITUTE    A    DETERMINATION    OR    RECOMMENDATION    BY    THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS  DISCLOSURE  STATEMENT  CONTAINS  SUMMARIES  OF  CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS    RELATING    TO    THE    PLAN,    AND    CERTAIN    FINANCIAL INFORMATION.  ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES    ARE    FAIR    AND    ACCURATE    AND    PROVIDE    ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH  THE  ENTIRE  TEXT  OF,  OR  ARE  INCONSISTENT  WITH,  SUCH DOCUMENTS.

ALTHOUGH THE PLAN PROPONENTS HAVE MADE EVERY EFFORT TO BE ACCURATE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT OR OTHER REVIEW BY AN ACCOUNTING FIRM.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN, THIS DISCLOSURE STATEMENT, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, OR THE FINANCIAL INFORMATION INCORPORATED HEREIN OR THEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES.  ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN  MADE  AS  OF  THE  DATE  HEREOF  UNLESS  OTHERWISE  SPECIFIED. HOLDERS  OF  CLAIMS  AND  INTERESTS  REVIEWING  THIS  DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE  HAVE  BEEN  NO  CHANGES  IN  THE  FACTS  SET  FORTH  HEREIN. ALTHOUGH THE PLAN PROPONENTS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERY UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OCCUR.

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  PERSONS OR ENTITIES HOLDING OR TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING, CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

## TABLE OF CONTENTS

Page(s)

I.      INTRODUCTION ...................................................................................................1

II.     PLAN OVERVIEW ...............................................................................................1

     A.      General Structure of the Plan.....................................................................1

     B.      Material Terms of the Plan ........................................................................2

     C.      Summary of Treatment of Claims and Interests Under the Plan ..............3

     D.      Plan Voting Instructions and Procedures ..................................................9

          1.      Voting Rights ................................................................................9

          2.      Solicitation Materials ...................................................................9

          3.      Voting Instructions and Procedures ...........................................10

          4.      Confirmation Hearing and Deadline for Objections to Confirmation...............................................................................13

III.    GENERAL INFORMATION ABOUT THE DEBTORS AND THE CASES .................14

     A.      Business Overview and Background .........................................................14

     B.      Circumstances Leading to Chapter 11 Filing...........................................14

     C.      Sale of Substantially All of the Debtors' Assets.......................................15

     D.      Corporate Structure ..................................................................................16

     E.      Debtors' Assets ........................................................................................17

     F.      Prepetition Capital Structure....................................................................17

          1.      Secured Debt................................................................................17

          2.      Unsecured Debt............................................................................18

          3.      Interests ......................................................................................18

     G.      Prepetition Litigation ...............................................................................18

IV.     THE CHAPTER 11 CASES ...............................................................................18

     A.      First Day Motions .....................................................................................19

     B.      Cash Collateral..........................................................................................20

     C.      Sale of Certain Assets to the Buyer ........................................................20

     D.      Retention of Debtors Professionals..........................................................20

     E.      Appointment of Committee and Retention of Committee Professionals...............21

F.     Schedules, Statements of Financial Affairs ............................................................21

G.    Bar Date for Filing Proofs of Claim and Requests for Administrative Expense ........................................................................................................................21

H.    Motion to Authorize Key Employee Retention Program .......................................21

I.      Exclusivity Extension ...............................................................................................22

J.      Removal Extension ...................................................................................................22

K.    Lakeshore and Bank Leumi Agreements .............................................................22

L.     2.9 Film Adversary Proceeding and Settlement ..................................................23

M.   Global Settlement with the Committee and the Prepetition Lenders....................23

N.    Global Settlement with the Guilds........................................................................24

V.    SUMMARY OF THE JOINT CHAPTER 11 PLAN ........................................................25

A.    Purpose and Effect of the Plan...............................................................................25

B.    Substantive Consolidation .......................................................................................26

C.    Estimated Recoveries...............................................................................................27

VI.   CERTAIN PLAN PROVISIONS ...................................................................................28

A.    Classification and Treatment of Classified Claims and Interests ..........................28

      1.    Summary. ....................................................................................................28

      2.    Classification and Treatment of Claims and Interests. .............................28

B.    Acceptance of Rejection of the Plan.......................................................................31

      1.    Classes Permitted and Not Permitted to Vote...........................................31

      2.    Effect of Non-Voting. ................................................................................31

      3.    Nonconsensual Confirmation.....................................................................31

      4.    Postpetition Interest. ..................................................................................31

      5.    Elimination of Vacant Classes. ..................................................................31

      6.    Special Provisions Regarding Insured Claims...........................................32

C.    Means for Implementation of the Plan....................................................................32

      1.    Settlement of Intercompany Claims............................................................32

      2.    Substantive Consolidation. ........................................................................32

      3.    Continued Corporate Existence and Vesting of Assets. ............................33

4. Corporate Action; Winding Up of Affairs. ...............................................34

5. Plan Administrator. ....................................................................................35

6. Source of Funding. .....................................................................................36

7. Retained Rights of Action. .........................................................................37

8. Interests in Non-Debtors Affiliates and Subsidiaries. ...............................37

9. Payment of Plan Expenses. ........................................................................37

10. Dissolution of Debtors; Final Decree. .......................................................38

11. Records. ......................................................................................................38

12. Certain Bank Accounts. ..............................................................................38

D. Treatment of Executory Contracts and Unexpired Leases ....................................38

1. Rejection of Executory Contracts and Unexpired Leases. .........................38

2. Bar Date for Rejection Claims. ..................................................................39

E. Distributions and Related Matters .........................................................................39

1. Dates of Distribution. .................................................................................39

2. Cash Distributions. .....................................................................................39

3. Rounding of Payments. ...............................................................................39

4. Disputed Claims. ........................................................................................40

5. Undeliverable and Unclaimed Distributions. .............................................40

6. Minimum Distributions. .............................................................................40

7. Compliance With Tax Requirements. .........................................................40

8. Record Date in Respect to Distributions. ...................................................41

F. Litigation, Objections to Claims, and Determination of Taxes .............................41

1. Litigation. ....................................................................................................41

2. Objections to Claims; Objection Deadline. ...............................................41

3. Tax Determinations. ....................................................................................41

4. Temporary or Permanent Resolution of Disputed Claims. ........................41

|  |  | 5. | Setoffs. | 42 |
|  | G. |  | Injunctions, Exculpation, Releases and Related Provisions | 42 |
|  |  | 1. | Injunctions | 42 |
|  |  |  | (a) | Generally. | 42 |
|  |  |  | (b) | Non-Discharge of Debtors; Injunction | 42 |
|  |  | 2. | Exculpation. | 43 |
|  |  | 3. | Debtor Release. | 43 |
|  |  | 4. | Consenting Creditor Release | 44 |
| VII. | RISK FACTORS | | | 44 |
|  | A. | | Parties May Object to the Plan's Classification of Claims and Interests | 44 |
|  | B. | | The Plan Proponents May Not Be Able to Obtain Confirmation of the Plan | 44 |
|  | C. | | Claims May Exceed the Plan Proponents' Estimates | 45 |
|  | D. | | The Conditions Precedent to the Effective Date of the Plan May Not Occur | 45 |
|  | E. | | Risks Related to Income Taxation | 45 |
| VIII. | CONFIRMATION OF THE PLAN | | | 45 |
|  | A. | | The Confirmation Hearing | 45 |
|  | B. | | Requirements for Confirmation of the Plan | 46 |
|  | C. | | Best Interests of Creditors | 47 |
|  | D. | | Feasibility | 48 |
|  | E. | | Acceptance by Impaired Classes | 48 |
|  | F. | | Confirmation Without Acceptance by All Impaired Classes | 48 |
|  |  | 1. | No Unfair Discrimination | 49 |
|  |  | 2. | Fair and Equitable Test | 49 |
|  | G. | | Alternatives to the Plan | 49 |
| IX. | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | | | 50 |
| X. | RECOMMENDATION | | | 55 |

## EXHIBITS

EXHIBIT A     Joint Plan of Liquidation

EXHIBIT B     Organizational Chart

<div style="border:1px solid black; text-align:center;">

**THE PLAN PROPONENTS HEREBY ADOPT AND INCORPORATE EACH**
**EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT**
**BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

</div>

## I.    INTRODUCTION

Pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), the above-captioned debtors and debtors-in-possession (the "Debtors" or the "Company") and the Official Committee of Unsecured Creditors (the "Committee") hereby jointly submit this disclosure statement (the "Disclosure Statement") for the *Joint Chapter 11 Plan of Liquidation Proposed by Debtors and Official Committee of Unsecured Creditors* (as may be amended or modified, the "Plan").  The definitions contained in the Bankruptcy Code are incorporated herein by this reference.  The definitions set forth in Article II of the Plan will also apply to capitalized terms used herein that are not otherwise defined.  A copy of the Plan is attached hereto as **Exhibit A**.[2]

The purpose of this Disclosure Statement is to enable creditors whose Claims are Impaired under the Plan and who are entitled to vote to make an informed decision in exercising their right to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection under chapter 11 of the Bankruptcy Code, and the anticipated wind-down and liquidation of the Liquidating Debtors by a Plan Administrator.  This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the Confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

## II.    PLAN OVERVIEW

### A.    General Structure of the Plan

The Plan effectuates the terms of an agreement and settlement among the Debtors, the Committee, and the Prepetition Lenders regarding the means for distributing the remaining assets of the Debtors' Estates and winding-up the Debtors' affairs.  Under the Plan and in accordance with the priorities set forth in the Bankruptcy Code, and as part of a compromise contained in the Plan, the Prepetition Lenders (on account of their security interests in the Prepetition Collateral) receive the bulk of the assets in the Estates in the form of cash distributions, with the remaining assets, including approximately $5.1 million in Cash as of June 12, 2019, available for the satisfaction of Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Miscellaneous Secured Claims, as well as to pay Plan Expenses, and, to the extent Distributable Estate Assets remain after the foregoing payments, to make distributions to Holders of Allowed General Unsecured Claims.  Taken together, the Plan proposes to fairly and efficiently allocate the Debtors' remaining assets in a manner that is supported by the principal constituencies in these Chapter 11 Cases and will allow these Chapter 11 Cases to be promptly resolved.

---

[2]    All capitalized terms used but not defined herein shall have the meanings provided to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern.

The Plan will be implemented through the substantive consolidation of the Debtors' Estates, the re-vesting of the Estates' assets in Liquidating Debtor Open Road Films, and the appointment of a Plan Administrator to liquidate or otherwise dispose of the Estates' remaining assets (if and to the extent such assets were not previously monetized to Cash or otherwise transferred by the Debtors prior to the Effective Date). All Intercompany Claims will be waived and eliminated. The Plan Administrator will act for the Liquidating Debtors in the same fiduciary capacity as applicable to a board of directors of a Delaware corporation implementing such liquidation and wind-down as contemplated under the Plan, subject to the provisions hereof, and shall, among other powers, wind up the affairs of the Liquidating Debtors; use, manage, sell, abandon and/or otherwise dispose of the remaining property of the Estates; prosecute objections to Claims and any litigation on behalf of the Liquidating Debtors; cause distributions to be made to Creditors pursuant to the Plan; and take such other actions required under or consistent with the Plan. The initial Plan Administrator will be John Roussey. Mr. Roussey was previously employed by an affiliate of NBC Universal Media LLC ("NBCU") and briefly served as NBC's representative on the Committee prior to his departure from NBCU in October 2018.

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE TO THESE ESTATES, AND IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CONSTITUENTS.**

**FOR THESE REASONS, THE PLAN PROPONENTS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN.**

### B. Material Terms of the Plan

The following is an overview of certain material terms of the Plan:

- Allowed Administrative Expenses, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims will be paid in full on the later of (i) the Effective Date and (ii) thirty (30) calendar days following the date on which any such Claim becomes Allowed, unless otherwise agreed with the Holders of such Claims.

- Allowed Miscellaneous Secured Claims will, on the later of (i) the Effective Date and (ii) thirty (30) calendar days following the date on which such Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim, at the option of the Liquidating Debtors, either: (a) be reinstated, (b) receive, in full satisfaction, settlement, and release of, and in exchange for, such Miscellaneous Secured Claim, (x) payment in full in Cash of the unpaid portion of such Allowed Miscellaneous Secured Claim, (y) the collateral securing such Allowed Miscellaneous Secured Claim, or (z) such other treatment as may be agreed to by the Holder of such Claim and the Debtors or the Liquidating Debtors.

- Prepetition Lender Claims will receive in the aggregate, in full satisfaction and release of their Prepetition Lenders Claims and as the sole amounts to be paid by the Debtors or their Estates on account of the Prepetition Lender Claims, the Distributable Lender Assets, which consist of all of the Distributable Assets

except, collectively, (i) approximately $5.1 million in Cash as of June 12, 2019; (ii) the 2.9 Films Proceeds; (iii) Retained Rights of Action (including (a) Avoidance Claims unless and until all claims other than Prepetition Lender Claims have been paid in full and (b) Prepetition Lender Rights of Action with any proceeds of such to be shared ratably between the Holders of Prepetition Lender Claims and Holders of Allowed Class 4 Claims as shall be set forth in the Plan Supplement); (iv) up to $25,000 from any sale or other disposition of the property known as "The Tank" (net of expenses of the Debtors' estates applicable to the sale proceeds); and (v) the Sale Adjustment Holdback Excess Amount; and (vi) the Debtors' furniture, fixtures, and equipment. Holders of Prepetition Lender Claims will also receive the Administrative/Priority Claim Lender Recoupment Amount, if any. Any deficiency owing on account of the Prepetition Lender Claims shall not constitute a General Unsecured Claim and shall not be entitled to any other distribution under the Plan.

- Allowed General Unsecured Claims will receive all Distributable Estate Assets after the payment of (or reserves for) Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Miscellaneous Secured Claims, and Plan Expenses.

- Allowed Subordinated Claims will receive no recovery until all Allowed General Unsecured Claims are paid in full. Because the Allowed General Unsecured Claims are not projected to be paid in full, Holders of Allowed Subordinated Claims are not expected to realize any recovery under the Plan.

- Holders of Interests shall receive no distributions under the Plan, and on the Effective Date, all Interests shall be deemed cancelled. As of the Effective Date, each Holder of an Interest shall retain a contingent interest in the Net Distributable Estate Assets remaining, if any, after all Allowed Claims have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in accordance with the Plan. For the avoidance of doubt, no distribution of Net Distributable Estate Assets (once all liquidated to Cash) shall be made to Holders of Interests until and unless all Holders of Allowed Claims receive payment in full of such Allowed Claims, plus all accrued postpetition interest at the Federal Judgment Rate. Because several Classes of Claims are projected not to be paid in full, Holders of Interests are not expected to realize any recovery under the Plan.

## C.    Summary of Treatment of Claims and Interests Under the Plan

The Plan provides for the classification and treatment of Claims and Interests. The Plan designates 5 Classes of Claims and 1 Class of Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

The table below summarizes the classification and treatment of the Claims and Interests under the Plan.  The Plan substantively consolidates the Debtors for voting and distribution purposes.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Claim or Interest | Summary of Treatment | Projected Recovery | Estimated Claims Amount | Proposed Treatment |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired; Not Entitled to Vote (Presumed to Accept) | 100% | Approximately $100,000 to $400,000 | Class 1 consists of Priority Non-Tax Claims. At the election of the Liquidating Debtors, each Holder of a Priority Non-Tax Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Priority Non-Tax Claim, on or as soon as practicable after the later of (i) the Effective Date, or (ii) thirty (30) calendar days following the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, (a) a Cash payment from the Liquidating Debtors equal to the Allowed amount of such Claim, or (b) such other treatment as otherwise agreed by the Holder of such Claim and the Debtors or the Liquidating Debtors.<br><br>Class 1 Priority Non-Tax Claims are Unimpaired by the Plan, and Holders of such Class 1 Priority Non-Tax Claims are therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, Holders of Class 1 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan. |
| 2 | Miscellaneous Secured Claims | Unimpaired; Not Entitled to Vote (Presumed to Accept) | 100% | Less than $5,000 | Class 2 consists of any Miscellaneous Secured Claims. Although all Miscellaneous Secured Claims have been placed in one Class for the purposes of nomenclature, each Miscellaneous Secured Claim, to the extent secured by a Lien on any property or interest in property of any of the Debtors different from that securing any other Miscellaneous Secured Claim, shall be treated as being in a separate sub-Class for purposes of voting and receiving distributions under the Plan.<br><br>Except to the extent that a Holder of an Allowed Miscellaneous Secured Claim has been paid by the Debtors, in whole or in part, prior to the Effective Date, on the later of (i) the Effective Date and (ii) thirty (30) calendar days following the date on which such |

5

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim, at the option of the Liquidating Debtors, in full and final satisfaction of such Miscellaneous Secured Claim, (i) each Allowed Miscellaneous Secured Claim shall be reinstated and Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed Miscellaneous Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Miscellaneous Secured Claim, (x) payment in full in Cash of the unpaid portion of such Allowed Miscellaneous Secured Claim, (y) the collateral securing such Allowed Miscellaneous Secured Claim, or (z) such other treatment as may be agreed to by the Holder of such Claim and the Debtors or the Liquidating Debtors.<br><br>Class 2 Miscellaneous Secured Claims are Unimpaired by the Plan, and Holders of such Class 2 Miscellaneous Secured Claims are therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, Holders of Class 2 Miscellaneous Secured Claims are not entitled to vote to accept or reject the Plan. |
| 3 | Prepetition Lender Claims | Impaired; Entitled to Vote | Approximately 57% - 61%, excluding adequate protection payments | $90,750,000, plus fees and interest | Class 3 consists of all Prepetition Lender Claims.  The Holders of Allowed Prepetition Lender Claims shall receive in the aggregate, in full satisfaction and release of their Prepetition Lenders Claims and as the sole amounts to be paid by the Debtors or their Estates on account of the Prepetition Lender Claims, the Distributable Lender Assets. Any Distributable Lender Assets comprising proceeds under the APA (but not including the Sale Adjustment Holdback Excess Amount) shall be paid by the Plan Administrator to the Prepetition Agent, for the benefit of the Prepetition Lenders, within three (3) Business Days of receipt of any such proceeds.  All other Distributable Lender Assets shall be paid to the Prepetition Agent, for the benefit of the Prepetition Lenders, in such form and at such time as determined by the Plan Administrator, in reasonable consultation with the Prepetition Agent. Any deficiency owing on account of the Prepetition Lender Claims shall not constitute a General Unsecured Claim and shall not be entitled to any other distribution under the Plan.  All Distributions to |

6

| | | | | | |
|---|---|---|---|---|---|
| | | | | | be made on account of any Prepetition Lender Claims shall be paid in bulk to the Prepetition Agent for further distribution in accordance with the Prepetition Loan Agreement.<br><br>Class 3 Prepetition Lender Claims are Impaired.  Holders of Class 3 Prepetition Lender Claims are therefore entitled to vote to accept or reject the Plan. |
| 4 | General Unsecured Claims | Impaired; Entitled to Vote | Approximately 2% to approximately 6% based on currently available information. | Approximately $60,000,000 to $70,000,000[3] | Class 4 consists of General Unsecured Claims.  Except to the extent that a Holder of an Allowed Class 4 General Unsecured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement and release of each Allowed Class 4 General Unsecured Claim, each Holder of an Allowed Class 4 General Unsecured Claim shall receive a Cash payment equal to its Pro Rata share of the Net Distributable Estate Assets.  Allowed Class 4 General Unsecured Claims need not be paid until after the reconciliation of all Disputed Class 4 General Unsecured Claims; *provided, however*, that in the discretion of the Plan Administrator, Allowed Class 4 General Unsecured Claims may receive distributions before the reconciliation of all Disputed Class 4 General Unsecured Claims provided that (i) reserves are maintained for any Class 4 General Unsecured Claim that is Disputed at the time of such distribution and (ii) the Plan Administrator shall make a corrective Distribution following the resolution of any Disputed Claim within thirty (30) days of such resolution.<br><br>Class 4 General Unsecured Claims are Impaired under the Plan.  Therefore, Holders of such Class 4 General Unsecured Claims are entitled to vote to accept or reject the Plan. |
| 5 | Subordinated Claims | Impaired; Not Entitled to Vote | 0% | $0 | Class 5 consists of all Subordinated Claims.  Holders of Subordinated Claims shall receive no distributions under the Plan until all Prepetition Lender Claims and all Allowed General Unsecured Claims |

---

[3] Reflects an estimate of Class 4 Claims that will ultimately be Allowed.

7

| | | | | | |
|---|---|---|---|---|---|
| | | (Deemed to Reject) | | | have been paid in full.  Because the Prepetition Lender Claims and Allowed General Unsecured Claims are projected not to be paid in full, Holders of Subordinated Claims are not expected to realize any recovery under the Plan.<br><br>Class 5 Subordinated Claims are Impaired under the Plan, and Holders of such Class 5 Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 5 Subordinated Claims are not entitled to vote to accept or reject the Plan. |
| 6 | Interests | Impaired; Not Entitled to Vote (Deemed to Reject) | 0% | n/a | Class 6 consists of all Interests.  Holders of Interests shall receive no distributions under the Plan, and on the Effective Date, all Interests shall be deemed void and of no force and effect.  As of the Effective Date, each Holder of an Interest shall retain a contingent interest in the Net Distributable Estate Assets remaining, if any, after all Allowed Claims have been paid or otherwise satisfied in full, plus all accrued postpetition interest at the Federal Judgment Rate (unless otherwise agreed to by the applicable Creditor) and all Plan Expenses have been paid (or otherwise reserved) in accordance with the Plan.  Because several Classes of Claims are projected not to be paid in full, Holders of Interests are not expected to realize any recovery under the Plan.<br><br>Class 6 Interests are Impaired and Holders of such Class 6 Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 6 Interests are not entitled to vote to accept or reject the Plan. |

01:24729857.2

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

D.    **Plan Voting Instructions and Procedures**

1.    **Voting Rights**

Under the Bankruptcy Code, acceptance of the Plan by a Class of Claims is determined by calculating the number and the amount of Allowed Claims voting to accept, based on the actual total Allowed Claims voting on the Plan. Acceptance by a Class of Claims requires more than one-half of the number of total voting Allowed Claims in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan.

Under the Bankruptcy Code, only Classes of Claims or Interests that are "Impaired" and that are not deemed as a matter of law to have rejected a plan under Section 1126 of the Bankruptcy Code are entitled to vote to accept or reject the Plan. Any Class that is "Unimpaired" is not entitled to vote to accept or reject the Plan and is conclusively presumed to have accepted the Plan. As set forth in Section 1124 of the Bankruptcy Code, a Class is "Impaired" if the legal, equitable, or contractual rights attaching to the Claims or Interests of that Class are modified or altered. Any Class of Claims or Interests that does not receive or retain any property under the Plan on account of such Claims or Interests is deemed to have rejected the Plan.

Pursuant to the Plan, Classes 3 and 4 are Impaired under the Plan and entitled to vote to accept or reject the Plan. Only the Holder of a Claim as of [DATE], 2019 (the "Voting Record Date"), may vote to accept or reject the Plan.

Pursuant to the Plan, Claims in Classes 1 and 2 are Unimpaired by the Plan, and such Holders are conclusively presumed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, Claims and Interests in Classes 5 and 6 will not receive or retain any property under the Plan on account of such Claims or Interests, as applicable, and are, therefore, deemed to reject the Plan and are not entitled to vote on the Plan.

2.    **Solicitation Materials**

The Debtors have engaged Donlin, Recano & Company, Inc. (the "Voting Agent") to serve as the voting agent to process and tabulate Ballots for each Class entitled to vote on the Plan and to generally oversee the voting process. The following materials shall constitute the solicitation package (the "Solicitation Package"):

•    This Disclosure Statement, including the Plan and all other Exhibits annexed thereto;

01:24729857.2

9

- The Bankruptcy Court order approving this Disclosure Statement (the "<u>Disclosure Statement Order</u>");

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "<u>Confirmation Hearing Notice</u>");

- One or more Ballots, as applicable, to be used in voting to accept or to reject the Plan, and applicable voting instructions (the "<u>Voting Instructions</u>");

- A pre-addressed, postage pre-paid return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Plan Proponents, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order.  The Solicitation Package is also available at the Debtors' restructuring website at https://www.donlinrecano.com/Clients/orf/Index.

Prior to the Confirmation Hearing, the Plan Proponents intend to file a Plan Supplement that includes, among other things, (i) the qualifications and proposed compensation of and other disclosures regarding the Plan Administrator; (ii) certain specifically enumerated Retained Rights of Action; and (iii) any executory contracts and unexpired leases designated for assumption by the Debtors. As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website at https://www.donlinrecano.com/Clients/orf/Index.

If you are the Holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to Donlin, Recano & Company, Inc. Re: Open Road Films, LLC, Et Al. Attn: Voting Department; PO Box 199043 Blythebourne Station; Brooklyn, NY 11219; Email: DRCVote@DonlinRecano.com.  If the reason that you did not receive a Ballot is because your Claim is subject to a pending claim objection and you wish to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes by [DATE], 2019, or you will not be entitled to vote to accept or reject the Plan.

**THE DEBTORS AND THE LIQUIDATING DEBTORS, AS APPLICABLE, RESERVE THE RIGHT THROUGH THE CLAIM OBJECTION PROCESS TO OBJECT TO ANY CLAIM.**

### 3.    Voting Instructions and Procedures

All votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages.  No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed [DATE], 2019 as the Voting Record Date for the determination of the Holders of Claims who are entitled to (i) receive a Solicitation Package and (ii) vote to accept or reject the Plan.  The Voting Record

Date and all of the Plan Proponents' solicitation and voting procedures shall apply to all of the Debtors' Creditors and other parties in interest.

If you are a Holder of a Claim in a Class that is entitled to vote, after carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is [DATE], 2019 at 5:00 p.m. (prevailing Eastern Time) (the "<u>Voting Deadline</u>").**

In order for your vote to be counted, your Ballot must be properly completed, in accordance with the Voting Instructions on the Ballot, and received no later than the Voting Deadline at the following address, if by First-Class Mail:

> **Open Road Films Ballot Processing**
> **c/o Donlin, Recano & Company, Inc.**
> **Attn: Voting Department**
> **P.O. Box 192016 Blythebourne Station**
> **Brooklyn, NY 11219**

Ballots sent by hand delivery or overnight mail should be sent to the following address:

> **Open Road Films Ballot Processing**
> **c/o Donlin, Recano & Company, Inc.**
> **Attn: Voting Department**
> **6201 15th Avenue**
> **Brooklyn, NY 11219**

Holders of Claims in Classes 3 and 4 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline. Each Holder of a Claim must vote its entire Claim within a particular Class either to accept or reject the Plan and may not split such votes. If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any Ballot previously received. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions accompanying the Ballots, the following Ballots will not be counted in determining whether the Plan has been accepted or rejected:

• Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan;

- Any Ballot received after the Voting Deadline, except if the Debtors have granted an extension of the Voting Deadline with respect to such Ballot or by order of the Bankruptcy Court;

- Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

- Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;

- Any Ballot cast by a Person or Entity that does not hold a Claim in the voting Class with respect to which the Ballot is cast; and

- Any Ballot without an original signature.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan.  If more than one timely, properly completed Ballot is received, only the last timely received Ballot will be counted for purposes of determining whether the requisite acceptances have been received.  Any party who has delivered a properly completed Ballot for the acceptance or rejection of the Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline.  To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) contain the original signature of the withdrawing party, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Voting Agent prior to the Voting Deadline.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS.  IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE CLASSES ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

In addition, for all Holders of Class 4 Claims, the Ballot contains an option to "opt-out" of certain releases provided under the Plan.  The Plan provides that each Holder of a Claim that votes to accept, or is deemed to accept, the Plan is considered a "Releasing Creditor" under the Plan and is bound by certain releases provided in Article IX thereof, and as set forth below, other than any Holder of a Class 4 Claim that affirmatively elects on its Ballot to opt out of being a Releasing Creditor.  Each Class 4 Ballot will contain the text of the proposed release and instructions to each Holder of a Class 4 Claim regarding the option to opt-out of the release.

If you have any questions about (i) the procedure for voting your Claim, (ii) the Solicitation Package that you have received, or (iii) the amount of your Claim, or if you wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan, this Disclosure Statement, or any appendices or

Exhibits to such documents, please contact the Voting Agent by writing to Donlin, Recano & Company, Inc. Re: Open Road Films, LLC, Et Al. Attn: Voting Department; PO Box 199043, Blythebourne Station; Brooklyn, NY 11219.  Copies of the Plan, Disclosure Statement, Plan Supplement and other documents filed in these Chapter 11 Cases may be obtained free of charge on the Voting Agent's website at https://www.donlinrecano.com/Clients/orf/Index.  Documents filed in these Chapter 11 Cases may also be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Eastern Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") in accordance with the Disclosure Statement Order.  The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE PLAN PROPONENTS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**

### 4.      Confirmation Hearing and Deadline for Objections to Confirmation

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on [DATE], 2019 at [TIME] (prevailing Eastern Time), before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801.  The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing, has been included along with this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made in the agenda for the Confirmation Hearing or at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served on the Plan Proponents and certain other entities, all in accordance with the Confirmation Hearing Notice, so that they are actually received by no later than [DATE], 2019 at [TIME] (prevailing Eastern Time). Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, which is attached to this Disclosure Statement, they may not be considered by the Bankruptcy Court.

### III.    GENERAL INFORMATION ABOUT THE DEBTORS AND THE CASES

#### A.    Business Overview and Background

Prior to the Petition Date, the Company was an independent distributor of motion pictures in the United States and licensed motion pictures in ancillary markets, principally to home entertainment, pay television, subscription and transactional video-on-demand, free television, and other non-theatrical entertainment distribution markets.  Based in Los Angeles, California, the Company was launched in 2011 as a strategic partnership between Regal Entertainment Group and AMC Entertainment, two leading film exhibitors in the United States.

The Company has released approximately 45 films since its inception, generating a total of over $1.3 billion in worldwide theatrical box office receipts.  Its films have been nominated for 49 Academy Awards and have won 13 Academy Awards.  In 2015, the Company made history by becoming the youngest studio to win a Best Picture Academy Award[TM] for the film *Spotlight*.

The Company's film library included, among others, *Killer Elite (2011)*, *Jobs* (2013), *Machete Kills* (2013), *Side Effects* (2013), *JB: Believe* (2013), *Nightcrawler* (2014), *Chef* (2014), *Rosewater* (2014), *The Gunman* (2015), *Little Boy* (2015), *Dope* (2015), *Mother's Day* (2016), and *The Nut Job 2* (2017).  As of the Petition Date, after a major reduction in force, the Company utilized the services of approximately 40 employees.  Currently, excluding ordinary course and case professionals, the Company uses the services of approximately 4hourly contractors.

The Company generated revenue from the exhibition or licensing of films.  Each film was distributed theatrically to major and independent exhibitors of motion pictures in the United States and other countries. Home entertainment, subscription and transactional video-on-demand, free television, and non-theatrical distribution of each film are generally effected through a major film distribution, pay subscription, or television broadcasting company in the United States.  The Company operated under longstanding relationships with theatrical exhibitors, and under output agreements with leading home entertainment, Pay TV, Streaming, Video On-Demand, and non-theatrical providers, including Showtime, Amazon Instant Video, Paramount, and Universal.

#### B.    Circumstances Leading to Chapter 11 Filing

On August 4, 2017, the equity membership interests in Open Road Holdings were sold (the "2017 Sale") by its then-members (Regal and AMC) to TMP Holdings, part of a media enterprise owned by TMPL.  The intention at that time was to combine (i) the Debtors' business and (ii) certain assets of non-Debtor IM Global LLC ("IM Global"), which entity focuses on the complementary activities of international film sales, co-financing, production, and distribution and which had also recently been acquired by a TMPL affiliate, into a newly-formed non-debtor entity, Global Road Entertainment, LLC ("Global Road"), a subsidiary of TMP Holdings (the "Global Road Restructure").  The Global Road Restructure was intended to be consummated contemporaneously with a fundraising round which TMPL was in the process of arranging (the "Round D Financing").  Ultimately, neither the Global Road Restructure, nor the Round D Financing were consummated as originally contemplated.

Several factors precipitated the Debtors' financial distress. Among other things, increased volatility in overall film performance exacerbated investor concerns regarding the probability and predictability of studio financial success, especially outside of the major studios. This overall volatility was exacerbated by the specific underperformance of certain of the Debtors' prepetition motion picture releases, most of which were initiated by prior management. In addition, competitive options for consumers have limited interest in theatrical distribution and the traditional film business model, imposing additional pressure on companies like the Debtors, and further fueling investor skepticism. Accordingly, the Debtors incurred significant losses from operating activities during 2017, after the 2017 Sale, and used significant cash in operations, including significant equity contributions. As a result of these and other factors, it was not possible for TMPL to consummate the Round D Financing by April 2018, which was necessary to fund elements of the Global Road Restructure.

The inability to consummate the Round D Financing left TMPL without the funds to contribute into the Global Road Restructure, and thus the Debtors were unable to obtain an audit opinion without a "going-concern" qualification, putting the Debtors in default under the Prepetition Credit Agreement. The Debtors entered into a Fourth Amendment to the Credit Agreement in May 2018, which provided an additional 60 days until June 30, 2018 to provide the required financial statements. The Debtors' financial position deteriorated further in May and June 2018, as the business suffered from the disappointing box office performance of its motion picture releases, in connection with which the Debtors had incurred tens of millions of dollars in marketing and advertising expenses to third parties. In part as a result of this disappointing performance, in the beginning of July 2018, TMPL's board of directors decided not to make available any additional funds to the Debtors.

Recognizing these challenging realities, the Company retained FTI Consulting, Inc. ("FTI") to provide a CRO and supporting staff to explore strategic alternatives. FTI and the Debtors, working with the Debtors' management and the Prepetition Lenders, determined that the most likely and feasible alternative was an orderly bankruptcy sale, which would allow the Debtors to maximize value by enabling a sale of the Debtors' assets free and clear of Liens, Claims, encumbrances, and other interests. In the weeks leading up to the Petition Date, the Debtors undertook a prepetition reduction in force and FTI began the process of diligently and aggressively marketing the Debtors' assets for sale.

## C.    Sale of Substantially All of the Debtors' Assets

Since its engagement, FTI diligently and aggressively marketed the Company's assets through a comprehensive sale and marketing process. FTI developed a thorough list of potential buyers—both strategic and financial—based on management discussions and FTI's industry experience and relationships. FTI identified over 40 potential buyers, many of whom signed non-disclosure agreements, and 11 of which submitted indications of interest for the Debtors' assets.

On the Petition Date, the Debtors filed a motion for orders establishing bid and related sale procedures and approving the sale of certain of the Debtors' assets [Docket No. 9].  On October 9, 2018, the Bankruptcy Court entered the *Order: (1) Approving Bid and Sale Procedures, (2) Approving Assumption, Assignment and Cure Procedures and Related Notices, (3) Establishing Date for Auction and Approving Related Procedures, (4) Scheduling the Sale Hearing and Related Deadlines, and (5) Granting Related Relief* [Docket No. 160] (the "Bid Procedures Order").  In accordance with the Bid Procedures Order, the Debtors continued their efforts, commenced prior to the Petition Date, to market their assets for sale.

Ultimately, the Debtors negotiated an asset purchase agreement (the "APA") with OR Acquisition Co, LLC (the "Buyer").  Pursuant to and subject to the terms and conditions of the APA, the Buyer agreed to acquire certain of the Debtors' assets in exchange for a cash purchase price and the Buyer's assumption of certain liabilities.  In particular, the Buyer purchased the Debtors' right, title, and interest in approximately forty-five (45) motion pictures and took assignment of numerous contracts relating to those motion pictures.

On October 26, 2018, the Bankruptcy Court entered the *Order Authorizing and Approving Certain Bidding Protections, Amendments to Bid Procedures Order, and Granting Related Relief* [Docket No. 239], which approved the Buyer as a "Stalking Horse" and provided the Buyer with certain bidding protections.

After the signing of the APA, the Debtors continued to work closely with the Buyer to obtain Court approval of, and ultimately consummate, the sale.  As part of that process, the Debtors and Buyer negotiated extensively with contract counterparties and other parties-in-interest to resolve formal and informal objections to the proposed Sale.  After a hearing on December 19, 2018, the Bankruptcy Court entered the *Order (I) Approving Asset Purchase Agreement Among the Debtors and the Buyer, (II) Approving Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), (f) and (m), (III) Approving Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 363 and 365, (IV) Determining the Amounts Necessary to Cure Such Executory Contracts and Unexpired Leases, and (V) Granting Related Relief* [Docket No. 483] (the "Sale Order").  The Sale Order approved, among other things, the sale of certain assets of the Debtors to the Buyer and the assignment of certain contracts of the Debtors to the Buyer (the "Sale").

The Sale closed on December 21, 2018.  *See* Docket No. 507.

### D.    Corporate Structure

Debtor Open Road Releasing is a wholly owned subsidiary of non-debtor Tang Media Partners Holding LLC ("TMP Holdings"), which is in turn a wholly owned subsidiary of non-debtor Tang Media Partners Limited ("TMPL").  Debtor Open Road Films is a wholly owned subsidiary of Debtor Open Road Releasing.  Debtors OR Productions, LLC, Briarcliff LLC, and Open Road International LLC are wholly owned subsidiaries of Open Road Films.  Debtor Empire Productions LLC is a wholly owned subsidiary of OR Productions.  Attached hereto as **Exhibit B** is a corporate organizational chart for the Debtors.

The Board of Directors of Open Road Releasing currently consists of two members: Donald Tang and Jie "Kevin" Kang. The other Debtors are all member-managed. The Debtors' only remaining officer is Mr. Amir Agam, the Chief Restructuring Officer. At the Petition Date, the Debtors' Chief Executive Officer was Rob Friedman, and the Debtors' Chief Financial Officer was Mimi Tseng.

### E.    Debtors' Assets

The Debtors' assets consist primarily of unrestricted cash, in the amount, as of July 16, 2019, of approximately $5.2 million (which includes the proceeds from the Playmobil Settlement, as described and defined below). Approximately $1.7 million remains in an escrow related to a holdback (the "Holdback") from sale proceeds from the Sale, as described above. Pursuant to the terms of the Global Settlement (described below) any funds released from this escrow will be remitted to the Holders of the Prepetition Lender Claims. However, under the terms of the APA and related escrow agreement, some or all of the remaining amounts of the Holdback may be released to the buyer. The Debtors also hold the Rights of Action; however, any recovery on the Rights of Action is speculative and contingent. Accordingly, the Plan Proponents have not assigned any value to the Rights of Action in calculating estimated recoveries under the Plan. The Debtors' assets also consist of certain rights related to a limited number of development or film assets, miscellaneous furniture and IT equipment, certain websites and domains, and certain deposits and retainers (to the extent that such amounts are not exhausted by the third parties holding such deposits and retainers). The Plan Proponents expect that the Debtors or Liquidating Debtors will liquidate the foregoing assets or, to the extent appropriate, deliver them to the Holders of the Prepetition Lender Claims. This Disclosure Statement does not take into account any non-Cash assets in calculating projected payments and estimated recoveries, except for the Holdback and in limited cases where such recoveries can be reasonably projected, and the Plan Proponents' determination that the Plan is feasible, as discussed in Section VIII.D hereof, relies solely on the Debtors' Cash assets.

### F.    Prepetition Capital Structure

#### 1.    Secured Debt

In 2015, Open Road Films, as borrower, Open Road Releasing, as a pledgor, the remaining Debtors, as guarantors (the "Guarantors"), Bank of America, N.A., as lender and letter of credit issuer and each of the lenders party thereto (together, the "Prepetition Lenders"), and Bank of America, N.A., as administrative agent (in such capacity the "Prepetition Agent"), entered into that certain *Second Amended and Restated Credit, Security, Guaranty and Pledge Agreement*, dated as of April 8, 2015 (as amended, restated, amended and restated, refinanced, replaced, supplemented, or otherwise modified, the "Prepetition Loan Agreement").

As of the Petition Date, the outstanding aggregate principal amount owing under the Prepetition Loan Agreement was $90,750,000. The obligations under the Prepetition Loan Agreement are secured by liens in favor of the Prepetition Agent on most assets of the Debtors.

### 2.    Unsecured Debt

The Plan Proponents believe that unsecured claims against the Debtors approximate $60 to $70 million.  Unsecured claims against the Debtors include: (i) accrued and unpaid trade and other unsecured debt incurred in the ordinary course of the Debtors' business, (ii) contract rejection claims, (iii) claims by employees, (iv) claims arising from transactions with non-Debtor affiliates, (v) claims arising from litigation, and (vi) certain other miscellaneous claims for damages against the Debtors.

### 3.    Interests

Debtor Open Road Releasing is a wholly owned subsidiary of non-debtor TMP Holdings, which is in turn a wholly owned subsidiary of non-debtor TMPL.  As described above, the Interests of each Debtor other than Open Road Releasing are held by another Debtor.

### G.    Prepetition Litigation

As of the Petition Date, the Debtors were party to certain litigation pending in non-bankruptcy forums in the ordinary course of their business.  The litigation in which the Debtors are defendants has been stayed by Bankruptcy Code section 362(a).  The most significant prepetition litigation to which the Debtors were a party was a civil action commenced by Bank Leumi USA against Open Road and others in the United States District Court for the Central District of California styled *Bank Leumi USA v. Open Road Films, LLC; Global Road Entertainment, LLC; Tang Media Partners, LLC; and Does 1-10, Inclusive*, Case No. 2:18 cv 7573.  Pursuant to the Bank Leumi Settlement (as defined below), all claims in that action against the Debtors have been dismissed as of March 20, 2019.

As for pending litigation in which one or more of the Debtors is a plaintiff, the Plan Proponents are evaluating such actions and determining whether the continued pursuit of any of such actions is in the best interests of the Debtors' estates.  The Liquidating Debtors' rights are reserved to the extent set forth in the Plan to continue to prosecute any and all such actions.

## IV.    THE CHAPTER 11 CASES

On September 6, 2018, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Debtors requested, and the Bankruptcy Court approved, joint administration of their Chapter 11 Cases under the caption *In re Open Road Films, LLC,  et al.*, Case No. 18-12012 (LSS).  The Debtors continue to operate their businesses and manage their properties as debtors in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

An immediate effect of commencement of the Chapter 11 Cases was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors during the pendency of the Chapter 11 Cases.  The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the Effective Date.

### A.    First Day Motions

On the Petition Date, the Debtors filed certain "first day" motions and applications with the Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of their Chapter 11 Cases and to facilitate the Debtors' transition to debtor in possession status. The Bankruptcy Court held a hearing on these first day motions on September 7, 2018. Following the first day hearing, the Bankruptcy Court entered the following orders:

> *Interim Order (I) Authorizing Payment of Limited Prepetition Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (II) Authorizing Payment of Reimbursement for Prepetition Expenses, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, and (IV) Authorizing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments* [Docket No. 41];

> *Order Authorizing and Directing the Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only* [Docket No. 42];

> *Interim Order (I) Authorizing Continued Use of Cash Management System, (II) Authorizing the Continuation of Intercompany Transactions, (III) Granting Administrative Priority Status to Postpetition Intercompany Transactions, (IV) Authorizing Use of Prepetition Bank Accounts, Account Control Agreement, and Certain Payment Methods, (V) Extending Time to Comply With Requirements of 11 U.S.C. § 345(b)* [Docket No. 43];

> *Order Granting Application Appointing Donlin, Recano & Co., Inc. as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. 156(c) Nunc Pro Tunc to the Petition Date* [Docket No. 44];

> *Interim Order, Pursuant to Sections 105(a), 361, 362, 363(c), 503(b), and 507(b) of the Bankruptcy Code, (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Setting Final Hearing, and (IV) Granting Related Relief* [Docket No. 51];

> *Final Order (I) Authorizing Payment of Limited Prepetition Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (II) Authorizing Payment of Reimbursement for Prepetition Expenses, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, (IV) Authorizing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments* [Docket No. 108];

> *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 110];

> *Order Providing That Any Creditors Committee Is Not Authorized or Required to Provide Access to Confidential or Privileged Information to Creditors* [Docket No. 111];

> *Order Authorizing the Employment and Retention of Donlin, Recano & Company, Inc. as Administrative Agent to the Debtors, Nunc Pro Tunc to the Petition Date* [Docket No. 112];

*Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized By the Debtors in the Ordinary Course of Business* [Docket No. 113];

*Final Order (I) Authorizing Continued Use of Cash Management System, (II) Authorizing the Continuation of Intercompany and Affiliate Transactions, (III) Granting Administrative Priority Status to Postpetition Intercompany and Affiliate Claims, (IV) Authorizing Use of Prepetition Bank Accounts, Account Control Agreements, and Payment Methods, (V) Extending Time to Comply With Requirements of 11 U.S.C. § 345(b)* [Docket No. 117]; and

*Final Order, Pursuant to Sections 105(a), 361, 362, 363(c), 503(b), and 507(b) of the Bankruptcy Code, (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection and (III) Granting Related Relief* [Docket No. 135]

### B.      Cash Collateral

On the Petition Date, the Debtors filed the *Motion for Entry of Orders, Pursuant to Sections 105(a), 361, 362, 363(c), 503(b), and 507(b) of the Bankruptcy Code, (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Setting Final Hearing, and (IV) Granting Related Relief* [Docket No. 6] (the "Cash Collateral Motion"). By the Cash Collateral Motion, the Debtors sought Bankruptcy Court approval of the use of cash collateral, the provision of adequate protection to the Prepetition Agent and Prepetition Lenders, and modifications of the automatic stay. The Court approved the Cash Collateral Motion on an interim basis on September 7, 2018 [Docket No. 51] and on a final basis on October 2, 2018 [Docket No. 135].

### C.      Sale of Certain Assets to the Buyer

The most significant event to date in these Chapter 11 Cases has been the successful sale of certain of the Debtors' assets to the Buyer. The background, process, and Bankruptcy Court documents relevant to the Sale, which closed on December 21, 2018, are discussed in Section III.C above.

### D.      Retention of Debtors Professionals

On August 3, 2018, the Debtors engaged FTI, effective as of August 1, 2018, to provide interim management services in connection with a potential restructuring. On October 2, 2018, the Bankruptcy Court entered an order authorizing the Debtors to (i) employ and retain FTI to provide the Debtors with a CRO and certain additional supportive FTI personnel to assist the CRO and (ii) designate Amir Agam as CRO *nunc pro tunc* to the Petition Date. See Docket No. 134.

The Debtors retained (i) Klee, Tuchin, Bogdanoff & Stern LLP ("KTB&S") and (ii) Young Conaway Stargatt & Taylor, LLP ("YCST") as bankruptcy counsel. On September 28, 2018 and October 1, 2018, respectively, the Bankruptcy Court entered orders authorizing the Debtors to retain YCST and KTB&S as co-bankruptcy counsel in these Chapter 11 Cases *nunc pro tunc* to the Petition Date. *See* Docket Nos. 109 & 118.

### E. Appointment of Committee and Retention of Committee Professionals

On September 14, 2018, the U.S. Trustee appointed the Committee. The initial members of the Committee were Bank Leumi USA, The Walt Disney Company, NBC Universal Media LLC, BBG Home Again LLC, and Twenty-First Century Fox, Inc. *See* Docket No. 72. On January 15, 2019, the U.S. Trustee revised the composition of the Committee such that BBG Home Again LLC is no longer a member of the Committee. *See* Docket No. 527.

The Committee retained (i) Pachulski, Stang, Ziehl & Jones LLP ("PSZ&J") as bankruptcy counsel and (ii) Dundon Advisers LLC ("Dundon") as financial advisors. On October 24, 2018 and October 31, 2018, respectively, the Bankruptcy Court entered orders authorizing the Committee to retain PSZ&J and Dundon. *See* Docket Nos. 224 & 251.

### F. Schedules, Statements of Financial Affairs

On October 22, 2018, each of the Debtors filed its schedules of assets and liabilities and statements of financial affairs with the Bankruptcy Court, which set forth, *inter alia*, the assets of each Debtor and the prepetition Claims against each Debtor as of the Petition Date, based on the Debtors' books and records [Docket Nos. 203–214]. On April 25, 2019, Debtor Open Road Films filed an amended statement of financial affairs [Docket No. 660]. The Debtors reserve all rights to make further amendments to the schedules of assets and liabilities and statements of financial affairs.

### G. Bar Date for Filing Proofs of Claim and Requests for Administrative Expense

On November 26, 2018, the Debtors filed a motion to establish deadlines for the filing of proofs of claim on account of Claims arising prior to the Petition Date and Administrative Expenses incurred on or before December 20, 2018 [Docket No. 407]. On December 13, 2018 the Bankruptcy Court entered the *Order (I) Establishing Deadlines for Filing Proofs of Claim, Administrative Claims Incurred on or Before December 20, 2018, and Section 503(b)(9) Claims and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 458], which, among other relief, establishes (i) 5:00 p.m. (Eastern Time) on January 25, 2019 as the deadline by which each Person, other than governmental units, must file a proof of claim based on Claims that arose prior to the Petition Date, including requests for allowance and payment of claims under section 503(b)(9) of the Bankruptcy Code, (ii) 5:00 p.m. (Eastern Time) on January 25, 2019 as the deadline by which each Person that holds or wishes to assert an Administrative Expense that arose during the period from the Petition Date through and including December 20, 2018 must file a request for payment of such Administrative Expense, and (iii) 5:00 p.m. (Eastern Time) on March 5, 2019 as the deadline by which any governmental unit must file a proof of claim based on Claims that arose prior to the Petition Date. As of July 3, 2019, 349 claims had been filed against the Debtors.

### H. Motion to Authorize Key Employee Retention Program

On October 19, 2018, the Debtors filed a motion to authorize the implementation of a Key Employee Retention Program (the "KERP") [Docket No. 191]. The participants in the KERP were fourteen valuable non-insider members of the Debtors' workforce and the KERP

was designed to retain those individuals through and including the date that is thirty days after the closing of the above-described sale to the Buyer. On November 8, 2018, the Bankruptcy Court entered the *Order Authorizing the Implementation of a Key Employee Retention Program, Approving the Terms Thereof, and Granting Related Relief* [Docket No. 348] authorizing and approving the Debtors' implementation of the KERP. Payments in respect of the KERP have been effectuated by the Debtors.

### I.    Exclusivity Extension

On January 3, 2019, the Debtors filed their first motion to extend the Debtors' exclusive periods to file and solicit acceptances of a chapter 11 plan pursuant to Section 1121(d) of the Bankruptcy Code [Docket No. 512]. On January 24, 2019, the Bankruptcy Court entered the *Order, Pursuant to Section 1121(d) of the Bankruptcy Code, Extending the Exclusive Periods for the Filing a Chapter 11 Plan and the Solicitation and Acceptance Thereof* [Docket No. 537] extending the Debtors' exclusive period to file a plan through and including April 4, 2019 and extending the Debtors' exclusive period to solicit acceptances of such plan through and including June 5, 2019. On April 11, 2019, the Bankruptcy Court entered the *Order, Pursuant to Section 1121(d) of the Bankruptcy Code, Extending the Exclusive Periods for the Filing a Chapter 11 Plan and the Solicitation and Acceptance Thereof* [Docket No. 640] further extending the Debtors' exclusive period to file a plan through and including July 10, 2019 and further extending the Debtors' exclusive period to solicit acceptances of such plan through and including September 6, 2019. On July 3, 2019, the Debtors filed their third motion to extend the Debtors' exclusive periods to file and solicit acceptances of a chapter 11 plan [Docket No. 754].

### J.    Removal Extension

On November 26, 2018, the Debtors filed their first motion to extend the period within which the Debtors may remove civil action pursuant to 28 U.S.C. § 1452 [Docket No. 405]. On December 12, 2018, the Bankruptcy Court entered the *Order Pursuant to Bankruptcy Rules 9006 and 9027 Extending the Period Within Which the Debtors May Remove Actions Pursuant to 28 U.S.C. § 1452* [Docket No. 444] extending the removal period through and including March 5, 2019. On February 28, 2019, the Debtors filed their second motion to extend the period within which the Debtors may remove civil action pursuant to 28 U.S.C. § 1452 [Docket No. 583]. On March 28, 2019, the Bankruptcy Court entered the *Order Pursuant to Bankruptcy Rules 9006 and 9027 Extending the Period Within Which the Debtors May Remove Actions Pursuant to 28 U.S.C. § 1452* [Docket No. 621] further extending the removal period through and including June 5, 2019. On June 21, 2019, the Bankruptcy Court entered the *Order Pursuant to Bankruptcy Rules 9006 and 9027 Extending the Period Within Which the Debtors May Remove Actions Pursuant to 28 U.S.C. § 1452* [Docket No. 739] further extending the removal period through and including September 10, 2019.

### K.    Lakeshore and Bank Leumi Agreements

The Sale did not include the sale to the Buyer of any rights, title or interest in or to the films "AXL" or "City of Lies." On February 7, 2019, the Debtors filed a motion to approve a settlement among the Debtors and the lender in connection with the film "City of Lies," Bank Leumi, USA (the "<u>Bank Leumi Settlement</u>"), in order to resolve, among other things, Bank

Leumi's prepetition lawsuit against the Debtors and the approximately $18.5 million proof of claim that Bank Leumi filed against the Debtors in the Chapter 11 Cases.   On February 26, 2019, the Bankruptcy Court entered the *Order, Pursuant to Bankruptcy Code Section 105(a) and Bankruptcy Rule 9019, Approving Settlement with Bank Leumi, USA* [Docket No. 580] approving and authorizing the Debtors to enter into the Bank Leumi Settlement.  Among other things, the Bank Leumi Settlement provides that Bank Leumi shall dismiss its prepetition lawsuit against the Debtors, Bank Leumi shall have a $2.5 million Allowed General Unsecured Claim against Debtor Open Road Films, and the Debtors shall release and relinquish any and all rights, title or interest in or to the film "City of Lies."  The Bank Leumi Settlement is effective.

With respect to the film "AXL," the Debtors entered into a stipulation (the "Lakeshore Settlement") with Lakeshore Entertainment Group LLC and Lakeshore Entertainment Productions LLC (collectively, "Lakeshore"), pursuant to which, among other relief, the Debtors rejected certain executory contracts with Lakeshore related to the production, financing, and/or distribution of the film "AXL;" the Debtors agreed to remit to Lakeshore certain payments received by the Debtors on account of the film "AXL" and to assign to Lakeshore certain attendant rights; and Lakeshore and the Debtors agreed that Lakeshore shall have a $3.25 million Allowed General Unsecured Claim against the Debtors.  On March 11, 2019, the Bankruptcy Court entered the *Order Approving Stipulation By and Among the Debtors and Lakeshore Entertainment Regarding Rejection and Termination of Executory Contracts and Transfer of Attendant Rights* [Docket No. 595] approving and authorizing the Debtors to enter into the Lakeshore Settlement.  The Lakeshore Settlement is effective.

### L.    2.9 Film Adversary Proceeding and Settlement

On October 9, 2018, 2,9 Film Holding Ltd. and 2,9 Distribution Ltd. (collectively, "2.9 Film") filed a *Complaint for Declaratory and Interpleader Relief* against Debtor Open Road Films, thereby initiating Adversary Proceeding No. 18-50887, to determine the parties respective rights and obligations under certain agreements related to the animated theatrical motion picture currently entitled "The Untitled Playmobil Movie."  The Sale did not include the sale to the Buyer of any rights, title or interest in or to the film "The Untitled Playmobil Movie."  In order to resolve the parties disputes and the adversary proceeding, the parties entered into a settlement agreement, pursuant to which, *inter alia*, 2.9 Film shall make or cause to be made a payment to Open Road Films or its designee in the amount of $430,000.00, 2.9 Film and the Debtors shall each ratify certain agreements and documents, the parties shall exchange mutual releases, and the adversary proceeding shall be dismissed (the "Playmobil Settlement").  On May 23, 2019, the Debtors filed a motion seeking approval of the Playmobil Settlement [Docket No. 695].  On June 12, 2019, the Bankruptcy Court approved the Playmobil Settlement.  The Playmobil Settlement is now effective and 2.9 Film has made the required $430,000 payment.

### M.    Global Settlement with the Committee and the Prepetition Lenders

After conducting an extensive investigation, the Committee had asserted, and the Prepetition Lenders had denied, that the Debtors' estates had valid potential claims against the Prepetition Lenders under chapter 5 of the Bankruptcy Code (the "Potential Claims").  The Committee undertook extensive investigation and related discovery in connection with the Potential Claims and the nature and extent of the Prepetition Lenders' liens.  Following the

closing of the Sale to the Buyer, the Committee and the Prepetition Agent negotiated extensively and in good faith regarding the nature and extent of the Prepetition Lenders' liens and claims, the merits of the Potential Claims, and the ultimate disposition, as between the Prepetition Lenders and other stakeholders of the Debtors' estates, of the proceeds of the Sale and any other assets of the Debtors' estates.    After approximately five months of analysis and negotiation, the Committee, the Prepetition Lenders, and the Debtors negotiated a global settlement resolving these issues (the "Global Settlement"), which Global Settlement provided for the allocation, as between the Prepetition Lenders and other stakeholders of the Debtors' estates, of the Distributable Assets and paved the way for the filing of the Plan.[4]

On May 23, 2019, the parties filed a joint motion seeking approval of the Global Settlement [Docket No. 692].  Following a hearing on June 11, 2019, the Bankruptcy Court approved the Global Settlement.  The Global Settlement provides, *inter alia*, that the Prepetition Lenders will agree to allocate to the Debtors' estates the assets comprising the Distributable Estate Assets.

In addition, pursuant to the Global Settlement, the Committee has waived any right to bring the Potential Claims and the Prepetition Lenders will have an Allowed Claim for the full amount of the Senior Secured Claims (as defined in the Global Settlement).  Pursuant to the Global Settlement, on June 12, 2019, the Debtors remitted approximately $52.1 million to the agent for the Prepetition Lenders (comprising Sale proceeds and certain interest payments).

### N.    Global Settlement with the Guilds

As set forth in the reservations of rights and limited objection filed by the Directors Guild of America, Inc., Screen Actors Guild—American Federation of Television and Radio Artists, and Writers Guild of America West, Inc., for themselves and their respective pension and health plans (collectively, the "Guilds") and the Motion Picture Industry Pension and Health Plans (the "MPIPHP") at docket numbers 101, 228, 319, and 320 in these Chapter 11 Cases and on the record at certain hearings held before the Bankruptcy Court, the Guilds and the MPIPHP asserted various claims against the Debtors and their estates, including as a result of the Debtors' distribution rights concerning several motion pictures.

As a result, on or before January 25, 2019, the Guilds and the MPIPHP filed numerous proofs of claim, asserting numerous unsecured, priority, administrative, and secured claims (collectively, the "Guild/MPIPHP Claims"). The Guilds also have asserted security interests in the Debtors' cash collateral. As such, that certain *Final Order, Pursuant to Sections 105(a), 361, 362, 363(c), 503(b), and 507(b) of the Bankruptcy Code, (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection, and (III) Granting Related Relief* [Docket No. 135] (as subsequently amended [Docket No. 434], the "Final Cash Collateral Order") provides, among other things, the Guilds with certain rights and protections in regard to the Debtors' cash collateral.

---

[4]    To the extent there is any inconsistency between this summary and the terms of the Global Settlement itself, the Global Settlement controls.

The Sale, which has now closed, involved, among other things, the cure of certain amounts owed to the Guilds, and the Buyer's assumption of future liabilities that may be owed to the Guilds in respect of motion pictures acquired by the Buyer.  In light of the closing of the Sale, and the impact thereof on the Guild/MPIPHP Claims, and following extensive discussions and arm's-length negotiations among the parties and other stakeholders, the Debtors, on the one hand, and the Guilds and MPIPHP, on the other hand, entered into a global settlement (the "Guild Settlement").  The Guild Settlement memorializes certain agreements among the parties thereto regarding the allowance of specific Guild/MPIPHP Claims, the withdrawal of all of the Guild/MPIPHP Claims not specifically addressed by the Guild Settlement, the modification of the Final Cash Collateral Order in light of the resolution of the Guild/MPIPHP Claims, and certain related matters.

The Guild Settlement was approved by the Bankruptcy Court on June 25, 2019 [Docket No. 744].

## V.    SUMMARY OF THE JOINT CHAPTER 11 PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the Exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Liquidating Debtors, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict, inconsistency, or discrepancy between this Disclosure Statement and the Plan, the Plan Supplement, or any other operative document, the terms of the Plan, Plan Supplement, and/or such other operative document, as applicable, shall govern and control; provided that, in any event, the terms of the Plan shall govern and control over all other related documents.

### A.    Purpose and Effect of the Plan

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its constituents.  Chapter 11 also allows a debtor to formulate and consummate a plan of liquidation.  A plan of liquidation sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of liquidation by a bankruptcy court makes the plan binding upon the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The Plan provides for the distribution of the Debtors' assets to various Creditors as contemplated under the Plan and for the wind-up the Debtors' corporate affairs. More specifically, the Plan provides that a Plan Administrator will administer and liquidate all remaining property of the Debtors, including the Retained Rights of Action.

Under the Plan, with the exception of certain Claims against the Debtors that are not required to be classified, Claims against, and Interests in, the Debtors are divided into certain Classes according to their relative seniority and other criteria. If the Plan is confirmed by the Bankruptcy Court and consummated, the unclassified Claims and the Claims and Interests of the various Classes will be treated in accordance with the applicable provisions in the Plan and the Plan Administrator will make Distributions if and as provided in the Plan. A general description of the unclassified Claims and the Classes of Claims and Interests created under the Plan, the treatment of those Claims and Interests under the Plan, and the property to be distributed under the Plan are described below.

### B.    Substantive Consolidation

Solely for purposes of voting and distribution in connection with the Plan, pursuant to Section 5.2 of the Plan, the Claims and assets of the Debtors and their Estates shall be "substantively consolidated" into the Estate of the Debtor Open Road Films. This means that solely for such purposes, the separateness of the Debtors and the Estates will be ignored and all of the Debtors and all of the Estates will be treated as if they were one Debtor and one Estate.

More specifically, on and after the Effective Date, and except as otherwise set forth in the Plan, (i) all assets and liabilities of the Liquidating Debtors shall be treated as though they were pooled into the Liquidating Debtor Open Road Films, (ii) each Claim filed or to be filed against any Debtor, as to which two or more Debtors are co-liable as a legal or contractual matter, shall be deemed filed as a single Claim against, and a single obligation of, the Debtors, (iii) all Claims held by a Debtor against any other Debtor shall be cancelled or extinguished, (iv) no distributions shall be made under the Plan on account of any Claim held by a Debtor against any other Debtor, (v) all guarantees of any Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof executed by any other Debtor shall be treated as one Claim against the substantively-consolidated Debtors, and (vi) any joint or several liability of any of the Debtors shall be one obligation of the substantively-consolidated Debtors and any Claims based upon such joint or several liability shall be treated as one Claim against the substantively-consolidated Debtors.

The Plan is predicated on the treatment of General Unsecured Claims without regard to the specific Debtor as to which the Holders of such Claims assert their Claims. The form of substantive consolidation proposed under the Plan ultimately should benefit all Creditors. Absent the substantive consolidation proposed under the Plan, the process of disentangling the Estates of the Debtors would be time consuming, costly, and may fundamentally not be feasible for at least several reasons.

First, allocating the relative value of each Debtor's assets that were sold in connection with the Sale would be challenging. There is no clear apportionment of the value of the sold assets of each of the Debtors and the associated liabilities that were assumed. Apportioning the

value of the Debtors' assets and associated liabilities with respect to these and other assets would be a difficult task and could lead to prolonged disputes or litigation.  All sale proceeds were received by Debtor Open Road Films.

Second, the vast majority of all of the assets at all of the Debtors were the collateral of the Prepetition Lenders.  As described above, the Global Settlement agreed to between the Debtors, the Committee and the Prepetition Lenders specified certain amounts to be paid to the Prepetition Lenders and certain amounts to be left in the Debtors' estates to fund the costs of winding down the Debtors' estates and satisfying claims.  The Global Settlement did not specify which cash should be remitted to the Prepetition Lenders and which should stay with the Debtors' estates and litigating this issue amongst the Debtors would be inefficient and wasteful.  As of May 31, 2019, the assets at the Debtors other than Open Road Films consisted only of approximately $268 thousand in cash and approximately $337 thousand in capitalized film developments costs, with three of the Debtors having no assets whatsoever.  To date, the non-Open Road Films Debtors have not paid any of the professional fees related to administering these cases and any litigation or efforts to determine what their fair burden of those costs are and if any assets would remain would be inefficient and wasteful.  In addition, although the Debtors are aware that claims have been filed specifying certain Debtors other than Open Road Films and such claims are yet to be evaluated, the Debtors' records indicate that all amounts owed by Debtors other than Open Road Films are owed to other Debtors.

Finally, as permitted by section 1123(a)(5)(C) of the Bankruptcy Code, one basis for substantive consolidation in these Chapter 11 Cases is the vote of the Class of Creditors entitled to vote in favor of such treatment.  The Plan does not propose substantive consolidation to deprive a specific Creditor or group of Creditors of their rights while providing a windfall to other Creditors.  Rather, given the limited amount available for distribution to General Unsecured Creditors, and the expense involved in allocating the remaining assets and liabilities of the Debtors among the Estates, the recovery by Creditors will be maximized by consolidating the assets and liabilities of each of the Debtors.

Accordingly, the Plan Proponents believe that substantive consolidation of the Debtors, for purposes of voting and distribution in connection with the Plan, is in the best interest of the Debtors' Estates and parties in interest.

## C.    Estimated Recoveries

The Plan Proponents estimate that Holders of Allowed General Unsecured Claims in these Chapter 11 Cases may recover approximately 2% to 6% of the total amount of their Allowed General Unsecured Claims.  The Plan Proponents have calculated the estimate of projected recoveries for Holders of General Unsecured Claims taking into account: (i) the total estimated amount of General Unsecured Claims, (ii) the estimated costs of winding down the estate and amounts required to satisfy administrative, priority, and secured claims, and (iii) the total estimated amount of amount of Cash available for distributions to Holders of General Unsecured Claims.  This estimate assumes that (i) there are no significant future recoveries with respect to the Retained Rights of Action, (ii) the total amount of Allowed Claims is not significantly different from the current estimated amount of Claims that will be Allowed based on the Schedules and the proofs of claims Filed against the Debtors, and (iii) that administrative,

priority, and secured claims are resolved in a manner consistent with the current estimates of the Committee. The Plan Proponents estimate that the General Unsecured Claims approximate $60 to $70 million. For purposes of estimated recoveries in this Disclosure Statement, the Plan Proponents have not attributed value to non-Cash assets of the Debtors.

## VI.    CERTAIN PLAN PROVISIONS

### A.    Classification and Treatment of Classified Claims and Interests

#### 1.    Summary.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest (or a portion thereof) is classified in a particular Class only to the extent that the Claim or Interest (or a portion thereof) qualifies within the description of that Class. A Claim or Interest (or a portion thereof) is also classified in a particular Class only to the extent that such Claim or Interest (or a portion thereof) is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date. Any postpetition payment by or on behalf of the Estates in respect of a Claim shall reduce the Allowed amount thereof.

#### 2.    Classification and Treatment of Claims and Interests.

### Class 1 – Priority Non-Tax Claims.

(a)    Classification: Class 1 consists of all Priority Non-Tax Claims.

(b)    Treatment: At the election of the Liquidating Debtors, each Holder of a Priority Non-Tax Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Priority Non-Tax Claim, on or as soon as practicable after the later of (i) the Effective Date, or (ii) thirty (30) calendar days following the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, (a) a Cash payment from the Liquidating Debtors equal to the Allowed amount of such Claim, or (b) such other treatment as otherwise agreed by the Holder of such Claim and the Debtors or the Liquidating Debtors.

(c)    Impairment/Voting: Class 1 Priority Non-Tax Claims are Unimpaired by the Plan, and Holders of such Class 1 Priority Non-Tax Claims are therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, Holders of Class 1 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

### Class 2 – Miscellaneous Secured Claims.

(a)    Classification: Class 2 consists of any Miscellaneous Secured Claims. Although all Miscellaneous Secured Claims have been placed in one Class for the purposes of nomenclature, each Miscellaneous Secured Claim, to the extent secured by a Lien on any property or interest in property of any of the Debtors different from that securing any other Miscellaneous Secured Claim, shall be treated as being in a separate sub-Class for purposes of voting and receiving distributions under the Plan.

(b)     Treatment: Except to the extent that a Holder of an Allowed Miscellaneous Secured Claim has been paid by the Debtors, in whole or in part, prior to the Effective Date, on the later of (i) the Effective Date and (ii) thirty (30) calendar days following the date on which such Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim, at the option of the Liquidating Debtors, in full and final satisfaction of such Miscellaneous Secured Claim, (i) each Allowed Miscellaneous Secured Claim shall be reinstated and Unimpaired in accordance with section 1124 of the Bankruptcy Code,  or (ii) each Holder of an Allowed Miscellaneous Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Miscellaneous Secured Claim, (x) payment in full in Cash of the unpaid portion of such Allowed Miscellaneous Secured Claim, (y) the collateral securing such Allowed Miscellaneous Secured Claim, or (z) such other treatment as may be agreed to by the Holder of such Claim and the Debtors or the Liquidating Debtors.

(c)     Impairment/Voting: Class 2 Miscellaneous Secured Claims are Unimpaired by the Plan, and Holders of such Class 2 Miscellaneous Secured Claims are therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, Holders of Class 2 Miscellaneous Secured Claims are not entitled to vote to accept or reject the Plan.

**Class 3 – Prepetition Lender Claims**.

(a)     Classification: Class 3 consists of all Prepetition Lender Claims.

(b)     Treatment: The Holders of Allowed Prepetition Lender Claims shall receive in the aggregate, in full satisfaction and release of their Prepetition Lenders Claims and as the sole amounts to be paid by the Debtors or their Estates on account of the Prepetition Lender Claims, the Distributable Lender Assets.  Any Distributable Lender Assets comprising proceeds under the APA (but not including the Sale Adjustment Holdback Excess Amount) shall be paid by the Plan Administrator to the Prepetition Agent, for the benefit of the Prepetition Lenders, within three (3) Business Days of receipt of any such proceeds.  All other Distributable Lender Assets shall be paid to the Prepetition Agent, for the benefit of the Prepetition Lenders, in such form and at such time as determined by the Plan Administrator, in reasonable consultation with the Prepetition Agent. Any deficiency owing on account of the Prepetition Lender Claims shall not constitute a General Unsecured Claim and shall not be entitled to any other distribution under the Plan.  All Distributions to be made on account of any Prepetition Lender Claims shall be paid in bulk to the Prepetition Agent for further distribution in accordance with the Prepetition Loan Agreement.

(c)     Impairment/Voting: Class 3 Prepetition Lender Claims are Impaired.  Holders of Class 3 Prepetition Lender Claims are therefore entitled to vote to accept or reject the Plan.

**Class 4 – General Unsecured Claims**.

(a)     Classification: Class 4 consists of all General Unsecured Claims.

(b)     Treatment: Except to the extent that a Holder of an Allowed Class 4 General Unsecured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement and release of each Allowed Class 4 General Unsecured Claim, each Holder of an

Allowed Class 4 General Unsecured Claim shall receive a Cash payment equal to its Pro Rata share of the Net Distributable Estate Assets. Allowed Class 4 General Unsecured Claims need not be paid until after the reconciliation of all Disputed Class 4 General Unsecured Claims; *provided, however*, that in the discretion of the Plan Administrator, Allowed Class 4 General Unsecured Claims may receive distributions before the reconciliation of all Disputed Class 4 General Unsecured Claims provided that (i) reserves are maintained for any Class 4 General Unsecured Claim that is Disputed at the time of such distribution and (ii) the Plan Administrator shall make a corrective Distribution following the resolution of any Disputed Claim within thirty (30) days of such resolution.

(c)    Impairment/Voting: Class 4 General Unsecured Claims are Impaired under the Plan. Therefore, Holders of such Class 4 General Unsecured Claims are entitled to vote to accept or reject the Plan.

### Class 5 – Subordinated Claims.

(a)    Classification: Class 5 consists of all Subordinated Claims.

(b)    Treatment: Holders of Subordinated Claims shall receive no distributions under the Plan until all Prepetition Lender Claims and all Allowed General Unsecured Claims have been paid in full. Because the Prepetition Lender Claims and Allowed General Unsecured Claims are projected not to be paid in full, Holders of Subordinated Claims are not expected to realize any recovery under the Plan.

(c)    Impairment/Voting: Class 5 Subordinated Claims are Impaired under the Plan, and Holders of such Class 5 Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 5 Subordinated Claims are not entitled to vote to accept or reject the Plan.

### Class 6 – Interests in the Debtors.

(a)    Classification: Class 6 consists of all Interests.

(b)    Treatment: Holders of Interests shall receive no distributions under the Plan, and on the Effective Date, all Interests shall be deemed void and of no force and effect. As of the Effective Date, each Holder of an Interest shall retain a contingent interest in the Net Distributable Estate Assets remaining, if any, after all Allowed Claims have been paid or otherwise satisfied in full, plus all accrued postpetition interest at the Federal Judgment Rate (unless otherwise agreed to by the applicable Creditor) and all Plan Expenses have been paid (or otherwise reserved) in accordance with the Plan. Because several Classes of Claims are projected not to be paid in full, Holders of Interests are not expected to realize any recovery under the Plan.

(c)    Impairment/Voting: Class 6 Interests are Impaired and Holders of such Class 6 Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 6 Interests are not entitled to vote to accept or reject the Plan.

### B.    Acceptance of Rejection of the Plan

#### 1.    Classes Permitted and Not Permitted to Vote.

Classes 1 and 2 are Unimpaired.  Holders of Claims in these Classes are conclusively presumed pursuant to section 1126(f) of the Bankruptcy Code to have accepted the Plan and therefore shall not be entitled to vote to accept or reject the Plan.  Classes 3, 4, 5, and 6 are Impaired.  Holders of Claims in Classes 3 and 4 are permitted to vote to accept or reject the Plan. Holders of Claims in Class 5 and Holders of Interests in Class 6 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  The Plan Proponents reserve all rights with respect to all Claims and Interests classified by the Plan.  An Impaired Class of Claims that votes shall have accepted the Plan if (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.

#### 2.    Effect of Non-Voting.

If no Holder of a Claim eligible to vote in a particular Class timely votes to accept or reject the Plan, the Plan Proponents may seek to have the Plan deemed **accepted** by the Holders of such Claims in such Class for purposes of section 1129 of the Bankruptcy Code.

#### 3.    Nonconsensual Confirmation.

In the event any Class of Claims votes to reject the Plan and given the deemed rejection of the Plan by the Holders of Subordinated Claims in Class 5 and the Holders of Interests in Class 6, the Plan Proponents request that the Bankruptcy Court confirm the Plan notwithstanding such rejection pursuant to section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly as to the Holders of any Class of Claims or Interests.

#### 4.    Postpetition Interest.

Nothing in the Plan or the Disclosure Statement shall be deemed to entitle the Holder of a Claim to receive postpetition interest on account of such Claim, except to the extent that the Holder of a Claim has the benefit of a Lien on assets the value of which exceeds the amount of such Claim or the Plan expressly provides for postpetition interest on account of such Claim.

#### 5.    Elimination of Vacant Classes.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6. **Special Provisions Regarding Insured Claims.**

With respect to any Insured Claim, any party with rights against or under the applicable insurance policy may pursue such rights. Nothing in the Plan shall constitute a waiver of any causes of action the Debtors or the Liquidating Debtors may hold against any Person, including the Debtors' insurance carriers; and nothing in the Plan is intended to, shall, or shall be deemed to preclude any Holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any Distribution such Holder may receive under the Plan; *provided, however*, that the Debtors and the Liquidating Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

The Plan shall not modify the scope of, or alter in any other way, the rights and obligations of the Debtors' insurers under their policies, and the Debtors' insurers shall retain any and all rights, claims and defenses to liability and/or coverage that such insurers may have, including the right to contest and/or litigate with any party the existence, primacy and/or scope of liability and/or available coverage under any alleged applicable policy. The Plan shall not operate as a waiver of any other Claims the Debtors' insurers have asserted or may assert in any proof of claim, including, without limitation, any rights or defenses arising out of, or in the nature of, setoff or recoupment, or the Debtors' rights and defenses to such proofs of claim.

C. **Means for Implementation of the Plan**

1. **Settlement of Intercompany Claims.**

Upon the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, each Debtor and their successors and assigns hereby waive and release each other and all of their respective successors from any and all Intercompany Claims and Rights of Action among and between any or all of the Debtors, which waiver and release shall be effective as a bar to all actions, causes of action, suits, Claims, Liens, or demands of any kind with respect to any Intercompany Claim or Right of Action among or between any or all of the Debtors

2. **Substantive Consolidation.**

In furtherance of the settlements contained in the Plan, the entry of the Confirmation Order shall constitute approval by the Bankruptcy Court, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, as of the Effective Date, of the substantive consolidation of the Debtors and their respective Estates into the Estate of Debtor Open Road Films, solely for purposes of voting and distributions under the Plan. Pursuant to the Confirmation Order, on and after the Effective Date, (i) all Distributable Assets to be used for distributions to Creditors of any of the Debtors will be treated as though they were merged into Liquidating Debtor Open Road Films; and (ii) any obligation of any Debtor and all guarantees thereof executed by, or joint liability of, any of the Debtors will be treated as one obligation of Liquidating Debtor Open Road Films for distribution purposes pursuant to the Plan.

Notwithstanding the foregoing, the substantive consolidation of the Debtors for voting and distribution purposes shall not affect or impair (i) any rights, Claims, remedies or defenses of

(or between) the separate Debtors as of the Petition Date, including with respect to any Retained Rights of Action; (ii) the legal and organizational structure of the Debtors; (iii) any Liens that are maintained, recognized, or preserved under the Plan; and (iv) claims under or with respect to any insurance policy of any Debtor (or any right to the proceeds of any such policy or policies).

The Disclosure Statement and the Plan shall be deemed to be a motion by the Plan Proponents for substantive consolidation. Any objection by an affected Creditor to such consolidation shall be treated as an objection to Confirmation and shall be determined by the Bankruptcy Court in the context of considering Confirmation of the Plan.

If the Bankruptcy Court determines that substantive consolidation of any given Debtor(s) is not appropriate, then the Plan Proponents may request that the Bankruptcy Court otherwise confirm the Plan and approve the treatment of and distributions to the different Classes under the Plan on an adjusted, Debtor-by-Debtor basis. Furthermore, the Plan Proponents reserve their rights to seek Confirmation of the Plan without implementing substantive consolidation of any given Debtor, and, in the Plan Proponents' discretion, to request that the Bankruptcy Court approve the treatment of and distributions to any given Class under the Plan on an adjusted, Debtor-by-Debtor basis.

Notwithstanding the substantive consolidation called for in the Plan, each and every Debtor shall remain responsible for the payment of U.S. Trustee fees pursuant to 28 U.S.C. § 1930 until its particular case is closed; provided, however, the Debtors or some of them may apply to close the cases of those Debtors other than Debtor Open Road Films following Confirmation.

### 3. Continued Corporate Existence and Vesting of Assets.

On and after the Effective Date, subject to the requirements of the Plan, the Liquidating Debtors will continue to exist as separate limited liability companies and shall retain all of the powers of limited liability companies under applicable non-bankruptcy law, and without prejudice to any right to amend their respective operating agreement, dissolve, merge or convert into another form of business entity, or to alter or terminate their existence. The existing membership interests of the Debtors shall be deemed to be held through the Plan Administrator, and the Plan Administrator shall be deemed to have been admitted as the sole member of Open Road Releasing under applicable non-bankruptcy law and shall be authorized to exercise all of the rights and powers of a sole member as provided by the Plan. Further, the Debtors' operating agreements shall be deemed to include a provision prohibiting the issuance of nonvoting equity securities and such other provisions as may be required pursuant to section 1123(a)(6) of the Bankruptcy Code.

Except as otherwise provided in the Plan, on and after the Effective Date, all Distributable Assets and property of the Debtors and their Estates, including any interests in subsidiaries and affiliates and any Retained Rights of Action of the Debtors, will vest in Liquidating Debtor Open Road Films free and clear of all Claims, Liens, charges, other encumbrances and Interests. Neither the occurrence of the Effective Date, nor the effectiveness of the Plan, nor any provision of applicable non-bankruptcy law shall cause a dissolution of the

Debtors, which shall be continued as limited liability companies following the Effective Date subject to the terms of the Plan.

On and after the Effective Date, subject to the requirements of the Plan, the Liquidating Debtors shall be permitted to conduct their business (to the extent permitted by the Plan), reconcile Claims, use and dispose of assets, prosecute litigation, make required tax filings, and otherwise take any and all actions as may be appropriate to implement the Plan without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules.  The Liquidating Debtors shall be authorized, without limitation, to use and dispose of the Distributable Assets of the Debtors and their Estates, to investigate and pursue any Retained Rights of Action as the representative of the Debtors' Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to acquire and dispose of other property, and to otherwise administer their affairs.

### 4.      Corporate Action; Winding Up of Affairs.

On the Effective Date, the matters under the Plan involving or requiring limited liability company action of the members, managers, or officers of the Debtors, including but not limited to actions requiring a vote or other approval of the board of managers or any of the members or officers of the Debtors or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date, without any further action by the Bankruptcy Court or the members, managers, or officers of the Debtors.

Without limiting the generality of the foregoing, on the Effective Date and automatically and without further action, (i) any existing director, manager and officer of the Debtors will be deemed to have resigned on the Effective Date without any further corporate action, (ii) the Plan Administrator shall be deemed the sole manager, officer and representative of the Liquidating Debtors to exercise the rights, power and authority of the Liquidating Debtors under applicable provisions of the Plan and bankruptcy and non-bankruptcy law, and (iii) all matters provided under the Plan shall be deemed to be authorized and approved without further approval from the Bankruptcy Court.  The Confirmation Order shall modify the Debtors' operating agreements such that the provisions of the Plan can be effectuated.  The Plan shall be administered by the Plan Administrator, and all actions taken thereunder in the name of the Liquidating Debtors shall be taken through the Plan Administrator.  All corporate governance activities of the Liquidating Debtors shall be exercised by the Plan Administrator in his or her discretion, subject to the terms of the Plan.

Following the Confirmation Date, the Liquidating Debtors shall not engage in any business activities or take any actions, except those necessary or appropriate to (i) effectuate the Plan and (ii) dispose of their assets and wind up the affairs of the Debtors and their Estates as soon as reasonably practicable.  On and after the Effective Date, the Plan Administrator may, in the name of the Liquidating Debtors, take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Plan Administrator may, without application to or approval of the Bankruptcy Court, pay, from the proceeds of Distributable Assets, the charges that he or she

incurs after the Effective Date for professional fees and expenses that, but for the occurrence of the Effective Date, would constitute Allowed Administrative Expenses.

From and after the Effective Date, (i) the Debtors, for all purposes, shall be deemed to have withdrawn their business operations from any state or territory in which they were previously conducting or are registered or licensed to conduct their business operations, and the Debtors shall not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal, and (ii) the Debtors shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers effected pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.

### 5.    Plan Administrator.

On the Effective Date, the Plan Administrator shall begin acting for the Liquidating Debtors in the same fiduciary capacity as applicable to a board of directors of a Delaware corporation implementing such liquidation and wind-down as contemplated under the Plan, subject to the provisions hereof. The Plan Administrator shall serve in such capacity through the earlier of the date the Debtors are dissolved in accordance with the Plan and the date such Plan Administrator resigns, is terminated or otherwise unable to serve; *provided, however*, that any successor Plan Administrator appointed pursuant to the Plan shall serve in such capacity after the effective date of such person's appointment as Plan Administrator.

The qualifications and proposed compensation of and other disclosures regarding the Plan Administrator shall be set forth as part of the Plan Supplement; such compensation may be paid from the Liquidating Debtors' Cash on hand, without further notice or order of the Bankruptcy Court. Further, the Plan Administrator shall be entitled to reimbursement, from the Liquidating Debtors' Cash on hand, for his or her actual, reasonable, and necessary expenses incurred in connection with the performance of his or her duties, without the need for further notice or Bankruptcy Court approval. All distributions to be made to Creditors and, if applicable, Interest Holders under the Plan shall be made by the Plan Administrator (or his or her designated agent). The Plan Administrator shall deposit and hold all Cash in trust for the benefit of Creditors (including Professional Persons) receiving distributions under the Plan. The duties and powers of the Plan Administrator shall include, without limitation, the following (without need of further Court approval):

(i) To exercise all power and authority that may be exercised, to commence all proceedings (including the power to continue any actions and proceedings that may have been commenced by the Debtors prior to the Effective Date) that may be commenced, and to take all actions that may be taken by any officer or manager of the Liquidating Debtors with like effect as if authorized, exercised, and taken by unanimous action of such officers and managers, including consummating the Plan and all transfers thereunder on behalf of the Liquidating Debtors;

(ii) To wind up the affairs of the Liquidating Debtors and any or all of their subsidiaries and affiliates and their Estates to the extent appropriate as expeditiously as reasonably possible;

(iii) To maintain all accounts, make distributions, and take other actions required under or consistent with the Plan, including the maintenance of appropriate reserves, in the name of the Liquidating Debtors;

(iv) To use, manage, sell, abandon, convert to Cash and/or otherwise dispose of the Distributable Assets for the purpose of liquidating or otherwise disposing of all remaining property of the Estates, making distributions and fully consummating the Plan;

(v) To take all steps necessary or appropriate to terminate the corporate existence of the Debtors consistent with the Plan;

(vi) To prosecute objections to Claims and Interests, and to compromise or settle any Claims or Interests (Disputed or otherwise);

(vii) To prosecute any and all Retained Rights of Action and compromise or settle any Retained Rights of Action;

(viii) To prepare and file tax returns to the extent required by law;

(ix) To employ and compensate any and all such professionals and agents as the Plan Administrator, in his or her sole discretion, deems appropriate to perform his or her duties under the Plan without further order of the Bankruptcy Court; and

(x) To take all other actions not inconsistent with the provisions of the Plan that the Plan Administrator deems reasonably necessary or desirable in connection with the administration of the Plan, including, without limitation, filing all motions, pleadings, reports, and other documents in connection with the administration and closing of the Chapter 11 Cases.

The Plan Administrator may be removed by the Bankruptcy Court upon application for good cause shown.  In the event of the resignation, removal, death, or incapacity of the Plan Administrator, the Bankruptcy Court shall, upon motion or *sua sponte*, appoint another Person to become Plan Administrator, with notice thereof provided to the Post-Effective Date Service List. Any successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of his or her predecessor.

### 6.    Source of Funding.

The source of all distributions and payments under the Plan will be the Distributable Assets and the proceeds thereof, including, without limitation, the Debtors' Cash on hand and proceeds from any sale or other disposition of the Debtors' assets and prosecution of Retained Rights of Action.

01:24729857.2

7.      **Retained Rights of Action.**

In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Rights of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Liquidating Debtors' rights to commence, prosecute, or settle such Retained Rights of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Administrator may pursue such Retained Rights of Action, as appropriate, in accordance with the best interests of the Liquidating Debtors. **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Right of Action against it as any indication that the Debtors or Liquidating Debtors, as applicable, will not pursue any and all available Retained Rights of Action against it. The Debtors or Liquidating Debtors, as applicable, expressly reserve all rights to prosecute any and all Retained Rights of Action against any Person, except as otherwise expressly provided in the Plan.** Unless any Right of Action is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Debtors and the Liquidating Debtors expressly reserve all Rights of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Retained Rights of Action upon, after, or as a consequence of Confirmation or Consummation of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Rights of Action shall vest in the Liquidating Debtors. The Liquidating Debtors shall have standing as the representative of the Debtors' Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to pursue, or decline to pursue, the Retained Rights of Action and objections to Claims, as appropriate, in the business judgment of the Plan Administrator. The Liquidating Debtors, acting through the Plan Administrator, may settle, release, sell, assign, otherwise transfer, or compromise Retained Rights of Action and/or objections to Claims without need for notice or order of the Bankruptcy Court.

8.      **Interests in Non-Debtors Affiliates and Subsidiaries.**

As of the Effective Date, except as expressly provided in the Plan or by separate order of the Bankruptcy Court, the Liquidating Debtors shall retain any stock or interests that they may hold in their non-Debtor affiliates or subsidiaries and retain any rights to which such stock or interests may be entitled under applicable law with respect to such shares or other interests. After the Effective Date, the Liquidating Debtors may sell, transfer, assign or otherwise dispose of such shares or interests as permitted by applicable law.

9.      **Payment of Plan Expenses.**

The Liquidating Debtors may pay all reasonable Plan Expenses without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court.

### 10.     Dissolution of Debtors; Final Decree.

Once the Plan Administrator determines that the Final Resolution Date has occurred as to any of the Liquidating Debtors, such Liquidating Debtors shall be dissolved for all purposes by the Plan Administrator without the necessity for any other or further actions to be taken by or on behalf of any Liquidating Debtors or payments to be made in connection therewith; *provided, however*, that, without the need of any further approval, the Plan Administrator in his or her discretion may execute and file documents and take all other actions as he or she deems appropriate relating to the dissolution of the Liquidating Debtors under the laws of Delaware and/or any other applicable states, and in such event, all applicable regulatory or governmental agencies shall take all steps necessary to allow and effect the prompt dissolution of the Liquidating Debtors as provided in the Plan, without the payment of any fee, tax, or charge and without need for the filing of certificates.  At any time following the Effective Date, the Plan Administrator, on behalf of the Liquidating Debtors, shall be authorized to move for the entry of a final decree closing any or all of the Chapter 11 Cases pursuant to section 350 of the Bankruptcy Code.

### 11.     Records.

The Liquidating Debtors and Plan Administrator shall maintain reasonably good and sufficient books and records of accounting relating to the Distributable Assets, the Liquidating Debtors' Cash, the management thereof, all transactions undertaken by such parties, all expenses incurred by or on behalf of the Liquidating Debtors and Plan Administrator, and all distributions contemplated or effectuated under the Plan.  Upon the entry of a final decree closing the Chapter 11 Cases, unless otherwise ordered by the Bankruptcy Court, the Liquidating Debtors and Plan Administrator may destroy or otherwise dispose of all records maintained by the Liquidating Debtors and/or Plan Administrator.  Notwithstanding anything to the contrary, the Plan Administrator may, upon notice to the Post-Effective Date Service List and without Bankruptcy Court approval, destroy any documents that he or she believes are no longer required to effectuate the terms and conditions of the Plan.

### 12.     Certain Bank Accounts.

On the Effective Date, the Liquidating Debtors and Plan Administrator are authorized to (i) consolidate all accounts containing deposits of the Debtors to a single bank account and close any non-consolidated accounts; and (ii) promptly return the remaining balances of segregated "P&A" accounts relating to the motion pictures *Max Steel*, *Collide*, and *AXL* to the applicable producer or other counterparty.

## D.     Treatment of Executory Contracts and Unexpired Leases

### 1.     Rejection of Executory Contracts and Unexpired Leases.

Except for any executory contracts or unexpired leases:  (i) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) that are listed for assumption by the Debtors as of the Effective Date in a Plan Supplement to be filed and served on affected non-Debtor counterparties; (iii) as to which a motion for approval of the assumption or rejection of such contract or lease has been Filed and served prior to the

Effective Date; (iv) that constitute contracts of insurance in favor of, or that benefit, the Debtors or the Estates; or (v) that were previously sold, conveyed or otherwise assigned pursuant to Final Order, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date. Without limiting the foregoing, the indemnification obligations in favor of the Debtors' current officers, managers, and representatives, to the extent not previously rejected, shall be assumed as of the Effective Date, and all other pre-Effective Date indemnification obligations of the Debtors shall be deemed rejected as of the Effective Date to the extent that such obligations are contained in executory contracts within the meaning of section 365 of the Bankruptcy Code, but only to the extent not inconsistent with any existing insurance obligations.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions or rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

<p align="center">**2.**     **Bar Date for Rejection Claims.**</p>

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors or their Estates unless a proof of Claim is Filed and served on the Plan Administrator and its counsel within thirty (30) calendar days after the earlier of (a) the Effective Date and (b) service of a notice that the executory contract or unexpired lease has been rejected.  All such Claims for which proofs of Claim are required to be Filed, if Allowed, will be, and will be treated as, General Unsecured Claims, subject to the provisions of the Plan.

**E.     Distributions and Related Matters**

<p align="center">**1.**     **Dates of Distribution.**</p>

Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, by the Liquidating Debtors (or their agent) on the immediately following Business Day.

<p align="center">**2.**     **Cash Distributions.**</p>

Distributions of Cash may be made either by check drawn on a domestic bank or wire or ACH transfer from a domestic bank, at the option of the Liquidating Debtors, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

<p align="center">**3.**     **Rounding of Payments.**</p>

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as "Unclaimed Property" under the Plan.

4.      **Disputed Claims.**

Notwithstanding all references in the Plan to Claims that are Allowed, solely for the purpose of calculating (but not distributing) the amount or number of distributions to be made on account of Allowed Class 4 General Unsecured Claims under the Plan, such calculations may be made, in the Plan Administrator's sole discretion, as if each Disputed Claim were an Allowed Claim, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Liquidating Debtors), such amount or number as determined by the Bankruptcy Court may be used for calculations as to such Disputed Claim instead.

5.      **Undeliverable and Unclaimed Distributions.**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Plan Administrator has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, however*, that such distributions shall be deemed Unclaimed Property at the expiration of ninety (90) calendar days from the date of such attempted distribution. After such date, all Unclaimed Property shall revert to the Liquidating Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be forever barred. The Plan Administrator may implement reasonable attempts to reach any recipient of an undeliverable distribution prior to reverting such property to the Liquidating Debtors.

6.      **Minimum Distributions.**

Notwithstanding any other provision of the Plan, in the Plan Administrator's sole discretion, the Plan Administrator will not be required to make distributions of Cash less than $25 in value, and each such Claim to which this limitation applies shall be deemed fully and finally satisfied and not entitled to any further payment or consideration pursuant to Article IX and its Holder is forever barred pursuant to Article IX from asserting that Claim or Claims against the Debtors, the Liquidating Debtors, their Estates, or their property.

7.      **Compliance With Tax Requirements.**

(a) The Liquidating Debtors shall comply with all withholding and reporting requirements imposed by federal, state, or local taxing authorities in connection with making distributions pursuant to the Plan.

(b) In connection with each distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Liquidating Debtors shall file such information return with the IRS and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received, the Liquidating Debtors may, in their sole

option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received.

### 8.    Record Date in Respect to Distributions.

Except as set forth below, the record date and time for the purpose of determining which Persons are entitled to receive any and all distributions on account of any Allowed Claims or Interests, irrespective of the date of or number of distributions, shall be the Record Date.

### F.    Litigation, Objections to Claims, and Determination of Taxes

### 1.    Litigation.

Except as may be expressly provided otherwise in the Plan, the Liquidating Debtors, through the Plan Administrator, shall be responsible for pursuing Retained Rights of Action, any objection to the allowance of any Claim, and the determination of tax issues and liabilities.

### 2.    Objections to Claims; Objection Deadline.

As of the Effective Date, the Liquidating Debtors shall have exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims.  Any objection to a Claim or Interest shall be filed with the Bankruptcy Court and served on the Person holding such Claim or Interest within one hundred eighty (180) calendar days after the Effective Date (as may be extended, the "Objection Deadline"), provided that the Liquidating Debtors may seek one or more extensions thereof subject to Bankruptcy Court approval and with notice only to parties that have requested such notice pursuant to Bankruptcy Rule 2002.

### 3.    Tax Determinations.

In addition to any other available remedies or procedures with respect to Tax issues or liabilities or rights to tax refunds, the Liquidating Debtors, at any time, may utilize (and receive the benefits of) section 505 of the Bankruptcy Code with respect to: (1) any tax issue or liability or right to a tax refund relating to an act or event occurring prior to the Effective Date; or (2) any tax liability or right to a tax refund arising prior to the Effective Date.  If the Liquidating Debtors utilize section 505(b) of the Bankruptcy Code: (1) the Bankruptcy Court shall determine the amount of the subject Tax liability or right to a Tax refund in the event that the appropriate Governmental Unit timely determines a Tax to be due in excess of the amount indicated on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with section 505(b) of the Bankruptcy Code, the Liquidating Debtors shall be entitled to such discharge which shall apply to any and all Taxes relating to the period covered by such return.

### 4.    Temporary or Permanent Resolution of Disputed Claims.

The Liquidating Debtors may request that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether any Person has previously objected to such Disputed Claim.  The Bankruptcy Court will retain jurisdiction and power to estimate any contingent or unliquidated Disputed Claim at

any time.  If the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim, that estimated amount will constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Disputed Claim, then the Liquidating Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim.  In addition, the Liquidating Debtors may resolve or adjudicate any Disputed Claim in the manner in which the amount of such Claim or Interest and the rights of the Holder of such Claim or Interest would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

       5.      **Setoffs**.

The Liquidating Debtors may, but shall not be required to, setoff against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim may be setoff against claims of any nature whatsoever that the Debtors or the Estates may have against the Holder of such Claim; *provided, however*, that neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Liquidating Debtors of any such claim that the Liquidating Debtors may have against such Holder, unless otherwise agreed to in writing by such Holder and the Liquidating Debtors.  Notwithstanding the foregoing, the Debtors, the Estates, and the Liquidating Debtors do not have, and shall not exercise, any setoff rights against the Prepetition Lender Claims.

       G.      **Injunctions, Exculpation, Releases and Related Provisions**

       1.      **Injunctions.**

       (a)      Generally.

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Cases pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date, shall remain in full force and effect until the Effective Date.  From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action or other proceeding, or otherwise asserting any claim or interest, seeking to hold (i) the Liquidating Debtors or their Estates, or (ii) the property of the Debtors or their Estates, liable for any Claim, obligation, right, interest, debt or liability that has been released pursuant to the Plan.

       (b)      Non-Discharge of Debtors; Injunction.

**In accordance with section 1141(d)(3) of the Bankruptcy Code, the Plan does not discharge the Debtors.  Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  As such, no Person may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Person under the Plan.  As of the Effective Date, all parties are precluded from asserting against any property to be distributed under the Plan**

any Claims, rights, causes of action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

2.    Exculpation.

As of and subject to the occurrence of the Effective Date, for good and valuable consideration, including the consideration provided under the Plan, the Exculpated Parties shall neither have nor incur any liability to any Person for any act taken or omitted to be taken, on or after the Petition Date, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan or any contract, instrument, waiver, release or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Cases or the Debtors up to and including the Effective Date; *provided, however*, that the foregoing provisions of this subsection shall have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted willful misconduct or actual fraud.  For the avoidance of doubt, the scope of the exculpation provided under the Plan does not include any of the current or former non-Debtor members of the Debtors or any of the former officers, managers and representatives of the Debtors who did not serve in such capacities during the Chapter 11 Cases or a portion thereof.  Notwithstanding anything in the Plan to the contrary, no Person serving as Plan Administrator shall have or incur any personal liability as the manager, member or officer of the Debtors or Liquidating Debtors for any act taken or omission made in connection with the wind-up or dissolution of the Liquidating Debtors or any nondebtor subsidiary or affiliate; *provided, however*, that the foregoing shall have no effect on the liability of the Plan Administrator that results from any such act or omission that is determined in a Final Order to have constituted willful misconduct or actual fraud.

3.    Debtor Release.

As of and subject to the occurrence of the Effective Date, for good and valuable consideration, the Debtors, for themselves and the Estates, hereby irrevocably, unconditionally and generally release the Released Parties from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, in law or equity or otherwise, which the Debtors or their Estates ever had, now have or hereafter can, shall or may have against any of the Released Parties from the beginning of time to the Effective Date that in any way relate to the Debtors, their direct or indirect non-Debtor subsidiaries, the Estates, or the Chapter 11 Cases; *provided, however*, that the foregoing provisions of this subsection shall have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted willful misconduct or actual fraud.  For the avoidance of doubt, the scope of the release provided under the Plan does not include any of the current or former members of the Debtors or any of the former officers, managers and representatives of the Debtors who did not serve in such capacities during the Chapter 11 Cases or a portion thereof.

4.      **Consenting Creditor Release.**

**As of and subject to the occurrence of the Effective Date and except for the treatment provided in the Plan, for good and valuable consideration each Releasing Creditor, for itself and its respective present or former officers, directors, managers, shareholders, trustees, partners and partnerships, members, agents, employees, representatives, attorneys, accountants, professionals, and successors or assigns, in each case solely in their capacity as such, shall be deemed to have completely, conclusively, unconditionally and irrevocably released the Released Debtor/Committee Parties from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, in law or equity or otherwise, which the Releasing Creditor, the Debtors or their Estates ever had, now have or hereafter can, shall or may have against any of the Released Debtor/Committee Parties from the beginning of time to the Effective Date that in any way relate to the Debtors, their direct or indirect non-Debtor subsidiaries, the Estates, or the Chapter 11 Cases, *provided, however*, that the foregoing release does not affect or impair any obligations under any intercreditor agreements or any other agreements or arrangements between and among non-Debtor parties.   For the avoidance of doubt, the Released Debtor/Committee Parties do not include any of the current or former non-Debtor members of the Debtors or any former officers, managers and representatives of the Debtors who did not serve in such capacities during the Chapter 11 Cases or a portion thereof.**

## VII.   RISK FACTORS

### A.      Parties May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.   The Plan Proponents believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Proponents created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests in each such Class.   Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B.      The Plan Proponents May Not Be Able to Obtain Confirmation of the Plan

With regard to any proposed chapter 11 plan, the Plan Proponents may not receive the requisite acceptances to confirm a plan.   In the event that votes from Claims in Classes entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponents intend to seek Confirmation of the Plan by the Bankruptcy Court.   If the requisite acceptances are not received, the Plan Proponents may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims.   The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an Impaired Class of Claims if it determines that the plan satisfies section 1129(b) of the

Bankruptcy Code.  To confirm a plan over the objection of a dissenting Class, the Bankruptcy Court also must find that at least one Impaired Class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such Class.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under section 1129 of the Bankruptcy Code have not been met.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Plan Proponents would be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors, and what, if any, distributions Holders of Claims ultimately would receive with respect to their Claims.

### C.    Claims May Exceed the Plan Proponents' Estimates

There is a risk under the Plan that Claims will materially exceed the Plan Proponents' estimates, in which case distributions to Creditors would be significantly reduced or eliminated. Among other things, payments will only be made to Class 4 General Unsecured Creditors from Net Distributable Estate Assets—in other words, after payment in full, or reserves for, all Plan Expenses and all Administrative, Priority, and Secured Claims.  The process of reconciling all such Claims has not yet been completed and outstanding disputes remain that will need to be litigated or otherwise resolved.  If and to the extent Plan Expenses and Allowed Administrative, Priority, and Secured Claims exceed the Plan Proponents' estimates, amounts available for General Unsecured Creditors may be significantly reduced or eliminated.

### D.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in the Plan, the Effective Date is subject to several conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not occur.

### E.    Risks Related to Income Taxation

There are several income tax considerations, risks, and uncertainties associated with the Plan.  Interested parties should read carefully the discussions set forth in Article IX of this Disclosure Statement regarding certain United States federal income tax consequences of the transactions proposed by the Plan.

## VIII.    CONFIRMATION OF THE PLAN

### A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on [DATE], 2019 at [TIME] (prevailing Eastern Time), before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge, in the United States Bankruptcy Court for the

District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made in the agenda for the Confirmation Hearing or at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served so that they are actually received by no later than [DATE], 2019 at [TIME] (prevailing Eastern Time). **Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court**.

### B.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Plan Proponents believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Plan Proponents have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, in addition to other applicable requirements, the Plan Proponents believe that the Plan satisfies or will satisfy the following applicable Confirmation requirements of section 1129 of the Bankruptcy Code:

• The Plan complies with the applicable provisions of the Bankruptcy Code.

• The Plan proponents have complied with the applicable provisions of the Bankruptcy Code.

• The Plan has been proposed in good faith and not by any means forbidden by law.

• Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

• Either each Holder of a Claim in an Impaired Class of Claims has accepted the Plan, or will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of a Class that did not accept the Plan pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent a different treatment is agreed to, the Plan provides that all Allowed Administrative Expenses, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto.

- All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

## C.    Best Interests of Creditors

Often called the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that a Bankruptcy Court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the Effective Date.  To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the Debtors' Chapter 11 Cases were converted to a chapter 7 case on the Effective Date and the assets of the Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of a Claim or an Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare the Holder's liquidation distribution to the distribution under the Plan that the Holder would receive if the Plan were confirmed and consummated.

Here, the costs of liquidation under chapter 7 of the Bankruptcy Code would include the statutory fees payable to a chapter 7 trustee, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage (who would need time to understand case issues), which amounts would have to be paid before anything is paid to Holders of Allowed General Unsecured Claims.

Conversion to chapter 7 of the Bankruptcy Code would also mean the establishment of a new claims bar date, which could result in new General Unsecured Claims being asserted against the Estates, thereby diluting the recoveries of other Holders of Allowed General Unsecured Claims.

In addition, the Plan is the product of a compromise between the Debtors, the Committee, and the Prepetition Lenders, pursuant to which the Prepetition Lenders have agreed to fund not less than $5.1 million in Cash as of June 12, 2019  for the satisfaction of Allowed Administrative

Expenses, Priority Tax Claims, Priority Non-Tax Claims, and Miscellaneous Secured Claims; the payment of Plan Expenses; and, to the extent Distributable Estate Assets remain after the foregoing, the payment of distributions to Holders of General Unsecured Claims under the Plan. In a chapter 7 liquidation, it is unknown whether the Prepetition Lenders would agree to this settlement and what additional discovery and litigation costs would be incurred.

For these reasons, among others, the Plan Proponents believe that Holders of Claims will receive equal or greater value as of the Effective Date under the Plan than such Holders would receive in a chapter 7 liquidation.

### D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors, or any successor to the Debtors (unless such liquidation or reorganization is proposed in the plan).  This requirement is satisfied as the Plan proposes a liquidation and the Plan Proponents believe that the Debtors already have sufficient Cash on hand from proceeds of the Sale in order to fund distributions to Creditors pursuant to the terms of the Plan.

### E.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or reject the plan.  Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

### F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan even if all impaired classes have not accepted it, <u>provided</u> that the plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the plan by any insider.  Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" (as discussed below) and is

"fair and equitable" (as discussed below) with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Plan Proponents shall request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

### 1.     No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Plan Proponents submit that if the Plan Proponents "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" against any rejecting Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.     Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending upon the type of claims or interests in such rejecting class. The Plan Proponents submit that if the Plan Proponents "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that the applicable "fair and equitable" standards are met.

### G.     Alternatives to the Plan

The Plan Proponents believe that the Plan is in the best interests of Holders of Claims. If, however, the requisite acceptances of the voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives to the Plan include: (a) formulation of an alternative plan or plans of liquidation, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The Plan Proponents believe that the Plan enables Holders of Claims to realize the greatest possible recovery under the circumstances, and, as compared to any alternative plan of liquidation, has the greatest chance of being confirmed and consummated.

## IX.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

This discussion is provided for information purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on the date hereof.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the United States federal income tax consequences of the Plan.

The following summary is limited to Holders that are United States persons within the meaning of the IRC.  For purposes of the following discussion, a "**United States person**" is any of the following:

(i)    An individual who is a citizen or resident of the United States;

(ii)    A corporation created or organized under the laws of the United States or any state or political subdivision thereof;

(iii)    An estate, the income of which is subject to federal income taxation regardless of its source; or

(iv)    A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

This discussion does not address all aspects of United States federal income taxation that may be relevant to a particular Holder in light of its particular facts and circumstances, or to certain types of Holders subject to special treatment under the IRC.  Examples of Holders subject to special treatment under the IRC include, without limitation, governmental entities and entities exercising governmental authority, foreign companies, persons who are not citizens or residents of the United States, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, persons that have a functional currency other than the United States dollar, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction. This discussion does not address the state, local or foreign tax consequences of the Plan with respect to any such Holders.

The tax treatment of Holders of Claims and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon the following factors, among others:  (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the Holder in exchange for the Claim, and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to United States federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the Holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for United States federal income tax purposes; and (xi) whether the "market discount" rules apply to the Holder.  Therefore, each Holder should consult such Holder's own tax advisor for tax advice with respect to that Holder's particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan.  Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the United States federal income tax consequences of the Plan and the transactions contemplated thereunder.  No ruling has been or will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto.  No representations are being made regarding the particular tax consequences of confirmation or implementation of the Plan as to any Holder of a Claim.  This discussion is not binding upon the IRS or other taxing authorities.  No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

**THE FOLLOWING DISCUSSION IS: (I) INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL; AND (II) FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN, AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT SUCH HOLDER'S TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

### Certain Tax Consequences to Holders of Claims

A Holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Allowed Claim and the amount realized by the Holder in respect of its Allowed Claim.  Over time and on a cumulative basis, the amount realized generally will equal the aggregate amount of the Cash (and the fair market value of

property, if any) distributed to the Holder by the Plan Administrator, less the amount, if any, attributable to accrued but unpaid interest. A Holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or deemed received) under the Plan is attributable to interest that accrued on a Allowed Claim but was not previously paid by the Debtors or included in income by the Holder of the Allowed Claim.

The character of any gain or loss that is recognized as such will depend upon a number of factors, including the status of the Holder, the nature of the Allowed Claim in the Holder's hands, whether the Allowed Claim was purchased at a discount, whether and to what extent the Holder has previously claimed a bad debt deduction with respect to the Allowed Claim, and the Holder's holding period of the Allowed Claim. If the Allowed Claim in the Holder's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Holder held such Allowed Claim for longer than one year, or short-term capital gain or loss if the Holder held such Allowed Claim for one year or less. Any capital loss realized generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus a certain limited statutorily proscribed amount of ordinary income in any single taxable year.

A Holder of an Allowed Claim who receives, in respect of the Holder's Allowed Claim, an amount that is less than that Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC Section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to the ability to take a bad debt deduction. A Holder that has previously recognized a loss or deduction in respect of that Holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Allowed Claim.

Holders of Allowed Claims who were not previously required to include any accrued but unpaid interest with respect to an Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A Holder previously required to include in gross income any accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A Holder of an Allowed Claim constituting an installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than at face value or distributed, transmitted, sold or otherwise disposed of within the meaning of IRC Section 453B.

Under backup withholding rules, a Holder of an Allowed Claim may be subject to backup withholding with respect to payments made pursuant to the Plan unless such Holder: (i) is a corporation or is otherwise exempt from backup withholding and, when required, demonstrates this fact; or (ii) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup

withholding because of failure to report all dividend and interest income. Any amount withheld under these rules will be credited against the Holder's federal income tax liability. Holders of Allowed Claims may be required to establish an exemption from backup withholding or to make arrangements with regard to payment of any backup withholding.

Holders of Subordinated Claims and Claims that are not Allowed ("**Disallowed Claims**") will not receive any Distribution as part of the Plan. Accordingly, because such a Holder may receive an amount that is less than that Holder's tax basis in such Claim, such Holder may be entitled to a bad debt deduction under IRC Section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a bad debt deduction is claimed. Holders of Subordinated Claims and Disallowed Claims, therefore, are urged to consult their tax advisors with respect to the ability to take a bad debt deduction.

**Certain Tax Consequences to the Debtors**

*1.    Federal Taxation Issues Related to Pass-Through Entities in General*

For United States federal income tax law purposes, an entity can be organized as a corporation, a partnership, or a hybrid entity (otherwise known as S corporations and limited liability companies). The two primary differences between corporations and partnerships are how the entity's earnings are taxed and whether or not the shareholder/owners are shielded from the liabilities of the entity. Generally, corporations are treated as independent tax-paying entities, unaffected by the personal characteristics of their shareholders or changes in their composition as a result of transfers of stock from old shareholders to new ones, giving rise to the potential for double taxation. Because corporations are treated independently, corporate income is taxed to a corporation as it is received or accrued, and is taxed at the shareholder level when and if the corporation distributes earnings to the shareholders or they sell their stock. Partnerships, however, are not entities subject to income tax. Instead, the partners are taxed directly on partnership income whether or not it is actually distributed to them.

Hybrid entities, on the other hand, combine the two primary differences between corporations and partnerships. As to S corporations, shareholders are shielded from entity level liability similar to that of a corporation; however, generally, the earnings of the entity are taxed at the ownership level similar to that of a partnership. As to limited liability companies, such as the Debtors, member-owners are shielded from entity level liability similar to that of a corporation; however, unique to the LLC, an option exists to be taxed as a corporation or taxed as a partnership, provided that the LLC has at least two member-owners, as set forth under Treasury Regulations Section 301.7701-3. The Debtors, which are all limited liability companies, are taxed as partnerships.

Generally, pass-through entities are subject to a single layer of tax on their earnings at the ownership level (partner, member, or shareholder depending on entity type). Taxable income of pass-through entities is computed at the entity level (generally each type of entity will file a tax return showing no tax liability at the entity level); however, each owner is taxed separately on his, her, or its distributive share of income, gain, loss, deduction, and/or credit, as applicable. The character of the items included in taxable income is determined at the entity level with no

regard to the owners' individual characteristics. With respect to tax attributes, pass-through entities are generally not allowed to maintain certain tax attributes, such as net operating losses, given such entities are not directly taxable. These tax attributes pass-through to the owners, and usage, carryback, or carryforward of these attributes is determined at the ownership level.

   2.    *Cancellation of Indebtedness Income*

Under the IRC, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("**COD Income**") realized during the taxable year. Section 108 of the IRC provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the bankruptcy court and the cancellation is granted by the court or is pursuant to a plan approved by the court.

Section 108 of the IRC requires the amount of COD Income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer or, in the case of a pass-through entity, the owner of such entity. The tax attributes of the taxpayer or, in the case of a pass-through entity, the owner of such entity, that may be subject to reduction include the net operating losses and net operating loss carryovers (collectively, "**NOLs**"), certain tax credits and tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and passive activity loss carryovers. Section 108 of the IRC further provides that a taxpayer does not realize COD Income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Under the Plan, Holders of certain Allowed Claims are expected to receive less than full payment on their Claims, and Holders of Subordinated Claims and Disallowed Claims are expected to receive no payment. The Debtors' liability to the Holders of such Claims in excess of the amount satisfied by Distributions under the Plan will be canceled, and therefore will result in COD Income to the Debtors. The Debtors should not realize any COD Income, however, to the extent that payment of such Claims would have given rise to a deduction to the Debtors had such amounts been paid. In addition, any COD Income that the Debtors realize should be excluded from the Debtors' gross income pursuant to the bankruptcy exception to Section 108 of the IRC described above, because the cancellation will occur in a case under the Bankruptcy Code, while the taxpayer is under the jurisdiction of a bankruptcy court, and the cancellation is granted by the court or is pursuant to a plan approved by the court. The exclusion of the COD Income, however, will result in a reduction of certain tax attributes, such as any NOLS, as described above.

**Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS: (I) INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL; and (II) FOR INFORMATIONAL PURPOSES ONLY, AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN, AND MAY VARY DEPENDING ON A CLAIM HOLDER'S OR INTEREST HOLDER'S PARTICULAR**

**CIRCUMSTANCES.  ACCORDINGLY, SUCH HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE TAX CONSEQUENCES OF THE PLAN.**

## X.     RECOMMENDATION

In the opinion of the Plan Proponents, the Plan is superior and preferable to the alternatives described in this Disclosure Statement.  Accordingly, the Plan Proponents recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

July 17, 2019

/s/ Amir Agam
Amir Agam
Chief Restructuring Officer of
Debtors and Debtors in Possession

July 17, 2019

/s/ Robert Feinstein
Robert Feinstein
PACHULSKI STANG ZIEHL & JONES LLP
Authorized Representative of
Official Committee of Unsecured Creditors

Prepared by:

*Debtors' Counsel*

Michael R. Nestor, Esq. (Bar No. 3526)
Robert F. Poppiti, Jr., Esq. (Bar No. 5052)
Ian J. Bambrick (Bar No. 5455)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Tel: (302) 571-6600
Fax: (302) 571-1253

Michael L. Tuchin, Esq.
Jonathan M. Weiss, Esq.
Sasha M. Gurvitz, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel: (310) 407-4000
Fax: (310) 407-9090

        -and-

*Committee Counsel*

 Robert J. Feinstein (NY Bar No. 1767805)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
PACHULSKI STANG ZIEHL & JONES LLP
919 Market Street, 17th Floor | P.O. Box 8705
Wilmington, Delaware  19899-8705
Tel:  (302) 652-4100
Fax:  (302) 652-4400